MAUSKOPF, J.   ORIGINAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------

WAYNE CHIN,

                       **PETITIONER,**

         **-against-**

JOSEPH NOETH: SUPERINTENDENT
ATTICA CORRECTIONAL FACILITY,

                       **RESPONDENT.**

------------------------------------

**VERIFIED
PETITION FOR A WRIT OF
HABEAS CORPUS**

**CV19-2729**



TO THE UNITED STATES DISTRICT COURT:

    **WAYNE CHIN,** petition this United States District Court pursuant to 28 U.S.C. § 2254 of the Civil Right law, for a Writ of Habeas Corpus relief in the pursuit of his liberty which was obtained in deprivation of his Federal Constitutional rights to due process, equal protection of law, and a fundamental fair trial. (U.S.C.A. IV, V, VI, XIV). Petitioner contends that his imprisonment by the State of New York, was imposed in violation of the United States Constitution, laws, or treaties of the United States. (28 U.S.C. § 2241[c][3]).

### JURISDICTION

    1. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331, 2241(A)(C)(3), and 2254(A), to inquire into the constitutionality of Petitioner's November 17, 2009, judgment of conviction by the State of New York, Supreme Court, Kings County, 320 Jay Street, Brooklyn, New York 11201, for murder in the

second degree (N.Y. Penal Law § 125.25[1]).

2. Petitioner also invokes the "Fundamental Miscarriage of Justice Exception," justifying federal review. See, **McQuiggin v. Perkins**, 559 US 383, 133 S.Ct. 1924, 1931-32 (2013)(original citations and quotations omitted); **Coleman v. Thompson**, 501 US 722, 750 (reaffirming that the "fundamental miscarriage of justice" exception applies to procedurally default claims).

## PARTIES

3. Petitioner, **WAYNE CHIN**, Din. 09-A-6287, is imprisoned at Attica Correctional Facility, 639 Exchange Street, Attica, New York 14011-0149.

4. Respondent, **JOSEPH NOETH**, is the superintendent of Attica Correctional Facility, 639 Exchange Street, Attica, New York 14011-0149. In that capacity, he has custody of petitioner's unlawful confinement.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

5. Petitioner's plead not guilty at his arraignment. Trial was by jury.

6. Petitioner did not testify in any pretrial proceedings or at trial. Petitioner was sentenced to an indeterminate term of imprisonment of twenty-five years to life.

## FACTUAL BACKGROUND

7. In 2001, Petitioner resided in Trenton, New Jersey, with his former girlfriend, Renee Aarons and her two sons, Ryan and Rashawn Aarons. Petitioner two other girlfriends, Angela Wingate and Doreen Hart, resided in Brooklyn, New York. In June 2001, Ms. Hart gave petitioner a cell-phone so she could

maintained communication.

8. The People's contended that on June 12, 2001, the petitioner called Ms. Renee Aarons on her cell-phone and lured her to 95 Linden Boulevard, Brooklyn, New York, with the intent to kill her her for fifty thousand dollars. (See, People's sentencing application and America's Most Wanted editorial (http/www.amw.com/centures/brief.cfm?id=28362), "Lawsuit lead to death."

9. At approximately 10:30 p.m‖, on June 12, 2001, Ms. Aarons was talking on her cell-phone while seated in a dark green Lexus vehicle, parked in front of 95 Linden Boulevard (80, 156),[1] when she was assaulted and shot by an assailant who fled in a vehicle.

Twelve individuals within the confines of crime scene, contacted the 911 emergency operator[s],[2] which generated the response of the New York City Police Department (hereinafter "NYPD"), the Fire Department of New York (hereinafter ""FDNY"), and the Emergency Medical Services (hereinafter "EMS")‖

11. Ms. Deanna Cobbs and Ms. Odette Gaston, were two of the individual whom had observed the crime from their respective forth floor apartment at 100 Linden Boulevard and make 911 calls contemporaneous with the crime as it unfolded. Both witnesses' statements were admissible as excited utterance exception to the hearsay rule. See, **People v. Edwards**, 47 NY2d 493, 496-97 (1979).

---

1. Unprefixed numbers refers to the minutes of the trial. Numbers prefixed by "VD" refers to the pretrial proceedings and vior dire. Numbers prefixed by "S" refers to the minutes of sentencing.

2. The victim's brother, Andre Lehong, made a 911 call from Manhattan.

12. What exactly Ms. Cobbs told operator 1526, is one of the objectives of this petition because of the prosecution's wilful and pervasive destruction of all the original 911 master tape recordings within forty-eight hours of the alleged crime. The prosecutor's asserted she had a audio tape recording of Ms. Cobbs' describing two individuals fleeing the crime scene in a black vehicle (273-75).[3] On June 14, 2001, Detective Patrick Henn interviewed her by phone, and wrote a DD5 police report attesting that Ms. Cobbs observed two individuals fleeing the crime scene in a black vehicle. (See, Exhibit C-3).[4]

13. Ms. Gaston's informed 911 operator 2018, that she observed a black male assailant wearing a gray Esco short set, fleeing the crime scene in a gray vehicle. (See, Exhibit C-1). On June 13, 2001, Detective Crick interviewed her and wrote a DD5 police report attesting that Ms. Gaston observed a black male accompanied by a hispanic female, who referred to him as Johnny, assaulting a female, who was seated in a vehicle. (See, Exhibit C-4).

14. Ms. Aisha White, who falsely claimed she was the victim's niece, informed 911 operator 2249; **"A man shot female two times in the head and fled in a black Lexus."** (See, Exhibit C-1, [Certified "FDNY" Computerized Aid Dispatch reports and "NYPD" Sprint reports]). Due to the exculpatory nature of Ms. White's

---

3. The edited secondary audio tape recordings which was introduced at trial as People's exhibit 8, contained thirteen alleged 911 calls and a police dispatch. It shows that Ms. Cobbs spoke with operator 1526, and she did not indicated observing any individuals leaving the crime scene in a black vehicle.

4. All exhibits abbreviated by "C" and annexed herewith, were previously submitted with Petitioner's first coram nobis application.

statements to 911 operator 2249, the prosecution was motivated by a culpable state of mind, to wilfully destroyed all the original 911 master tape recordings within forty-eight hours of the alleged crime and manufactured a secondary audio tape recording[5] to provided Ms. White with the opportunity to committed perjury.

15. Police Officers Kerry Calvo and William Davitt were allegedly the first to arrived at the crime scene and observed a large crowd of people surrounding the victim's vehicle. (31-33). Officer Calvo allegedly was able to secured the crime scene.

16. The first "EMS" technicians that responded to the crime scene was Unit 58-G-3 out of Battery Park, which arrived at 10:48 p.m. (See, Exhibit C-1). Instead of immediately transporting the victim to Kings County Hospital which was a minute drive and five blocks away. The Technicians began performing cardiopulmonary resuscitation ("CPR") on the victim[6] for approximately twelve minutes while the victim bled to death. The victim was pronounced dead on arrival at Kings County Hospital.

17. A Crime Scene Unit (hereinafter "CSU"), responded to the crime scene, and allegedly recovered two spent shall casing that were laying in the street, beside the victim's dark green Lexus vehicle (171), but failed to processed the entire vehicle

---

5. To facilitated Ms. Aisha White's false statements, Detectives Henn and Guinane allowed her to listened to Rashawn Aarons' interrogation at the 67th., precinct (See, Exhibit C-5). Subsequently, she made statements implicating the petitioner. (See, Exhibit C-6).

6. All penetrating gunshot wounds to the victim's chest and abdomen, were places where the victim needed to be in the operating room very quickly in order to survive. The victim needed blood and her collapsed lungs need to be rapidly expanded. The EMS Technicians' negligence caused the victim to lost valuable blood at the scene and contributed to her demised.

for evidence.

    18. Leeford White was interviewed at the 67th., Precinct. Whether Mr. White's statements were inculpatory or exculpatory is unknown to the petitioner because the prosecutors' withheld Mr. White's statements from disclosure.

    19. A gold colored Lexus vehicle owned and registered to the victim was discovered securely locked and parked on Linden Boulevard, neared the corner of Nostrand avenue, two blocks away from the crime scene. The prosecutors' contended that the vehicle belonged to the petitioner and was allegedly used in the commission of the crime.

    20. On June 12, 2001, at approximately 11:50 p.m., police officers unlawfully broke into the gold Lexus vehicle without a search warrant and conducted a search with a bloodhound, named Kojak. (173)

    21. On June 13, 2001, Detective John Guinane sought and was granted a facially defective search warrant to obtain ballistics and forensics evidence from the gold Lexus vehicle. Both the dark green Lexus and gold Lexus vehicles were transported to the 71st., Precinct where they were left unsecured in an area accessible to the public.

    22. Ryan Aarons (the deceased's adult son) was arrested on June 12, 2001, and detained at the 71st., Precinct. Detectives Calabrese and Leto had Ryan released into their custody and conducted an interview with him. Ryan gave the detectives an extensive statements detailing things that he allegedly observed between the petitioner and his mother. (See, Exhibit C-7).

23. From the onset of his investigation, Detective Henn started to suppressed and ordered physical material evidence destroyed to deprived the petitioner of constitutional due process of law and prevented the petitioner from establishing his actual and factual innocence.

24. On the morning of June 13, 2001, Detective Henn's retrieved the deceased's jewelry from the attending physician at Kings County Hospital. Instead of securing and preserving the evidence, Henn took the jewelry back to the 67th., Precinct, cleansed them of all biological DNA, and suppressed the evidence by returning the jewelry to the deceased's mother.(248).

25. Medical Examiner, Doctor Joseph Veress' performed the autopsy on the deceased's on June 13, 2001, and allegedly retrieved a copper-coated nine millimeter bullet, and some bullet fragment from an old gunshot wound. Dr. Veress' filed a Death Certificate with his opinion statements that the victim died from gunshot wounds.

26. On June 14, 2001, Police Telecommunication Technician, Officer Jackson, with a culpable state of mind, wilfully destroyed all the original 911 master tape recordings because of their exculpatory values. To enabled the prosecutor's commission of fraud upon the court. Officer Jackson created a secondary audio tape recording which she edited with her testimonial opinion statements and made substantial changes to components of the original 911 master tape recordings. That secondary evidence did not corresponded with either the certified "FDNY" Computerized Aid Dispatch reports or the "NYPD" sprints reports.

(<u>See</u>, People's trial exhibit 8; [and its transcription Exhibit C-20]).[7]

27.   On   June   15,   2001,   Detective   Gilford   allegedly processed both vehicles for evidence at the 71st. Precinct. Gilford's documented that he recovered eighteen fingerprints, a deformed nine millimeter bullet from the front passenger's seat, a   nine   millimeter   bullet   from   the   center   console,   a   nine millimeter shall casing from behind the driver's seat, and a bag of clothing, all from the dark green Lexus vehicle. Gilford also documented the recovery of sixteen fingerprints[8] from the gold Lexus vehicle.

28. However, Detective Gilford's failed to inventoried all the evidence recovered and allowed Detective Henn to removed and suppressed the victim's cellphone, purse, wallets, handbags, slippers, and the contents of several shopping bags from the green Lexus (246-49). Detective Henn was also allowed to removed and suppressed the dry cleaners receipts, cigarette butts, papers napkins, food containers, bottles, and Cee Dee discs, all from the gold Lexus vehicle. Subsequently, Detective Henn's removed the gold Lexus vehicle from the 71st., Precinct and parked it on Synder Avenue, accessible to the public for several months before

---

7. The thirteen purportedly 911 calls and a police dispatch transmission contained in the edited secondary audio tape, were each separated by Officer Jackson's opinionated testimonial statements. (<u>See</u>, People's trial exhibit 8, and/or [Exhibit C-20, transcriptions of People's trial exhibit 8]).

**8.**   Detective Gilford was a dishonest officer who had testified in a Manhattan court's case that he had recovered evidence and signed vouchers indicating he processed a crime scene, when in fact he had not. ("VD" 4, 12). That criminal case was dismissed against the accused.

the vehicle was allegedly sent to the Property Clerk Department for storage.

29. On July 3, 2001, Detective Timpanaro conducted fingerprints comparisons of all the fingerprints recovered from the vehicles and determined that the fingerprints excluded the petitioner as the source.

30. The results of the fingerprints comparisons did not equated with Detective Henn's theory of the case. Therefore, Detective Henn, with a culpable state of mind, decided to suppressed the vehicles by writing an undated letter to the Property Clerk's Office with direction to destroy the vehicles and its contents. (55-63). This was done with the complicity of the prosecuting Assistant District Attorney, Ms. Paisner. (66-67).[9]

31. By ordering the destruction of the vehicles, ADA Paisner and Detective Henn, ensured that no future defense team would be able to examine the vehicles for exculpatory evidence. That was a conscious procedural maneuver indicative of the prosecution's determination to undermined the petitioner's rights to due process and a fundamental fair trial.

32. On February 11, 2003, Ms. White and Detective Henn appeared before a Kings County's grand jury. (See, Exhibit C-8).

---

9. For purposes of procedural default, a petitioner can show "cause" most readily when the State is at fault. See, Strickler v. Green, 527 US 263, 282 (1998)(Finding that State suppression of material documents constitutes cause).

Appellant was indicted for two counts of second degree murder (**New York State Penal Law §§ 125.25[1] & 125.25[2]**); two counts of criminal possession of a weapon in the  second and third degree (**PL. §§ 265.03[2] & 265.02[4]**), and endangering the welfare of a child (**PL. § 260.10[1]**).

33. On November 6, 2003, Detective Otero reevaluated the fingerprints and concluded that a palm print recovered from the green Lexus' interior visor mirror and two index fingerprints recovered from the back trunk-lid of the gold Lexus belonged to appellant. The prosecution did not disclosed the source of the other thirty-one fingerprints.

34. On November 17, 2005, petitioner was arrested in Tucson, Arizona, on unrelated charges. On November 28, 2005, Pima County Sheriff, Sam Almodota, notified Detective Henn of the arrest of petitioner.

35. A Kings County's Fugitive Warrant was executed and petitioner was arraigned in Arizona Superior Court, Pima County, and bail offered in the sum of one million dollars.

36. Petitioner was unable to make bail and contested extradition for two years. Eventually, the extradition proceedings was terminated on November 30, 2007, without advance notice to petitioner or his attorney.

37. On February 29, 2008, Detectives from the Kings County District Attorney's squad took custody of petitioner from the Arizona State Department of Correction, Yuma County, and transported him to 67th. Precinct in Brooklyn.

38. On March 10, 2008, Petitioner represented by defense

attorney, Harold Baker, 32 Court Street, Suite 1800, Brooklyn, New York 11201, was arraigned on indictment number 1018/03, in the Supreme Court, Kings County, (Matthew D'Emic, J.). The Assistant District Attorney, Elisa Paisner, sought and was granted dismissal of count two of the indictment which charged depraved indifference murder in the second degree **(PL. § 125.25[2]).**

39. As a part of an Omnibus motion dated April 2, 2008, defense attorney, Mr. Baker demanded, inter alia, discovery and a hearing to preclude all identification evidence the People intended to present at trial pursuant to **C.P.L. § 710.30**; all recorded statements of witnesses the People intended to produced at trial; all scientific test and experimentations conducted by the people during the course of the investigation; all exculpatory evidence, or arguable exculpatory evidence as required by **Brady v. Maryland**, 373 US 83 (1963).

40. The People's responded April 17, 2008, contending inter alia, "the original 911 calls has been erased, the People's reserved the right to locate other recordings and used them; all identifications are confirmatory because the witnesses and defendant are known to each other; and affirmed they obligations under **Brady** (**See**, exhibit C-9).

41. The court (Matthew D'Emic, J.) in its decision dated April 22, 2008, denied petitioner a Wade hearing on the basis that all identifications were confirmatory and held that the People remained aware of their **Brady** obligations. The court's overlooked the People's destruction of **Brady** material evidence

-11-

(See, exhibit C-10).

42. On April 23, 2008, the prosecutor informed the court and the defense that the vehicles which unquestionable constituted trial evidence, had been destroyed. As a result, on August 31, 2008, Attorney Baker filed a supplemental discovery demands contending that the vehicles should have been retained and preserved. Further, requesting all papers works relative to the transportation of the vehicles, storage, invoices, log book entries, and disposal of the vehicles. (See, exhibit C-11).

43. On October 7, 2008, petitioner sought substitution of defense counsel predicated upon a conflict of interest and the court granted the request and appointed Alan Stutman, Esq., 50 Court Street, Suite 501, Brooklyn, New York 11201.

44. On December 23, 2008, petitioner sought substitution of counsel predicated upon a conflict of interest because the victim's mother had paid Attorney Stutmen for the services rendered to petitioner in a prior criminal case. (See, exhibit C-12).

45. On January 16, 2009, Judge Matthew D'Emic granted substitution of counsel and appointed his college friend and close associate Phillip Smallman, 32 Court Street, Suite 1702, Brooklyn, New York, 11201, to represented petitioner at trial.

46. Several weeks after his appointment, Mr. Smallman had his personal private investigator interviewed petitioner at the Supreme Court, Kings County. Approximately, twenty minutes into the interview, the investigator informed petitioner that he was a former member of the United States Marshal's Service, who had

-12-

worked with the Kings County District Attorney's apprehension team in locating the petitioner. Consequently, trial counsel relieved his personal investigator from working on the petitioner's case, and reassigned Mr. John Brown, Universal Investigations Inc., 325 Broadway, Suite 505, New York, New York 10013, who had previously worked on petitioner's case for Attorney Baker.

47. To appeased Judge D'Emic, trial counsel did not file a single pretrial motion to safeguard any of the petitioner's constitutional rights to due process and a fair trial.

48. On account of the prosecutor's failure to comply with the defense's supplemental discovery demands. Petitioner took proactive measures to protect his own interest by filing pro-se motions dated March 27, 2009, and April 20, 2009, requesting an evidentiary hearing on federal and state constitutional grounds for the prosecution wilful and pervasive destruction of material evidence. (See, Exhibit C-13).

49. The prosecutor file no opposition to the petitioner's motions and procedurally forfeited all rights in the motion court. However, the court summarily denied petitioner's motions without conducting a hearing which constituted an unreasonable abused of discretion. For the court to require the petitioner to prove bad faith by the prosecution that the destruction of material evidence violate due process. Then, for the court to take away from the petitioner the forum in which to challenge the prosecution, is to create absurdity within the law and render meaningless the U.S. Supreme Court holding in Youngblood v.

-13-

**Arizona**, 488 US 51 (1988).

50. By letter dated May 21, 2009, petitioner sought substitution of defense counsel predicated on a conflict of interest. (See, exhibit C-14).

51. By letter dated July 17, 2009, petitioner expressed concerns to the court that the prosecutor had not disclosed pertinent records of his cell-phone. (See, exhibit C-15).

52. By letter dated August 4, 2009, addressed to defense Attorney, Smallman, the court and the prosecutor, petitioner's expressed Smallman's reluctance to allow access to audio recorded statements of the People's witnesses and his failure to subpoena petitioner's cell-phone records. (See, exhibit C-16).

53. By motion dated August 22, 2009, Petitioner sought substitution of counsel predicated on a conflict of interest. Petition's motions made clear that defense counsel was not communicating with him. Specifically, the motions asserted that counsel never review with petitioner any discovery materials, either did counsel discuss any details of what the People's trial evidence would consist of or what the defense strategy would be. (See, exhibit C-17).

54. However, the court's summarily denied the motion without a hearing on September 2, 2009. The court's summary denial of petitioner's motions was an unreasonable and contrary application of clearly established federal law because, "from counsel's function as assistance to the defendant derives the overarching duty to advocate the defendant's cause and the more particular duty to consult with the defendant on important

-14-

decisions and keep the defendant informed of important developments in the course of the prosecution." (**Strickland v. Washington**, 446 US 668, 688 (1984); **Mitchell v. Childs**, 26 AD3d 685 (3d Dept. 2006)(Finding ineffective assistance where counsel persistently failed to communicate with client); see also, ABA **Standards of Criminal Justice, § 4-3[a] & [b] [3d ed. 1993]**).

On August 26, 2009, twenty days prior to trial, Phillip Smallman visited petitioner for the first and only time at Rikers Island to discussed the relevance investigation of the case.[11] (Exhibit C-18 annexed).

At conference call on September 9, 2009, the motion court's inquired whether petitioner still wanted substitution of counsel. Petitioner's contended that Mr. Smallman should be relieved because he was sabotaging petitioner's defense by disregarding his instruction to file a notice to advance an affirmative alibi defense. Despite the petitioner's protestation and intransigent objections to trial counsel's perceived strategy, the motion court's responded:

> "This is your third attorney. Why didn't you tell that to Mr. Stutman, or Mr. Baker. First time I'm hearing about it and I've been on this case since what, March 2001. All right, I've had enough. Motion denied."

(Id., See, pretrial tr. @ pages 2-5; Exhibit C-19 annexed).

The motion court failed to recognized the conflict-of-interest that was inherent in petitioner's case and that it was within the petitioner's exclusive prerogative to chose the objectives of his defense. See, McCoy, 138 S.Ct. 1500, 1507.

---

11. On April 25, 2010, Private Investigator John Brown, wrote a letter which detailed the investigation of the case and confirmed that the petitioner's allegations that trial counsel only visited petitioner once to discussed the relevance of the case.

57. The court's decision was contrary to, or involved an unreasonable application of clearly established federal law, as was determined by the United States Supreme Court, and/or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented before the state court because the court's violated the petitioner's Sixth Amendment secured autonomy to decide the objectives of his own defense by allowing trial counsel to usurped control of a issue within the petitioner's exclusive prerogative. See, **McCoy v. Louisiana**, 138 S.Ct. 1500, 1508 (2018); **Weaver v. Massachusetts**, 137 S.Ct. 1899, 1908 (2017)("The fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty.")(citing **Farretta**, 422 US @ 834); **People v. DeGina**, 72 NY2d 768, 776 (1988)[12] .

58. A Molineau/Rosario hearing preceded petitioner's trial on September 14, 2009. There, the prosecutor disclosed a edited audio tape recording (hereinafter, "secondary evidence"), and requested that the petitioner waive confrontation with Police Telecommunication Technician, Officer Jackson ("VD" 4, 6-7) who had created the false secondary evidence to undermined the adjudicative process and bring about the petitioner's unlawful conviction.

---

12. Appellate counsel failed to raise the issue on appeal due to her inexcusable failure to investigate and settle the record on appeal. In Edwards v. Carpenter, 529 US 446 (2000), the Court held; "When a prisoner can show cause to excuse a default claim of ineffective assistance of appellate counsel, he can in turn rely on that claim as cause to litigate an underlying claim of trial error that was default due to appellate counsel's ineffectivenes. Id.

59. Petitioner's refused to waive confrontation with Officer Jackson ("VD" 195-96), and the prosecutor sought and was granted permission to play the secondary evidence in her opening statements to the jury without any evidentiary foundation being first established ("VD" 46-51, 55-56, 78). Trial counsel's objection to the playing of the secondary evidence on confrontation grounds was overruled by the trial court ("VD" 53, 72-73).

60. The trial prosecutor's informed the court and trial counsel that she had personally assisted the victim's mother and sons which certain incentives/benefits for their cooperations ("VD" 3-4, 16-17). With the intent to knowingly present false testimony at trial, the prosecutor's proffered a trial theory that Ryan Aarons would testify that the petitioner harbored a premeditation to kill his mother for a percentage of the money she had received as a result of a car accident ("VD" 35-36). The prosecutor also proffered that one of the deceased's friend would testify that the petitioner had on a prior occasion, assaulted the deceased ("VD" 36-37).

61. On September 15, 2009, the trial court's ruled that Ryan Aarons would be allowed to testify about an incident he had observed in May 2001, where allegedly the petitioner demanded fifty thousand dollars from his mother to dissolved the relationship, intimidated and threatened her with a firearm ("VD" 69-70). Relatedly, the court would permitted the victim's friend (Hyacinth White), to testify that the petitioner allegedly pointed firearm at the victim and punched her, two months prior

to the instant offense, and that petitioner allegedly called Hyacinth a few days later stating that if he did not receive the money, she [13] would be attending a funeral. ("VD" 35-37, 69-71).

62. At the conclusion of jury selection, the court's inquired whether trial counsel would interpose a third-party-culpability defense. Counsel's responded that the prosecutor had not disclosed a stitch of paperwork related to Ms. Chinwe Ifeoma's pretrial statements and any inquiries by the court would placed him in an untenable position ("VD" 505"). Counsel was forced to proceeded to trial without the benefit of Ms. Ifeoma's prior statements.

63. At trial, counsel advanced a defense strategy that the police investigation was not thorough over the petitioner's instructions to advance an affirmative alibi/third-party-culpability defense, while conceding a material element of the offense (330-35), and petitioner's guilt by requesting a manslaughter charge over petitioner's instant objections (361-63). Thus, undermining petitioner's assertion of innocence by interjecting into the case, a factually and logically inconsistent defense, impermissibly compromising that personal rights of the accused. [14]

---

13. **Hyacinth White is related to Clifford White, who is Ryan Aarons' biological father.**

14. **"The right to defend is personal, and a defendant's choice in exercising that right must be honored out of that respect for the individual which is the lifeblood of the law." McCoy, 137 S.Ct. @ 1507-08. Conceding a client's guilt over his expressed objection is error structural in kind, for it blocks the defendant's right to make a fundamental choice about his own defense, id., McCoy, 138 S.Ct. @ 1510-11; (citing Weaver, 137 S.Ct. 1899).**

## THE PEOPLE'S CASE AT TRIAL

### The Prosecutor's Opening Statements

64. The prosecutor played the edited secondary evidence with Officer Jackson's opinionated testimonial statements entering into the jury's calculus, then used the imprimatur of her office to self-authenticated the secondary evidence by telling the jury that the recording was a narrative of an execution. She stated that Renee and Rashawn were seated in the green Lexus vehicle when the defendant drove up and had words with Renee about Ryan's arrest earlier that day, angry the defendant punch Renee in the face ...., his anger rises and he reaches into his waistband and pulled out a handgun and shoot Renee ....   He began to walk away, but ... Renee calls out and the defendant heard and walk back to the car and he shoots her two more time .... One of those bullets lodges into the center console between the two front seats, another smashes into the front passenger's seat where moments before Rashawn had been sitting. Then without disclosure or an evidentiary hearing to establish the bloodhound's reliability to distinguished the human's scent, she ambushed the defendant with her improper and prejudicial statements that a bloodhound, named Kojak, picked up defendant's scent and traces it from the Lexus to the nearby bus-stop. She stated they employed media coverage, even plea on America's Most Wanted, and finished by derogating the defendant as evil. (Id. See, trial tr. @ 13-17).

65. Trial counsel took no exceptions to the prosecutor's improper statements by moving for a mistrial or requesting any

-19-

other ameliorative remedies and the prejudicial impact of the prosecutor's bad faith interjection of the bloodhound lacking evidentiary foundation would exacerbated throughout the rest of the trial without objections from counsel.

## Chin'we Ifoema's Testimony

66.    Despite the prosecutor's **Rosario** violation to disclosed Ms. Ifoema's pretrial statements, trial counsel took no exceptions to precluded her testimony. Ms. Ifoema identified the defendant in court and stated that her daughter received a lawsuit settlement resulting from a car accident. She claimed that Rashawn referred to the defendant as daddy and that the deceased bough the green Lexus vehicle for Ryan and the gold Lexus vehicle for the defendant's mobility. She received the deceased's jewelry and wallet from Detective Henn, but did not received the deceased's cell phone. She could not tell if her son, Andra Iehong managed the deceased's money. She explained that while the deceased and the defendant had an eighteen years relationship, Rashawn was fathered by another man whom she did not know (21-29).

## Officer Kerry Calvo's Testimony

67.    Officer Calvo stated that she and Officer Davitt arrived on the crime scene and observed a crowd of people surrounding the green Lexus where the victim's was unconscious. She claimed she was able to secured the crime scene, obtained two spent shell casings from members of the Crime Scene Unit, voucher the vehicles and had an initial encountered with Rashawn Aarons who allegedly told her that dad shot mom (30-34). Notably, on

cross-examination she admitted that in her written reports, she wrote perpetrator unknown and made no mention of Rashawn's purported statements (48-49).

## Officer Fanking Lai's Testimony

68.   Detective Lai was called by the prosecutor to knowingly provided false testimony to excused Detective Henn's wilful suppression/destruction of the vehicles and its contents.[15]   Detective Lai testified that the Property Clerk Division generally stored vehicles for two years because of the lack of storage space (55-58). He explained that he received an undated letter from Detective Henn with instructions to disposed of the vehicles, but could not recalled when he received the letter. When pressed by trial counsel on cross-examination for specific details, Detective Lai admitted he was not working at the Property Clerk Division in 2003 -2004, when the vehicles were supposedly destroyed (59-63). Nonetheless, the court would subsequently ruled that Detective Henn's criminal suppression of the vehicles was a consequential fault of defendant and refused to dispensed a advance inference charge (382-383).

## Rashawn Aarons' Testimony

69.   Rashawn Aarons had a tendency of changing his statements to appeased the prosecutor and each time he met with her, his statements evolved. On the morning of June 13, 2001,

---

15. Detective Henn could have easily wrote a letter ordering that the vehicles be preserved as trial evidence, but with a culpable state of mind, he suppressed the evidence. NY Penal Law § 215.40(2) reads in pertinent part; A person is guilty of tempering with physical evidence, believing that certain evidence is about to be produced or used in an official proceeding ... and intending to prevent such production of use, he suppresses it by any act of concealment, alteration, or destruction ..."

Detective Henn's memorialized Rashawn's initial statements which
stated in substance:

"At approximately 3:30 p.m., Wayne picked him up from school and dropped him
off at Jamal Bogle's house in New Jersey. At approximately 5:00 p.m, he came
back and said we are going to Brooklyn. Its your grandmother's birthday.
Sometime around 7:00 p.m, Wayne dropped Rashawn off at 95 Linden Boulevard and
drove off. Rashawn stated that he went to visit a friend a few doors down and
stayed there until a little after 10:00 p.m., when Rashawn walked outside and
observed his mother sitting in the car in front of 95 Linden Blvd. He then
walked up to the car and said hello to her and got into the car, she seems
shocked and asked him how you got here, he stated that daddy brought me here.
At this time dad pulled alongside them in the car. Dad asked mom, 'what happen
to Ryan,' and she replied, 'don't say anything to me, this is your fault.' Dad
got out of his car and walked up to the driver's side and punched mom in the
face. He pulled out his gun and shot mom about 4 or 5 times, Rashawn stated
that he jumped out of the car and was grabbed by his cousin Leeford."

(Summarizing Police Follow-up report # 5 [See, exhibit C-5]).

70. The above statements were made before the prosecution

informed Rashawn that a nine millimeter handgun was used in the

offense and that a bullet had struck the passenger's seat of the

green Lexus vehicle, then Rashawn statements started to evolved,

into the following:

He testified that he lived in Trenton, New Jersey with his

mother, brother and Wayne who on the day in question, picked him

up from school, got clothing from the dry cleaners, and brought

him from Trenton to Brooklyn at approximately 4:45 p.m., and left

him at 95 Linden Boulevard. Sometime after 10:30 p.m., he saw his

mother parked in front of 95 Linden Boulevard in his brother's

green Lexus vehicle and got inside the passenger's seat ..., his

mother was on her cell phone talking when Wayne pulled up in his

car and asked what happened to Ryan ...., mom told Wayne it's all

your fault Ryan was locked up ..., Wayne got out of his car,

walked over to them, asked mom something, and punched his mother

in the face. Wayne pulled out a nine millimeter gun and shot her

three times (75-78). He got out of the vehicle, run over to Wayne, pulling him, telling him to stop. His mother called out his name and Wayne went back and shot her two more times. Wayne then got into his car, made a u-turn, and drove up Linden Boulevard. He recognized Wayne's car parked at the corner of Linden Boulevard and Nostrand Avenue, because it contained Wayne's clothing, collected earlier that day. Rashawn was arrested three times and the prosecutor's expunged one charge and he was presently serving community services for the other for marijuana charges. (83-92). Rashawn acknowledged that his biological father named Michael Morriott and that he had first met the defendant at age five or six. (98, 107).

(Summarizing Rashawn Aarons' testimony in the original)

71. The record substantiated the egregious prosecutorial misconduct. Rashawn was eleven years of age when the alleged crime occurred and he had no experience with firearms or ammunitions. The only individuals with knowledge of the caliber of the three bullets and shall casings recovered from the crime scene, were the prosecution.[16]   Ironic, the prosecutor's elicited the caliber of firearm used in the offense from Rashawn. (83).

72. The prosecutor offered no explanation of how three bullets could have been used to shot the victim five times, but invited jurors to speculated on the implausibility of Rashawn's

---

16.   The trajectory of the three bullets which included one that allegedly struck the passenger's seat, led some officers to a conclusion that Rashawn was not sitting in the green Lexus vehicle passenger's seat but was sitting on the stoop of the building. See, America's Most Wanted edition; "Lawsuit lead to death." Http/www.amw.com.

testimony that the defendant shot the victim three times before walking away and returned to shoot the victim two more times.

73. To exposed Rashawn's bias motives to fabricate and color his testimony for the trial prosecutor. Trial counsel sought to questioned Rashawn about his unrecorded phone conversations with the trial prosecutor every time he was arrested, but the court's curtailed counsel's cross-examination of Rashawn and denied any confrontation with the prosecutor to impeach Rashawn's credibility (93-97). The trial court's rulings were contrary to, and an unreasonable application of clearly established federal law as was determined by the United States Supreme Court in **Delaware v. Van Arsdall**, 475 US 673, 680 (1986), quoting **Davis v. Alaska**, 415 US @ 318.

## Ryan Aarons' Testimony

74. On June 13, 2001, Detective Leto memorialized Ryan Aarons' pretrial statements which stated in pertinent part:

> "Ryan added that Wayne and his mother always argued and explained that on one occasion he went to his mothers aid because Wayne was forcing his mother to have sexual intercourse with him and Wayne was yelling and in a rage stated in substance that he could kill her and then kill both her children so there would be no witnesses. Ryan explained that there were many times that Renee was afraid to come home .... and she would call Ryan and tell him that she was afraid Wayne will kill her. Ryan stated that his mother was in Florida looking for a house to move her children and herself to get away from Wayne Chin. ... Ryan explained that his mother had told Wayne that she planned to move to Florida after the school year was over. Ryan stated that the arguments between his mother and Wayne were lately about the move and Wayne was extremely upset about the moving."

(Summarizing Police follow-up report # 7 [exhibit C-7]).

75. To improperly bolstered their identification case and established premeditation, the prosecutor allowed Ryan to dramatically alter the substance of the above cited statements and knowingly elicited false prejudicial testimony that he

had observed the petitioner in possession of a firearm, threatening to harm his mother, and the petitioner allegedly asked her for fifty thousand dollars to terminated the relationship (113-125). The court's instructed the jury to considered Ryan's prejudicial false testimony as background information, motive, intent, and opportunity (123, 424).

76. In an attempt to impeach Ryan's credibility with his prior statements to Detective Leto, and establish the deceased's cell phone number, trial counsel's sought to questioned Ryan about his prior statements (132-34). However, counsel was later precluded from recalling Ryan to lay a proper foundation to impeach his credibility when the court's ruled that unless counsel could articulate an exception to the hearsay rules, counsel could not elicit any hearsay statements from the officers whom had recorded the witnesses' initial statements (305-07). Counsel's inexcusably allowed Ryan's prejudicial false testimony to go unchallenged.

## Ms. Aisha White's Testimony

77. Notwithstanding that Ms. White told 911 operator 2249, that "a man shot a female two times in the head and run into a black Lexus" (See, certified FDNY "CAD" reports). Substantiating that Ms. White  could not identified the perpetrator and was provided with the opportunity to listened to Rashawn's initial

---

17. Ms. White's eldest brother had been killed in a drug related transaction prior to the alleged crime and she had a axe to grind to see the petitioner convicted.

interview at the 67th., Precinct (See, exhibit C-5). Detective

Henn's memorialized her initial statements which reads;

> "At approximately 10:35 p.m., She was in her apartment at 95
> Linden Boulevard, her mother received a phone call and it was
> Renee calling from her cell phone. Renee stated to her mother
> that Kevin drove off the block with Aisha's vehicle. Aisha
> then walked outside and saw Renee sitting in her car parked
> curbside in from of 95 Linden Blvd., with her son Rashawn. As
> she neared the car, she observed Wayne pulled alongside
> Renee' car in his gold colored Lexus and double parked next
> to her. Aisha heard the two conversing about Ryan who was
> arrested in the 71st., Precinct earlier on todays date. Wayne
> Then exited the car and approached the driver's side window
> of Renee's car. He then punched her in the face. Aisha then
> ducked down and called 911, at this time Wayne pulled out a
> handgun and kept firing into the car as Aisha was still on
> the phone with the 911 operator, Aisha heard Renee screaming
> for Wayne to stop."

(Id. Police follow-up report # 4 [See, exhibit C-6]).

78. Like Rashawn, Ms. White's statements evolves after

several proffer sessions with the trial prosecutor. She testified

that the defendant drove up in his champagne colored Lexus

vehicle [18] and angrily argued with Renee over money (144). Her

interjection of money was to collaborated Ryan's false testimony

that the defendant had a premeditation to kill Renee.

79. Ms. White's professed that she knew the defendant from

him being around the family and she was within fifteen to twenty

feet of Renee's vehicle when the defendant approached Renee and

punched her in the face when she call the 911 operator.

Surprising, she did not knew Rashawn was sitting with Renee in

the car (144-46, 161), .. but she saw the defendant shooting into

---

18. With all the physical evidence collected and analyzed by the
prosecution, no fingerprints or DNA connected the defendant to the doors,
or steering wheel of the gold Lexus vehicle.

the vehicle and Rashawn running out, hugging the defendant, and telling him daddy no (144-46) .. the defendant pulled him away, and went back to the car and fired more shots inside of the vehicle ..., defendant got back into his car and made a U-turn toward Nostrand Avenue (147-48).

80. The prosecutor showed Ms. White the audio tape recording manufactured and edited by Officer Jackson, for identification purpose and asked her whether it represented her complete 911 call. Ms. White's responded in the affirmative. However, the prosecutor posed no question of whether the recording was accurate without alterations. The edited secondary evidence was marked People's exhibit 8, and played to the jury with Officer Jackson's testimonial opinionated statements entering into the jury's calculus (149-50).

81. Trial counsel who had objected earlier to the admission of the edited secondary evidence on confrontation grounds ("VD" 53, 72), objected to the playing of the edited secondary evidence which was court's overruled (151). On cross-examination, Ms. White stated that the defendant was wearing a "button down shirt and a dress pant" (154), but she did not know Renee's phone number, .... she knew the fathers of Renee's children but was surprised that the defendant was not Rashawn's father (157). Aisha admitted she did not named the defendant as the perpetrator in her 911 call.

(Summarizing Ms. White's testimony in the original)

## Detective Calabrese's Testimony

82. Detective Calabrese testified that he responded to

95 Linden Boulevard and observed a four door Lexus parked with blood on the seat, a pair of slippers inside on the floor along with a cell phone ..., and two shell casings outside the vehicle. He went to Kings County Hospital, spoke with the attending doctor and went to the 71st. Precinct to obtained Ryan' release from custody ...., returned to the crime scene to notify the deceased's mother and observed a gold Lexus parked with its doors closed on Linden Boulevard about 50 feet from Nostrand Avenue and canine unit was called to conduct a search (169-173).

83. Notwithstanding that petitioner's pretrial Omnibus motion requested a hearing to opposed all identification testimony the People intended to offered at trial which the court's summarily denied upon the grounds that all identification was confirmatory. The prosecutor without disclosure or evidentiary foundation to establish the bloodhound's reliability to distinguished the human's scent, elicited unduly prejudicial opinion testimony from Detective Calabrese about the blood's reaction. Calabrese's stated that "they let the dog go in the car .., the dog came out and went to Nostrand Avenue, ... there was a bus-stop, and the dog stopped, ... At this point we were not sure [the defendant] got on a bus or if he jumped into a cab..." (173).

(Summarizing Calabrese's testimony in the original)

84. Trial counsel made no objections to the inadmissible and prejudicial bloodhound's identification testimony lacking evidentiary foundation that added substantial weigh to the People's case. Instead counsel's compounded the trial error by

-28-

questioning Calabrese about the bloodhound's reaction (86-189).
Thus, under the circumstances, trial counsel's abdicated his duty
to preserved substantial trial error for appellate review.

**Detective Muzek's Testimony**

85. Detective John Muzek who was a firearm examiner, gave
his expertise and determination that the three nine millimeter
bullets and shell casings recovered in the case, where all fired
from the same nine semiautomatic millimeter handgun. The
prosecutor asked whether his opinions were based on a reasonable
degree of scientific certainty and Muzek responded, "yes." (192-
205).

86. Prior to the trial, several judges had addressed the
scientific vel non of ballistics identification testimony and
concluded that in one respect or another, it does not have
sufficient rigor to be received as "science." See, e.g., **United
States v. Monterio**, F.Supp.2d 351, 355 (D. Mass. 2006)(original
citations and quotations omitted); **United States v. Glynn**, 578
F.Supp.2d 567, 570-72 (S.D.N.Y. 2008)("holding that whatever
ballistics identification analysis could be called, it could not
fairly be called "science."); **People v. Given**, 30 Misc.3d 475,
477 n. 2 (N.Y. Sup. 2010). According any standard of federal and
state law, Detective Muzek's testimony that his analysis were to
a scientific certainty was false and misleading. However, due to
trial counsel's inexcusable failure to investigated the laws and
facts of the case, counsel made no objection to Muzek's
testimony.

## Detective Patrick Henn's Testimony

87.  Detective Henn's falsely alleged he arrested the defendant March 2008 (232). He asserted that in responding to the crime scene, he observed a dark green Lexus with the driver's door opened, blood on the driver's seat, a bullet hole in the center console, a bullet hole in the passenger's seat, and two nine millimeter shell casings laying on the street beside the vehicle ... EMS was administering CPR to the victim ..., there was a large crowd of people forming and Aisha and Leeford White was comforting Rashawn Aarons who was crying hysterically.  He escorted Rashawn, Aisha, and Leeford to the 67th., Precinct, ... En-route to the precinct, Rashawn saw the defendant's gold Lexus parked two blocks from the crime scene, at the corner of Linden Boulevard and Nostrand Avenue ..., the vehicle was locked and illegally parked at a fire hydrant ..., there was articles of clothing wrapped in a dry cleaning bags hanging in the vehicle [19] (232-38, 246)

88.  Once again without disclosure or evidentiary foundation, the prosecutor impermissibly elicited prejudicial bloodhound's identification evidence from Detective Henn who stated; "The dog went up to the car, sniffed the door handler to the driver's side door, [20] then started to walked toward Nostrand Avenue and ..., stopped at a bus-stop (239-40).

---

19. Detective Henn's wilfully destroyed the dry cleaners' receipts because it would have shown the date and time when the individual who had collected the clothing was video recorded at the Dry Cleaners, and contradicted Rashawn's statements that petitioner collected the clothing.
20. None of the fingerprints recovered from the vehicle door handles belonged to the defendant and the identity of the individual whose fingerprints were on the handles were withheld from disclosure by the People.

89. Detective Henn stated both Lexus vehicles were registered to Renee Aarons and a warrant was obtained to search the vehicles (241-42), ... Detective Gilford processed the vehicles for evidence and recovered two deformed nine millimeter bullets along with a spent nine millimeter shell casing from the dark green Lexus (246-47), ... he received the victim's jewelry from the doctor ..., took it back to the precinct, washed the blood off, and returned it to Renee's family, ... "there were a cell phone, wallet and assortment of clothing and they were returned to the victim's family on June 15, 2001" (248) ... he requested the assistance of America's Most Wanted, Fox News, ... and received numerous tips (256).

(Summarizing Henn's direct testimony in the original).

90. Although every police communications on the night of the alleged crime described the perpetrator's wearing a gray Esco shorts outfit clothing (See, exhibit C-1). On cross-examination Detective Henn claimed he could not recalled the description of the perpetrator's clothing. Despite Henn's wilful suppression of the victim's cell phone and the dry cleaners' receipts, he was unable to recalled the victim's cell phone number but was certain Michael Gillings name was on the dry cleaners' receipts (261-267, 271-72). [21]

91. Once again, trial counsel without objections to the inadmissible and prejudicial bloodhound's tracking evidence, elicited the worse inferential bolstering from Detective Henn

---

21. Michael Gillings, a fashion designer/tailor, was a friend of both the defendant and victim and made clothing for both (See, Exhibit C-7, @ ¶ 8).

about the dog's reactions (267-68), and compounded the error with his summation statements (392-93).

92. In laying a defense foundation to prove that the officers's investigation was incomplete, trial counsel asked Detective Henn about Ms. Deanna Cobbs' exculpatory statements that she observed two individuals fleeing the crime scene in a black vehicle (272). The prosecutor's objected that Ms. Cobbs's exculpatory statements to Detective Henn, constituted hearsay (273). Counsel informed the court of the relevance of Ms. Cobbs' 911 call, made contemporaneous with the crime as it unfolded, that she observed two individuals fleeing the crime scene (274), and asserted that he was not offering Ms. Cobbs' statement for the truth of the matter. The court's curtailed counsel's cross-examination of Detective Henn, limiting counsel to one question (274-76);(See, exhibit C-2).

## Doctor Pasquale Styles' Testimony

93. The prosecutor's repetitious improper, unduly prejudicial bolstering of their witnesses' identification testimony lacking evidentiary foundation continued unabated with Doctor Styles. On October 10, 2008, Assistant District Attorney, Ms. Sedeno, requested that Doctor Styles examined clothing contained in an evidence bag (See, exhibit 21). Doctor Styles' testified that after examining the clothing from the victim, the clothing contained stippling (gunpowder residue) consistent with a firearm being fired within eighteen inches of the victim (320-26). There were no foundational testimony to establish where the clothing were recovered, who placed them inside the evidence bag,

-32-

when they were placed inside the bag, or that the clothing were unaltered. Trial counsel simply sat silent and raised no objections to the inadmissible testimony and photographs, lacking evidentiary foundation (330).

## Admission of Death Certificate And Medical Records

94. To deprived the defendant of his federal constitutional right to confront Medical Examiner, Doctor Joseph Veress who conducted the autopsy on the deceased, and to relieved the People of their burden of proving a factual material element of the charged crime, specifically, that Renee Aarons' death was caused by firearm. The court, prosecutor and trial counsel convened outside the court and the defendant's presence, to discussed admission of the Death Certificate with Doctor Veress' testimonial statements (330-35).[22] Trial counsel objected to the introduction of the Death Certificate but relinquished his objection for the convenience of the court (331).

95. The prosecutor's rested their case, and then disclosure the medical records of the deceased (337-338). Instead of objecting to the prosecutor's disclosure violation and move for a mistrial, or preclusion of the medical evidence, counsel simply surrendered the defendant's due process rights to investigate the medical records and prepare prior to trial. Both Death Certificate and medical records were admitted into evidence as business record without foundational testimony (338-41).

---

22. The court stenographer's incorrectly numbered two set of transcripts 335-344, one set was for September 23, 2009, the other was for September 24, 2009.

**The Defense's Case**

96. Both Ms. Cobbs and Ms. Gaston could not be located and was unavailable for trial. Trial counsel first attempted to set the stage of the defense by questioning Detective Henn about Ms. Cobbs' exculpatory statements but the court's curtailed counsel's cross-examination. Counsel's interposed that Ms. Cobbs' statements was not offered for the truth of the matter (See, Exhibit C-2). Counsel second attempt to introduced Ms. Gaston's exculpatory statements were precluded by the court's unreasonable rulings which stated in substance:

> "Well, obviously, the rules of evidence are going to apply. I don't know exactly what the defense is going to do. What's going to apply is that if the defendant calls these witnesses, he's going to have to asked direct questions. He cannot cross-examine the witness and that's --- those are the rules ... If he is to elicit hearsay, I will preclude it, unless it falls under a recognized exception. What the application was then, Mr. Smallman, was whether or not there was an interview of an eyewitness, not necessarily the substance, which of course, would be hearsay ..."

(Id., See, trial tr. @ pgs. 306-07).

Compare, **Lopez v. Miller**, 915 F.Supp.2d 373, 420-26 (E.D.N.Y. 2013)("discussing the admission of hearsay statements under Rule 807, and finding that state's denial of discovery and evidentiary hearing produced an adjudication of a claim that was materially incomplete, and thus, requires no deference to state court.").

97. The trial court's unreasonable evidentiary rulings deprived petitioner of his federal and state constitutional rights to due process and a fair trial in two fundamental ways.

-34-

First, it prevented the petitioner from confronting witnesses and introducing evidence in his own defense has was guaranteed by the Fifth, Sixth, and Fourteenth amendments of the United States Constitution. Second, it prevented the petitioner from recalling the People's witnesses to impeach them with their prior inconsistent statements made to the investigative officers.

98. The state courts' adjudication of petitioner's claims were contrary to, or involved an unreasonable application of clearly established federal law, as was determined by the United States Supreme Court, and/or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Petitioner's invokes; **Holmes v. South Carolina**, 547 US 319 (2006); **Delaware v. Van Arsdall**, 475 US 673 (1986); **Davis v. Alaska**, 415 US 308 (1974); **Chambers v. Mississippi**, 410 US 284, 302 (1973)(original citations and quotations omitted).

99. The trial transcripts shows that trial counsel had never properly prepared for trial and had no effective strategy. On the second day of trial, the prosecutor's demanded the defense's witness list (294-95). Counsel had none prepared, and insisted that petitioner prepared his own list of witnesses. Petitioner's witness list consisted of; Detectives John Guinane, Sherman, Thomas Gallo, Crick, Fiorica, Bruno Valenti, Gregg Timpanaro, Robert Oteno, Fitzerald, Glynn, Gary Gomula, (Civilians) Andre Lehong, Chinwe Ifeoma, Nesita White, Angela Wingate, Doreen Hart, and a Sprint Telecommunication Specialist.

100. Ms. Hart, petitioner's former girlfriend for over

-35-

fourteen years, had phone petitioner several times on the date of the alleged crime and requested petitioner's visited her in Brooklyn. Counsel was informed by petitioner that his cell-phone was a genetic footprint of his movement/location and directed counsel to advance an affirmative alibi defense with cell-phone records. However, counsel did not subpoena and investigate petitioner's cell-phone records or contact any of the petitioner's listed witnesses. Thereby, the prosecutor saw the opportunity to manipulated counsel, by providing Detective Steiner as a witness for the defense and counsel readily accepted (314-17).

101. Detective Steiner was called by trial counsel without preparations. Steiner's testified about his qualifications working with the "NYPD" Crime Scene Unit and what his experiences were in the collection of evidence (345-52). Steiner did not knew any specifics of the case, and counsel did not show, or asked him to review any photographs or documentations related to the case. Detective Steiner's testimony was rather worthless‖

102. For example, the prosecution washed the gold Lexus vehicle to removed exculpatory forensics evidence (See, Exhibit E-1 annexed). Both Lexus vehicles were parked in close proximity surrounded by debris, allowing for cross-contamination of the evidence (See, Exhibit E-2, annexed). The trajectory of the bullet in the passenger's seat of the green Lexus and the figuration of items on the seat and floor (See, Exhibit E-3), shows the improbability that Rashawn had sat in the passenger's seat. None of those photographs are questions were posed by counsel to Steiner.

**Charge Conference**

103. The People's requested that the court charged all counts of the indictment (359-60). Trial counsel's requested a charge to a lesser included count of manslaughter in the first degree (360-63) to which the People's objected (363-64). Counsel requested a missing witness charge and an adverse inference instruction for the People's wilful destruction of the vehicles on prejudicial grounds that the suppression of the evidence deprived the defense of the opportunity to have independent experts examination of the vehicles (366). The People's objected that there were no bad faith in the suppression of the vehicles because the vehicles were auctioned pursuant to procedure (367). Counsel responded that the vehicles were wilfully suppressed on the color of a letter to the Property Clerk Division from the case detective (367).

104. The court's rejected the People's request to charge all counts and charged only murder in the second degree (370, 380); rejected trial counsel's request for a missing witness charge (374-376); and also rejected counsel's request for a manslaughter charge (381-82). The court's ruled that the People wilful destruction of the vehicles were a consequential fault of the defendant's flight to avoid apprehension and found no prejudice (382-84).

**Jury Charge**

105. The court's charged the jury on the presumption of innocence and the burden of proof beyond a reasonable doubt (414-417), witness motive to lie, and inconsistent statements (419-

-37-

421), expert witness's testimony (422-23), the value of uncharged crime consideration for motive, intent, identity, opportunity (424). The court further charged the jury with murder in the second degree and instructed them on the standard of returning an unanimous verdict, tampered with a cautionary instruction that they must not surrender their individual judgment for the sake of returning a verdict (428-30).

**Jury Deliberation**

106. This was not an overwhelming case in which the jurors rendered a quick verdict. The jurors' struggled with a decision for the better part of two days and given a coercive and unbalanced supplemental jury instruction which deprived the defendant of a fundamental fair trial. The jurors' requested to reheard the edited secondary evidence, Rashawn's testimony for the night of the alleged crime, Ms. White's direct and cross-examination, to see all the photographs. Some jurors were suspicious that the witnesses' testimony was coerced and requested to know the names of the witnesses whom had met with the prosecutor before trial (436-40; see also, Jury's note 3A).

107. The court, prosecutor and trial counsel, all agreed to informed the jury that their question for the names of the witnesses whom had proffer sessions with the prosecutor was not understood, and they should clarified their question with specificity (439-440). The edited secondary evidence was played with Officer Jackson's testimonial opinion statement entering the jury's calculus (440). Lunch recess was taken and approximately two and one half hours later, the jury's submitted their third

-38-

note, requesting instruction on the definition of second degree murder (442-447; see also, Jury's note 4). In the interim, the court finished responding to jury's note 3A, but failed to revisited the jury's request to know the names of the witnesses whom had proffer sessions with the prosecutor before trial.

108. Two hours later, the jurors' requested to know (1) "What happened if we do not decide today?" and (2) "What happened if all twelve of us cannot come to the same decision?" (447-49; See also, Jury's note 5). The court, prosecutor and trial counsel, all decided that the court could give the jury a coercive and unbalanced supplemental jury instruction without any cautionary instruction (448-49). The following day at approximately 10:55 a.m., the jurors' requested to reheard the testimony of Detective Henn (455-57; see also, Jury's note 6). On September 30, 2009, at approximately 1:17 p.m., the jurors' rendered a guilty verdict for second degree murder (458-59; see also, Jury's note 7).

## Pro-se C.P.L. § 330.30 Post-Verdict Motion

109. On October 14, 2009, the trial court's substituted trial counsel, Phillip Smallman, (32 Court Street, Suite 1702, Brooklyn, New York 11201), and appointed Jay D. Cohen, Esq., (26 Court Street, Suite 810, Brooklyn, New York 11201), to represented petitioner at sentencing. Attorney Cohen sought and was granted an adjournment to facilitated the filing of a New York State Criminal Procedure Law § 330.30, post-verdict motion to set aside the verdict.

110. Attorney Cohen's informed petitioner in no uncertain

manner that Attorney Smallman was his friend and a good attorney and refused to participated in petitioner's defense efforts. Attorney Cohen basically abandoned petitioner at a crucial stage of the proceeding. Cf., **Maples v. Thomas**, 565 US 266 (2012)[23]

111. On October 27, 2009, a member of petitioner's family retrieved petitioner's CPL § 330.10 motion on Rikers Island and faxed it to Mr. Cohen. On October 28, 2009, Attorney Cohen submitted petitioner's pro-se motion to the court without any personal input because of his fidelity to Attorney Smallman.

112. Among the asserted grounds in petitioner's inartful CPL § 330.30 motion, were the contentions that the trial court's abrogated his constitutional rights to a fundamental fair trial when it precluded petitioner from confronting witnesses and presenting evidence; The People's failed to disclosed Brady material tending to substantiate the bloodhound's reliability to distinguish the human scent; and ineffective assistance of trial counsel.

113. The People filed their opposition on November 5, 2009, asserting compliance with their Brady obligation, and that the bloodhound's training and service records were not requested by the defense, and if the records existed, the records were exempted from disclosure. They further asserted that defendant's failure to located Ms. Cobbs and Ms. Gaston, was attributed to his flight to avoid apprehension rather than with trial counsel's

---

23. Petitioner's invokes the limited exception to any procedural default as was enumerated by <u>Martinez v. Ryan</u>, 566 US 1, 132 S.Ct. 1309, 1320 (2013).

ineffectiveness and although counsel informed the court that the defendant was considering a possible alibi defense ----, trial counsel did not file any specifics information required by C.P.L. § 250.20. In any event, any further conversations that the defendant may .., have had with his attorney regarding potential alibi, forensics evidence, or phone records to support that claim, are not on the record, ... not preserved and procedurally barred. Lastly, the People argued that there was no error with the trial court's limitations on Detective Henn's testimony regarding Ms. Cobbs' and Ms. Gaston's exculpatory statements, because the statements were being offered for the truth and they did not fit into any of enumerated exceptions to the hearsay rules (See, People's Oppos. Memo., @ pgs. 5-10).

114. On November 17, 2009, the trial court's summarily denied the post-verdict C.P.L. § 330.30 motion without a hearing and held that the defendant's ineffective assistance of counsel claim largely concerned matters dehors the record as they involves challenges to trial counsel's strategic decisions and alleged failure to investigate and call certain witnesses (See, Exhibit A, annexed herewith [Court's decision  @ 18])(emphasis added). The court's iterated that it allowed limited cross-examination of Detective Henn's testimony concerning Ms. Cobbs statements although it did not fit into any hearsay exceptions, and reasoned that the defendant's contentions that the court somehow prevented him from eliciting other statements ...., may not be reviewed ..., as it was not raised at trial (See, Court's decision @ 11)

115. The court rejected the **Brady/Rosario** claims, ruling that there were no evidence that the bloodhound's records even exist, and any assertions that such records are exculpatory is based on nothing more than sheer speculation and surmised and must failed (Court's decision @ 5). The court did not elaborated what other records it would have relied upon to assess the bloodhound's reliability to distinguish the human's scent if the records did not exist. Nonetheless, the court's held that overwhelming evidence of Rashawn's and Ms. White's testimony corroborated by the edited secondary evidence, ballistics evidence, and Doctor Styles' testimony and photographs showing stippling was found on the deceased's clothing, overcome any prejudice to the defendant (Court's decision @ 6-7).

116. The trial court's sentenced the defendant to an indeterminate prison term of twenty-five years to life (Konviser, J., [at trial and sentencing]).

117. A timely notice of appeal was filed and the Second Judicial Department, Appellate Division of the State of New York, 45 Monroe Place, Brooklyn, New York 11201, appointed Lynn W.L. Fahey, Esq., Appellate Advocates, 111 John Street, New York, New York 10038, to perfect the defendant's appeal.

## Pro-se Post-Conviction C.P.L. § 440.10 Motion

118. On February 7, 2012, while the appeal was pending, Petitioner moved pro-se to vacate the judgement pursuant to **NYCPL § 440.10-1(c)(d)(f) and (h). Petitioner's** post-conviction motion of ineffective assistance of trial counsel involved ..., "mixed-claims relating to both record-based and non-record-based issues

-42-

..., [such] claim may be brought in a collateral proceeding, whether or not the [defendant] could have raised the claim on direct appeal. See, **People v. Evans**, 16 NY3d 571, 575 n. 2 (2011), cert. denied 565 US 912 (2011); **People v. Kocaj**, 160 AD3d 766, 767 (2d Dept. 2018).

119. Petitioner's mixed-claim post-conviction petition asserted, inter alia, trial counsel's rendered constitutional deficient and prejudicial performance when he [inexcusably] failed to objected to inadmissible bloodhound's tracking evidence lacking evidentiary foundation that contributed to the verdict; counsel's inexcusably failed to object to Doctor Styles' inadmissible and prejudicial testimony and photographs, lacking evidentiary foundation which contributed to the verdict; counsel's inexcusable failed to object and acceded with the court and the prosecutor to relieved the People of their burden of proving a essential material element of the charged crime; counsel's inexcusably failed to investigate and advance the defendant's alibi and concurrent third-party-culpability defense; counsel's inexcusably failed to investigate and object reliability and admissibility of the People's edited secondary evidence; counsel's inexcusably failed to object to the trial court's unreasonable evidentiary ruling which prevented him from impeaching the People's witnesses with their prior inconsistent statements; and sentencing counsel, Jay Cohen, Esq., labored under a conflict-of-interest that deprived petitioner of effective assistance.

120. Petitioner also asserted that the prosecutor

knowingly used false material evidence and false testimony at trial to procured the judgment. Petitioner's post-conviction motion was supported by his sworn affidavit and unrefuted documentary evidence. (See, Petitioner's **CPL § 440.10** motion on file in the Appellate Division).

121. On June 15, 2012, the People filed their opposition reiterating that a bloodhound's identified appellant's scent from the gold Lexus vehicle and traced it to a nearby bus-stop and acknowledged the defendant's contentions that they perpetrated a fraud upon the court, but failed to refuted the contentions (See, People's Aff. @ 3-7). The prosecutor argued that six of the defendant's claims, including ineffective assistance of counsel, suffered another procedural barrier because the issues were raised upon a prior motion or proceeding, and defendant's claims that do not appeared on the record are nonetheless, subjected to a permissive procedural bar (People's Oppos. Memo. @ 4-5).

122. In addressing the defendant's allegations that trial counsel's failed to develop and advance a third-party-culpability defense using Ms. Gaston's exculpatory statements. The prosecutor's stressed that counsel could not articulated an exception to the hearsay rules to have the unavailable witness's exculpatory statements admitted (People's Memo. @ 14). The prosecutor took the position that she would not addressed most of the defendant's contentions because they were procedurally barred from review pursuant to C.P.L. **§ 440.10(2)(b)**.

-44-

The Motion Court's Summary Denial Of Petitioner's CPL § 440.10 Mixed-Claim Motion Was Contrary To, Or Involved An Unreasonable Application Of Clearly Established Federal Law, As Determined by the Supreme Court Of The United States; And/Or Resulted In A Decision That Was Based On An Unreasonable Determination Of The Facts In Light Of The Evidence Presented In State Court.

123. In a decision and order dated February 20, 2013, the 440 motion court (Simpson, J.,) summarily denied the petitioner's CPL § 440.10 mixed-claim motion without a hearing pursuant to CPL § 440.10(2)(b), in total disregards for stare decisis. See, **People v. Evans**, 16 NY3d @ 575, n. 2 (2011); **People v. Maxwell**, 89 AD3d 1108, 1109-10 (2d Dept. 2011).

124. Petitioner's sworn 440 affidavit recounted a conversation with trial counsel regarding preparations of an affirmative alibi/third-party-culpability defense. The weight of federal and state case law has never suggested that ineffective assistance of counsel claim based on out-of-court conversation between a defendant and his attorney are procedurally barred. See, **Pierotti v. Welsh**, 834 F3d 171, 177-80 (2d Cir. 2016); **Constant v. Sabol**, 987 F.Supp.2d 323, 351-52 (E.D.N.Y. 2013)(collecting cases); **People v. Pegue**, 22 NY3d 168, 202 (2013)(original citations and quotations omitted).

125. Instead of conducting a hearing in accordance with applicable standard of CPL § 440.30(5), the motion court went to great length to purported to merits of petitioner's contentions with the following;

> "The defendant has failed to alleged any facts that would have warranted further examination of the defendant's cell phone records. defendant contends that counsel could have substantiated an alibi through the phone global positioning system ("GPS") that he was not at the scene of the crime. On June 13, 2001, Detective Guinane applied for and was granted a pen register and trap and trace device on a phone that defendant had used to call Renee. The police intended to use the pen register and trap and trace device in order to locate

> and apprehend defendant, who had since fled. To the extend
> that defendant is claiming that counsel should have obtain
> those records from the police, they would not have been
> relevant because they would have been generated after the
> shooting. In addition, counsel had little basis to pursue
> an alibi defense because he was faced with two strong
> eyewitnesses' account of the shooting that unequivocally
> identified defendant as the shooter."
>                                                        24

(Id., **People v. Chin**, 2013 WL 990955 [NY Sup. 2/20/13]).

126. Petitioner timely filed an application to appeal,
and per order of a judge of the Appellate Division, Second
Department, 45 Monroe Place, Brooklyn, New York 11201, permission
was granted to appeal the denial of the CPL § 440.10 motion. See,
**People v. Chin**, App. Div. Docket # 2013-04432 (Hinds-Radix, J.).
Both petitioner's direct appeal and 440 appeal were calendar
together for oral arguments on the same day. Appellate Advocates,
Lynn W.L. Fahey, Esq., 111 John Street, 9th., Floor, New York,
New York 10038, was appointed the 440 appeal.

## EXHAUSTION OF STATE REMEDY

### Petitioner's Direct Appeal

127. On October 3, 2012, Anna Pervukhin, Esq., (Appellate
Advocates), filed petitioner's direct appeal brief without
investigating and settling the entire record on appeal, a
procedural and structural error which lies with the correctness

_____

24. Petitioner's complaint was directed at his cell-phone records
for June 12, 2001, the day of the underlying offense. Trial counsel could have
easily obtain a subpoena and compelled disclosure of the phone records from
Sprint Telephone Company, which Judge Simpson was obviously aware happened in
many cases. See, e.g., **People v. Hall**, 86 AD3d 450 (1st. Dept. 2011); **United
States v. Velazquez**, 197 F.Supp.3d 481 (E.D.N.Y. 2016). But it was easier for
the judge to arbitrarily dismissed petitioner's contentions without properly
considering the facts and laws. Further, whether or not, counsel was faced
with two eyewitnesses, it was the petitioner's exclusive prerogative to chose
the objectives of his own defense which is the life of blood of the law. **McCoy
v. Louisiana**, 138 S.Ct. @ 1509. Petitioner hereby invoke **Cone v. Bell**, 566 US
449, 465 (2009)(Adequacy of the State procedural, bar, is itself a federal
question); Lee v. Kemna, 534 US 362, 376 (2002).

-46-

of the process. **Draper v. Washington**, 372 US 487, 495 (1963)("the constitutional rights to adequate appellate review and effective assistance of appellate counsel, mandates a record of completeness."); **People v. Harrison**, 85 NY2d 794, 796 (1994)(original citations and quotations omitted); C.P.L.R. §§ 5525 & 5526.

128. Appellate counsel, Anna Pervukhin, raised two unpreserved and patently frivolous issues. One claim in particular, undermined petitioner's C.P.L. § 440.10, contention that the People's knowingly used false material evidence (the edited secondary audio tape recording) to procured the judgment of conviction. Actually, appellate counsel legitimized the inadmissible edited secondary audio tape recording, giving the people a podium to argued a waived issue in the appellate court. She contended that (1) Appellant was denied due process and a fair trial by (a) the admission of a highly inflammatory 911 call, in which shots and screams can be heard and the decedent's young niece, an eyewitness to the shooting, sobs hysterically, and (b) the court's decision, over defense objection, to let the prosecutor play that 911 call at the beginning of her opening statement; (2) The court deprived appellant of his right to a fair trial by permitting the people to elicit from multiple witnesses that the deceased's son named appellant as the shooter.

129. By application dated October 24, 2012, petitioner sought to withdrew the appeal brief submitted by appellate counsel, substitution of counsel based on a conflict-of-interest and/or permission to file a supplemental direct appeal brief. The

-47-

Appellate Division summarily denied petitioner's application on December 13, 2012. Subsequently, petitioner's submitted a motion for reargument/renewal of his application‖ On February 27, 2013, the Appellate Division granted permission for petitioner to serve and file a supplemental direct appeal brief.

130. On account of appellate counsel's failure to investigate and settle the record on appeal before she filed the direct appeal brief. Petitioner moved the appellate court on June 10, 2013, for an order to enlarge the judgment roll to included the pretrial transcripts of September 9, 2009. The Appellate Division granted petitioner's motion and order the lower court's stenographer to provided the September 9, 2009, pretrial transcripts within forty-five days.

131. The lower court's failed to certified and provided the required pretrial transcripts in a timely manner. Therefore, petitioner's submitted a motion for summary judgment dated January 2, 2014, and properly served the district attorney. However, the Clerk's Office (Appellate Division) stamped petitioner's motion for summary judgment received January 9, 2014, but refused to record the motion file. Instead, the Clerk's office returned the motion to petitioner, thus, depriving him procedural due process and equal protection of law.

**Petitioner's Supplemental Direct Appeal Brief**

132. Approximately sixteen months after appellate counsel had filed the direct appeal brief, the September 9, 2009, pretrial transcripts were made available. Petitioner submitted his supplemental direct appeal brief on April 23, 2014, raising

-48-

seven substantial claims that his trial was at odds with due process and a fundamentally unfair:

> (1) Appellant was denied due process and a fair trial by virtue of the court's failure to conduct a reasoned inquiry of his requests for substitution of trial counsel; and (b) Appellant was denied conflict-free representation premised on the casual link between a bias investigator and trial counsel taking an adverse position to allegations of incompetency, run counter to effective assistance; (2) The trial court's evidentiary rulings infringed on the appellant's rights to raised a defense and runs afoul of due process, alternatively, trial counsel's representation was less than meaningful; (3) Appellant was denied due process and a fair trial by (a) The court's erroneous admission of a secondary evidence without the required foundation, and (b) The court's admission of the secondary evidence improperly bolstered the credibility of the People's witnesses and violated appellant's rights to confrontation; (4) The court's denied appellant due process and a fair trial to present a full and complete defense by (a) Precluding him from presenting relevant material evidence that another person committed the crime, and (b) Improperly curtailed defense cross-examination of Detective Henn; (5) The trial court's denied appellant due process and a fair trial when it lessen the People's burden by deliberately failing to charged the jury with all essential elements of murder in the second degree, and (b) Failed to adequately respond to jury's note # 3; (6) The prosecutor's cumulative misconducts deprived appellant of his rights to due process and a fair trial, alternatively, defense counsel provided less than meaningful representation; (7) Appellant's rights to be present at all material stages of his trial was violated by the court, prosecutor, and defense counsel."

(Id., See, Pro-se supplemental direct appeal brief)

133. The People who had took a position in their CPL § 440.10 opposition that most of petitioner's claims were record-based and procedurally barred from review by the motion court. In their responsive supplemental direct brief, took an inconsistent position and argued that the appellate court could not review petitioner's claim that the trial court's evidentiary rulings infringed upon his constitutional rights to confront witnesses

and present evidence because Ms. Gaston's exculpatory statements dehors the record (See, People's supplemental direct appeal brief @ pg. 32). Further, the People who had waived all oppositions in the motion court that their wilful destruction of material evidence violated petitioner's constitutional rights to due process, contended in the appellate court that the petitioner had not established bad faith, nor established good cause for substitution of trial counsel. (See, generally People's supplemental direct appeal brief).

134. In a decision and order dated March 15, 2017, affirming petitioner's conviction, the Second Department, Appellate Division of the New York State Supreme Court, 45 Monroe Place, Brooklyn, New York 11201, held that the defendant's main arguments are unpreserved and without merit. The Court also ruled that the record as a whole demonstrated that the defendant received effective assistance of counsel under both federal and state constitution standards. (See, **People v. Chin**, 148 AD3d 925 (2d Dept. 2017).

135. While the appellate court's professed, without explanation, that the defendant received effective assistance as a whole, it did not explain how trial counsel's failure to object to the inadmissible and prejudicial bloodhound's tracking evidence, lacking evidentiary foundation that added substantial weight to the People's case and contributed to the verdict, could have been reasonable; nor did the court explain how counsel's failure to object to Doctor Styles' inadmissible and prejudicial testimony and photographs regarding gunpowder residue on the

on the clothing that lacked evidentiary foundation, adding substantial weight to the People's case, and contributing to the verdict, could have been reasonable. The result of a criminal proceeding can be rendered unreliable, and hence, the proceeding itself unfair, even if the errors of counsel cannot be shown by the preponderance of the evidence to have determined the outcome. **Purdy v. Zeldes,** 373 F3d 253, 260 (2d Cir. 2003)(quoting **Strickland,** 466 US @ 694).

136. The petitioner's application for leave to appeal to the New York Court of appeals, 20 Eagle Street, Albany, New York 12227, was denied on August 1, 2017. See, **People v. Chin,** 29 NY3d 1124 (2017). The petitioner's application for reconsideration to the Court of Appeals was denied on October 30, 2017. See, **People v. Chin,** 30 NY3d 978 (2017).

## Petitioner's CPL § 440.10 Appeal

137. On September 16, 2015, appellate counsel, Anna Pervukhin filed the petitioner's 440 appeal brief (APP. DIV. # 2013-04432) without obtaining and reviewing the September 9, 2009, pretrial transcripts. To protect her own self-interest and despite trial counsel's cumulative errors and omissions. She advanced a frivolous contentions that trial counsel was ineffective for not conducting an adequate investigation to locate two eyewitnesses who had given potentially exculpatory statements and failed to entered the police reports of their statements into evidence.

-51-

138. The People decisively countered appellate counsel's only argument that trial counsel was not ineffective by emphatically pointing to the pretrial record of September 9, 2009, where trial counsel had proffered to the court that the eyewitnesses could not be located because they had moved to locations unknown. (See, generally, People's 440 brief brief dated January 29, 2016).

## Petitioner's Supplemental 440 Appeal Brief

139. Due to appellate counsel's conflict of interest to undermined petitioner's 440 appeal, petitioner sought and was granted permission from the appellate court to serve and file a supplemental 440 appeal brief on the context that trial counsel's cumulative errors and omissions constituted a single ground upon which relief should be granted and not to be review separately.

140. On July 26, 2016, petitioner submitted his supplemental 440 appeal brief which set forth four substantial arguments contending that; (1) The lower cour erred when it summarily denied petitioner's mixed-claim post-conviction CPL § 440.10 motion which alleged that the trial court deprived him of due process and a fair when it precluded him from confronting witnesses and presenting evidence in his own defense; (2) The lower court's abused its discretion when it denied petitioner's mixed-claim CPL § 440.10 motion without a hearing where trial counsel's cumulative errors were so significant that viewed in its totality, the representation was not meaningful; (3) The lower court's abused its discretion when it denied petitioner's post-conviction 440.10 motion without a hearing which alleged

that the People's knowingly used false material evidence to obtained the judgment; and (4) The People knowingly perpetrated a fraud upon the court in violation of the petitioner's rights to due process and a fair trial. (See, Petitioner's supplemental 440 appeal brief, exhibit B, annexed herewith).

141. The People in their opposition, reiterated that both Ms. Cobbs' and Ms. Gaston's exculpatory statements were inadmissible hearsay which was properly excluded by the trial court. The People avoided any acknowledgment that all state and federal courts has established that an unavailable witness's exculpatory statements offered not for the truth of the matter, but to show that the statements were made, is not hearsay. See, **George v. Celotex Corp.**, 914 F2d 26, 30 (2d Cir. 1990)("If the significance of an offered statements lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, the statement is not hearsay."); **People v. Gibian**, 76 AD3d 583 585 (2d Dept. 2010)("Evidence of a statement offered not to prove the truth of its contents but to prove that the statements were made, is not hearsay.") Id.

142. Furthermore, the People's conceded two arguments relative to ineffective assistance of trial counsel by failing to refuted them in the motion court and/or the appellate court. (See, Petitioner's supplemental 440 appeal brief @ pages 27-33). Notwithstanding that the People had waived their rights in the motion court by failing to disputed petitioner's contentions that their knowingly used false testimony and false material evidence to obtained the judgment, they tried to raised a waived issue in

-53-

the appellate court. (See, People's supplemental 440 appeal brief in its entirety).

143. Despite the 440 motion court's refusal to analyzed trial counsel';s cumulative errors and omissions in its totality under the unreasonable concept that petitioner's mixed-claim motion was procedurally barred under CPL § 440.10(2)(b), disregarding stare decisis. See, **Contant v. Sabol**, 987 F.Supp.2d 323, 351-52 (S.D.N.Y. 2013)("If the 'state procedural rule is employed infrequently, unexpectedly, or freakishly ..., it is not an ... adequate state ground."); **People v. Evans**, 16 NY3d 571, 575 n. 2 (2011); **People v. Maxwell**, 89 AD3d 1108, 1109-10 (2d Dept. 2011)(original citations and quotations omitted)||

144 In a decision and order dated March 15, 2017, the Appellate Division ruled that; "The court could determined from the parties' submission that the defendant was not denied effective assistance of counsel, ... and the arguments raised by the defendant in his pro se supplemental brief are without merit." See, **People v. Chin**, 148 AD3d 926 (2d Dept. 2017).

145. Petitioner's application for leave to appeal to the New York Court of Appeals was denied on August 1, 2017. See, **People v. Chin**, 29 NY3d 1124 (2017). Petitioner's application for reconsideration was denied by the Court of Appeals on October 30, 2017. (See, **People v. Chin**, 30 NY3d 978 (2017). The grounds raised in petitioner's leave application were the same as those specified in paragraph one hundred and forty.

**Petitioner's First Coram Nobis Application**

146. By application for a writ of error coram nobis dated December 4, 2017, Petitioner moved the Second Department, Appellate Division of the New York State Supreme Court, for an order reversing the judgment and/or a new appeal, based on ineffective assistance on direct appeal provided by appellate counsel, Anna Pervukhin, Esq. **(App. Div. No. 2009-10764).**

147. Petitioner's combined writ application and addendum set forth ten meritorious grounds that appellate counsel's omitted from her direct appeal brief while pursuing issues that were clearly and significantly weaker‖ (**Mayo v. Henderson**, 13 F3d 528, 533 [2d Cir. 1994]). Particularity, appellate counsel's incompetence was exhibited by her egregious failure to investigate and settle the entire record on appeal before filing her brief. A mode of proceedings error which directly affected the organization of the court to provided a record of completeness. (See, Petitioner's combined coram nobis application and addendum in support).

148. In a decision and order dated July 25, 2018, the Appellate Division denied the petitioner's coram nobis application, ruling that appellate counsel provided effective assistance‖ (See, **People v. Chin**, 163 AD3d 986 (2d Dept‖ 2018).

149. The Appellate Division's rulings on petitioner's direct appeal, 440 appeal, and coram nobis application, were contrary to, or involves an unreasonable application of clearly established federal law, as was determined by the United States Supreme Court, or resulted in a decision that was based on an

unreasonable determination of facts in light of the evidence
presented in the state court proceedings.

150. On August 15, 2018, Petitioner sought a Certificate
of appealability from the New York State Court of Appeals. On
November 14, 2018, the Court of Appeals denied leave to appeal.
See, **People v. Chin**, 32 NY3d 1110 (2018).

## Petitioner's Second Coram Nobis Application

151. On July 30, 2018, Petitioner submitted a second
application for a Writ of Error Coram Nobis predicated on
appellate counsel's conflict of interest representation on the
petitioner's **C.P.L. § 440** appeal (**App. Div. Dkt. # 2013-04432**).

152. Petitioner's coram nobis application contended that
appellate counsel's deliberately undermined appellant's cause on
the 440 appeal to protected her own self-interest from any
possible liability for failing to investigate and settle the
entire record on appeal. Petitioner's presented unrefuted
evidence that appellate counsel's file a frivolous claim without
investigating the September 9, 2009, pretrial transcripts which
embodied the very substance underlying her only argument on
appeal. The factual contentions are more fully set forth in
petitioner's second coram nobis application @ pages 1-63;
addendum in support @ pages 1-6.

153. The Appellate Division, Second Judicial Department,
denied Petitioner's second coram nobis relief on February 20,
2019. See, **People v. Chin**, 169 Ad3d 916 (2d Dept. 2019).

154. By application dated March 14, 2019, Petitioner
sought a Certificate of appealability from the New York State
Court of Appeals. (See, Exhibit D, annexed herewith).

-56-

## GROUNDS FOR RELIEF

**Grounds One:**  **Due process and fair trial violation.** USCA V, VI, XIV; **Illinois v. Fisher,** 540 US 544 (2004); **Arizona v. Youngbleed,** 488 US 51 (1988); **California v. Trombetta,** 467 US 479 (1984); **United States v. Agurs,** 427 US 97 (1976); **Brady v. Maryland,** 373 US 83, 87 (1963); **People v. Handy,** 20 NY3d 663 (2013); **People v. Torres,** 190 AD2d 52, 54 (3d Dept. 1993); C.P.L. §§ 240.20(1)(d), (g) & (h), 240.70.

**Supporting Facts:** To deprived the petitioner of due process and a fundamental fair trial, Police Telecommunication Technician, Officer Jackson, (with a culpable state of mind), wilfully destroyed all the original 911 master tape recordings within forty-eight hours of the alleged crime because of the exculpatory nature of Ms. White's statement to 911 operator 2249 that; "a man shot female two times in the head and fled in a black Lexus."

Assistant District Attorney, Ms. Paisner, asserted that she had a 911 recording of Ms. Cobbs' exculpatory statements that two individuals fled the crime scene in a black vehicle (See, trial tr. @ 273-75). The audio tape recordings manufactured by Officer Jackson, shows Ms. Cobbs' stated to 911 operator 1526;

Operator 1526: "What is your emergency and borough?"

Ms. Cobbs: "Brooklyn, I think someone just got shot across The street."

Operator 1526: "OK, what's the address?

Ms. Cobbs: "It's Linden Boulevard between Bedford and Rogers"

Operator 1526: "Linden Boulevard?"

Ms. Cobbs: "It's either 98 or 95, it's the big building across the street, they're still in the car and they're out there screaming, Oh my God."

Operator 1526: "OK, Bedford and Rogers?"

Ms. Cobbs: "Yes. Oh, please tell them to send somebody, hurry. Oh my God. I don't believe it."

Operator 1526: "We got a call already!"

Ms. Cobbs: "Oh, you did? Good, good."

Operator 1526: "It's that on Linden and shots were fired?"

Ms. Cobbs: "Yes. But they're still in the car."

Operator 1526: "Right. We sent someone already. Hold on?"

Ms. Cobbs: "Oh my God. The cops are there. They are there."

Operator 1526: "Would you like to leave your name?"

Ms. Cobbs: "No." ..., "I just hope they're alright. Oh my God. Ok, good night, I am sorry."

                                                       ***

(Id., People's exhibit 8 [See, transription --- Exhibit C-20])

From the onset of his investigation, Detective Henn started to suppress and destroy material evidence. On the night of June 12, 2001, Detective Henn's retrieved the victim's jewelry from the attending physician at Kings County Hospital. Instead of securing the jewelry as trial evidence, Henn's cleansed the victim's jewelry of all biological DNA, and returned them to the victim's mother (248). Detective Henn wilfully destroyed the dry cleaners' receipts and the victim's cell-phone because of their exculpatory values. With a culpable state of mind, Detective Henn's wrote an undated letter to the Property Clerk's Office, directing them to destroy the vehicles and all contents (55-63).

---

    *** Ms. Cobbs made a single 911 emergency call but the prosecutor purportedly had two different and distinctive recordings of Ms. Coobs' 911 call. This reinforced the petitioner's contentions that Officer Jackson's wilfully destroyed the original 911 master tape recordings and manufactured a secondary audio tape recording to enabled the prosecutor's fraud upon the court with the knowing used of false material evidence. This Court is vested with the discretion to conduct an evidentiary hearing to allow the petitioner an opportunity to establish the factual basis of his contentions.

Petitioner submitted two pro-se motions to the pretrial motion court seeking an evidentiary hearing for the People's Brady violations predicated upon their wilful and pervasive destruction of material evidence. The People did not oppose the petitioner's motions and waived their rights. Notwithstanding, the motion court (D"Emic, J.), summarily denied the petitioner's motions without a hearing. The full text of Petitioner's arguments are more fully set forth in the petitioner's supplemental direct appeal brief @ pages 24-32; and first coram nobis application @ pages 74-80.

Ground Two:   The court deprived the petitioner of his constitutional rights to conflict-free representation. U.S.C.A. VI, XIV; N.Y. Const., Art. 1, § 6; Micken v. Taylor, 535 US 162 (2001); Wheat v. United States, 486 US 153 (1988); Cuyler. Sullivan, 446 US 335 (1980); United States v. Armienti, 234 F3d 820, 824 (2d Cir. 2000); People v. Sides, 75 NY2d 822 (1990).

Supporting Facts: By application dated May 21, 2009, the petitioner request substitution of trial counsel predicated irreconcilable conflict in the representation. On August 21, 2009, the petitioner submitted a motion to the court requesting substitution of trial counsel. Petitioner's combined applications contended;

"...there is a lack of communication between trial counsel and myself, ..., phone calls and letters sent to counsel's office were never responded to, ..., even appointments made to discuss the investigation and developments of the case were never fulfilled.

(Id., Exhibit C-14).

"..., counsel has failed to pursue suppression of evidence, ..., he has misled me about visiting me in an environment where its convenient for us to discuss important issues..., he has denied me access to copies of legal documents and audio tapes disclosed by the people so I cannot intelligently assess the People's allegations ..., he has not discuss what his defense strategy would be...,"

(Id., Exhibit C-17).

-59-

Even under the liberal standards of America Bar Association, (Criminal Justice Standard 4.3[a] & [b]); and the applicable law of Strickland v. Washington, 466 US 668, 688 (1984);

> "From counsel's function as assistance to the defendant derives the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and keep the defendant informed of important developments in the course of the prosecution." Id.

Petitioner's complaints established substantial good cause for substitution of trial counse. The People's did not oppose the motions and the motion court's summary denial of petitioner's motions without a hearing was an abused of discretion and an error of law.

On August 26, 2009, twenty days prior to trial, counsel visited petitioner for the first and only time on Rikers Island to discuss the developments of the case. (See, Exhibit C-18). In Hurrell-Harring, the Court of appeals characterized a claim that counsel was routinely unavailable to clients as a complete denial of counsel --- where prejudice is presumed --- and not simply a claim of ineffectiveness. See, Hurrell-Harring v. State, 15 NY3d 8, 19 (2010)(Finding plaintiffs alleged facts sufficient to state a civil claim for denial of right to counsel where lawyers met with clients "little, if at all, were often completely unresponsive to their urgent inquires and requests from jail sometimes for months on end, waived important rights without consulting them ...").

Ground Three: The court violated Petitioner's Sixth Amendment secured autonomy to make his own choices about the proper way to protect his liberty, by allowing trial counsel to usurped control of an issue that was within the petitioner exclusive prerogative.

U.S.C.A. VI; XIV; **McCoy v. Louisiana**, 138 S.Ct. 1500 (2018); **Weaver v. Massachusetts**, 137 S.Ct. 1899 (2017); **Farretta v. California**, 422 US 806 (1975); **People v. DeGina**, 72 NY2d 768, 776 (1988); **People v. Clark**, 129 AD3d 1, 11-13 (2d Dept. 2015).

**Supporting Facts:** The motion court abused of discretion to substituted trial counsel was not cured and only exacerbated on September 9, 2009, when an actual conflict in the representation became even more apparent on the record. There, Petitioner made it known to the court that trial counsel had defied the petitioner's instruction to file a notice to advance an affirmative alibi defense. (See, Exhibit C-19). When the court rejected the petitioner's contentions and allowed counsel to usurped control of an issue within the petitioner sole prerogative. The violation of the petitioner's constitutional rights to decide the objectives of his own defense was completed. See, **Weaver v. Massachusetts**, 137 S.Ct. @ 1908 ("the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty."). In **McCoy v. Louisiana**, 138 S.Ct. 1500, 1508 (2018), the Supreme Court affirmed the defendant's autonomy to determine the "objectives" of a defense, a right the Supreme Court recognized in **Farretta**, 422 US @ 806; **Illinois v. Allen**, 397 US 337, 350-51 (1970)(Brennan, J., concurring).

Furthermore, trial counsel also took an adverse position against the petitioner, challenging him to make allegations of the private investigators' incompetence more specific in order to defend the unrepresented investigators (See, Exhibit C-19, @ pages 4-5)

**Ground Four**: Due process and fair trial violation. The trial court's deprived Petitioner's of his Constitutional rights to confront witnesses and present evidence in his defense. U.S.C.A. V, VI, XIV; Holmes v. South Carolina, 547 US 319 (2006); Chambers v. Mississippi, 410 US 284 (1973).

**Supporting Facts**: To supported a trial strategy that the police investigation was inadequate because they had ignored other potential suspect(s). Trial counsel sought to introduced Ms. Cobbs' and Ms. Gaston's exculpatory statements. Both witnesses were unavailable for trial and counsel tried to elicited their statements from the case detectives. The prosecutor's objected that Ms. Cobbs' and Ms. Gaston's exculpatory statements constituted inadmissible hearsay. Counsel interposed that Ms. Cobbs' statements were not offered for the truth of the matter asserted, but was made during the police investigation. (Cf. **People v. Gibian**, 76 AD3d @ 585). However, the court's curtailed cross-examination of Detective Henn's testimony regarding the substance of Ms. Cobbs' exculpatory statements and precluded Ms. Gaston's exculpatory statements from admission on the grounds of inadmissible hearsay. (Cf. **Alvarez v. Ercole**, 763 F3d @ 230-33).

The court's unreasonable evidentiary rulings deprived petitioner of due process and a fundamental fair trial in two ways. First, it deprived petitioner from confronting witnesses and presenting evidence in his own defense. Second, it deprived petitioner from recalling the People's witnesses to impeach them with their prior inconsistent statements. See, Petitioner supplemental 440 appeal brief @ 16-22; 44-49;

**Ground Five**: Due process and fair trial violation. The Petitioner's Sixth Amendment right to confrontation with Police

Telecommunication Technician, Officer Jackson was violated. U.S.C.A. V, VI, XIV; Bullcoming v. New Mexico, 564 US 647 (2011); Melendez-Diaz v. Massachusetts, 557 US 305 (2009); Crawford v. Washington, 541 US 36 (2004); People v. John, 27 NY3d 296 (2016); People v. Brown, 13 NY3d 332, 338 (2009).

Supporting Facts: On June 14, 2001, Police Telecommunication Technician, Officer Jackson created a secondary audio tape recording. To strengthened the People's case against the petitioner, she edited the secondary evidence with her testimonial opinion statements and made substantial changes to components of the original 911 master tape recordings with did not corresponded with either the "NYPD" sprint reports or the "FDNY" Computerized Aid Dispatch reports. In adding her testimonial opinion statements to the secondary evidence, Officer Jackson's altered the materiality of the secondary evidence, thus, destroying its probative value.

Notwithstanding that Petitioner's Omnibus motion demanded the disclosure of all recordings the prosecutor intended to introduce at trial. To deprived the petitioner of constitutional due process to conduct essential pretrial investigation, the prosecutor's withheld disclosure of the edited secondary audio tape recording until jury selection on September 14, 2009. There, the prosecutor requested that the petitioner waive his constitutional rights to confront Officer Jackson, which was rejected (See, Voir Dire @ 4, 6-7), and trial counsel's objected to the admission of the secondary evidence on confrontation grounds was overruled by the court.

The edited secondary evidence was played three times to the jury with Officer Jackson's testimonial opinion statements

-63-

entering the jury's calculus without her in court appearance. Since the prosecutor exhibited her desire to avoid calling Officer Jackson as a witness, it was evidenced that the prosecutor intentionally engaged in conduct to impaired the deliberative process of the tier of finders and pervaded the integrity of the adversary in producing an unjust result in contravene of **Bullcoming**, **Melendez-Diaz**, **Crawford**.

**Ground Six**: **Due process and fair trial violation. The People's perpetrated a fraud upon the court with the knowing uses of false material evidence. U.S.C.A. V, VI, XIV; United States v. Agurs, 427 US 97 (1976); Giglio v. United States, 405 US 150 (1972); Hazel-Atlas v. Hartford-Empire Co., 322 US 238 (1944); Napue v. Illinois, 360 US 264 (1959); Mooney v. Holohan, 294 US 103 (1935); Drake v. Portuondo, 553 F.3d 230 (2d Cir. 2009).**

**Supporting Facts**: On June 12, 2001, Ms. Aisha White informed 911 operator 2249; **"A black male shot a female two times in the head and fled in a black Lexus."** (See, certified "FDNY" CAD reports annexed as Exhibit C-1). The exculpatory nature of Ms. White's statements caused the prosecution to destroyed all original 911 master recordings within forty-eight hours of the alleged crime. To perpetrated fraud upon the court, a secondary audio tape recording was created by Officer Jackson, who altered the materiality of Ms. White original statements.

The issue was properly presented to the motion court in Petitioner's **C.P.L. § 440.10** mixed-claim motion, supported by of-the-record, undisputed "CAD" reports. The People's failed to refuted the petitioner's allegations with any affidavit or evidence to the contrary, thus, waiving their right. The People are deemed to have impliedly conceded the truthfulness of a defendant's factual allegations by failing to dispute them. (See,

-64-

**People v. Wright**, 86 NY2d 591, 595-96 [1995]). To the extent the
People conceded these facts, the court, under **CPL § 440.30(3)**,
should have granted the petitioner a new trial without holding a
hearing, since the facts "constitute a legal basis for the
motion" --- namely, the violation of petitioner's constitutional
rights to due process and a fair trial. However, the court
summarily denied petitioner's motion pursuant to **CPL §
440.10(2)(b)**.

When specific allegations before this Court shows
reasons to believe that the petitioner may, if facts are fully
developed, be able to demonstrate that he is ‖.., entitled to
relief, it is the duty of the Court to provide the necessary
facilities and procedures for adequate inquiry. See, **Bracy v.
Gramley**, 520 US 899, 908-09 (1997)(internal quotations marks
omitted).

Since the People procedurally waived their right to to
dispute the factual allegations in the state motion court.
Petitioner respectfully request an evidentiary hearing in this
Court to prove the substance of his factual allegations that the
People perpetrated a fraud upon the court with the knowing uses
of false material evidence and that trial counsel rendered
constitutional ineffective assistance by failing to investigate
the People's edited secondary audio tape recording. the factual
allegations that the People's knowingly presented false evidence
and false testimony are fully set forth in Petitioner's
supplemental 440 appeal brief @ 55-61; Petitioner's second coram
nobis application @ pages 55-63.

**Ground Seven:** Due process and fair trial violation. Petitioner constitutional rights to be present at all material stages of his trial was violated. U.S.C.A. V, VI, XIV; <u>Synder v. Massachusetts</u>, 291 US 97 (1934); <u>People v. Rivera</u>, 23 NY3d 827 (2014); <u>People v. Velasco</u>, 77 NY2d 469 (1991).

<u>Supporting Facts:</u>   To deprived the petitioner of his constitutional rights to be present at all material stages of his trial and his constitutional rights to confront Medical Examiner, Doctor Joseph Veress. The trial judge, prosecutor and trial counsel, convened outside the courtroom and petitioner's presence to discussed what aspects of Dr. Veress' testimonial opinion statements would be redacted from the Death Certificate in order to relieved the People of their burden of proving an essential material element of the charged crime. Specifically, that Renee Aarons' death was caused by a firearm. The petitioner was excluded from participating in the redaction and the crucial aspects of Dr. Veress' testimonial opinion statements were left unredacted.

The prosecutor offered no evidentiary foundation for the admission of the Death Certificate as a business record. Faced with that type of hearsay evidence, petitioner had no means of challenging the People's proof on a critical element without the opportunity to cross-examine Dr. Veress or a foundation witness. In short, the lack of live witnesses to confront, eliminated petitioner's opportunity to contest a decisive piece of evidence against him. This is exactly the evil the Confrontation Clause was designed to prevent. <u>See</u>, <u>Bullcoming v. New Mexico</u>, <u>Melendez-Diaz v. Massachusetts</u>, and <u>Crawford v. Washington</u>, <u>supra.</u>

**Ground Eight:** Due process and fair trial violation. Trial counsel's rendered constitutional ineffective assistance which deprived the petitioner of a fundamental fair trial. U.S.C.A. V, VI, XIV: Hinton v. Alabama, 571 US 263 (2014); Rompilla v. Beard, 545 US 374 (2005); Wiggins v. Smith, 539 US 510 (2003); Strickland v. Washington, 466 US 668 (1984); Rivas v. Fischer, 780 F3d 529 (2d Cir. 2015); People v. Baldi, 54 NY2d 137 (1981).

Supporting Facts: (A) The People's contended that the gold Lexus vehicle belonged to the petitioner and obtained a facially defective search warrant to search the vehicle. At trial, it became apparent that officers unlawfully broke into the vehicle without first obtaining a warrant (173). Trial counsel's inexcusably failed to file a motion to challenge the unlawful search and seizure. See, e.g., Kimmelman v. Morrison, 477 US 365, 384-85 (1986).

(B) The factual allegations that formed the basis of trial counsel's cumulative trial errors and omissions, are more fully set forth in the petitioner's supplemental direct appeal brief @ pages 24-31, 61-72; petitioner's supplemental 440 appeal brief @ pages 23-52; (annexed herewith) and petitioner's first coram nobis application @ pages 53-84.

**Ground Nine:** Due process and fair trial violation. The prosecutor's cumulative misconducts deprived the petitioner of his constitutional rights to due process and a fundamental fair trial. U.S.C.A. V, VI, XIV; Donnelly v. DeChristoforo, 416 US 637 (1974); Berger v. United States, 295 US 78 (1935); United States v. Elias, 285 F3d 183 (2d Cir. 2002); People v. Redd, 141 A.D.3d 546 (2d Dept. 2016).

Supporting Facts: (A) Petitioner's Omnibus motion demanded a hearing to precluded all identification evidence. The prosecutor's contended that all identification were confirmatory because the defendant and the witnesses are known to each other. The motion court's summarily denied petitioner a hearing upon the

prosecutor's contentions. Having waived their rights to presented any other identification evidence but confirmatory at trial. The prosecutor without disclosure or evidentiary foundation, ambushed the petitioner at trial with her improper and unduly prejudicial opening statements that a bloodhound's identified the petitioner's scent and followed it from the Lexus vehicle to a nearby bus-stop. To established the truth of her improper bad faith statements and prejudiced petitioner's constitutional rights to due process and a fundamental fair trial, she improperly elicited opinion statements regarding the bloodhound's reaction from Detectives Henn and Calabrese whom were not the bloodhound's handler and had no proficiency in the bloodhound's reliability to distinguish the human's scent. Thus, depriving the petitioner of his state and federal constitutional rights to confront the bloodhound's handler.

(B) In order to conduct essential investigation in preparation for trial, petitioner's Omnibus motion requested disclosure of all scientific testing or analysis reports in the People's possession. The prosecutor's averred that a copy of the Death Certificate, emergency room medical records and autopsy have been provided to the defendant, there are no other scientific reports in the possession of the People at this time .., the People reserve the right to have report prepared, upon receipt of these reports, copies will be provided to the defendant. Id, (See Exhibit C-9).

Assistant District Attorney, Ms. Sedeno requested that Medial Examiner, Doctor Melissa Pasquale-Styles examine clothing

contained in an evidence bag. On October 10, 2008, Dr. Styles concluded her examination and analysis of the clothing. However, to prejudiced petitioner's constitutional rights to due process and a fair trial, the prosecutor's withheld full disclosure of Dr. Styles' analytic reports and photographs until the middle of petitioner's trial ("VD" 89).

Dr. Styles' analysis and photographs was introduced into evidence by the prosecutor without any evidentiary foundation. In her summation, ADA Cedeno's infested and prejudiced the entire trial with unfairness by improperly vouching and bolstering her witnesses' credibility:

> "The medical examiner told you she found stippling (gunpowder residue), and that stippling means a gun was shot at close range. It make sense that she would found stippling on the left side of Renee's shirt, because that would have been the closest part of Renee's body to the defendant as he stood outside of the car and shot her."

(Id., trial tr. @ 410).

The emphasis ADA Sedeno placed on the inadmissible evidence lacking evidentiary foundation, demonstrated its substantial injurious character. See, e.g., **Satterwhite v. Texas**, 486 US 249, 260 (1988); **Wood v. Ercole**, 644 F3d 83, 96-97 (2d Cir. 2005).

C.    Despite the prosecutor's averments that she had disclosed the medical records of the deceased, the prosecutor had withheld the most pertinent parts of the deceased's medical records until she had rested her case. Then, the prosecutor disclosed the withheld medical records and sought its admission into evidence pursuant to the business records exception (See, trial tr. @ pages 337-338).

-69-

The prosecutor's egregious misconducts of withholding material evidence was pervasive and specifically designed to impeded the petitioner's preparation for trial and deprived him of due process and a fair trial.

**D** Similarly, the petitioner's Omnibus motion demanded all recorded statements the people intended to offer at trial. The People's averred that all the original 911 call were erased, and reserved the right to find other recordings and use them at trial. Although the People had in their possession or control an edited secondary audio tape recording created by Police Telecommunication Technician, Officer Jackson, on June 14, 2001. The prosecutor's withheld the secondary evidence until jury selection to prevented the petitioner from conducting pretrial investigation of their edited secondary evidence.

**E.** In defiance of the petitioner's supplemental discovery request for all paperwork relative to the removal, transport, storage and disposal of the vehicles. The prosecutor's withheld Detective Henn's undated letter to the Property Clerk Department to destroyed the vehicles. In her proffer to the court during trial, ADA Paisner's stated:

> "..., Included in Sergeant Lai's files was a letter from Detective Henn to release the cars. I will get counsel a copy of that. I am willing to stipulate that I instructed Detective Henn it was okay to release those cars, and I did so at a time when the defendant was nowhere in custody."

(**Id. See**, trial tr. @ 66-67).

Despite the petitioner's pretrial motion for a **Trombetta/Youngblood** hearing which the court's summarily denied. The prosecutor's acknowledged her complicity with the wilful

-70-

destruction of the vehicles only after she had called Detective Fanking Lai to knowing elicited false testimony that the vehicles were destroyed inadvertently. Detective Lai was forced to admitted on cross-examination that he was not working at the Property Clerk Department when the vehicles were ordered destroyed. (See, Lai's testimony, trial tr. @ 55-63). The inescapable is that ADA Paisner and Detective Henn could have easily order the Property Clerk to preserved the vehicles as trial evidence. **Brady v. Maryland**, supra, did not appoint the police and the District Attorney as the final arbiters of whether or not the destroyed evidence was exculpatory. Because of the wilful destruction or failure to preserve the vehicles, it must be presumed so. Notably, the prosecutor only disclosed Detective Henn's undated letter after Detective Lai had testified.

F.     Ms. Chinwe Ifeoma's pretrial statements were withheld from disclosure indefinitely by the prosecutor. At the conclusion of jury selection, the court's inquiry whether trial counsel intended to interpose a third-party-culpability defense. Counsel's responded that the prosecutor had not disclosed a stitch of paperwork related to Ms. Ifeoma's pretrial statements. (See, "VD" @ 505).

G.     No weapon was recovered in the case and the only ballistics evidence recovered, were three nine millimeter bullets and three shell casings. Rashawn Aarons was eleven year-old when the alleged crime occurred and had no experience with firearms or ammunitions. The only individuals who knew the caliber of firearm used in the crime ware the prosecution. That information was

-71-

given to Rashawn to bolstered his credibility. Disingenuously, ADA Paisner elicited from Rashawn the caliber of firearm used in the alleged crime. (See, trial tr. @ 83).

H.    The prosecutor's improperly introduced evidence on redirect examination. The only cell phone trial counsel questioned Detective Henn about was the deceased's cell phone which Henn's had suppressed on June 15, 2001 (261-266). Yet, the prosecutor went beyond the scope of defense cross-examination and questioned Henn about a cell phone that petitioner's girlfriend, Doreen Hart had given to the petitioner. The court's chose to characterized it as mis-stating the evidence (282-85). Of course, it was clear that the prosecutor was not merely misstating the evidence, since the prosecutor had refreshed Henn's memory with a document that was not disclosed to the defense, or admitted into evidence, DD5 # 40. (283). The same goes for the prosecutor's interjection of Michael Downer's name whom home address the vehicles were registered. (280).

I.    The prosecutor exceeded the bounds of legitimate advocacy by resorting name calling such as characterizing the petitioner as evil (17) and true killer (408). This was improper under applicable case law. See, **Malicoat v. Mullin**, 462 F3d 1241, 1256 (10th. Cir. 2005); **People v. Smith**, 25 AD3d 575 (2d Dept. 2006).

Equally, the prosecutor became an unsworn witness and vouched for Rashawn and Ms. White's credibility by inferring that Ms. Cobbs did not observed a black vehicle with two individuals fleeing the crime scene (405), and also vouched for the credibility of Officer Calvo (406). The fact that there were no

-72-

biological DNA or fingerprints linking the petitioner to the alleged crime or the gold Lexus vehicle, the prosecutor's justified the lack of physical evidence by telling the jurors;

> "Defense also talk to you about fingerprints and scientific testing. Fingerprints in a case like this proves nothing to you. Those are people who knew each other, who had a relationship that spanned throughout the years. We know it was his car, everyone told you it was his car. Finding fingerprints on a car that we already know belong to the defendant offers you nothing, you learn nothing from it. You learn everything from the witnesses ..."

(Id., trial tr. @ 406-07).

Despite Rashawn's testimony that Michael Marriott is his biological father (98), the prosecutor's vouched that the petitioner is the only father Rashawn ever knew (407). The prosecutor also vouched that the dry cleaners's receipts (which Detective Henn's unlawfully obtained and suppressed), had the name of Michael Gillings, a friend of the defendant (409).

Ground Ten: Due process and fair trial violation. Sentencing counsel, Jay Cohen, labored under a actual conflict-of-interest which deprived petitioner of his Sixth Amendment right to effective assistance. U.S.C.A. V, VI, XIV; Gardner v. Florida, 430 US 349, 358 (1977); Mickens v. Taylor, 535 US 162 (2002); Cuyler v. Sullivan, 446 US 335 (1980); Lopez v. Scully, 58 F3d 38 (2d Cir. 1995); United States v, Levy, 25 F3d 146 (2d Cir. 1994).

Supporting Facts: Sentencing counsel, Jay Cohen, requested an adjournment to file a C.P.L. § 330.30 motion to vacate the verdict but thereafter, informed the petitioner that trial counsel, Phillip Smallman, was a good attorney and his friend and refused to participated in the petitioner's defensive efforts. Because of Attorney Cohen's fidelity to trial counsel, petitioner was compelled to make his own inartful motion which the trial court's summarily denied without a hearing.

The alternative defense strategy that Attorney Cohen could

have presented to the court if not for his conflict-of-interest, are fully set forth in petitioner's supplemental direct appeal brief @ pages 10-76; Supplemental 440 brief @ pgs. 16-61; First coram nobis application @ pgs. 21-87; grounds one through nine incorporated in this verified petition. The limited exception enumerated in **Martinez v. Ryan**, 566 US 1 (2013), is invoked.

**Ground Eleven: Appellate counsel, Anna Pervukhin, rendered constitutional ineffective assistance on direct appeal. U.S.C.A. VI, XIV; Davila v. Davis, 137 S.Ct. 2058, 2067-68 (2018); Smith v. Robbins, 528 US 259 (2000); Ramchair v. Conway, 601 F3d 66 (2d Cir. 2010); Mayo v. Henderson, 13 F3d 533 (2d Cir. 1994).**

**Supporting Facts:** Appellate counsel filed the petitioner's direct appeal brief on October 3, 2012, without investigating and settling the entire record on appeal. A procedural and structural defect which lies with the correctness of the adjudicative process. See, **Draper v. Washington**, 372 US 487, 495 (1963)("A state is required to provide a 'record of sufficient completeness' to permit adequate and effective appellate review after a defendant is convicted of a crime"); **People v. Harrison**, 85 NY2d 794, 796 (1994); **C.P.L.R. §§ 5525 & 5526.** Contrary to the appellate Division's ruling (163 AD3d 986), is the facts and law found in **Hinton v. Alabama**, 571 US 263 (2014), where it was held that "an attorney's ignorance of the point of law that is fundamental to the case, combined with his failure to preform basic investigation and research of that point, is a quintessential example of unreasonable performance' under **Strickland v. Washington**, 466 US @ 690-91; see also, **People v. Oliveras**, 21 NY3d 339, 346-48 (2013); **USCA, Const., 6th. Amend.**

Because the right to amend the record is not a mere

-74-

frivolous issue. It is a fundamental constitutional right, of which, the failure to amend or settle the record on appeal would amount to "appellate counsel's representation falling below an objective standard of reasonableness." See, e.g, **Ramchair v. Conway**, 601 F3d 66 (2d Cir|| 2010)(counsel's performance must be measured against an objective standard of reasonableness under the prevail norms).

Furthermore, the state court's failure to adhered to its own procedural rules (CPLR §§ 5525-5526; **Harrison**, 85 NY2d @ 796), which affected the organization of the court as a mode of proceedings error, created an irreconcilable conflict in counsel-client relationship. On June 10, 2013, petitioner moved the Appellate Division to enlarge the judgment roll, to included the pretrial transcripts of September 9, 2009. Thus, exposing counsel's deficiency in failing to investigate and settle the record on appeal before she filed the direct appeal brief.

On account of appellate counsel's egregious procedural and structural error of settlement of the record, certain issues were never investigated and presented by counsel on direct appeal. Most significant, that the motion court's violated the petitioner's Sixth Amendment secured autonomy and freedom of choice to decided the objective of his own defense by allowing trial counsel to usurped control of a decision that was within the petitioner's exclusive prerogative. (**McCoy v, Louisiana**, 138 S.Ct. 1500). Instead, appellate counsel's raised two unpreserved and frivolous issues over issues that were preserved, obviously meritorious, and patently stronger.

-75-

In a letter to petitioner dated January 13, 2017, appellate counsel's conceded her egregious failure to obtain and investigate the September 9, 2009, pretrial transcripts. There, counsel's stated; **"You have sent me a transcripts dated September 9, 2009, I have read it with interest and if I think it is helpful for answering a question, I will not hesitate to bring it up."** (See, Exhibit D, annexed herewith). Counsel's letter demonstrated a lack of any strategy. She did not evaluated or weigh the relevant issues before filing the direct appeal brief on October 3, 2012. Such gleaming failure to conduct essential investigation was not strategy akin to selecting which points to advance and how to order them.

Where defendant "demonstrate[s] the absence of strategy or other legitimate explanation for counsel's failure[,]" the court will not "presume that counsel ..., exercised professional judgment." **People v. Rivera**, 77 NY2d 705, 709 (1988); see also, **Wiggins v. Smith**, 539 US 510, 526-27 (2003)("accurate description," not post hoc "rationalization of defense counsel's conduct control."); **Ramchair v. Conway**, 601 F3d 66, 77 (2d Cir. 2010)(accepting counsel's claim that her omission was "not of strategy, sound or otherwise, but of mistake["); **Marcrum v. Luebbers**, 509 F3d 489, 502 (8th Cir. 2007)("When a petitioner shows that counsel's actions actually resulted from inattention or neglect, rather than from reason judgment, the petitioner has rebutted the presumption of strategy, even if the government offers a possible strategic reason that could have, but did not, prompt counsel's course of action.") Id.

The Appellate Division's ruling dated July 25, 2018, denying petitioner equitable relief (See, 163 AD3d 986), was contrary to, or involved an unreasonable application of clearly established federal law, as was determined by the United States Supreme Court, and/or resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in the state court proceedings.

The factual contentions that appellate counsel's representation deprived the petitioner of his Sixth Amendment right to effective assistance, are more fully set forth in the petitioner's first coram nobis application at pages 21-87; supplemental affidavit and Memorandum of Law at pages 1-5; addendum in support at pages 1-7.

**Ground Twelve:** Appellate counsel's operated under a conflict-of-interest that violated petitioner's Sixth Amendment right to conflict-free representation. U.S.C.A. VI, XIV; Wood v. Georgia, 450 US 261 (1981); Cuyler v. Sullivan, 446 US 335 (1980); Armienti v. United States, 234 F3d 820, 824 (2d Cir 2000).

**Supporting Facts:** In August 2011, the petitioner requested that appellate counsel, Anna Pervukhin, thoroughly investigate the record on appeal before filing the direct appeal brief because certain records were missing from the files she had obtained from the court. By letter dated August 31, 2011, appellate counsel assured the petitioner that she would investigate the records "extremely careful" to make sure nothing is missing. (See, Exhibit D-1 annexed herewith). On October 3, 2012, counsel's filed the petitioner's direct appeal brief without investigating and settling the record on appeal.

Petitioner's June 10. 2013, application to enlarge the

-77-

judgment roll to included the September 9, 2009, pretrial transcripts, exposed counsel's ineptitude in failing to conduct essential investigation and settlement of the entire record on appeal, created a conflict in counsel's representation of petitioner. In her affirmation dated August 23, 2013, to the appellate Division in response to the petitioner's application to expand the judgment roll, counsel's stated: **"I support his recent request for the minutes of ..., September 9, 2009, if they exist."** (See, Exhibit D-2 annexed). Even then, counsel refused to conduct any investigation to acquire and certify the existence of the pretrial transcripts.

In protecting her own self-interest, appellate counsel diligently worked to undermined the petitioner's 440 appeal to avoid any conclusion that her failure to investigate and settle the record on appeal, although egregious, would have been harmless. As a result, counsel's presented a wholly frivolous argument on the 440 appeal without investigating the September 9, 2009, transcripts in favor of issues that were clearly meritorious and inherently stronger. The People's decisively rebutted counsel only argument on appeal with the September 9, 2009 transcripts.

The factual allegations that appellate counsel's labored under an actual conflict-of-interest that deprived Petitioner of his Sixth Amendment right to effective assistance, are fully set forth in Petitioner's second coram nobis application @ 1-63, with Addendum in support @ 1-6; and Application for a Certificate of appealability @ 1-19 (App. Div. Dkt. # 2013-04432).

**Ground Thirteen:** The courts' failure to provided a record of completeness before appellate counsel's filed the direct appeal brief was prejudicial and violated the petitioner's constitutional rights to procedural due process and effective assistance. U.S.C.A. V, VI, XIV; <u>Draper v. Washington</u>, 372 US 487, 495 (1963); <u>People v. Harrison</u>, 85 NY2d 794, 796 (1988)

<u>Supporting Facts</u>: The state courts' failure to provided a record of completeness before appellate counsel filed appellant's direct appeal on October 3, 2012, deprived the petitioner of procedural due process and effective assistance of counsel. The resulting prejudice deriving from an incomplete record was occasion by the lack of benefit of legal development that effective appellate counsel could have provided in arguing the relevant issues attended from the September 9, 2009, pretrial hearing transcripts.

Given a complete record, an effective appellate attorney might have make a strategic decision to argue, among other things, that the court's violated the petitioner's constitutional rights to conflict-free representation; the court's violated the petitioner's Sixth Amendment secured autonomy and freedom of choice to decided the objective of his own defense by allowing trial counsel to usurped control of a decision that was within the petitioner's exclusive prerogative; and the court's abused its discretion when it summarily denied the petitioner's pretrial motion requesting sanctions for the People's wilful destruction of material evidence.

**Ground Fourteen:** The Appellate Division's erred when it summarily denied Appellant's requests for new appellate counsel predicated upon specific complaints demonstrating good cause as a matter of law. U.S.C.A. VI; <u>Wood v. Georgia</u>, 450 US 261 (1981)

<u>Supporting Facts</u>: On October 24, 2012, Appellant submitted

a request demonstrating good cause for substitution of appellate counsel which was summarily denied by the appellate court.

Subsequent, the Appellate Division's reassigned appellate counsel to perfect petitioner's 440 appeal. On January 22, 2015, submitted a second request showing good cause why substitution of appellate counsel was necessary. Petitioner showed that appellate counsel's failure to investigate and settle the entire record on appeal had compromised the correctness of the adjudicative process, (C.P.L.R. §§ 5525 & 5526), causing an actual conflict for appellate counsel to protect her own self-interest. The factual allegation are more fully set forth in the petitioner's second coram nobis application @ pages 15-19.

**Ground Fifteen**: **Due process and fair trial violation. The trial court's response to jury's note 3A was inadequate and its failure to revisited the jurors' request to know the names of the witnesses whom met with the prosecutor before testifying, deprived the petitioner of a fundamental fair trial. U.S.C.A. V, XIV; Estelle v. McGuire, 502 US 62 (1991)**

**Supporting Facts**: The factual allegations pertaining to Ground Fifteen, are set forth in the petitioner's supplemental direct appeal brief @ 51-60, and petitioner's first coram nobis application @ pages 31-33.

*********************************

## TIMELINESS OF PETITION

155. This Habeas corpus petition is timely file within the one-year statute of limitation as required by **U.S.C. § 2244(d)**, excluding the tolling period of time the petitioner's applications for a writ of error coram nobis was submitted and adjudicated or under advisement in state courts.

## CONCLUSION

156.   Petitioner is a layman litigant and as such, respectfully request that his pleadings be liberally construed to include any colorable legal claims and the strongest arguments suggested. **Haines v. Kerner**, 404 US 519, 521 (1972); **Parisi v. United States**, 529 F3d 134, 139 (2d Cir. 2008).

157.   Petitioner's respectfully request an evidentiary hearing to conclusively establish the factual basis of his allegations that the prosecutor's knowingly used false material evidence at trial to obtained the judgment, and that trial counsel, sentencing counsel, and appellate counsel, all rendered objectively deficient and prejudicial ineffective assistance.

158.   Because the state courts' adjudication of the merits of the petitioner's constitutional claims were contrary to, or involved an objectively unreasonable application of clearly established federal law, and/or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court proceedings. This United States District Court must resolve Petitioner's claims without deference to the State Courts' legal conclusion, (**Panetti v. Quartman**, 551 US 930, 953 [2007]), and may consider any evidence to be produce at a federal evidentiary hearing based upon the petitioner's actual innocence claim, structural error claims, ineffective assistance claims, and the People's knowing presentation of false material evidence. **McQuiggins v. Perkins**, **supra**; **McCoy v. Louisiana**, **supra**; **Strickland v. Washington**, **supra**; **Martinez v. Ryan**, **supra**; **Travino v. Thaler**, 569 US 413 (2013); **Napue v. Illinois**, **supra**.

159. Considering the "sui generis" circumstances surrounding the facts of the case, and the nature and extent of the constitutional violations underlying the petitioner's extradition without due process of law, legal representation, actual innocence, and unlawful conviction, law and justice requires the extraordinary measures of the petitioner immediate and unconditional release from State custody.

WHEREFORE; Petitioner prays that the Court grant relief to which he may be entitled in this proceeding.

Dated: April 25 , _____, 2019
Attica, New York 14011-0149

Respectfully submitted,

Wayne Chin
Din: 09-A-6287
Petitioner: Pro-se
Attica Corr. Fac.
639 Exchange Street
Attica, New York 14011-0149

## VERIFICATION

I, WAYNE CHIN, the petitioner herein, declare under the penalties of perjury that the foregoing statements are true and correct and that this petition for a Writ of Habeas Corpus was placed in the prison mailing system on April 25 , _____, 2019.

Wayne Chin

Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM PART 26
----------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,       :

               -against-                    :

                                  Ind. No. 1018/03

WAYNE CHIN,                                :

              Defendant.                 :

----------------------------------------X

JILL KONVISER, JUSTICE:

    On September 30, 2009, the defendant was convicted of murder in the second degree after a jury trial for shooting and killing his girlfriend of eighteen years in front of her then eleven year old son. The defendant has filed a motion to set aside the verdict pursuant to Criminal Procedure Law §330.30(1). The People opposed the defendant's motion. The defendant filed reply papers. For the reasons that follow, the motion to set aside the verdict is denied.

**Criminal Procedure Law §330.30(1)**

    At any time after rendition of a verdict of guilty and before imposition of sentence, a court may set aside a verdict if a claim raised by the defendant would "require" reversal "as a matter of law by an appellate court." C.P.L. §330.30(1). A trial judge is without authority, however, to review a claim raised under C.P.L. §330.30(1) unless such claim was preserved at trial by a specific and timely objection or other application for relief. People v. Everson, 100 N.Y.2d 609, 610 (2003); People v. Hines, 97 N.Y.2d 56 (2001); People v. Green, 46 A.D.3d 324 (1st Dept. 2007), lv. denied, 10 N.Y.3d 840

(2008); People v. Patino, 259 A.D.2d 502 (2d Dept.), lv. denied, 93
N.Y.2d 976 (1999); People v. Tillman, 273 A.D.2d 913 (4th Dept.), lv.
denied, 95 N.Y.2d 939 (2000); People v. Amato, 238 A.D.2d 432, 433 (2d
Dept.), lv. denied, 90 N.Y.2d 237 (1997); People v. Josey, 204 A.D.2d
571 (2d Dept. 1994); People v. D'Alessandro, 184 A.D.2d 114, 118 (1st
Dept. 1992), lv. denied, 81 N.Y.2d 884 (1993); People v. Sadowski, 173
A.D.2d 873 (2d Dept. 1991).  A trial judge has no authority to review
a claim under C.P.L. §330.30 in the interest of justice as such powers
are reserved exclusively for the intermediate appellate courts. See
C.P.L. §470.15(1); People v. Carter, 63 N.Y.2d 530, 536 (1984); People
v. Carthens, 171 A.D.2d 387, 391-92 (1st Dept. 1991).

**The Motion Before the Court**

The defendant has raised the following claims in support of his
motion to set aside the verdict pursuant to C.P.L. §330.30: (1) the
Court erred during voir dire by failing to inquire of the prospective
jurors whether they had been exposed to any pre-trial publicity about
the case; (2) the People committed Brady and Rosario violations; (3) the
Court's Molineux ruling with respect to the testimony supplied by
Rashawn Aarons regarding a conversation he had with the victim in 2001
violated his Sixth Amendment right to confrontation; (4) his right to
a fair trial was prejudiced by Rashawn Aarons's testimony on cross-
examination regarding the nature of the defendant's relationship with
the deceased; (5) Detective Henn's testimony that a bullet was recovered
from the victim's body violated his Sixth Amendment right to

2

confrontation; (6) he was prejudiced by Detective's Calabrese's testimony that the police searched for him in "Jamaican restaurants and bars in the precinct;" (7) the Court prevented cross-examination of Detective Henn regarding statements made by other alleged eyewitnesses to the murder; (8) the Court erred by failing to sanction the People for the destruction of the victim's car and the contents thereof; (9) his right to a fair trial was prejudiced by the testimony that the police used the television program "America's Most Wanted" in their efforts to apprehend him; (10) the verdict was against the weight of the evidence; and, (11) trial counsel provided him with ineffective representation.

For the reasons that follow, each of these claims has been considered and rejected.

1. **The Defendant's Claim that Prospective Jurors Should have Asked whether they had been Exposed to Pre-Trial Publicity Regarding the Case.**

The defendant did not ask the Court during jury selection to inquire of the prospective jurors whether they had been exposed to any pre-trial publicity regarding this case. Nor did the defendant ever object at trial on such ground. Accordingly, the defendant's claim with respect to this Court's conduct during jury selection is unpreserved for appellate review and not cognizable under C.P.L. §330.30(1). <u>People v. Everson</u>, 100 N.Y.2d at 610; <u>People v. Robinson</u>, 88 N.Y.2d 1001, 1002 (1996).[1]

_____

[1]As the defendant has failed to preserve this claim as a matter of law
(continued...)

3

In any event, the defendant's claim is without merit as the Court repeatedly advised the selected and sworn jurors to keep an open mind, to decide the case solely on the evidence presented in the courtroom, not to do any of their own research, and to refrain from reading or listening to any news accounts about this case, including those that might have been found on the internet.  As the jury is presumed to have followed these instructions, the defendant's claim is without merit. People v. Davis, 58 N.Y.2d 1102, 1104 (1983); People v. Marji, 43 A.D.3d 961, 962 (2d Dept.), lv. denied, 9 N.Y.3d 1007 (2007); People v. D'Alessandro, 184 A.D.2d 114, lv. denied, 81 N.Y.2d 884 (1993).

## 2.    The Defendant's Brady and Rosario Claims.

The defendant claims that the People violated Brady v. Maryland, 373 U.S. 83 (1963) and People v. Rosario, 9 N.Y.2d 286, cert. denied, 368 U.S. 866 (1961) by failing to provide him with: (1) the "training and active service records" for a police dog about which Detectives Calabrese and Henn testified at trial; and, (2) a dry cleaning ticket that Detective Henn testfied about at trial.  As the defendant failed to raise these alleged Brady and Rosario violations at trial, such claims are unpreserved for appellate review and may not be reviewed by this Court under C.P.L. §330.30(1).  People v. Everson, 100 N.Y.2d at 610; People v. Wolf, 98 N.Y.2d 105, 119 (2002); People v. Thomas, 8

---

[1](...continued)
as required by C.P.L. §330.30(1), the fact that the People did not expressly respond to this claim in their motion papers is of no moment.

A.D.3d 303 (2d Dept.), lv. denied, 3 N.Y.3d 682 (2004); see People v.
McFarlane, 24 A.D.3d 570 (2d Dept. 2005), lv. denied, 6 N.Y.3d 836
(2006); People v. Rodriguez, 281 A.D.2d 644, 645 (2d Dept. 2001).
In any event, the defendant's claims are wholly without merit.

### Brady Claim

With respect to the defendant's Brady claim, there is no evidence
that the K-9 service records about which he complains even exist.  Thus,
his assertion that such records are exculpatory is based on nothing more
than sheer speculation and surmise and must fail. People v. Pacheco,
38 A.D.3d 686, 688 (2d Dept.); lv. denied, 9 N.Y.3d 849 (2007); People
v. Pannell, 3 A.D.3d 541, 542 (2d Dept.), lv. denied, 2 N.Y.3d 743
(2004); People v. Finley, 190 A.D.2d 859, 860 (2d Dept. 1993).  Equally
speculative is the defendant's claim that the dry cleaning ticket found
inside the car in which the defendant shot the victim to death was
somehow exculpatory.  People v. Finley, 190 A.D.2d at 860.[2]

Finally, and in light of the overwhelming evidence of guilt, the
defendant's Brady claim is rejected as he has not shown that there is
a reasonable probability or even a reasonable possibility that the
results at trial would have been different had the items at issue been
disclosed.  People v. Bond, 95 N.Y.2d 840, 843 (2000); People v.
Vilardi, 76 N.Y.2d 67, 77 (1990); People v. Rhodes, 215 A.D.2d 696, 696-

---

[2]The defendant's claim in his reply papers that Detective Henn's
testimony regarding the dry cleaning ticket violated the best evidence rule
was not raised at trial and, thus, cannot be considered by this Court under
C.P.L. §330.30(1).  People v. Amato, 238 A.D.2d at 243.

5

97 (2d Dept. 1995); People v. Gonzalez, 168 A.D.2d 568, 569 (2d Dept.

1990), lv. denied, 78 N.Y.2d 955 (1991); People v. Russo, 109 A.D.2d

855, 856 (2d Dept. 1985). To be clear, the defendant shot and killed

his girlfriend of eighteen years, Renee Aarons, in front of her then

eleven year old son, Rashawn Aarons. Rashawn Aarons testified at trial

that he saw the defendant, to whom he referred to at the time of the

shooting as "daddy," punch his mother in the face and then shoot her

multiple times.

| | |
|---|---|
| The Prosecutor: | Now, you mentioned that he (the defendant) punched her (the decedent). How did he punch her? |
| Rashawn Aarons: | He just walked out. He pulled out his fist and jabbed her. |
| The Prosecutor: | So would it be fair to say that his hand was clenched? |
| Rashawn Aarons: | Yes. |
| The Prosecutor: | Did something happen after that? |
| Rashawn Aarons: | Yeah, he pulled out his gun out of his waist and shot her three times. |
| The Prosecutor: | And after he shot her, what happens? |
| Rashawn Aarons: | When he shot her, I came out of the car and ran over to his side pulling him telling him to stop, stop. |
| The Prosecutor: | What, if anything, does defendant do? |
| Rashawn Aarons: | He walked away, and I looked at my mother and she said my name. And I see him, he was at the side of his car and he came back over and shot her two more times. |
| The Prosecutor: | And where were you when that happened? |

6

Rashawn Aarons:      Right next to him.

Transcript at 82-83.

A second eyewitness, Aisha White, the decedent's niece, testified that she too knew the defendant and also saw him shoot and kill the decedent on the date and time in question.  The testimony supplied by these two eyewitness was corroborated by, inter alia, a 911 call, ballistics evidence, medical evidence and testimony that stipling was found on the deceased's clothing.  In light of the overwhelming evidence of the defendant's guilt, the defendant's claimed Brady violation is rejected.  People v. Rhodes, 215 A.D.2d at 696-97; People v. Gonzalez, 168 A.D.2d at 569.

### Rosario Claim

Equally without merit is the defendant's Rosario claim.  The K-9 service records, to the extent they even exist, do not qualify as Rosario material as they were not prepared by an individual who testified at trial.  C.P.L. §240.45(1)(a); People v. Santorelli, 95 N.Y.2d 412, 422 (2000); People v. Williams, 229 A.D.2d 603, 604 (2d Dept.), lv. denied, 89 N.Y.2d 931 (1996).  Likewise, the dry cleaning ticket also does not qualify as Rosario material as it was not prepared by a witness who testified at trial.  People v. Santorelli, 95 N.Y.2d at 422. In any event, even if the failure to furnish the defendant with the subject materials (assuming their existence) constituted a Rosario violation, in light of the overwhelming evidence of the defendant's guilt, he has not shown that there is a reasonable possibility that the

failure to disclose such material contributed to the result at trial.
See C.P.L. 240.75; People v. Wood, 40 A.D.3d 663 (2d Dept.), lv. denied,
9 N.Y.3d 928 (2007); People v. Cordero, 306 A.D.2d 9 (1st Dept. 2003).

The defendant's unpreserved Brady and Rosario claims are rejected.

3.   **The Defendant's Claim that this Court's Molineux Ruling Deprived him of his Sixth Amendment Right to Confrontation.**

The defendant claims that this Court's Molineux ruling with respect
to the testimony supplied by Rashawn Aarons regarding a conversation he
had with the victim in 2001 violated his Sixth Amendment right to
confrontation.  As the defendant did not object to this testimony at
trial on this precise ground his current claim is unpreserved as a
matter of law and may not be considered by this Court under C.P.L.
§330.30.  People v. Everson, 100 N.Y.2d at 610; People v. Gray, 86
N.Y.2d 10, 19-20 (1995).

In any event, the defendant's claim with respect to the propriety
of the challenged testimony is entirely without merit.  This Court made
an extensive Molineux ruling at trial in which it determined that the
challenged testimony was admissible as it was relevant to the
defendant's motive, intent, and identity as the perpetrator of the
charged crimes.  This Court also ruled that the testimony was relevant
background information with respect to the defendant's relationship with
the decedent.  See Trial Transcript at 65-72.  This Court adheres to the
Molineux ruling it made at trial -- the defendant's current claim is
rejected.  Moreover, any undue prejudice that may have been caused to

8

the defendant by the challenged testimony was ameliorated by this Court's limiting instruction that the jury is presumed to followed. People v. Davis, 58 N.Y.2d at 1104.

**4.    The Defendant's Claim that his Right to a Fair Trial was Prejudiced by Rashawn Aarons's testimony on Cross-Examination Regarding the Nature of the Defendant's Relationship with the Deceased.**

The defendant, while cross examining the decedent's son, Rashawn Aarons, questioned him about the nature of the defendant's relationship with the deceased.

> Q.    In your recollection, that was an on-again-off-again relationship?
>
> A.    Because he got incarcerated.  He came home.

Trial Transcript at 99.

Pursuant to defense counsel's request, the witness's answer, which was responsive to the question posed, was immediately stricken from the record.  As the Court repeatedly advised the jury that stricken testimony was to be disregarded by them, and the jury is presumed to have followed these instructions, the defendant's claim that he was prejudiced by the above-referenced isolated responsive remark is rejected.  People v. Davis, 58 N.Y.2d at 1104; People v. Marji, 43 A.D.3d at 962. Notably, the stricken testimony was never brought to the jury's attention during the prosecutor's summation and any possible error resulting from such testimony was harmless in light of the overwhelming evidence of the defendant's guilt. People v. Crimmins, 36 N.Y.2d 240, 243 (1975).

5.  **The Defendant's Claim that Detective Henn's Testimony Regarding Recovery of a Bullet from the Decedent's Body Violated his Sixth Amendment Right to Confrontation.**

The defendant's claim that his Sixth Amendment right to confrontation was violated by Detective Henn's testimony regarding the recovery of a bullet from the victim's body was not raised at trial. As such, his current claim is unpreserved as a matter of law and may not be reviewed by this Court under C.P.L. §330.30. See People v. Amato, 238 A.D.2d at 433. In any event, the challenged testimony was entirely proper as Detective Henn merely testified that during the course of the police investigation he vouchered the shell casings and sent them to the police lab for comparison with a bullet recovered from the victim's body. Detective Henn's remarks were not "testimonial," and thus, did not violate the defendant's Sixth Amendment right to confrontation. See Crawford v. Washington, 541 U.S. 36 (2004). Furthermore, in light of the overwhelming evidence of guilt, any error in admitting such testimony was harmless beyond a reasonable doubt. People v. Crimmins, 36 N.Y.2d at 243.

6.  **The Defendant's Claim that he was Prejudiced by Detective Calabrese's Testimony that the Police Searched for him in "Jamaican Restaurants and Bars in the Precinct."**

The defendant claims that he was prejudiced by Detective's Calabrese's testimony that the police searched for him in "Jamaican restaurants and bars in the precinct." As the defendant failed to object to this testimony at trial, his current claim is unpreserved as a matter

10

of law and cannot be reviewed by this Court under C.P.L. §330.30. People v. Everson, 100 N.Y.2d at 610; People v. Amato, 238 A.D.2d at 433. In any event, the defendant's claim is entirely without merit as the challenged testimony was elicited to explain not only the efforts the police undertook to apprehend the defendant as many years had passed between the date of the crime and the defendant's arrest, but also to rebut the defendant's trial strategy attacking the adequacy and thoroughness of the police investigation. Accordingly, the defendant's motion to set aside the verdict on this ground is rejected.

7.   **The Defendant's Claim that he was Prevented from Cross-Examining Detective Henn about Statements made by other Alleged Eyewitnesses to the Murder.**

Contrary to the defendant's claim this Court permitted the defendant, over the People's strenuous objection, to elicit hearsay testimony from Detective Henn that he interviewed an eyewitness who told him that she saw, from her fourth floor apartment window at 100 Linden Boulevard, a black Lexus with two people inside leaving the crime scene. See Trial Transcript at 275-76, 286, 290. To the extent that the defendant appears to be claiming that this Court somehow prevented him from eliciting other statements that may have been made to Detective Henn, see Defendant's Motion at 10-11, such claim may not be reviewed by this Court under C.P.L. §330.30 as it was not raised at trial. See People v. Everson, 100 N.Y.2d at 610; People v. Amato, 238 A.D.2d at 433.

11

8. **The Defendant's Claim that this Court erred by Failing to Sanction the People for the Destruction of the Cars Involved in this Case and the Contents Thereof.**

At trial, this Court denied the defendant's application for an adverse inference with respect to the destruction of the vehicles in this case. See Trial Transcript at 382-84. This Court adheres to that ruling. To the extent that the defendant is now claiming that the People should have been sanctioned for the loss or destruction of other items that were inside of the vehicles, see Defendant's Motion at 11-13 and Reply Motion at 4-5, such claim may not be reviewed by this Court under C.P.L. §330.30 as it was not specifically raised at trial. See People v. Everson, 100 N.Y.2d at 610; People v. Robinson, 88 N.Y.2d at 1002. In any event, the defendant's claim that he was prejudiced by the absence of such items is purely speculative. Moreover, any error in failing to sanction the People in the manner now suggested by the defendant is harmless in light of the overwhelming evidence of the defendant's guilt. People v. Crimmins, 36 N.Y.2d at 243.

9. **The Defendant's Claim that his Right to a Fair Trial was Prejudiced by the Testimony that the Police used the Television Program "America's Most Wanted" in their efforts to Apprehend him.**

At trial this Court permitted the prosecutor to elicit brief and extremely limited testimony with respect to the investigative efforts taken by the police to apprehend him. These efforts included not only the use of wanted posters, neighborhood surveillance and witness interviews, but appeals to various media outlets including the Daily

12

News, Fox 5 News and "America's Most Wanted." Pursuant to this Court's explicit instruction, no details or particulars about the substance of the media coverage employed by the police were disclosed to the jury either by way of witness testimony or the prosecutor's opening or closing statements.

This Court permitted the prosecutor to elicit this testimony for a very narrow and specific reason. Eight years had passed between the time the defendant shot and killed the decedent and when this case was brought to trial. During those eight years, despite the efforts made by the police, the defendant avoided capture until the New York authorities located him in 2005 in the State of Arizona where he had been incarcerated for an unrelated felony. This Court prohibited the People from revealing to the jury that the police successfully apprehended the defendant as a result of his incarceration in Arizona. Nonetheless, the defendant sought to exploit the passage of time between the crime and the trial date by employing a trial strategy that challenged the adequacy and thoroughness of the police investigation. Rather than allowing the People to attempt to explain the lapse of time by eliciting the extremely prejudicial evidence that the defendant had been incarcerated in another state for a portion of this time period, this Court instead permitted the People to elicit very limited testimony with respect to the investigative efforts the police took to apprehend the defendant. This approach simultaneously protected the defendant's right to a fair trial while also allowing the People to defend the integrity of the police investigation.

13

Under these circumstances, there is absolutely no merit to the defendant's claim that he was unduly prejudiced by the brief references made at trial to the fact that one of several media outlets the police used to apprehend him was the "America's Most Wanted" television program. Indeed, the manner in which the testimony was elicited, which included no details regarding the substance of that coverage, showed that it was simply one small part of a larger effort undertaken by the police to apprehend the defendant.[3]

Moreover, as this Court repeatedly instructed the jury not to read or listen to any news accounts about this case, to keep an open mind, and to decide the case based solely on the evidence presented in the courtroom, the defendant's speculation that a juror may have been influenced by media coverage is rejected. See People v. Davis, 58 N.Y.2d at 1104. Accordingly, the defendant's challenge to said testimony is rejected.

The defendant's similar claim that he was prejudiced by the prosecutor's reference during her opening and closing statements to the

---

[3]The defendant's apparent claim that the police elicited the testimony with respect to the "America's Most Wanted" program to establish his consciousness of guilt was not raised at trial and, therefore, may not be reviewed by this Court under C.P.L. §330.30. In any event, the defendant's claim is wholly is without merit as the People neither in the opening or closing statements ever suggested to the jury that the defendant engaged in behavior that demonstrated his consciousness of guilt. Rather, from the context in which the challenged testimony was elicited, it is clear that such testimony was elicited for the sole purpose of establishing the steps the police took to apprehend the defendant and for no other reason.

14

"America's Most Wanted" television show is also without merit.  The defendant raised only a general objection to these remarks during the prosecutor's opening statement and, therefore, his current claim with respect to their propriety is unpreserved as a matter of law. People v. Lino, 65 A.D.3d 1263 (2d Dept. 2009); People v. Coleman, 64 A.D.3d 787 (2d Dept. 2009); People v. Stiff, 60 A.D.3d 1094 (2d Dept.), lv. denied, 12 N.Y.3d 921 (2009).  In addition, the defendant utterly failed to object to the remarks made during the prosecutor's closing statement. People v. Gillespie, 36 A.D.3d 626, 626-27 (2d Dept.), lv. denied, 8 N.Y.3d 984 (2007); see People v. Gray, 86 N.Y.2d 10, 19-20 (1995); People v. Heide, 84 N.Y.2d 943, 944 (1994).  Accordingly, as the defendant's challenge to the prosecutor's opening and closing statements were not preserved as a matter of law, they cannot be reviewed by this Court under C.P.L. §330.30.  People v. Everson, 100 N.Y.2d at 610; People v. Amato, 238 A.D.2d at 433.

In any event, for the reasons stated above, the brief comments were allowed to rebut the defendant's attack on the quality and thoroughness of the police investigation and to explain the efforts they undertook to apprehend the defendant who had absconded over the several years that passed between the date of the murder and the time of the defendant's apprehension, and did not prejudice the defendant's right to a fair trial.  Moreover, any possible prejudice to the defendant was ameliorated by the fact that the jury was instructed that the prosecutor's opening

15

and closing statements were not evidence – an instruction that the jury is presumed to have followed.  People v. Davis, 58 N.Y.2d at 1104.[4]

Finally, any error in eliciting the challenged testimony is harmless in light of the overwhelming evidence of the defendant's guilt.  People v. Crimmins, 36 N.Y.2d at 243.

## 10.   The Defendant's Claim that the Verdict was Against the Weight of the Evidence.

The defendant's claim that the verdict should be set aside as it was against the weight of the evidence is rejected.  A trial court is not empowered to set aside the verdict as against the weight of the evidence under C.P.L. §330.30(1) as such power is reserved exclusively for the Appellate Division.  See People v. Carter, 63 N.Y.2d 530, 536 (1984); People v. Brown, 141 A.D.2d 657 (2d Dept. 1988).  In any event, were this Court empowered to review the defendant's claim, it would find that in light of the overwhelming evidence that the defendant shot and killed the decedent, his girlfriend of eighteen years, in front of her eleven year old son and her young niece, the verdict was not against the weight of the evidence. People v. Romero, 7 N.Y.3d 633, 644-45 (2006); People v. Burke, 287 A.D.2d 512, 514 (2d Dept.), lv. denied, 97 N.Y.2d 679 (2001).

---

[4]Additionally, this Court finds that the prosecutor's summation constituted fair comment on the evidence, fair response to the defendant's summation and otherwise fell within the four corners of the evidence.  People v. Cephus, 11 A.D.3d 553 (2d Dept.), lv. denied, 4 N.Y.3d 742 (2004); People v. Holland, 204 A.D.2d 483 (2d Dept.), lv. denied, 83 N.Y.2d 1004 (1994); People v. Elliot, 151 A.D.2d 498 (2d Dept.), lv. denied, 74 N.Y.2d 808 (1989).

11.   **The Defendant's Claim that Trial Counsel Provided him with Ineffective Representation.**

The defendant's ineffective assistance of counsel claim largely concerns matters that are *de hors* the record as they involve challenges to defense counsel's strategic decisions and alleged failure to investigate and call certain witnesses. People v. Dashosh, 59 A.D.3d 731 (2d Dept.), lv. denied, 12 N.Y.3d 852 (2009); People v. Alvarez, 51 A.D.3d 470, 471 (1st Dept.), lv. denied, 11 N.Y.3d 785 (2008); People v. Gillespie, 36 A.D.3d 626, 627 (2d Dept.), lv. denied, 8 N.Y.3d 984 (2007); People v. Zimmerman, 309 A.D.2d 824 (2d Dept. 2003), lv. denied, 1 N.Y.3d 603 (2004); People v. Rosas, 306 A.D.2d 91 (1st Dept.), lv. denied 100 N.Y.2d 645 (2003); People v. Aguirre, 304 A.D.2d 771 (2d Dept. 2003); People v. Boyd, 244 A.D.2d 497, 497-98 (2d Dept. 1997), lv. denied, 93 N.Y.2d 850 (1999). As such, these claims are not cognizable under C.P.L. §330.30. People v. Hardy, 49 A.D.3d 1232 (4th Dept. 2008), aff'd __ N.Y.3d __, 2009 WL 3294966 (Oct. 15, 2009); People v. Gruttadauria, 46 A.D.3d 837, 837-38 (2d Dept. 2007), lv. denied, 10 N.Y.3d 840 (2008).

In any event, to the extent that the defendant's claim is reviewable under C.P.L. §330.30(1), this court finds that the defendant has not met the "high burden of demonstrating that he was deprived of a fair trial by less than meaningful representation." People v. Hobot, 84 N.Y.2d 1021, 1022 (1995); People v. Finley, 27 A.D.3d 763 (2d Dept.); lv. denied, 7 N.Y.3d 788 (2006). This court finds that defense counsel

provided the defendant with meaningful representation in that he "prepared and pursued trial strategies and defense theories, presented a clear and cogent opening and summation, and adequately cross-examined the People's witnesses." People v. Tomlinson, __ A.D.2d __, 2009 WL 3766093 (2d Dept. Nov. 10, 2009); People v. Whaul, 63 A.D.3d 1182, 1183 (2d Dept. 2009); People v. Dashosh, 59 A.D.3d at 732. Furthermore, this Court finds that defense counsel, who frequently consulted with the defendant for long periods of time throughout the course of the trial, provided the defendant with thorough, competent, and professional representation. People v. Hinds, 183 A.D.2d 848, 849 (2d Dept.), lv. denied, 80 N.Y.2d 904 (1992); People v. Davis, 161 A.D.2d 787, 789 (2d Dept.), lv. denied, 76 N.Y.2d 939 (1990). The law is well-settled that "[h]indsight does not elevate counsel's unsuccessful trial strategies to ineffective assistance of counsel." People v. Monroe, 52 A.D.3d 623 (2d Dept. 2008); see People v. Benevento, 91 N.Y.2d 708, 712 (1998) People v. Satterfield, 66 N.Y.2d 796, 799 (1985); People v. Dashsoh, 59 A.D.3d at 732; People v. Hinds, 183 A.D.2d at 849.

In any event, due to the overwhelming evidence of the defendant's guilt, any "imperfections in trial counsel's performance . . . . did not rise to the level of ineffective assistance of counsel." People v. Chicas, 293 A.D.2d 687 (2d Dept.), lv. denied, 98 N.Y.2d 695 (2002); People v. Dover, 294 A.D.2d 594, 596 (2d Dept.), lv. denied, 98 N.Y.2d 767 (2002) ("it is evident that the defendant's conviction rested on the strength of the truly overwhelming weight of the evidence, and not upon

18

counsel's alleged ineffectiveness"); see People v. Arroyo, 38 A.D.3d 792 (2d Dept.), lv. denied, 9 N.Y.3d 839 (2007); People v. Ramirez, 22 A.D.3d 334 (1st Dept. 2005), lv. denied, 6 N.Y.3d 779 (2006); People v Wicker, 229 A.D.2d 602 (2d Dept.), lv. denied, 89 N.Y.2d 931 (1996).

As the defendant has failed to overcome the strong presumption that trial counsel rendered effective assistance, see People v. Louissant, 8 A.D.3d 407 (2d Dept.), lv. denied, 3 N.Y.3d 677 (2004); People v. Myers, 220 A.D.2d 461 (2d Dept.), lv. denied, 87 N.Y.2d 905 (1995), his ineffective assistance of counsel claim is rejected.

**Conclusion**

The motion to set aside the verdict under C.P.L. §330.30(1) is denied without a hearing. This constitutes the Decision and Order of the Court.


Dated: Brooklyn, New York
       November 17, 2009

                                        _____
                                        J.S.C.

                                        **HON. J. KONVISER**

19

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS : CRIMINAL TERM PART 24
------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK

            -against-

          WAYNE CHIN

------------------------------------------------------------x

By: Hon. ShawnDya L. Simpson

Date: February 20, 2013

DECISION & ORDER

Indictment No. 1018/2003

      Defendant moves to vacate his judgment of conviction pursuant to CPL § 440.10 on numerous grounds. For the following reasons, the motion is denied in its entirety.

      Defendant and the deceased, Renee Aarons, were involved in a relationship for approximately eighteen years. Renee Aarons originally lived in Brooklyn but had recently relocated with her children to Trenton, New Jersey. Shortly after the move, she was badly injured in a car accident near her new home. She then returned to Brooklyn with her two sons, Rashawn and Ryan, so that she could be closer to her family. Aarons lived at 95 Linden Boulevard, as did several other members of her and defendant's family.

      On June 12, 2001, defendant drove 12-year-old Rashawn Aarons from Trenton to Brooklyn in a car that Renee had purchased for defendant's use. Rashawn had known defendant all his life and called him "Daddy." Before dropping Rashawn off at his grandmother's residence at 95 Linden Boulevard, defendant stopped to pick up some dry-cleaning.

      Later that day, Renee parked her car in front of 95 Linden Boulevard to pick up Rashawn. At approximately 10:30pm that night, Renee was sitting in the driver's seat and Rashawn was

-1-

sitting next to her in the front passenger seat when defendant drove up alongside Renee's car. He and Renee began arguing about Ryan, who had been arrested earlier that day. Defendant got out of the car and punched Renee in the face. He then pulled out a 9mm pistol from his waist and shot her once. Rashawn jumped out from the car and ran to defendant, holding him in a bear hug and telling him to stop. Defendant pushed Rashawn off, walked away, and then turned back when Renee called out to Rashawn. Defendant shot Renee two more times, causing her death.

Renee's niece, Alisha White, also witnessed the shooting from the sidewalk in front of 95 Linden Boulevard, approximately ten to twenty feet from the car in which Renee was sitting. She recognized defendant right away, having known him for approximately seventeen years, and testified to her observations at trial. White was also familiar with members of defendant's family who lived at 95 Linden Boulevard.

Immediately after the shooting defendant fled in his car, which he abandoned about two blocks from the murder scene. A K-9 unit bloodhound tracked defendant's scent from the vehicle to a nearby bus stop but lost the trail from that point. The dry-cleaning that defendant had picked up earlier that day was still inside the vehicle.

For his acts, defendant was charged with two counts of murder in the second degree (PL §§ 125.25[1], [2]), criminal possession of a weapon in the second degree (PL § 260.10[1]), criminal possession of a weapon in the third degree (PL § 265.02[4]), and endangering the welfare of a child (PL § 165.05).

Defendant evaded apprehension for several years. During that time the police employed media coverage in their search for him, including "America's Most Wanted." Defendant was finally apprehended on unrelated drug charges in Arizona on November 17, 2005, having

-2-

remained at liberty for over four years. Although a warrant for his arrest for the murder of Renee Aarons was lodged with the state of Arizona, Arizona authorities chose to detain defendant until the conclusion of its case. Defendant was convicted on October 24, 2007 and sentenced on November 27, 2007. After defendant had served his sentence in Arizona, the People filed an Interstate Agreement on Retainer, which defendant signed and thereby waived extradition as a part of his request for the final disposition of the charges pending against him in New York. He was taken into custody by New York authorities in February 2008.

When proceedings commenced against defendant in New York, Harold Baker, Esq. was originally assigned to represent him. At defendant's motion for substitution of counsel, Baker was replaced by Alan Stutman, Esq. and later by Philip Smallman, Esq., who represented defendant at trial. Defendant's motion to replace Smallman was denied before his case was sent out for trial. Defendant considered proceeding pro se but ultimately elected to retain Smallman after speaking with the trial judge and counsel. Jay Cohen, Esq. was subsequently appointed to represent defendant at sentencing.

On October 15, 2009, defendant was convicted by a jury of murder in the second degree (Konviser, J.). Immediately following his conviction he filed a pro se motion pursuant to CPL § 330.30 to set aside the verdict, raising a litany of claims against the court, the People, and trial counsel. The motion was denied in its entirety on November 17, 2009. That same day defendant was sentenced to a prison term of twenty-five years to life (Konviser, J.).

Defendant filed a notice to appeal on November 18, 2009 but has not yet perfected his appeal.

Defendant now moves to vacate his judgment of conviction pursuant to CPL § 440.10.

-3-

His list of allegations numbers approximately fifty, ranging from complaints about the extradition process to counsel's performance on his post-conviction motion to set aside the verdict. These allegations can be grouped and characterized as the following: 1) trial counsel provided ineffective assistance of counsel, depriving defendant of due process and a fair trial; 2) sentencing counsel was ineffective; 3) improper conduct by the court deprived defendant of his right to due process and a fair trial; 4) improper and prejudicial conduct and fraud by the prosecutor deprived defendant of his right to due process and a fair trial; and 5) evidence at trial was obtained in violation in violation of his rights under the New York state constitution. In reviewing defendant's voluminous submissions, it appears that, as the People note, defendant has "scoured the trial record to arrive at a multitude of claims, which all appear to be derived from defendant's conclusions, based almost entirely on the record, about what the Court, the prosecutor, and his counsel could or should have done or failed to do."

Every claim of impropriety by the court and the prosecutor and nearly all of the allegations of ineffective assistance of counsel are record-based. Accordingly, the court must reject them because the judgment is now pending on appeal and sufficient facts appear on the record with respect to the grounds raised in the instant motion to permit adequate review thereof on appeal (CPL § 440.10[2][b]). While defendant has filed a notice of appeal, he has not yet perfected an appeal to the Appellate Division. Moreover, a motion to vacate the judgment of conviction should not be employed as a substitute for an appeal (*People v Cooks,* 67 NY2d 100, 500 [1986]).

The remainder of defendant's claims of ineffective assistance of counsel, which are based on matters outside the record, are both procedurally barred and lack merit. Defendant argues

-4-

that: 1) counsel failed to investigate the trajectory of the bullet in order to advance defendant's assertion that the murder was committed by two people; 2) counsel failed to obtain the records from defendant's cellular telephone, thus prejudicing defendant's ability to mount a defense of actual innocence; 3) counsel failed to pursue available defenses; 4) counsel failed to prepare a witness list or follow up on a witness list prepared by defendant; and 5) counsel ignored defendant's request to question jurors during *voir dire* about media publicity and uncharged criminal conduct. All of these claims, made only by defendant and unsupported by any other affidavit or evidence, are wholly unsubstantiated and there is no reasonable possibility that they are true (CPL § 440.30[4][b], [d]).

Defendant's claims of ineffectiveness also lack merit. Under the federal standard for ineffective assistance of counsel, the court must engage in a two-prong analysis of the defendant's claim (*Strickland v Washington*, 466 US 668 [1984]). The defendant must first be able to show that counsel's representation fell below an "objective standard of reasonableness" based on "prevailing professional norms (*Strickland* at 687, 688). Second, the defendant must also "affirmatively prove prejudice" by showing that were it not for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different (*Strickland* at 693). In assessing prejudice under *Strickland* "[t]he likelihood of a different result must be substantial, not just conceivable" (*Harrington v Richter*, __ U.S.__, 131 S.Ct. 770, 792 [2011]).

Under New York law, counsel's representation is adequate "so long as the evidence, the law, and the circumstances of a particular case, viewed in totality, and as of the time of the representation, reveal that the attorney provided meaningful representation" (*People v Baldi*, 54

NY2d 137, 147 [1981]; *People v Benevento*, 91 NY2d 708 [1998]).  With respect to prejudice under state law, "the claim of ineffectiveness is ultimately concerned with the fairness of the process as a whole rather than its particular impact on the outcome of the case" (*Benevento* at 714).  The "question is whether the attorney's conduct constituted 'egregious and prejudicial' error such that defendant did not receive a fair trial" (*id.* at 713, quoting *People v Flores*, 84 NY2d 184, 188 [1994]).  Accordingly, the reviewing court must separate ineffectiveness from "mere losing tactics" and the defendant must "demonstrate the absence of strategic or other legitimate explanation" for counsel's conduct (*People v Baldi* at 146; *People v Rivera*, 71 NY2d 705, 709 [1988]).  Hindsight cannot elevate counsel's trial strategies, even if ultimately unsuccessful, into ineffective assistance of counsel (*People v Benevento* at 712; *People v Satterfield*, 66 NY2d 796 [1985]; *People v Baldi*, supra).  Defendant must also show that his right to a fair trial was prejudiced by the unfairness of the proceedings as a whole (*People v Stulz*, 2 NY3d 277, 284 [2004]).

Defendant's first two claims pertaining to counsel's investigation of the case are without merit because defendant has failed to allege any facts that would have been revealed by such investigation and that would have possibly led to his acquittal.  With respect to the victim's bullet wounds, counsel had access to the medical examiner's report that became part of the trial record.  There is no indication from the report itself that further investigation was warranted.  Nor does any of the evidence support defendant's claim that there were two shooters.  Here, defendant has not established that counsel's investigation denied him meaningful representation or that deeper inquiry would have yielded a different outcome at trial (*see People v Henry*, 95 NY2d 563 [2000]; *Henry v Poole*, 409 F3d 48, 63 [2d Cir 2005] [even strategic choices made

-6-

after less-than complete investigation do not amount to ineffective assistance under the federal constitution so long as the known facts made it reasonable to believe that further investigation was unnecessary]).

Likewise, defendant has failed to allege any facts that would have warranted further examination of defendant's cell phone records.  Defendant contends that counsel could have "substantiate[d] an alibi through the phone global positioning system, 'GPS', that [he] was not at the scene of the crime."  On June 13, 2001, Detective Guinane applied for and was granted a pen register and trap and trace device on a phone that defendant had used to call Renee.  The police intended to use the pen register and trap and trace device in order to locate and apprehend defendant, who had since fled.  To the extent defendant is claiming that counsel should have obtained these records from the police, they would not have been relevant because they would have been generated after the shooting.  In addition, counsel had little basis to pursue an alibi defense because he was faced with two strong eyewitness accounts of the shooting that unequivocally identified defendant as the shooter.  In the instant motion defendant does not elaborate upon his proposed alibi beyond the bare allegation that he "was not at the scene of the crime."  Where defendant's alibi was far-fetched at best, counsel's decision not to pursue the cell phone records was sound under the circumstances (*Strickland*, 466 U.S. at 691 [a particular decision "not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."]).

Defendant's remaining allegations involving an available defense, witness lists and the jury voir dire are unavailing attempts to challenge legitimate, strategic decisions made by counsel.  First, in order to raise third-party culpability defense, as defendant argues his attorney

-7-

should have done, defense counsel must "make an offer of proof outside the presence of the jury to explain how it would introduce evidence of third-party culpability. The court will then hear any counter-arguments from the prosecutor, weigh the considerations, and make its determination followed by clear directives as to what it will and will not allow" (*People v Primo*, 96 NY2d 351, 359 [2001]). The proffered evidence must show a direct connection to the crime itself and its admission "may not rest on mere suspicion or surmise" (*id.*). Here, defendant offers no credible evidence of third-party culpability, instead offering vague and speculative assertions about an unnamed perpetrator and unfounded claims of innocence. Where counsel had no basis to make an offer of proof to the court, he cannot be faulted in hindsight for choosing not to pursue such a defense (*see People v Mathieu*, 19 AD3d 219 [1st Dept 2005] ["Even if we were to conclude that trial counsel should have introduced additional evidence in support of a theory of third-party culpability, we would find that the omitted evidence was exceedingly weak"]). As many practitioners realize, employing this strategy can be risky because a failure to produce credible evidence to support a third-party culpability defense could lead the jury to view the defense as consciousness of guilt on the part of the defendant. Thus, "[t]here can be no denial of effective assistance of trial counsel arising from counsel's failure to 'make a motion or argument that has little or no chance of success'" particularly where, as in the instant case, such an argument may have been detrimental to the defense (*People v Caban*, 5 NY3d 143, 152 [2005], quoting *People v Stulz*, supra at 287).

The record also contradicts defendant's claims concerning the witness lists and reveals strategic reasons for counsel's decision not to call witnesses whose testimony would not have been admissible or benefitted the defense. Counsel did in fact submit to the court, after private

-8-

consultation with defendant, a list of police officers whom defendant wanted to call in his direct case. The court ruled that the proposed testimony of Officer Guinane would be irrelevant to any issues in the case and that Detective Crick's testimony did not fall under any exception to the hearsay rule. Because Detective Sherman, who defendant wanted to testify about the crime scene investigation, had since retired, the parties agreed that defendant would instead call Detective Steiner of the Police Department Crime Scene Unit. Defendant also claims to have given counsel a list of eighteen proposed witnesses, including Guinane, Crick and Sherman, but there is no indication that these additional witnesses would have been able to offer relevant, beneficial, or otherwise admissible testimony. Counsel's decision not to call a witness whose testimony he or she assesses as weak is a strategic legal decision that does not amount to ineffective assistance of counsel (*People v Smith*, 82 NY2d 731 [1993]; *People v Peters*, 28 AD3d 686 [2d Dept 2006]). Moreover, disagreement over trial strategy alone is not a basis for a determination of ineffective assistance of counsel (*see People v Benevento*, 91 NY2d at 712–713; *People v Baldi*, 54 NY2d 137 at 146).

Finally, it is within the strategic province of counsel to question jurors and raise appropriate challenges (*see People v Turner*, 37 AD3d 874 [3d Dept 2007]). Defendant believes that counsel should have acceded to his request to question the jurors about "allegations of uncharged criminal conducts and media publicity." According to defendant, counsel did not "see the necessity for such inquiry." The record indicates that counsel made adequate inquiries during voir dire. There is no evidence that any of the jurors were biased by defendant's appearance on "America's Most Wanted" and the media's reference to uncharged criminal conduct. In this way, defendant has failed to establish that counsel's strategy affected the outcome of trial or

otherwise undermined the fairness of the proceedings (*Strickland* at 693; *Stulz*, 2 NY3d at 284).

Trial counsel proficiently advocated for his client even when faced with significant evidence of guilt. In this case, the People presented an overwhelmingly strong case supported by reliable eyewitness testimony and ballistics evidence. Rashawn, who had a close relationship with defendant, testified that he had looked on from the passenger's seat as defendant shot his mother to death. The other direct eyewitness, Alicia White, was only a short distance away from defendant when he shot Renee. She immediately recognized defendant based upon her longtime familial relationship with him. Both witnesses saw defendant driving a car that was known to belong to him. In addition, ballistics evidence confirmed the testimony that there was only one shooter, contrary to defendant's claim that there were two perpetrators.

Throughout the trial, counsel strategically mounted an effective defense of his client. Trial counsel gave an opening statement in which he cautioned the jury to be careful in listening to the evidence to determine whether it supported the claims made by the People. He effectively cross-examined the People's witnesses and highlighted inconsistencies between their trial testimony, grand jury testimony and statements to the police. He also raised questions about a large financial settlement that the victim had recently received, which may have provided a motive for someone other than defendant to kill the victim. For instance, he suggested through cross-examination that the victim's brother, who managed her money, may have had a motive to commit the murder. Counsel thoroughly cross-examined the police witnesses to highlight inconsistencies between their testimony and the police paperwork, as well as any questionable practices in the police investigation and the handling of evidence. Counsel successfully used the testimony of a crime scene unit detective to bolster defendant's theory that the police

-10-

investigation was sloppy and that the evidence was mishandled. Finally, trial counsel gave a compelling summation in which he tried to cast doubt upon the eyewitness testimony by arguing that although Alicia White knew defendant well, she did not name him in her 911 call. On the whole, the record demonstrates that defendant received meaningful representation (*People v Baldi*, supra; *People v Benevento*, supra).

Finally, there is no merit to defendant's claim that sentencing counsel was ineffective for failing to assist him in preparing his CPL § 330.30 motion. Defendant filed, pro se, an exhaustive 11-point motion which the court considered in depth and rejected as entirely meritless. The court reviewed every claim, finding each speculative, unpreserved and lacking in evidence. Even if counsel had adopted defendant's motion it would have failed. Thus, counsel cannot be found ineffective for failing to make a motion that had no chance of success (*People v Caban*, supra; *People v Stulz*, supra).

Accordingly, the motion is denied in its entirety.

This decision shall constitute the order of the court.

ENTER:

SHAWN DYA L. SIMPSON, J.S.C.

ENTERED

MAR - 5 2013

NANCY T. SUNSHINE
COUNTY CLERK

-11-

Exhibit B

NEW YORK STATE SUPREME COURT

APPELLATE DIVISION:   SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK

Respondent,

-against-

WAYNE CHIN,

Defendant/Appellant.

SUPPLEMENTAL BRIEF FOR DEFENDANT-APPELLANT

TO BE HEARD ON THE ORIGINAL RECORD
KINGS COUNTY Ind. No. 1018/2003
APPELLATE DIVISION No. 2013-04432

Wayne Chin
Defendant-Appellant, Pro-se
Reg. No. 09-A-6287
Green Haven Corr. Fac.
594 Route 216
Stormville, New York 12582

Kenneth Thompson
District Attorney, Kings County
Criminal Appeal  Bureau
Renaissance Plaza
350 Jay Street
Brooklyn, New York 11201

TABLE OF CONTENTS

                                                              Page

TABLE OF AUTHORITIES                                           iv

QUESTIONS PRESENTED                                            ix

STATEMENT PURSUANT TO 5531                                      1

PRELIMINARY STATEMENTS                                          2

INTRODUCTION                                                    2

STATEMENT OF FACTS                                             4

THE CRIME AND INVESTIGATION                                    4

THE CULPABLE STATE OF MIND DESTRUCTION OF
THE ORIGINAL 911 MASTER TAPE RECORDINGS                        6

PROCESSING THE VEHICLES AND SUPPRESSING EVIDENCE               7

CULPABLE STATE OF MIND DESTRUCTION OF THE VEHICLES             7

THE MOLINEUX/SANDOVAL HEARINGS                                 8

THE TRIAL                                                      9

THE DEFENSE CASE                                              10

CHARGE CONFERENCE                                             11

JURY CHARGE                                                   11

JURY DELIBERATION                                             12

THE C.P.L. § 330.30 POST-CONVICTION MOTION                    13

THE C.P.L § 440.10 POST-CONVICTION MOTION                     14

ARGUMENT                                                      16

POINT ONE

        THE LOWER COURT ERRED WHEN IT DENIED APPELLANT'S
        C.P.L. § 440.10 MOTION WHICH ALLEGED THAT THE
        TRIAL COURT DEPRIVED HIM OF DUE PROCESS AND A
        FAIR TRIAL TO CONFRONT WITNESSES AND  PRESENT
        EVIDENCE IN HIS DEFENSE                              16

POINT TWO

        THE LOWER COURT ABUSED IT  DISCRETION WHEN IT

Page

DENIED APPELLANT'S C.P.L. § 440.10 MOTION
WITHOUT A HEARING WHERE TRIAL COUNSEL'S
CUMULATIVE ERRORS AND OMISSIONS WERE SO SIGNIFI-
CANT THAT VIEWED IN ITS TOTALITY, THE REPRE-
SENTATION WAS NOT MEANINGFUL                                    23

A. THE LAW REGARDING THE RIGHT TO EFFECTIVE
   ASSISTANCE OF COUNSEL                                        23

B. THE LOWER COURT'S FACTUAL FINDINGS
   ARE ERRONEOUS                                                27

C. TRIAL COUNSEL'S CUMULATIVE ERRORS AND
   OMISSIONS WERE SO PREJUDICIAL THAT IT
   RENDERED THE TRIAL UNRELIABLE AND
   FUNDAMENTALLY UNFAIR                                         33

1. COUNSEL'S FAILURE TO INVESTIGATE THE
   PEOPLE'S SECONDARY EVIDENCE WAS DEFICIENT
   AND PREJUDICIAL                                              34

2. TRIAL COUNSEL'S FAILURE TO OBJECT TO THE
   RELIABILITY AND ADMISSIBILITY OF THE
   SECONDARY EVIDENCE WAS PREJUDICIAL                           37

3. TRIAL COUNSEL'S FAILURE TO OBJECT TO THE
   PROSECUTOR'S IMPROPER STATEMENTS THAT A
   BLOODHOUND IDENTIFIED APPELLANT'S SCENT
   WAS DEFICIENT AND PREJUDICIAL                                38

4. TRIAL COUNSEL'S FAILURE TO OBJECT TO
   DOCTOR STYLES' TESTIMONY AND PHOTOGRAPHS
   WAS OBJECTIVELY DEFICIENT AND PREJUDICIAL                    41

5. TRIAL COUNSEL'S FAILURE TO OBJECT TO THE
   TRIAL COURT'S ERRONEOUS EVIDENTIARY RULING
   WHICH BARRED CONFRONTATION, CROSS EXAMINATION
   AND IMPEACHMENT OF THE PEOPLE'S WITNESSES
   WITH PRIOR INCONSISTENT STATEMENTS WAS
   OBJECTIVELY DEFICIENT AND PREJUDICIAL                        44

RYAN AARONS                                                    45

RASHAWN AARONS                                                 46

AISHA WHITE                                                    48

6. TRIAL COUNSEL'S FAILURE TO OBJECT TO THE
   TRIAL COURT'S COERCIVE AND UNBALANCED
   SUPPLEMENTAL JURY INSTRUCTION WAS
   OBJECTIVELY DEFICIENT AND PREJUDICIAL                        50

Page

7. SENTENCING COUNSEL, JAY COHEN LABORED UNDER
   A CONFLICT OF INTEREST THAT COMPROMISED
   APPELLANT'S RIGHTS TO EFFECTIVE ASSISTANCE
   OF COUNSEL                                          53

POINT THREE

THE LOWER COURT ABUSED ITS DISCRETION WHEN IT
DENIED APPELLANT'S C.P.L. § 440.10 MOTION
WITHOUT A HEARING WHICH ALLEGED THE PEOPLE
KNOWINGLY USED FALSE EVIDENCE TO OBTAINED
THE JUDGMENT                                          55

POINT FOUR

THE PEOPLE KNOWINGLY PERPETRATED A FRAUD UPON
THE COURT IN VIOLATION OF APPELLANT'S RIGHTS
TO DUE PROCESS AND A FAIR TRIAL                       59

CONCLUSION                                            61

CERTIFICATE OF COMPLIANCE                             62

iii

TABLE OF AUTHORITIES

CASE                                                              PAGE

Alvarez v. Ercloe, 763 F.3d 223 (2d Cir. 2014)...... 16,19, 21

Aouds v. Mobil Oil Corp. 892 F2d 1115 (1 Cir. 1989).. 59

Baba-Ali v. State of New York, 19 N.Y.3d 627 (2012)...59

Berryman v. Morton, 100 F.3d 1089 (3 Cir. 1996).......26

Brady v. Maryland, 373 U.S. 83 (1983).............. 4, 35

Chambers v. Mississippi, 410 U.S. 284 (1973)....... 21, 45

Delaware v. Arsdall, 475 U.S. 673 (1986)........... 45

Elseman v. Herbert, 401 F.3d 102 (2 Cir. 2005) .... 54

Espinal v. Bennett, 588 F.Supp.2d 388 (E.D.N.Y 2008) 24, 49

Eze v. Senkowski, 321 F.3d 110 (2 Cir. 2003) ....... 33

Gersten v. Senkowski, 426 F.3d 588 (2 Cir. 2005) ... 26

Harris v. Senkowski, 298 F.Supp.2d 320 (E.D.N.Y 2004) 26

Hazel-Atlas Glass Co. v. Hartford-Empire Co.

322 U.S. 238 (1944) ................................ 59, 60

Homles v. South Carolina, 547 U.S. 319 (2006) ...... 20, 21

Jenkins v, United States, 380 U.S. 445 (1965) ...... 51

Kearl v. State of Montana, 213 U.S. 135 (1909) .... 51

Kimmelman v. Morrison, 477 U.S. 365 (1985) ........ 26

Koschak v. Gates Constr. Corp. 225 A.D.2d 315

(!st. Dept. 1986)................................... 59

Kyles v. Whitley, 514 U.S. 419 (1995) ............. 20

Lindstadt v. Keane, 239 F.3d 191 (2 Cir. 2001) .... 25, 32, 37

Locessio v. United States, 395 F.3d 56 (2 Cir. 2005) 54

Lowenfield v. Phelps, 484 U.S. 231 (1988) ........ 50

CASE                                                          PAGE

Mooney v. Holohan, 294 U.S. 103 (1935) ................. 60

Murray v. Carrier, 477 U.S. 478 (1986) ................. 24

Napue v. Illinois, 360 U.S. 264 (1959) ................. 55

New York City Hous. Auth. v. Pro Quest Sec.,
108 A.D.3d 471 (1st. Dept. 2013)........................ 38

Pavel v. Hollins, 261 F.3d 210 (2 Cir. 2001) ........... 24, 26

Pennsylvania v. Ritchie, 480 U.S. 39 (1987) ............ 20

Pyles v. Kansas, 317 U.S. 213 (1942) ................... 60

People v. Aber, 99 N.Y.2d 406 (2003) ................... 54

People v. Aleman, 12N.Y.3d 806 (2009) ................. 50

People v. Aponte, 306 A.D.2d 42 (1st. Dept. 2003) ....... 51

People v. Ausserau, 77 A.D.2d 152 (4 Dept. 1980) ........56

People v. Baldi, 54 N.Y.2d 137 (1981) .................. 23, 33

People v. Benevento, 91 N.Y. 2d 74 (1998) ............. 41, 49

People v. Berrett, 29 N.Y.2d 462 (1972) ................ 25,44,45

People v. Brown, 45 N.Y.2d 852 (1978) ................. 25

People v. Bussy, 6 A.D.3d 621 (2d Dept. 2004) .......... 37

People v.  Caban, 5 N.Y.3d 143 (2005) ................. 24

People  v. Caldavado, 26 N.Y.3d 1034 (2015) ........... 28, 53

People v. Cantave, 83 A.D.3d 857 (2 Dept. 2011) ........ 49

People v. Carracedo, 89 N.Y.2d 1059 (1997) ............ 40

People  v. Carver, 114 A.D.3d 1199 (4 Dept. 2014) ...... 36

People v. Cedeno, 27 N.Y.3d 110 (2016) ................ 22

People v. Demery, 60 A.D.2d 606 (2d Dept. 1977)........ 51

People  v. Dejesus, 134 A.D.3d 463 (1st. Dept. 2015) ... 52

People v. DiPippo, 27 N.Y.3d 127 (2016) ............... 19,30,31

People v. Droz, 39 N.Y.2d 457 (1976) ................. 25,27,44

CASE                                                          PAGE

People v. Ely, 68 N.Y.2d 520 (1986) .................. 34

People v. Finch, 23 N.Y.3d 408 (2014) ................ 20

People v. Fisher, 18 N.Y.3e 964 (2012) .............. 42,43

People v. Fogle, 307 A.D.2d 299 (2d Dept. 2003) ....... 27

People v. Gangler, 227 A.D.2d 946 (4th Dept. 1996) .... 39,40

People v. Gibian, 76 A.D.3d 583 (2d Dept. 2010) ....... 20

People v. Grant, 163 A.D.2d 117 (1st Dept. 1990) ...... 52

People v. Gruden, 42 N.Y.2d 214 (1977) ............... 58

People v. Hall, 86 A.D.3d 450 (1st. Dept. 2011) ....... 29

People v. Harris, 99 N.Y.2d 202 (2002) ............... 54

People v. Hayes, 17 N.Y.3d 46 (2011) .................. 20

People v. Henry, 56 A.D.2d 610 (2d Dept. 1977) ........ 50

People v. Hudy, 73 N.Y.2d 40 (1988) .................. 21

People v. Jenkins, 68 N.Y.2d 896 (1986) .............. 45

People v. Johnson, 189 A.D.2d 318 (4th Dept. 1993) .... 20(n)

People v. Jones, 24 N.Y.3d 623 (2014) ................ 58

People v. Julian, 41 N.Y.2d 340 (1977) ............... 42

People v. Maxwell, 89 A.D.3d 1108 (2d Dept. 2011) ..... 15, 55

People v. Miller, 87 A.D.3d 1075 (2d Dept. 2011) ...... 40

People v. Morales, 108 A.D.3d 174 (2d Dept. 2013) ..... 52

People v. Mullings, 83 A.D.3d 971 (2d Dept. 2011) ..... 17

People v. Negron, 26 N.Y.3d 262 (2015) ............... 19,30,31

People v. Oddone, 22 N.Y.3d 369 (2013) ............... 45

People v. Oliveras, 21 N.Y.3d 339 (2013) ............. 25,32

People v. Primo, 96 N.Y.2d 351 (2001) ................ 19,30,31

People v. Robinson, 89 N.Y.2d 648 (1997) ............. 21

CASE                                                                        PAGE

People v. Robinson, 84 A.D.2d 732 (1st Dept. 1981) .... 51

People v. Simons, 110 A.D.2d 666 (2d Dept. 1985) ...... 48

People v. Spence, 92 A.D.3d 905 (2d Dept. 2012) ....... 42

People v. Thompson, 111 A.D.3d 56 (2d Dept. 2013) ..... 21

People v. Ugweches, 116 A.D.3d 440 (2d Dept. 2014) .... 45

People v. Vega, 276 A.D.2d 414 (1st. Dept. 2000) ...... 27

People v. Villegas, 98 A.D.3d 427 (1st Dept 2012) ..... 29

People v. Wagner, 104 A.D.2d 457 (2d Dept. 1984) ......49

People v. Yates, 209 A.D.2d 888 (3d Dept. 2002) ....... 38

People v. Zeh, 22 N.Y.3d 1144 (2014) .................. 28

Rosario v. Ercole, 617 F.3d 683 (2d Cir. 2010) ........ 27

Rosario v. Kuhlman, 839 F.2d 918 (2d Cir. 1988) ....... 21

Sparman v. Edwards, 154 F.3d 51 (2d Cir. 1998) ........ 53

Schulz v. Marshall, 528 F.Supp.2d 77 (E.D.N.Y. 2008) .. 32

Schozer v. William Penn Life Ins., 84 N.Y.2d 639 (1994) 9, 36

United States v. Fuentes, 563 F.2d 527 (2d Cir. 1977) . 42

United States v. Iorizzo, 786 F.2d 52 (2d Cir. 1986) .. 54

United States v. McNiece, 558 F.Supp 612 (E.D.N.Y. 1983) 39

United States  v. Ruggiero, 928 F.2d 1289 (2d Cir. 1991) 35

United States v. Varoudakis, 233 F.3d 113 (1st Cir 2000) 22

Wiggin v. Smith, 539 U.S. 510 (2003) .................. 26

Williams v. Taylor, 529 U.S. 362 (2000) ............... 26

Williams v. Washington, 59 F.3d 673 (7 Cir. 1995) ..... 27

Wong v. Smith, 562 U.S. 1021 (2010) ................... 50

Strickland v  Washington. 466 U.S. 668 (1984) ....... passim

CONSTITUTION AND STATUTORY PROVISIONS                    PAGE

United States Constitutions

Fifth Amendment ................................. 16,23,35,55,59

Sixth Amendment ................................. 16,23,35,55,59

Fourteenth Amendment ........................... 16,23,35,55,59


NEW YORK STATE CONSTITUTION

Art 1, § 2 .................................... 50

Art. 1, § 6 ................................... 16,23,35,55,59

NEW YORK CRIMINAL PROCEDURE LAW

Rule § 440.10(2)(b) ........................... 4,15,23

Rule § 440.10 ................................. passim

Rule § 440.30(3) .............................. 56

Rule § 440.30(4) .............................. 28,56,57

Rule § 440.30(5) .............................. passim

Rule § 330.30 ................................. 13

NEW YORK CIVIL PRACTICE LAW AND RULES

Rule § 3101 ................................... 8,36

Rule § 3126 ................................... 9,36

Rule § 4539 ................................... 37,42

NEW YORK PENAL LAW

PL § 125.25(1) ................................ 3

PL § 215.40(1) & (2) .......................... 4,8

NYCPL § 240.45 ................................ 9

NYCPL § 470.15(6)(a) .......................... 44

## QUESTIONS PRESENTED

### POINT ONE

WHETHER THE LOWER COURT ERRED WHEN IT DENIED APPELLANT'S
C.P.L. § 440.10 MOTION WHICH ALLEGED THAT THE TRIAL
COURT DEPRIVED HIM OF DUE PROCESS AND A FAIR TRIAL
TO CONFRONT WITNESSES AND PRESENT EVIDENCE IN HIS
DEFENSE

### POINT TWO

WHETHER THE LOWER COURT ABUSED ITS DISCRETION WHEN IT
DENIED APPELLANT'S C.P.L. § 440.10 MOTION WITHOUT A
HEARING WHERE TRIAL COUNSEL'S CUMULATIVE ERRORS AND
OMISSIONS WERE SO SIGNIFICANT THAT VIEWED IN ITS
TOTALITY, THE REPRESENTATION WAS NOT
MEANINGFUL

### POINT THREE

WHETHER THE LOWER COURT ABUSED ITS DISCRETION WHEN
IT DENIED APPELLANT'S C.P.L. § 440.10 MOTION
WITHOUT A HEARING WHICH ALLEGED THE PEOPLE
KNOWINGLY USED FALSE EVIDENCE TO OBTAINED
THE JUDGMENT

### POINT FOUR

WHETHER THE PEOPLE KNOWINGLY PERPETRATED A FRAUD
UPON THE COURT IN VIOLATION OF APPELLANT'S
RIGHTS TO DUE PROCESS AND A FAIR TRIAL

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:   SECOND DEPARTMENT

---

THE PEOPLE OF THE STATE OF NEW YORK,

                Respondent,               Appellate Division
                                        Docket No. 2013-04432

        -against-

WAYNE CHIN,

           Defendant/Appellant.

---

## STATEMENT PURSUANT TO RULE 5531

1. The indictment number in the court below is 1018/2003.

2. The full names of the original parties were the People of the State of New York against Wayne Chin. There has been no change of the parties on this appeal.

3. This action was commenced in the Supreme Court, Kings County.

4. This appeal is from an order dated February 20, 2013, denying Appellant's C.P.L. § 440.10 motion.

5. Leave to appeal was granted by this Court on May 28, 2013.

6. Appellant has been granted permission to appeal as a poor person on the original record. The appendix method is not being used.

<u>PRELIMINARY STATEMENT</u>

Introduction

A trial is support to be a search for the truth, with the accused permitted to defend himself against the awesome power of the State. But not in this case. The prosecution carefully controlled and abbreviated the presentation of the defense's theory of the case by their willful and pervasive destruction/suppression of essential exculpatory evidence that would have established the defendant's actual/factual innocence. While at trial, the prosecutors successfully opposed the defendant's request to confront witnesses and present evidence in his defense. As a result, the jury was never presented with exculpatory evidence from an unavailable witness‖ Ms. Gaston, who told Detective Crick that she heard an argument coming from the street, looked through her fourth floor apartment window, and saw "a male black, wearing a gray Esco short outfit[,] punching at a female black, that was sitting in a vehicle across the street .... [A] hispanic female was attempting to hold back the subject, stating, "don't do that Johnny, a couple of times.'" Ms. Gaston than stated she heard approximately two or more shots while observing flashes of light [and] the subject entered an auto and left the location. (See, Defendant's CPL § 440.10 exhibit 6). The defendant was not known as Johnny.

Contrary to Ms. Gaston's statements, the prosecution's witness, Aisha White, testified she observed the defendant committing the crime wearing a dress-pant and a button-down shirt. However, because of the prosecution's malicious

-2-

destruction of the original 911 master tape recordings, the jury never learn that Ms. White initially identified the perpetrator's vehicle as a black Lexus as opposed to a gold Lexus which she stated the defendant used to fled the crime scene.

The conviction at issue rests primarily on the testimonies of Chinwe Ifeoma (the deceased's mother), Ryan and Rashawn Aarons (the deceased's sons), and Aisha White (Ryan's cousin by fathers). The linchpin of the prosecutors' case was a secondary audio tape recordings created by Police Telecommunication Technician, Officer Jackson, who edited the tape with her hearsay opinion statements and materially falsified essential components of the audio recordings from that of the original 911 master tape recordings.

The prosecution's egregious misconducts to deprived the defendant of due process started on the night of Ms. Aarons' demised and continued into a trial tinted by judicial bias and prejudicial errors.

This is an appeal from the denial of a post-conviction motion to vacate the judgment rendered on November 17, 2009, in the Supreme Court, Kings County, convicting appellant of murder in the second degree [PL § 125.25(1)], and sentencing him to an indeterminate prison term of 25 years to life (Konviser, J., at trial and sentencing).

Following the conviction, and while the appeal was pending, Appellant moved to vacate the judgment pursuant to C.P.L. § 440.10-1(b)(c)(d)(f), and (h), arguing inter alia, the cumulative errors and omissions of defense counsel's performance was

constitutionally deficient and prejudicial; the trial court's abrogated appellant's constitutional rights to confrontation and to a complete defense; and the People's perpetrated a fraud upon the court, whereas, vacatur of the judgment should have been granted. The motion was a "mixed-claim petition" of ineffectiveness of counsel, alleging facts on and off-the-record. However, the motion was arbitrarily and summarily denied without a hearing on February 20, 2013 (Simpson, J.,), based primarily on the reasons that "sufficient facts appeared on the record to permitted adequate review thereof on direct appeal pursuant to C.P.L. § 440.10[2][b]."

On May 28, 2013, Justice Sylvia Hinds-Radix, granted Appellant's permission to appeal. On November 7, 2013, Lynn W. Fahey, Esq., was assigned appellate counsel. Appellant has no co-defendant in the court below. No stay of execution had been sought and appellant is currently serving his sentence and hereby appeal from each and every part of the lower court's denial of his motion to vacate the judge. The appellant has been incarcerated for over ten years and it is time for the appellant to receive a fair trial in accordance with due process.

<u>STATEMENT OF FACT</u>

It is imperative for this Court to evaluate the significance of the prosecution's willful destruction/suppression of evidence that it was not only offensive to the concepts of <u>Brady v. Maryland</u>, 373 U.S. 83 (1983), but is also a criminal act punishable under Penal Law § 215.40[1] and [2].

1.   <u>The Crime And Investigation</u>

-4-

On June 12, 2001, at approximately 10:30 p.m., the defendant's former girlfriend, Renee Aarons, was talking on her cell phone (80, 156)[1] while sitting in her dark green Lexus vehicle, parked in front of 95 Linden Boulevard, Brooklyn, New York, when she was assaulted and shots several times by an assailant who fled in a vehicle. Twelve individuals[2] within the confines of 95 Linden Boulevard, called the 911 emergency operator(s), generating the responses of New York Police Department (hereinafter "NYPD"), the Fire Department of New York (hereinafter "FDNY"), and the Emergency Medical Services (hereinafter "EMS"). Officers Kerry Calvo and William Davitt were the first to arrived on the crime scene and observed a large crowd of people surrounding the deceased's vehicle (31-33, 45). "FDNY" and "EMS" personnels extracted Ms. Aarons from the vehicle, administered first Aid, and transported her to Kings County Hospital where she succumbed to her injuries.

Rashawn Aarons, Aisha White and Leeford White, were transported from the crime scene to the 67th. Precinct. Detectives Henn and Jack Guinane kept Aisha and Rashawn together during their interviews to facilitated a collaboration between their statements. (See, Def.'s CPL § 440.10 exhibit 3).

Subsequently, Detective Henn retrieved Ms. Aarons' jewelry from Doctor Jordan at the hospital and took the evidence to the

---

1. Unprefixed numbers refers to the minutes of the trial. Numbers prefixed by "VD" refers to the minutes of pretrial proceedings and voir dire. Numbers prefixed by "S" refers to the minutes of the sentencing.

2. Those individuals were Knight; White; Gaston; Cobbs; Taylor; Anderson; Elliot; William; Llodyston; Jacobs; Dove; and Princivil.

Precinct, cleansed them of all biological DNA, and returned them to the deceased's mother (24, 247-48). Thus, suppressing the evidence.

On June 12, 2001, at approximately 11:16 p.m., officers located a gold Lexus vehicle securely locked and parked on Linden Boulevard, near the corner to Nostrand Avenue. At approximately 11:40 p.m., officers illegally broke into the vehicle and conducted a canine search without a search warrant. (172-73, 187). The canine's utilization report was then falsified to coincide with the search warrant obtained on June 13, 2001 (See, Def||'s CPL § 440.10, exhibits 1 & 2).

On June 13, 2001, Ms. Deanna Cobbs and Odette Gaston, both residents of a fourth floor apartment at 100 Linden Boulevard, gave exculpatory statements, respectively, to Detectives Henn and Crick. Both witnesses were unavailable for trial.

2.   The Culpable State Of Mind Destruction Of the
     Original 911 Master Tape Recordings

Ms. White told the 911 operator in pertinent part; "A man shot a female two times in the head and fled in a Black Lexus." Her recorded statements were partially recapped by operator 2249 in the "NYPD" Computerized Sprint Reports and the "FDNY" Computerized Aid Dispatch reports (hereinafter "CAD"). (See, Def.'s CPL § 440.10, exhibit 17). Ms. Cobbs told the operator that several shots were fired outside her window and she observed two individuals fleeing the crime scene in a Black vehicle. (272-76). On June 14, 2001, within forty-eight hours of the alleged crime, Police Telecommunication Technician, Officer Jackson, destroyed the original 911 master tape recordings because of its

exculpatory nature, and created a secondary audio tape recordings, edited with her hearsay opinion statements and made substantial changes of important factual components of the recordings (See, People's trial exhibit 8, compared with Def.'s CPL § 440.10, exhibit 17).

3.   Processing The Vehicles And Suppressing Evidence

On June 13, 2001, Detective Jack Guinane swore out a affidavit for a warrant to search the gold Lexus which was not in compliance with the two prongs test enunciated in Aguiliar/Spinelli. The vehicles were transported by tow trucks to the 71 Precinct and left opened in an unsecured area assessable to the public, compromising the evidence.

On June 15, 2001, Detective Gilford allegedly processed the vehicles for evidence but failed to inventory and voucher all the evidence. Thereby, allowing Detective Henn to suppressed the deceased's cell phone and other items (247-48, 261-64). The suppression of the deceased's cell phone had a prejudicial and chilling effect upon the defense ability to locate an important fact witness to impeach Ms. White's credibility.

4.   Culpable State Of Mind Destruction
     Of The Vehicles

Detective Henn could have easily requested preservation of the vehicles to afford the defense the opportunity examined the vehicles. Instead, with a culpable state of mind, Henn wrote an undated letter to the Property Clerk Department to destroy the vehicles and all its forensic and biologic DNA. Thus, depriving the defendant from proving his actual/factual innocence. Henn's letter established "BAD FAITH" but the trial judge legitimized

-7-

3

his unlawful conduct (59-63, 382-83).

<u>THE MOLINEUX/SANDOVAL HEARINGS</u>

On September 14, 2009, prior to jury selection, the prosecutor disclosed a secondary audio tape recordings, and informed the trial court that the original 911 master tape recordings were destroyed ("VD" 4-5, 6-7). The transcripts for the audio recordings were withheld by the prosecutor under the guise that it constituted her work product ("VD" 48). Defense counsel failed to demand disclosure of the transcription pursuant to C.P.L.R. § 3101(1)(i). The prosecutor were persistent about obtaining a waiver of the defendant's constitutional right to confront Technician Officer Jackson which was rejected (6-7, 195-96).
4

The prosecutor proffered to the court that she would like to play the secondary evidence to the jury in their opening statements as the product of excited utterance exception to hearsay rule ("VD" 49, 78). The trial judge granted the People's request ("VD" 73-78), without any regards to the reliability of the secondary evidence, or the reasons underlying the destruction

---

3.   Penal Law § 215.40(2) reads in pertinent part: "A person is guilty of tampering with physical evidence, believing that certain evidence is about to be produced or used in an official proceeding ...., and intending to prevent such production or use, he suppresses it by any act of concealment, alteration, or destruction..."

4.   To mislead this Court and seek an adverse ruling against appellant, Ms. Marie John-Drigo, averred that; "The record does not reflect whether or not the stipulation regarding the 911 technician was signed by defendant. However, when the people present the stipulation in court, the defendant was certainly put on notice of the People's desire to avoid calling the technician to authenticate the tape. Defendant raised no objection to the stipulation. (Id., <u>See</u>, People's Supp. Brief on direct appeal at page 21).

-8-

of the original 911 master tape recordings as a foundational requirement (See, Schozer v. William Penn Life Ins., 84 N.Y.2d 639, 644 [1994], original citation omitted). Defense counsel failed to object, challenging the reliability of the secondary evidence on the best evidence rule and/or requested sanctions for the spoilation of the original 911 recordings pursuant to C.P.L.R. § 3126.

Although the People were consciously aware of Ryan Aarons' prior inconsistent statements (See, Def.'s CPL § 440.10, exhibit 7, paragraph 4), they knowingly sought to elicit false material testimony from him by proffering to the court that Ryan would testify that he observed the defendant using a firearm while attempting to extort fifty-thousand dollars from the deceased (See, "VD" 35-36; trial tr. 117-125). Defense counsel failed to challenge the prosecutor's proposed statements at the hearing and/or impeach Ryan's trial testimony.

After jury selection, defense counsel informed the court that the People had withheld disclosure of Ms. Ifeoma's prior statements and how it had impeded the defense ("VD" 504-506), but failed to demand sanctions for the Brady/Rosario/CPL § 240.45 violations.

### THE TRIAL

The prosecutor started her opening statements by playing of the false prejudicial audio tape recordings with the technician's hearsay opinion statements entering the jurors' calculus (See, People's trial exhibit 8). She then used the imprimatur of her office to self-authenticated the secondary evidence by telling

−9−

he jury that the recordings were a narrative of an execution (13-14). Then, without disclosure or evidentiary foundation, the prosecutor told the jury that a bloodhound identified defendant's scent and traced it from the Lexus to a nearby bus-stop (16-17).

Defense counsel took no exceptions to the prosecutor's improper statements by moving for a mistrial or any other ameliorative remedies and the prejudicial impact of the prosecutor's improper interjection of the bloodhound would only be exacerbated throughout the trial.

Defense counsel's opening statements were structured upon the inadequacy/thoroughness of the officers' investigation and willful destruction of exculpatory evidence (18-19; 388-404).

The People's identification case at trial was impermissibly bolstered by false, unreliable, and inadmissible evidence lacking foundation. In the interest of brevity, appellant does not reprint the facts, but incorporate them by reference herein. However, the following are pertinent to this brief.

## The Defense Case

The defendant provided counsel with his own list of witnesses (See, Def.'s CPL § 440.10, exhibit 18), but counsel conducted no investigation, contacted and/or prepared any witnesses. Its rare when a defense counsel prepared no witnesses in advance of trial and allowed himself to be forced into compromising his client's defense by accepting a witness provided by his adversary (314-17, 337).[5] That is exactly what occurred

_____

5.  The stenographer erroneously numbered pages 336-37 twice. A set of numbers related to September 23, and the other September 24, 2009.

on September 24, 2009, when defense counsel called Detective
Steiner without any preparation

Detective Steiner testified about his qualification and
experience working as a crime scene investigator in the
collection of evidence. Detective Steiner did not speak with any
of the officers related to the case, did not know any specifics,
and counsel did not show or ask him to review any documentations,
and his testimony was rather worthless (345-352).

Charge Conference

The People requested that the court charge all counts of
the indictment (359-60). Defense Counsel requested a negative
inference charge, stating that the People's willful destruction
of the vehicles prejudiced the defense's opportunity to use an
expert to examine the vehicles (366).

The trial court rejected the People's request and charged
only second degree murder (370, 380). The court rejected defense
counsel's request to charge manslaughter (381-82), and ruled that
the destruction of the vehicles were a consequential fault of
defendant's absence and found no prejudice (382-84).

Jury Charge

The court charged the jury on the presumption of innocence
and the burden of proof beyond a reasonable doubt (414-417),
witness motive to lie, inconsistent statements (419-21), expert
testimony (422-23), and unchanged crime consideration of motive,
intent, identity (424). The court instructed the jury on the
standard of returning an unanimous verdict, tampered with the
cautionary instruction that the jurors must not surrender their

-11-

individual judgment for the sake of returning a verdict (429-30).

Jury Deliberation

The jury deliberated for two days and asked to rehear Rashawn's and Ms. White's testimonies, examined all photographs, to rehear the false prejudicial secondary audio tape recordings, and to know the names of the witnesses whom had proffer session with the prosecutors before trial (See, Court's exhibits 3 & 3A; [436-440]). The Court, prosecutor, and particular defense counsel, all agreed to tell the jury that they did not understand the jurors' question regarding the witnesses/prosecutor's proffer sessions, and asked the jurors to clarified with specificity (440-41).

Approximately 2:49 p.m., the jury submitted another note to the court requesting re-instruction of second degree murder (Court's exhibit 4 [443-47]). However, the jurors' request for information on the witnesses whom had proffer sessions with the prosecutors, was never revisited by the court or defense counsel. Two hours later, the jury requested to know; (1) "What happened if we do not decide today?" and (2) "What happens if all 12 of us cannot come to the same decision?" (Court's exhibit 5, [447-49]). Defense counsel acceded with the court to give the jury a coerced and unbalanced supplemental charge (448-49) without any cautionary instruction. Approximately 10:55 a.m., the following morning, the jury requested to rehear Detective Henn's testimony (Court's exhibit 6, [454-57]). At 1:17 p.m., the jury rendered a verdict of guilty (Court's exhibit 7 [458-59]).

-12-

The C.P.L. § 330.30 Post-Conviction Motion

On October 28, 2009, Appellant moved pro se pursuant to C.P.L. § 330.30, to set aside the verdict raising eleven substantive meritorious grounds contesting the verdict was fundamentally at odds with due process. The arguments set forth therein alleged inter alia; Trial counsel was ineffective; The People's withheld Brady/Rosario materials and bolstered their case with inadmissible canine evidence; The trial court's abrogated appellant's rights to confrontation and to present a defense.

On November 17, 2009, the trial court summarily denied the motion, ruling that appellant's ineffective assistance of counsel claims largely concerned matters that are de-hors the record as they involved challenges to defense counsel's strategic decisions, and alleged failure to investigate and call certain witnesses. (See, Court's decision @ 18). The court also held that appellant's contentions that; "this court somehow prevented him from presenting a defense and eliciting other statements ....., may not be reviewed ....., as it was not raised at trial. (Id., Court's decision @ 11). However, the court arbitrarily overlooked the People's used of inadmissible canine evidence, its prejudicial impact on the trial, the People's Rosario violation, and contended that appellant did not proved that the foundational evidence existed and/or was exculpatory (See, Court's decision @ 5-6). The court further held that overwhelming evidence of Rashawn's and Ms. White's testimonies, corroborated by the (edited and false) secondary audio tape recordings, ballistics

-13-

evidence, the (inadmissible) medical examiner's testimony that stippling was found on the deceased's clothing, overcome any prejudice to defendant (See, Court's decision @ 6-7)(emphasis added). The court sentenced appellant to an indeterminate prison of 25 years to life.

The C.P.L. § 440.10 Post-Conviction Motion

On February 21, 2012, Appellant moved to vacate the judgment pursuant to C.P.L. § 440.10-1(c)(d)(f), and (h), contending inter alia; The trial court abrogated his constitutional rights to confrontation and a complete defense; The People perpetrated a fraud upon the court by knowingly using false evidence; and trial counsel's cumulative errors and omissions deprived him of a fair trial. By letter dated December 20, 2012, Appellant requested permission to amend his petition to alleged a violation pursuant to CPL § 440.10-1(b).

On June 15, 2012, the People filed their response and reiterated that a canine traced defendant's scent from the gold Lexus vehicle to a nearby bus-stop (See, People's affirmation @ 3). The People acknowledged defendant's claim that they perpetrated a fraud upon the court, but failed to dispute any aspect of defendant's argument (Peo.'s Aff. @ 7). First, the People argued that all of the defendant's claims were procedurally barred because they were based on matter that appeared on the record (People's memo. @ 2-3). Second, they argued that six of defendant's claims, including ineffective assistance of counsel, suffered another procedural barrier because the issues were raised upon a prior motion (Peo. memo., @

-14-

4-5). Third, they contends that defendant's claims that do not appears on the record are nonetheless, subjected to a permissive procedural bar (Peo. memo., @ 5). Fourth, the People argued that defendant's allegations are not supported by any other affirmation or evidence, and there are no reasonable possibility that the allegations are true (Peo. memo., @ 5-6). Fifth, they argued that if the court does not reject the defendant's allegations, then the defendant should be required to prove the truth of the allegations at a hearing (Peo. memo., @ 6).

Appellant's motion was a mixed-claims petition supported with off-the-record uncontroverted documentary evidence substantiating the factual predicates of the claims asserted therein. Nonetheless, the lower court mustered several bias and superficial reasons to support its denial and arbitrarily disregarded this Court's decision in **People v.Maxwell**, 89 A.D.3d 1108, 1109 (2d Dept. 2011)("defendant ineffective assistance of counsel mixed-claim petition is not barred under CPL § 440.10 [2][b]), to construct a barrier for appellant to obtain relief. By order dated February 20, 2013, the lower court (Simpson, J.,) summarily denied appellant's motion without conducting a hearing that is, albeit, repugnant to the provisions set forth in C.P.L. § 440.30(5).

ARGUMENT

POINT 1

THE LOWER COURT ERRED WHEN IT DENIED APPELLANT'S
C.P.L. § 440.10 MOTION WHICH ALLEGED THAT THE TRIAL
COURT DEPRIVED HIM OF DUE PROCESS AND A FAIR TRIAL TO
CONFRONT WITNESSES AND PRESENT EVIDENCE IN HIS
DEFENSE. U.S. CONST. AMEND., V, VI, XIV: N.Y. CONST.
ART. 1, § 6.

The instant case is analogous and distinct to the circumstances
in Alvarez v. Ercole, 763 F.3d 223 (2d Cir. 2014). There, the
Second Circuit Court of Appeals affirmed grant of habeas corpus
relief finding that the state trial court restricted defense
counsel who sought to examined the lead detective to show that
the authorities had not pursued lead provided by a witness whose
tip was contained in the detective's investigative reports. The
trial court restricted the introduction of the evidence upon the
mistaken assumption that defense counsel intended to use hearsay
to establish a third-party culpability defense. The restriction
was held unreasonable and violated the defendant's constitutional
rights to confrontation and his right to present a defense. Id.,
Alvarez, 763 F.3d @ 226-234.

Here, sub judice, trial counsel sought to support a trial
strategy that the police officers' investigation was inadequate
(See, 17-18, 388-404) because they had not pursued leads provided
by Ms. Gaston's statements contained in the detective's
investigative reports, and the trial court restricted
confrontation and cross-examination of the officers, barring
introduction of the evidence upon erroneous evidentiary
principles that appellant could not elicit exculpatory statements

in his defense because it was inadmissible hearsay. The following constituted the trial court's decision:

> Ms. Prisner: "He wants Detective Crick to put in evidence that is ranked hearsay. That should defendant wish to bring that information out, he should call Parnell Gaston, who is the source of that information."

> The Court: Well, obviously, the rules of evidence are going to apply. I don't know exactly what the defense is going to do. What's going to apply is that if the defendant calls those witnesses, he is going to have to ask direct question. He cannot cross-examine the witness, and those are the rules ..... If he elicit hearsay, I will preclude it, unless it falls under a recognized exception. What the application was then, Mr. Smallman, was whether or not there was an interview of an eyewitness, not necessarily the substance, which, of course, would be hearsay......

(Id., trial tr. 306-07).

Another exemplar compelling reversal is tendered upon this Court criticizing the same judge (Konviser, J.,), for precluding defense counsel from questioning the police officer about an investigative report made by the complainant's prior inconsistent statements, and the unfairness resulted in reversal. See, People v. Mullings, 83 A.D.3d 971 (2d Dept. 2011).

This Court will find it more preferable when the same trial judge repeatedly misinterpret New York State evidentiary rule that indeed threatens the fairness of the trial, in which this Court should refuse to uphold appellant's conviction as reliable to produce a fair result inconsistent with the cited precedents and fundamentally at odds with this Court's prior disposition in Mullings, supra, is not optional.

Appellant presented the lower court with uncontroverted documentary proof of Ms. Gaston's exculpatory statements which

-17-

was the basis of a written report filed by Detective Crick (See, Def.'s CPL § 440.10, exhibit 6), which de hors the trial records, substantiating all the factual contentions that the trial court deprived him of his constitutional rights to confront witnesses and present evidence in his defense (See, Def.'s CPL § 440.10 affidavit @ 41-43; memorandum @ 37-42).

Nonetheless, the People advanced a number of substantive and procedural deficiencies in the trial court's evidentiary ruling did not deprived the appellant of his rights to due process and a fair trial (See, People CPL § 440.10 memo., @ 14-16). The fallacy in the People's arguments and the lower court's rulings flounders on ones' closed-minded misapprehension of the law and appellant's rights to present a defense.

The People argued that; "Trial counsel could not state any exception to the hearsay rule under which Ms. Gaston's statements would have been admissible, and the lower court's ruling was proper in all respect ..., as whether the hearsay rule was properly applied during cross-examination of the People's witness ..., those claims are based on the record and defendant has not yet perfected his appeal, the People will not address the merits of the claim at this time." (See, People's CPL § 440 memo., @ 14-16). Contrary to that argument, the People took different position in their supplemental brief dated October 3, 2014, arguing that; "Ms. Gaston's statements are de hors the record and cannot be considered on direct appeal." (See, People's Supp. Br.

_____

6. To mislead this Court, the People averred in their response brief dated January 29, 2016; "In addition to having defense counsel's description

@ 32).

Due to Judge Simpson's misapprehension of the law for the admission of relevant evidence enunciated in People v. Primo, 96 N.Y.2d 351 (2001), she failed to conduct a hearing and/or give the proffered evidence the consideration it rightfully desired under the enumerated applicable standards of C.P.L § 440.30(5). (See, Court's decision @ 8-9). The lower court ruled that appellant had to "show a direct connection to the crime." However, Primo only laid out the test for the admissibility of third-party-culpability evidence, not the bare minimum factual connection a defendant must make between the crime and third-party. See, e.g., People v. DiPippo, 27 N.Y.3d 127 (2016); People v. Negron, 26 N.Y.3d 262 (2015). Further, the Second Circuit would reject the lower court's erroneous ruling on constitutional Sixth Amendment law, as incorrect, because it left the appellant without any means of supporting his defense. See, Alvarez, 763 F.3d @ 231.

Notably, trial counsel could not articulated the Federal and State Constitutional grounds to overcome the trial court's erroneous evidentiary ruling barring admission of Ms. Gaston's exculpatory statements. But, the undisputed fact remained that trial counsel preserved the issues by informing the trial court that the elicitation of the proffered evidence was not to prove the truth of the statements, when the trial court launched into its erroneous evidentiary ruling restricting cross-examination of

of Detective Crick's interview with Ms. Gaston in the trial record." Id., @ 26. The transcripts will substantiate Ms. Gaston's statements are de hors the record.

-19-

Detective Henn (272-275). Therefore, Appellant argues that the non-hearsay purposes trial counsel had earlier advanced for the admission of Ms. Cobbs' exculpatory statements when the court restricted cross-examination, properly preserved the non-hearsay purpose for admission of Ms. Gaston's exculpatory statements. See, People v. Finch, 23 N.Y.3d 408 (2014)("having received an advance ruling on a constitutional violation at an earlier stage of the proceeding, defendant did not need to assert the same theory in order to preserve the issue for appeal.").

A common tactics of defense lawyers is to discredit the caliber of the investigation, (Kyles v. Whitley, 514 U.S. 419, 446 [1995]),[7] and several courts recognized the non-hearsay purposes of trial counsel's strategic challenge to the adequacy of the police investigation, See, e.g., People v. Hayes, 17 N.Y.3d 46, 53 (2011)("challenging the adequacy of a police investigation may constitute a permissible non-hearsay purpose"); People v. Gibian, 76 A.D.3d 583, 585 (2d Dept. 2010)("evidence of a statement offered not to prove the truth of the statement but to prove that the statement was made is not hearsay").

The Supreme Court law clearly established that under the Sixth Amendment's Confrontation Clause, a defendant must have "a meaningful opportunity to cross-examine witnesses against him." Pennsylvania v. Ritchie, 480 U.S. 39, 51 (1987). Equally, the right to present evidence is an integral component of the adversarial trial process and a fundamental right. Holmes v South

_____

7.   See, e.g., People v. Johnson, 189 A.D.2d 318 (4 Dept. 1993)(reversed, in part, because jury was not told reasonable doubt can arise from lack of evidence).

Carolina, 547 U.S. 319, 324 (2006); People v. Hudy, 73 N.Y.2d 40, 57 (1988). State evidentiary rules "may not be applied mechanistically" to defeat this crucial right. Chambers, 410 U.S. at 302, accord Holmes, 547 U.S. at 321, 324-25, 330-31. Thus, the right to present a defense encompassed not only the right to present direct testimony of live witnesses but also, in certain circumstances, the right to present secondary forms of evidence such as hearsay or prior testimony. Rosario v. Kuhlman, 839 F.2d 918, 924 (2d Cir. 1988); People v. Robinson, 89 N.Y.2d 648, 654 (1997); People v. Thompson, 111 A.D.3d 56 (2d Dept. 2013)("exculpatory evidence admitted to challenge the consistency and accuracy of the victim's identification"); Cf. People v. Bradley, 99 A.D.3d 934 (2d Dept. 2012)("exculpatory hearsay statement should have been admitted for the truth").

Alvarez v. Ercole, supra, adequately supported trial counsel's strategy which was to introduce enough suspicion about the thoroughness of the "NYPD" investigation to plant reasonable doubt that the State had not met its burden of proof. By excluding Ms. Gaston's exculpatory statements and cross-examination, the trial court deprived appellant of evidence essential to his primary defense. Furthermore, the prosecutor repeatedly emphasized that shortcoming in summation, labeling as "speculative" criticism of the police investigation and submitting to the jury that the police "did a good job and follow up lead" (404-410). Thus, impermissibly vouching for their witnesses' credibility. Therefore, it would be far afield to affirm appellant's conviction in light of the cited variations o

-21-

the trial court's "restriction" run counter to New York and United States Constitutions, and sufficient enough to vacate the judgment on par and consistent with those cited holding.

The trial court's erroneous evidentiary ruling deprived appellant of his rights in two fundamental ways, from offering evidence and from confronting his accusers to impeach their credibility with prior inconsistent statements. Independently and in combination, the trial court's ruling effectively prevented appellant from defending himself. Thereby, depriving him of due process and a fair trial.

Futhermore, courts have been unwilling to find harmless error where the record, as in this case, affirmatively shows that the jury struggled with their decision and was given a coerced and unbalanced supplemental jury instruction (449-450). See, e.g., United States v. Varoudakis, 233 F.3d 113, 127 (1st. Cir. 2000)(noting, in weighing harmlessness, that "the jury's impasse note reveals uncertainty about the defendant's guilt); People v. Cedeno, 2016 Slip Op. 02281 (2016)(rejecting, harmless analysis because jury struggled with verdict, requiring the court to provide Allen charge).

Accordingly, the lower court erred and should have granted relief in compliance with the statutory provisions of C.P.L. § 440.30(5).

POINT 2

— THE LOWER COURT ABUSED ITS DISCRETION WHEN IT DENIED APPELLANT'S C.P.L. § 440.10 MOTION WITHOUT A HEARING WHERE TRIAL COUNSEL'S CUMULATIVE ERRORS WERE SO SIGNIFICANT THAT VIEWED IN ITS TOTALITY, THE REPRESENTATION WAS NOT MEANINGFUL. U.S. CONST. AMENDS. VI, XIV: N.Y. CONST. ART. 1, § 6.

Appellant has never wavered in his assertion that the judgment was obtained by the People's knowing uses of false evidence, manufactured with a criminal intent to perpetrate a fraud upon the court, and trial counsel's cumulative errors and omissions contributed to the gross injustice. The appellant presented the lower court with two pieces of powerful physical evidence which de hors the record that "created a probability that had such evidence been received at trial the verdict would have been more favorable to him."

Nonetheless, the lower court determined that grounds or issues in appellant's "mixed-claim petition" was adequate for appellate review, and thus, barred under C.P.L. § 440.10(2)(b). (See, Court's decision @ 4).

A.   The Law Regarding The Right to
     Effective Assistance Of Counsel

Under the United States and New York State Constitution, a criminal defendant is entitled to "effective" or "meaningful" representation. See, Strickland v. Washington, 466 U.S. 668 (1984); People v. Baldi, 54 N.Y.2d 137 (1981).

Under the Federal test, a defendant is deprived of this right when counsel's performance falls below a reasonable level of professional competence and prejudices the defendant. See, Strickland, 466 U.S. @ 692. "Prejudice" is defined as a

-23-

"reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. The defendant "need not show that counsel's deficient conduct more likely than not altered the outcome of the case." Id. @ 693. A "reasonable probability" is less than a preponderance of the evidence and need not be "more likely than not"; it is "a probability sufficient to undermine confidence in the outcome." Id., @ 694.

Ineffective assistance may be premised upon a single error that, regardless of the balance of the representation, is "sufficiently egregious and prejudicial" to compromise the defendant's right to a fair trial. Murray v. Carrier, 477 U.S. 478, 496 (1986)(citation omitted); People v. Caban, 5 N.Y.3d 143, 152 (2005)(citation omitted); see also Espinal v. Bennett, 588 F.Supp.2d 388, 401 (E.D.N.Y. 2008)(counsel ineffective for failing to properly investigate potential alibi defense, despite counsel's "vigorous" representation of defendant). Where defense counsel had made several errors, analysis as to whether his performance was unreasonable and prejudice occurred cumulative. See, Pavel v. Hollins, 261 F.3d 210, 216 (2d Cir. 2001)

New York Constitution "offer greater protection than the federal test." Caban, 5 N.Y.3d @ 156. Under New York law, a criminal defendant is guaranteed "meaningful representation" -- a standard that does not require the defendant to fully satisfy the Strickland prejudice prong, Id. "[E]ven in the absence of a reasonable probability of a different outcome, inadequacy of counsel will still warrant reversal whenever a defendant is

deprived of a fair trial," Id.; see also People v. Brown, 45 N.Y.2d 852, 853 (1978)(reversal even though the evidence of guilt was "overwhelming" because "defendant was entitled to a fair trial represented by effective counsel")(citation omitted).

This Court repeatedly has made clear that "the attorney's investigation of the law, the facts, and the issues" relevant to the case "[e]ssential to any representation, and to the attorney's consideration of the best course of action on behalf of the client." People v. Oliveras, 21 N.Y.3d 339, 346 (2013)(citing Strickland, 466 U.S. @ 690-91. "[I]t is elementary that the right to effective representation includes the right to assistance by an attorney who has taken the time to review and prepare both law and facts relevant to the defense." People v. Droz, 39 N.Y.2d 457, 462 (1976)(citation omitted). Indeed, because "[a]n attorney's strategy is shaped in significant part by the result of the investigation stage of the representaion," Oliveras, 21 N.Y.3d @ 346, the right to counsel entitles a defendant "to have counsel conduct appropriate investigation, both factual and legal, to determine if matter of defense can be developed." People v. Bennett, 29 N.Y.2d 462, 466 (1972)(internal quotations and citation omitted); see also, Strickland, 466 U.S. @ 691 (counsel must "make reasonable investigations" or "make a reasonable decision that make particular investigations unnecessary"). Where counsel has failed to conduct an investigation that would have led to evidence favorable to the defendant, ineffectiveness will be made out. See, Lindstadt v. Deane, 239 F.3d 191, 200-02 (2d Cir. 2001)(counsel ineffective

-25-

for failing to investigate evidence that defendant could not have committed the crime at the time alleged).

Additionally, it constitutes ineffective assistance to fail to utilize available evidence that contradicts or undermines an "eyewitness identification where such testimony of the primary evidence connecting the defendant to the crime. See, e.g., Berryman v. Morton, 100 F.3d 1089, 1097 (3d Cir. 1996)(where the case "hinges on an eyewitness' testimony .... it's difficult to assume that a reasonable tactical decision was made not to challenged that testimony"); Harris v. Senkowski, 298 F.Supp.2d 320, 337 (E.D.N.Y. 2004)(finding "inexcusable" defense counsel's failure to cross-examine victim with prior inconsistent description of her attacker).

While truly "strategic choices" by counsel are "virtually unchallengeable," the phrase only applies to decisions "made after thorough investigation of law and facts relevant to plausible options." Strickland, 466 U.S. @ 690. That is|| "strategy" is "conscious" reasonable informed" decision making "with an eye to benefiting" the client. Pavel, 261 F.3d @ 218. "[W]e judge the reasonableness of the purported 'strategic decision' on the part of defense counsel 'in terms of the adequacy of the investigations supporting it.'" Gersten v. Senkowski, 426 F.3d 588, 609 (2d Cir. 2005)(quoting Wiggins v. Smith, 539 U.S. 510, 521 [2003]).

Relatedly, a failure by counsel that is based upon a legal misunderstanding, Williams v. Taylor, 529 U.S. 362, 395 (2000); "mistaken belief," Kimmelman v. Morrison, 477 U.S. 365, 385

-26-

(1986); or "ignorance, Williams v. Washington, 59 F.3d 673, 680 (7th. Cir. 1995), is not "strategy." Counsel's error cannot be "rationalized away." People v. Fogle, 307 A.D.2d 299, 301 (2d Dept. 2003), when it result from a "misapprehension of the law," People v. Vega, 276 A.D.2d 414 (1st. Dept. 2000); see also Droz, 39 N.Y.2d @ 462 ("elementary" that effective counsel must review the law 'relevant to the defense.'").

B.    The Lower Court's Factual Finding Are Erroneous

It was totally bias and unfair for the lower court to analyzed trial counsel's off-the-record performance and made a finding of facts that counsel's provided effective assistance while refusing to analyze counsel's cumulative trial errors and omissions in its totality. See, e.g., Rosario v. Ercole, 617 F.3d 683 (2d Cir. 2010)("to the extent that any state court failed to afford relief for prejudicial error, that oversight would be contrary to both federal and state standard").

After jury selection, counsel's emphasized to the court;

"There are other possible people responsible for this crime, other than Mr. Chin. The decedent was involved in other relationship with people that prove to be difficult."

(Id., voir dire at pages 500-502).

During summation, trial counsel sternly argued that;

"If Wayne Chin drove that car (gold Lexus) from Jersey to Brooklyn ..., unless you can show me somebody who can drive a car without touching a steering wheel, there would likely have been fingerprints on that steering wheel. And we know the cars were dusted. I can only ask you to think about it?"

(Id., trial tr. at pages 395-96).

-27-

Appellant contended that trial counsel's failure to investigate fingerprints from the gold Lexus vehicle to determine the third-party source of prints recovered, and to obtained appellant's cell phone information was objectively deficient and prejudicial performance that deprived him from establishing his actual and factual innocence. (See, CPL § 440.10 Affidavit @ 26-27; memorandum @ 52-55).

First, the lower court relied on C.P.L. § 440.30(4)(b) & (d), to rejected appellant's allegations (See, Court's decision @ 5-8). Contrary to the court's factual findings, appellant's moving papers contained sworn allegations, exhibits, and the record substantiated all the essential factual components suppling a legal basis for the motion, requiring a hearing, See, C.P.L. § 440.30(5); see also, People v. Caldavado, 26 N.Y.3d 1034 (2015)("in the absence of any submission from defense counsell --- as to whether counsel's alleged deficiencies were merely the result of a reasonable, but unsuccessful trial strategy, or failure to pursue the minimal investigation, requires a hearing to resolve defendant's claim of counsel's ineffectiveness"), citing People v. Zeh, 22 N.Y.3d @ 1146.

Second, the lower court went to great lengths purporting the merits of appellant's arguments with the following:

> "The defendant has failed to alleged any facts that would have warranted further examination of the defendant's cell phone records. Defendant contends that counsel could have substantiated an alibi through the phone global positioning system [GPS], that he was not at the scene of the crime. On June 13, 2001, Detective Guinane applied for and was granted a pen register and trap and trace device on a phone that defendant had used to call Renee. The

police intended to use the pen register and trap and
trace device in order to locate and apprehend
defendant, who had since fled. To the extent that
defendant is claiming that counsel should have obtain
those records from the police, they would not have
been relevant because they would have been generated
after the shooting. In addition, counsel had little
basis to pursue an alibi defense because he was faced
with two strong eyewitnesses accounts of the shooting
that unequivocally identified defendant as the
shooter."

(Id., Court's decision @ 7-8).

Judge Simpson simply rationalized away trial counsel's
ineffectiveness with a superficial explanation that "Defendant
used the phone to call Renee" on June 12, 2001, but contradicted
herself by stating that appellant wanted to use the phone records
of June 13, 2001, to establish an alibi defense.

Appellant's complaint was directed at the omitted cell
phone records transmission the day of the underlying offense in
which the trace would have placed appellant at a location other
then the scene of the crime. Trial counsel could have easily
obtain a subpoena from the court, compelling disclosure of the
record from Sprint Telephone Company which Judge Simpson was
obviously aware happened in many cases. Instead, she arbitrarily
dismissed appellant's contentions without properly considering
the facts and law. See, e.g., People v. Villegas, 98 A.D.3d 427
(1st. Dept. 2012)("articulating a lower court's factual finding
will be set aside if it's clearly dubious and clearly unsupported
by the record).

For example, in People v. Hall, 86 A.D.3d 450 (1st. Dept.
2011), the records of the cell tower transmission disclosed
Hall's whereabouts without interruption and sufficiently placed

Hall at the location of the offense he was charged with. The Cell Site Location Information ("CSLI") produced calls made over a three days period surrounding the shooting. (emphasis added).

Had trial counsel merely obtain the cell phone records, he would have been able to critically derail the prosecution's theory of the case, whereas and insofar, forced the basis of an alibi against the alleged two eyewitnesses' account of the shooting, sufficiently creating reasonable doubt as to change the outcome of the proceeding.

Third, in rejecting appellant's third-party-culpability defense argument, Judge Simpson seized the moment to advance a short statement in a serious attempt to explained why the factors in People v. Primo, 96 N.Y.2d 351, 355-56 (2001), favors discounting trial counsel's failure to conduct pretrial investigation was misguided and unjust. (See, Court's decision @ 8-9).

Judge Simpson determined that the proffered evidence must show a "direct connection" to the crime for admissibility of third-party-culpability defense was clearly unreasonable. See, generally People v. DiPippo, 27 N.Y.3d 127 (2016); People v. Negron, 26 N.Y.3d 262 (2015)("reaffirming that third-party evidence should be evaluated in accordance with ordinary evidence principles").

To illustrate the point, the analogy in Negron is helpful. There, the victim of the shooting identified Negron as the shooter. Prior to the close of the People's case, defense counsel sought to introduce evidence that a third-party, Fernando Caban,

-30-

had committed the shooting. Counsel proffered that Caban closely matched the description of the perpetrator, lived in the same building and was arrested the day after the incident for possession of firearm and ammunitions. The People objected, disputing the close resemblance, and maintained that it was irrelevant that Caban had been arrested the next day for firearm possession which had not been use to commit the instant offence. The trial court rejected defendant's application, stating that there has to be a "clear link" between Caban and the crime in question. The Court of Appeals reversed, reaffirming its holding in Primo that the clear link test was nothing more than a abbreviation of conventional balancing evidentiary principles applicable to all relevant evidence. Therefore, Primo only laid out the test for the admissibility of third-party-culpability evidence, not the bare minimum factual connection a defendant must show between the crime and a third-party. See, Primo, N.Y.2d @ 355. Under Primo, Negron, and DiPippo, appellant need only show, that the proffered evidence was relevant and that its probative value was not outweighed "by the prospect of trial delay, undue prejudice to the opposing party, confusing the issues or misleading the jury."

Here, appellant presented the lower court with uncontroverted evidence that the initial 911 call from Ms. White was that "a man shot a female two times in the head and fled in a black Lexus" (See, FDNY "CAD" reports marked Defendant's CPL § 440.10 exhibit 17). Ms. Cobbs's statements that two individuals fled the crime scene in a "black vehicle" (272-276), and Ms.

-31-

Gaston's description of a perpetrator named "Johnny," wearing a gray Esco shorts outfit, accompanied by a hispanic female (<u>See</u>, Def.'s CPL § 440.10, exhibit 6)

Each fact (including the unknown third-party fingerprints) was an abbreviation of an ongoing criminal event in which counsel had an obligation to investigate and determine the validity that would ultimately advance a legal theory at trial. A proper investigation is "[e]ssential to any representation" <u>People v. Oliveras</u>, 21 N.Y.3d 339, 346 (2013). As Judge Rivera explained in <u>Oliveras</u>, this is because counsel's "strategy is shaped in significant part by the results of the investigation stage of the representation." <u>Id.</u> Where defense counsel has failed to conduct a proper investigation of his client's case, the court owes no deference to counsel's so-called strategic choices because those choices likely were skewed by counsel's ignorance. <u>See</u>, <u>Id.</u>, @ 346-48; see also <u>Strickland v. Washington</u>, 466 U.S. 688, 691 (1984)(counsel must "make reasonable investigations" or "make a reasonable decision that makes particular investigation unnecessary"). Where defense counsel has failed to conduct a necessary investigation that would have led to information favorable to the defendant, he is ineffective as a matter of law. <u>See</u>, <u>Lindstadt v. Keane</u>, 239 F.3d 191, 200-02 (2d. Cir. 2001); <u>Schulz v. Marshall</u>, 528 F.Supp.2d 77, 96 (E.D.N.Y. 2008)(finding counsel ineffective for failing to investigate [petitioner's] case diligently).

Viewed against those principles of law should lead this Court to no other conclusion than the fact that trial counsel's

-32-

inaction to conduct pretrial investigation was professionally inexcusable and the lower court's abused its discretion in rejecting appellant's contentions without conducting a hearing in compliance with C.P.L. § 440.30(5).

C.    Trial Counsel's Cumulative Errors and Omissions
      Were So Prejudicial That It Renders The Trial
      Unreliable And Fundamentally Unfair

As appellant have shown, trial counsel's errors, considered individually, prejudiced appellant's defense and thus denied him a fair trial. That conclusion becomes even more compelling when these errors considered cumulatively, as they must be under federal and state law. See, Eze v. Senkowski, 321 F.3d 110, 135-36 (2d Cir. 2003); Baldi, 54 N.Y.2d @ 146.

The ineffective performance of trial counsel permeated several aspects of the appellant's trial representation and occurred both on and dehors the record. With respect to the dehors the record ineffectiveness, the appellant's properly filed C.P.L. § 440.10 motion contained sworn allegations of facts that unequivocally established that counsel's performance in this case violated both Federal and State Standards for the effective assistance of counsel. Specifically, the C.P.L. § 440.10 motion below raised non-record based allegations of facts that trial counsel had no plausible strategic reasons for failing to impeach the People's witnesses with their prior inconsistent statements; failing to investigate exculpatory evidence and potential exculpatory witnesses; failed to file any pretrial motion to suppress/opposed and limit the People's trial evidence; and failed to demand Brady and Rosario materials. Because there did not existed any plausible legal strategy for the myriad of errors

by counsel and because appellant was severely prejudiced and denied meaningful representation, the lower court erred by summarily denying the C.P.L. § 440.10 motion without a hearing.

Similarly, the trial record also proves that trial counsel's errors in this case were so significantly egregious that his performance rendered the trial unreliable and fundamentally unfair, violating both federal and State standards for effective assistance. Specifically, the trial record shows that trial counsel lacked strategic reasons for failing to object and challenged the reliability of the People's secondary audio tape recordings, failed to object to inadmissible prejudicial bloodhound evidence that added substantial weight to the People's case not subjected to confrontation and cross-examination; failed to object to the Medical examiner's inadmissible prejudicial testimony and photographs which added substantial weight to the People's case not subjected to confrontation and cross-examination; failed to object to a coerced and unbalanced supplemental jury instruction; failed to object to the prosecutors' cumulative misconducts. All of which viewed independently or cumulatively, deprived appellant of his constitutional rights to effective assistance, due process, and a fair trial.

1.   Counsel's Failure To Investigate The People's
     Secondary evidence Was Deficient and Prejudicial

In People v. Ely, 68 N.Y.2d 520 (1986), the Court of Appeals recognized and was equally sensitive about the danger that audio tape recordings can be easily altered and contaminate the trial process, therefore, the Court recommended an heightened

-34-

concern for expert assistance to detect alteration. (Id., Ely, 68 N.Y.2d @ 528.); see also, United States v. Ruggiero, 928 F.2d 1289, 1303 (2d Cir. 1991)("recognizing that recorded evidence have a strong impression upon the jury and is susceptible to alteration").

The appellant's Omnibus Motion requested disclosure of all recordings which the prosecutor intended to use at trial (See, Defendant CPL § 440.10, exibit 20). On April 16, 2008, The People averred that; "The original 911 master tape recordings has been erased, the People reserved the right to locate other recordings, if they exist, and use them... " On September 14, 2009, jury selection, the People disclosed a secondary audio tape recordings and immediately expressed their desire to skirt the evidentiary foundation by requesting that appellant waive his constitutional rights to confront the technician who created and edited the secondary evidence, (See, "VD" 4-5, 6-7, 195-96), thus, exhibiting their culpable state of mind to perpetrate a fraud upon the court.

The Fifth, Sixth and Fourteenth Amendments to the United States Constitution imposed an absolute obligation on a prosecutor to preserve and disclose to the defense favorable evidence "material either to guilt or to punishment" Brady v. Maryland, 373 U.S. 83, 87 (1963). Failure to do so violates due process. Id. Trial counsel was duly obliged with protecting appellant's interest to make sure that the People honor its obligation to preserve and timely disclose Brady material and his failure to object the People's willful destruction of the

-35-

original 911 master tape recordings was objectively deficient and prejudicial in the context that Ms. White's initially stated the perpetrator fled in a bllack Lexus. See, e.g., People v. Carver, 114 A.D.3d 1199, 1206 (4th Dept. 2014)(recording of 911 call in which witness identified suspect as white male was material, for purposes of bllack defendant's Brady claim).

Yet, trial counsel sat idled and allowed the People to withheld the transcriptions of the secondary evidence under the guise that it constituted they work product ("VD" 48). Instead, of requesting an adjournment to investigate the secondary evidence with an expert.

Due to counsel's failure to investigate and challenge pretrial, the People's Brady violation, demanded full disclosure of the transcription pursuant to C.P.L.R. § 3101(i), and requested sanctions for the spoliation of the original 911 master tape recordings pursuant to C.P.L.R. § 3126. Appellant's defense was prejudiced because the People was able to avoid establishing the evidentiary foundation requirement for admission of the secondary evidence. See, e.g., Schozer v. William Penn Life Ins., 84 N.Y.2d 639, 644 (1994)("The more important the evidence to the resolution of the ultimate issue in the case, 'the sticker becomes the requirement of the evidentiary foundation establishing the loss/destruction was not done in bad faith, for the admission of the secondary evience'").

Had counsel's taken the time to investigate the secondary evidence, he would have known that the evidence was false and would have been able to critically and severely crippled the

People's case and impeach Ms. White's testimony, decisively changing the outcome of the proceedings, beyond a possibility or probability.

The failure to investigate is so fundamental to the deprivation of effective assistance of counsel ... that it cannot be rationalized away with post hoc construction of trial theory of defense. People v. Bussy, 6 A.D.3d 621, 622 (2d Dept. 2004). Failing to obtain expert witness' testimony or avail of expert consultant to evaluate evidence when the attorney is unable to assess the evidence, may constitute ineffective assistance. Pavel v. Hollins, 261 F.3d 210, 244 (2d Cir. 2001)("when a case hinges all-but-entirely on whom to believe, an expert's interpretation of relevant physical evidence ... may tip the scales before the fact finders").

2.    Trial Counsel's Failure to Object To The Reliability And Admissibility Of the Secondary Evidence Was Prejudicial

The falsified and edited secondary audio tape recordings were played three times to the jury (13-14, 149-50, 440) to improperly bolstered the People's identification case and influence the guilty verdict. This falsified secondary evidence added substantial and critical weight to the People's case in the form not subject to confrontation and/or cross-examination of the technician who manufactured the false evidence.

Trial counsel's failure to challenge the reliability of the secondary evidence and object to its admissibility on the best evidence rule (C.P.L.R. § 4539), was objectively deficient performance which compromised appellant's defense and prejudice

-37-

should be assumed. In furtherance, there were no plausible strategic explanation for counsel's failure to seek preclusion of the secondary evidence by demanding sanctions for the spoliation of the original 911 master tapes. See, New York City Hous. Auth. v. Pro Quest Sec., 108 A.D.3d 471 (1st. Dept. 2013)(a party may be precluded from entering the redacted video into evidence or having a witness testify to its contents).

Under the circumstances, trial counsel's failure to forego requesting a hearing to preclude the admission of the secondary evidence was not an objectively reasonable strategic calculation, but rather demonstrated a failure to properly comprehend the tactical process necessary to set the stage for the defense and preservation of the issues for appellate review. See, People v. Yates, 209 A.D.2d 888 (3rd. Dept. 2002)("trial counsel should litigate admissibility issues before trial").

3. **Trial counsel's Failure To Object To The Prosecutor's Improper Statements That A Bloodhound Identified Appellant's Scent Was Deficient and Prejudicial**

Without any disclosure or evidentiary foundational predicates to establish the bloodhound's ability to distinguish the human's scent, the prosecutors has repeatedly told the courts that a bloodhound identified appellant's scent and followed it from the Lexus vehicle to a nearby bus-stop. (See, trial tr. @ pg. 16; People's C.P.L. § 440.10 opposing affidavit @ 3; People's brief on direct appeal @ 10-11).

Here, the People would like to distance themselves from the trial prosecutors' improper statements and elicitation of inadmissible bloodhound evidence, to advanced an argument that

-38-

the officers stated that "the bloodhound tracked a specific scent from the Lexus to a bus-stop, neither officers stated that the bloodhound tracked defendant's scent." (People's Supp. Brief on direct appeal @ 45-46). Therefore, the People requested that this Court review the officers' observation opinion testimonies about the bolldhound's reaction in isolation and not in conjunction with the prosecutors' improper prejudicial opening statements. However, what the People cannot be allowed to do, is proffered evidence, passionately argued for its centrality to obtained the conviction, then abandoned reliance on the evidence once the conviction is obtained and the evidence is shown to be false.

Its horn book case law, that trial testimony regarding bloodhound's reaction will not be countenanced unless the People has established an evidentiary foundation and the court has given a cautionary instruction. See, United States v. McNiece, 558 F.Supp. 612, 615 (E.D.N.Y. 1983); People v. Gangler, 227 A.D.2d 946, 46-47 (4th. Dept. 1996)("bloodhound's tracking evidence is admissible on the issue of identity if proper foundation is laid and the jury is given cautionary instruction").

In light of those resounding precedents which set forth the evidentiary foundation requirements, trial counsel's inexplicably failed to object, move for a mistrial, or requested any ameliorative remedies for the prosecutors' improper prejudicial statements and elicitation of inadmissible bloodhound tracking evidence.

Not only did trial counsel allowed the People without objection or legal discussion to improperly bolstered their

-39-

identification testimony with inadmissible evidence. In fact, it was trial counsel himself who when cross-examining both Detectives Calabrese and Henn, elicited the worse inferential bolstering (186-89, 267-68), and compounded the error with his summation statements (392-93, 395). In People v. Miller, 87 A.D.3d 1075 (2d Dept. 2011), this Court unanimously found counsel ineffective for his negligence to pursued critical objections, failed to prevented unduly prejudicial testimony from being admitted into evidence, and failure to request a limiting instruction.

Nonetheless, it is axiomatic that it is impermissible to bolster a witness' identification in a manner that violates the Confrontation Clause, Indeed, the People had never afforded the appellant an opportunity to confront the bloodhound's handler or disclosed any Rosario material relevant to the bloodhound's ability to distinguish the human's scent. Notwithstanding, the trial court's imposition that it was appellant's burden to prove that Rosario material related to the bloodhound and his handler existed (See, Trial Court's decision dated November 17, 2009, @ 5, 7-8), see also, People v. Carracedo, 89 N.Y.2d 1059, 1062 (1997)("Where Rosario material related to the dog's handler notes are destroyed, the court is required to impose sanctions that are designed to eliminate resulting prejudice to the defendant").

The last testimony the jurors reheard before rendering their verdict, was the prejudicial statements from Detective Henn's reference to the bloodhound's reactions (455). Under these circumstances, the error cannot be considered harmless because it

-40-

contributed to the verdict. Furthermore, the Court of Appeals has affirmatively stated that even "harmless error" could undermine the fairness of the process in such a way that violates the state's constitutional guarantee of effective assistance of counsel. <u>People v. Benevento</u>, 91 N.Y.2d @ 74.

Trial counsel's inattention and lack of advocacy in this situation was so severe that it is impossible to ascertain at this stage the true effect of his lapse. to date, trial counsel has not provided any strategic reasons, valid or otherwise, for his errors and omissions cited herein. Incredibly, these errors by counsel were not the only ones illustrating that appellant was denied meaningful representation at trial. Accordingly, the lower court's refusal to adjudicate trial counsel's ineffectiveness in its totality was an arbitrary abused of discretion which contravened the applicable provisions of C.P.L. § 440.30(5).

4.   <u>Trial Counsel's Failure To Object to Doctor Styles'</u>
     <u>Testimony and Photographs Was Objectively</u>
     <u>Deficient And Prejudicial</u>

On October 10, 2008, Doctor Melissa Pasquale-Styles received a letter from ADA Sedano to examine a bag of clothing (<u>See</u>, Def's CPL § 440.10, exhibit 16). In all actuality, those clothing were never secured into the evidence bag until June 17, 2001. Nonetheless, Doctor Styles testified that she examined the clothing and determined that the clothing had gunpowder stippling (residue) consistent with a firearm fired within a distance of eighteen inches of the deceased (319-330). Her testimony and photographs of the clothing were erroneously admitted into evidence to improperly bolster Rashawn's and Ms. White's

-41-

identification testimonies without the People establishing any evidentiary foundation predicate. See, United States v. Fuentes, 563 F.2d 527, 532 (2d cir. 1977); People v. Julian, 41 N.Y.2d 340, 342-43 (1977)("the offering party must establish that the evidence is identical to that involved in the crime, and that it has not been tampered with").

Trial counsel's inexplicable lack of pretrial preparation and investigative efforts were readily appearant. Notably, counsel sat silent and failed to object to the People's lack of evidentiary foundation or move to preclude the admission of the photographs on the best evidence rule (CPLR § 4539). Furthermore, counsel compounded the error when without objection, he allowed the prosecutors without evidentiary foundation, to infested/prejudiced the entire trial process with unfairness by improperly vouching and bolstering the witnesses' credibility with her summation statements that; "the medical examiner told you she found stippling, and that stippling means a gun was shot at close range. It makes sense that she would found stippling on the left side of Renee's shirt, because that would have been the closest part of Renee's body to the defendant as he stood outside of the car and shot her." (Id. trial tr. 410). see also People v. Spence, 92 A.D.3d 905 (2d Dept. 2012)("prosecutor vouched for the witness and bolster her credibility without foundation").

In People v. Fisher, 18 N.Y.3d 964 (2012), the Court of Appeals took the rare occasion to look at the prosecutor's closing through the prism of defense counsel's effectiveness. The defendant was charged with sexual abused. The prosecutor's case

was built on the testimonies of Fisher's niece and a jailhouse confession to another inmate. The evidence of guilt was "sufficient" but "far from overwhelming." And the witness' credibility was crucial, it should have been resolved by the jury in a rational and fair way. The prosecutor's summation, however, directed the jury's attention elsewhere --- a circumstance that competent defense counsel should have sought to prevent. Since, there was no strategic reason for not objecting to the prosecutor's improper summation statements, the Court found that defense counsel had not fulfilled his obligation. Id., (original citation omitted).

No competent trial lawyer in the State of New York would have gone forward on a case of this nature without testing the reliability of the People's highly prejudicial evidence and object to the prosecutor's improper prejudicial statements without evidentiary foundation. If this Court has determined that strategy must be consistent with those of a "reasonable competent attorney," then there can be no question that Wayne Chin was denied adequate due process and a fundamentally fair trial.

Trial counsel's failures are so significant that they cannot be overcome by competent representation at the trial itself, representation must be viewed in its totality and, in this case, that evaluation can only lead to one conclusion, the representation was not meaningful.

Inasmuch that the trial court's determined that this particular prejudicial inadmissible evidence contributed to the verdict (See, Court's decision dated Nov. 17, 2009, @ 7), the

-43-

error cannot be considered harmless.

Of course, while this Court can ultimately reach unpreserved issues in the interest pursuant to C.P.L. § 470.15(6)(a), defense counsel's failure to recognized and preserve potential errors for appellate review, shows a lack of advocacy continuously displayed by counsel.

5.    Trial Counsel's Failure To Object To The Court's
      Erroneous Evidentiary Ruling Which Barred Confrontation,
      Cross-Examination, And Impeachment Of The People's
      Witnesses With Prior Inconsistent Statements
      Was Objectively Deficient And Prejudicial

The United States Supreme Court has stated that "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested" (Davis v. Alaska, 415 U.S. 308, 316 [1974]) and that the right of cross-examination is "implicit in the constitutional right of confrontation, and helps assure the accuracy of the truth determination process" Chambers, 410 U.S. @ 295. Here sub judice, trial counsel inexcusably failed to objected to the trial court's erroneous evidentiary ruling which precluded confrontation and cross-examination. As a result, counsel's abdicated impeachment of the accusers' with their prior inconsistent statements. Thus, rendering the trial unreliable and fundamental unfair, depriving appellant of meaningful representation

To be effective, counsel must have "taken the time to review and prepare both the law and facts relevant to the defense," and must be "familiar with, and able to employ at trial[,] basic principles of criminal law and procedures." People v. Droz, 39 N.Y.2d 457, 462 (1976); see also People v. Bennett,

-44-

29 N.Y.2d 462, 466 (1972). These basic principles include effective impeachment of prosecution witnesses. See, People v. Jenkins, 68 N.Y.2d 896, 898 (1986)(Counsel's failure to use police reports in her possession that was relevant to witness' credibility "was so prejudicial to defendant's cause as to deprive him meaningful representation"); People v. Ugweches, 116 A.D.3d 440, 441-442 (2d Dept. 2014)(original quotation and citation omitted).

The People correctly stated that; "The trial court's evidentiary ruling barred defense counsel from cross-examining his own witnesses, and precluded any elicitation of hearsay unless trial counsel could state an exception to the hearsay rule. (See, People's Supp. Brief on direct appeal @ 32). Cf. Delaware v. Van Arsdall, 475 U.S. 673, 677-79 (1986)("The Confrontation Clause is violated when 'the trial court prohibited all inquiry into' a potential source of bias on the part of a witness, a ruling that 'kept from the jury facts ... that were central to assessing [the witness'] reliability"); People v. Oddone, 22 N.Y.3d 369, 377 (2013)("Technical limitations on the impeachment of witnesses must sometimes give way, in a criminal case, to a defendant's rights to a fair trial"), quoting Chambers v. Mississippi, 410 U.S. 284 (1973).

RYAN AARONS

Ryan Aarons gave Detective Leto a prior inconsistent statements (see, Def.'s CPL § 440.10 exhibit 7, paragraph 4), that was significantly at odds with his trial testimony (112-137), and seriously impact upon his ability to tell the truth,

-45-

showing factually that the People knowingly elicited false testimony to pervaded the integrity of the court and the trier of fact finders' credibility process. Nonetheless, although Ryan denied making certain aspect of his lengthy statements (133-34), trial counsel's unjustifiably failed to objected to the trial court's erroneous evidentiary ruling and lay a proper foundation to impeach Ryan with his prior inconsistent statements, and/or call Detective Leto to cross-examine him about Ryan inconsistent statements. Therefore, Ryan's false testimony was basically admitted to the jury unchallenged. No competent attorney would have foregone impeaching Ryan with such valuable impeachment evidence readily at his disposal.

RASHAWN AARONS

Trial counsel failed to established to the jury that Rashawn Aarons had made two prior inconsistent statements to Detective Henn and the trial prosecutor. In a written report filed by Detective Henn, Rashawn stated that appellant picked him up from school at 3:30 p.m., and dropped him off at Jamal Bogles' house until 5:00 p.m., when appellant picked him back up and brought him to Brooklyn, arriving at 7:00 p.m. (See, Def.'s CPL § 440.10 exhibit 3). He testified at trial that Wayne took him from school, stopped to retrieved clothing from the dry cleaners and brought him directly to Brooklyn, arriving at 4:45 p.m. (78, 86). In the same written report, Rashawn stated that four or five shots were fired before he exited the vehicle. At trial, he contradicted that statement and stated that the appellant fired three shots into the vehicle, walked away, and returned after

-46-

hearing the deceased calling Rashawn's name, and fired two more shots. (83-84).

Those were some of the major discrepancies in Rashawn's testimony and his prior inconsistent statements that were critical to his credibility that should have been explored by counsel because evidence related to a witness' motive to fabricate and bias is highly relevant and ordinarily admissible. Had counsel simply used the inconsistencies of Rashawn's statements and his testimony, counsel could have effectively argued to the jury that Rashawn's testimony only evolved after several proffer sessions with the prosecutors to fit his testimony into a specific fact pattern to corroborate other potential evidence. The value of this cannot be overstated because the jury had made a specific request to know the names of the individuals whom had proffer sessions with the prosecutors before testifying at trial (437-442 [See, Court's exhibit 3A]), a situation which trial counsel explicitly failed to take advantage of and allowed the jurors' request to go unanswered without further inquiry. (442-446).

The importance of the inconsistencies is clear, the jurors asked to rehear "the entire direct and cross-examination of Rashawn's testimony of the alleged crime (436-37 [See, Court's exhibit 3]). Of course, when Rashawn's testimony was read back, it contained no reference to Rashawn's inconsistent statements about visiting Jamal Bogles' house and/or that he had exited the vehicle after all the shots were fired. Trial counsel's failure to adduced helpful evidence on those points that would have drawn

-47-

the jurors' attention to question Rashawn's credibility, was yet another blunder in counsel's deficient and prejudicial performance.

<u>AISHA WHITE</u>

It bears repetition to state that if the prosecution had not wilfully destroyed the original 911 master tape recordings, appellant would have been able to severely impeached Ms. White's credibility, exposing her lies in total. Nonetheless, even if trial counsel had conducted a cursory review of the FDNY "CAD" reports and interviewed 911 emergency operator 2249 (<u>See</u>, Def.'s CPL § 440.10 exhibit 17 @ [T-10]), he would most certainly have been able to impeach Ms. White with her prior inconsistent statements to operator 2249, that the perpetrator fled in a <u>black Lexus vehicle.</u> Therefore, trial counsel's failure to interview and call operator 2249 cannot be excused as trial strategy. <u>See</u>, <u>People v. Simons</u>, 110 A.D.2d 666, 667 (2d Dept. 1985)("failure to interview available witnesses, inter alia, ineffective").

On June 13, 2001, Detective Henn, filed a written report of Ms. White's statements which stated in pertinent part; "Wayne pulled out a handgun and kept firing into the vehicle and she heard Renee screaming for Wayne to stop." (Def.'s CPL § 440.10 exhibit 4). Her prior inconsistent statements contained no reference of Rashawn jumping out of the vehicle, bear-hugging appellant, saying daddy no, nor that the appellant returned to the deceased's vehicle and fired more shots, much less, that the appellant fled in a gold Lexus vehicle. (146-147)

The simple fact that there were no strategic calculus in

-48-

play is equally evident because trial counsel unpreparedness is painfully obvious, he did not even attempt to impeach Ms. White testimony with her prior inconsistent statements. See, e.g., Espinal v. Bennett, 588 F.Supp.2d 388, 400-02 (E.D.N.Y. 2008)(counsel's decision not to cross-examine witness based on his prior inconsistent hospital statement, inter alia, ineffective); People v. Wagner, 104 A.D.2d 457 (2d Dept. 1984)(defense counsel who "failed to also attempt to impeach two of three prosecution witnesses" with "prior inconsistent testimony," ineffective).

While it is true that an attorney's trial strategy and efforts should not be second guessed with the clarity of hindsight to determine how the defense might have been more effective .... where a witness had offered prior testimony/statements which are significantly at odds with his or her trial testimony, the discrepancies can be used on cross-examination to cast doubt on the credibility of the witness. People v. Cantave, 83 A.D.3d 857, 858 (2d Dept. 2011), quoting Benevento, 91 N.Y.2d 708, 712 (1998).

Independently or collectively, trial counsel's failure to object to the trial court's erroneous evidentiary ruling which barred him from recalling the accusers to impeach their credibility, was objectively deficient and prejudicial as to deprive appellant a fundamental fair trial. Accordingly, the lower court's ruling denying appellant's C.P.L. § 440.10 motion without a hearing was an arbitrary abused of discretion and the judgment should have been vacated.

-49-

6.   Trial Counsel's Failure To Object To The Trial
     Court's Coercive and Unbalanced Supplemental
     Jury Instruction Was Objectively Deficient
     And Prejudicial

A criminal defendant has a right to an "uncoerced" unanimous jury verdict representing each jurors' honest belief that the People have, or have not, carried their burden of proving the defendant guilty beyond a reasonable doubt. See, U.S. Const., Art. 111, § 2; N.Y. Const., Art. 1, § 2; Wong v. Smith, 562 U.S. 1021 (2010); Lowenfild v. Phelps, 484 U.S. 231, 240-41 (1988); People v. Aleman, 12 N.Y.3d 806, 807 (2009).

Here, sub judice, during the jurors' deliberation they submitted a note to the trial court requesting direction which stated; (1) "What happens if we do not decide today?" and (2) "What happens if all 12 of us cannot come to the same decision?" (447-450; see also, Court's exhibit 5). The trial court gave the jury a coercive and unbalanced supplemental instruction commonly referred to as an "Allen Charge" which stated; "I've told you, your verdict, whether its guilty or not guilty, must be unanimous, that is each and every juror must agree to it." (449). The court's supplemental instruction simply demanded a verdict without any compromise. See, People v. Henry, 56 A.D.2d 610 (2d Dept. 1977)("an attempt to drive the members of the jury into an agreement is beyond the power of the court, and an obvious effort to effect such a result demands a new trial").

The possibility of disagreement by the jury and the lack of unanimous verdict is a protection conferred upon a defendant in a criminal case. Indeed, there is no absolute necessity for a jury to reach a verdict in any trial, and the jury has no duty to do

-50-

so. People v. Robinson, 84 A.D.2d 732, 733 (1st. Dept. 1981). For a trial judge to tell a jury that a case must be decided is therefore not only coercive in nature, but misleading in fact. It precludes the right of the defendant to rely on the possibility of a disagreement by the jury. It was said in Kearl v. State of Montana, 213 U.S. 135, 138 (1909), that both the Fifth and Fourteenth Amendments invest courts of justice with the authority to discharge a jury from giving any verdict whenever, in the court's opinion, there is, after due time for deliberation, "a reasonable probability that the jury could not agree."

Thus, a supplemental jury instruction that stresses the need for a verdict at the expense of individual juror's judgment mandates reversal. People v. Aponte, 306 A.D.2d 42, 45 (1st. Dept. 2003), aff'd., 2 N.Y.3d 304 (2004); Jenkins v. United States, 380 U.S. 445 (1965)(court's instruction to jurors who had declared inability to agree on a verdict that they "have got to reach a decision in this case" was coercive"); People v. Demery, 60 A.D.2d 606 (2d Dept. 1977)(original quotation and citation omitted). Furthermore, the trial court's supplemental charge here did not included any encouraging language to balance its instruction that it was the jurors' duty to decide the case if they [can] conscientiously do so without surrendering their honest convictions for the mere purpose of returning a verdict.

Appellant contended in the lower court that trial counsel rendered ineffective assistance when he acceded and failed to object to the trial court's coercive and unbalanced supplemental jury instruction. (See, Def.'s CPL § 440.10 affidavit @ 48-51;

-51-

memorandum @ 7-8).  Nonetheless, as with other issues such as trial counsel's failure to challenge a facially defective search warrant (Def.'s CPL. § 440.10 memo., @ 48-52), and his failure to request a missing witness charge for the police technician who manufactured the false evidence (Def.'s CPL § 440.10 affidavit @ 45-46). The lower court simply refused to adjudicate those shortfalls of counsel's deficient and prejudicial performance in its totality. However, it is not an insurmountable barrier for this Court to review unpreserved errors that affect the fundamental rights of an accused. See, e.g., People v. Dejesus, 134 A.D.3d 463 (1st. Dept. 2015)(reviewing unpreserved objection to Allen charge "in the interest of justice"); People v. Grant, 163 A.D.2d 117, 119 (1st. Dept. 1990)(despite "strong" evidence in support of verdict, failure to object to coercive supplemental charge was "not an insurmountable barrier to review," as it "fundamentally affect[ed] the fairness of the proceeding").

There are no legitimate strategic explanation that could possible justify counsel's inexcusable deficient and prejudicial conduct of failing to object to the trial court's unduly coercive and unbalanced supplemental jury instruction, the People had offered none, and the lower court's abused its discretion when it denied relief. See, e.g., People v. Morales, 108 A.D.3d 174 (2d Dept. 2013)("no objectively reasonable and legitimate trial strategy for trial counsel's failure to object to repugnant verdicts, failure to contest court's erroneous instruction, and failure to object to prosecutor's improper remarks"). Id.

7.    Sentencing Counsel, Jay Cohen Labored Under A
      Conflict Of Interest That Compromised Appellant's
      Rights To Effective Assistance Of Counsel

Appellant contended in the lower court that sentencing
counsel, Jay Cohen, labored under a conflict of interest when he
informed appellant that trial counsel, Phillip Smallman, was his
good friend and a competent attorney and refused to offer any
assistance to litigate Mr. Smallman's incompetence (See, Def.'s
CPL § 440.10 affidavit @ 52-54). Appellant substantiated that Mr.
Cohen was unprepared to even represented him before the trial
court on November 17, 2009. For example, counsel represented to
the court that appellant did not have a federal conviction for
weapon possession in 1997. The trial court responded that counsel
had no documentation to supported his contentions and the
existing record would remained the same. ("S" 7-8). In the
absence of any submission from Mr. Cohen refuting appellant's
sworn allegations, appellant was entitled to a hearing. See,
People v. Caldavado, 26 N.Y.3d 1034. (quotation and citation
omitted).; Spearman v. Edwards, 154 F.3d 51, 52 (2d. Cir. 1998).

The People contends that appellant raised eleven claims in
his pro se C.P.L § 330.30 motion and the trial court's considered
and rejected them. (See, People's CPL § 440.10 memo., @ 17-18).
The lower court gave no consideration to appellant's argument
that he was entitled to conflict free representation, but rather,
parrot the People's arguments and arbitrarily denied appellant's
motion without conducting a hearing. (See, Court's decision @
11).

Under both federal and state law, a criminal defendant

-53-

whose counsel was burdened with an actual conflict, where the defendant has not waived the conflict, need not meet the usual federal test for ineffective assistance of counsel ---a "reasonable probability" that the outcome was affected --- nor even the state "meaningful representation" See, United States v. Iorizzo, 786 F.2d 52, 58 (2d Cir. 1986)("[A] defendant claiming that the assistance of counsel was ineffective due to counsel's conflict of interest need not establish prejudice"). Instead, under New York law, all that need to be shown for a defendant's conviction to be overturned, is that the conflict operated on" or "affected defendant's representation" See, People v. Aber, 99 N.Y.2d 406, 411 (2003); People v. Harris, 99 N.Y.2d 202, 211 (2002)("conviction should be overturned where defendant demonstrated a 'substantial relation' between the conflict and 'the conduct of the defense'"). The defendant need not make a showing that this alternative strategy would have been successful, (See, Locessio v. United States, 395 F.3d 51, 56 (2d Cir. 2005), or even that it would have been "reasonable." See, Elsemann v. Herbery, 401 F.3d 102, 107 (2d Cir. 2005).

Appellant's moving papers demonstrated that Mr. Cohen's undivided fidelity to Ms. Smallman, compromised and operated on his ability to render effective representation. Accordingly, the lower court erred and remittal necessitates a hearing to ascertain whether Mr. Cohen labored under a conflict of interest which deprived appellant of his constitutional rights to effective assistance.

POINT 3

THE LOWER COURT ABUSED ITS DISCRETION WHEN IT DENIED
APPELLANT'S C.P.L. § 440.10 MOTION WITHOUT A HEARING
WHICH ALLEGED THE PEOPLE KNOWINGLY USED FALSE
EVIDENCE TO OBTAINED THE JUDGMENT: U.S. CONST.
AMENDS., V, VI, XIV: N.Y. CONST. ART. 1, § 6.

Despite Appellant's submission of off-the-record uncontroverted documentary evidence (Ryan's inconsistent statements and the certified FDNY "CAD" reports) to the lower court, calling into question the validity of the judgment that it was obtained with the People's knowing uses of false evidence. The lower court not only disregarded stare decisis but also violated the appellant's concomitant statutory rights to C.P.L § 440.30(5), refusing the give the proffered evidence the consideration it rightly deserved. Thus, arbitrarily denying appellant's motion by implication citing C.P.L. § 440.10[2][b]. (See, Court's decision @ 4).

In People v. Maxwell, 89 A.D.3d 1108, 1109 (2d Dept. 2011), this Court held that a defendant who submits evidence de hors the record alleging that the People knowingly presented false evidence at trial cannot be procedurally barred under C.P.L. § 440.10[2][b]. Id.

A conviction obtained by the People through the knowing use of false evidence violated due process of law. See, Napue v. Illinois, 360 U.S. 264 (1959). As noted in United States v. Agursh, 427 U.S. at 104, this conduct not only violates constitutionally mandated disclosure obligations, but "involves prosecutorial misconduct" and a "corruption of the truth-seeking

-55-

function of the trial process." Id. The People has never contested the allegations and appellant should have prevailed on his motion to vacate the judgment in accordance with C.P.L. § 440.30(5).

1.   Standard Of Review

The plain text of N.Y.C.P.L. § 440.30 is unequivocal and governs when a hearing must be held. The appellant's case falls squarely under C.P.L. § 440.30(5)("If the court does not determine the motion pursuant to subdivisions, two, three, or four, it must conduct a hearing and make findings of facts essential to the determination thereof")(emphasis added). Under C.P.L. § 440.30(5), the court does not have discretion to deny a motion without a hearing, and the lower court erred as a matter of law when it denied the appellant's motion without a ordering a hearing to determine facts essential to the motion.

In deciding whether to hold a hearing on a C.P.L. § 440.10 motion, the court must look to C.P.L. § 440.30 for guidance. See e.g., People v. Ausserau, 77 A.D.2d at 154-155. The subsections of C.P.L. § 440.30 instruct a court on the precise circumstances under which it; "must grant or summarily deny" a motion, see, C.P.L. § 440.30(2); "must grant [the motion] without conducting a hearing, see C.P.L. § 440.30(3); "may deny [the motion] without conducting a hearing," see C.P.L. § 440.30(4); and when it cannot summarily decide a motion and accordingly "must conduct a hearing and make findings of facts essential to the determination thereof," see C.P.L. § 440.30(5)(emphasis added). Even a cursory glance at the statutory scheme reveals that the provisions are

unequivocal as to when a court has discretion, using the term "may;" the provisions are equally clear as to when a court lack discretion, using the term "must."

The only provision of C.P.L. § 440.30 under which a court has discretion to deny a motion to vacate without a hearing is C.P.L. § 440.30(4). However, such a denial is only warranted if one of the following four circumstances is present:

> (a) The moving papers do not allege any ground constituting a legal basis for the motion; or
>
> (b) The motion is based upon the existence or occurrence of facts and the moving papers do not contain sworn allegations substantiating or tending to substantiating all the essential facts, as required by subdivision one; or
>
> (c) An allegation of facts essential to support the motion is conclusively refuted by unquestionable documentary proof; or
>
> (d) An allegation of fact essential to support the motion (i) is contradicted by the court record or other official document, or is made solely by the defendant and is unsupported by any other affidavit or evidence, and (ii) under these and all other circumstances attending the case, there is no reasonable probability that such allegation is true.

N.Y.C.P.L. § 440.30(4). If none of the above circumstances are present, court does not have the discretion to summarily deny the motion. See, C.P.L. § 440.30(5).

The statute is clear that even if one of the circumstances in C.P.L. § 440.30(4) is present. a court may nevertheless order an evidentiary hearing as a matter of discretion. However, the statute does not provide for discretion in the other direction, as there is no discretion to deny a hearing in the absence of the factors enumerated in C.P.L. § 440.30(5). None of the factors in C.P.L. § 440.30(4) are present in appellant's case and the denial

-57-

of the appellant's motion without the statutorily required hearing was an error of law.

Furthermore, the People had not conclusively refuted the factual allegations that they knowingly elicited false testimony from Ryan Aarons, and knowingly manufactured and used a false secondary audio tape recordings (See, People's CPL § 440.10 response in its entirety). Therefore, what is not disputed is deemed to be conceded. People v. Gruden, 42 N.Y.2d 214, 216 (1977)("finding that useless and wasteful hearing held because of the People's failure to dispute defense motion for hearing warranted departure from general rule").

In a seminal case People v. Jones, 24 N.Y.3d 623 (2014), the Court of Appeals continued to inform analysis of C.P.L. § 440.10's instruction. There, the Court ousted its antediluvian restraints with broader power overseeing post-collateral pleading and has aligned itself with other enumerated subset statutory provisions intended purposes and resolve. Noting that, moving to vacate the lower court and the appellate court must give the proffered evidence the attention it rightfully deserve under any of the four enumerated circumstances, and failure to undergo a legitimate basis to deny a hearing once those conditions are met, may nevertheless be disturbed as an abused of discretion. Running parallel to this line of authority should significantly change the resolution on the lower court's summary denial of appellant's motion as an arbitrary abused of discretion of whether the the purported errors affected the judgment.

-58-

POINT 4

THE PEOPLE KNOWINGLY PERPETRATED A FRAUD UPON THE
COURT IN VIOLATION OF APPELLANT'S RIGHTS TO DUE
PROCESS AND A FAIR TRIAL: U.S CONST. AMENDS V, XIV:
N.Y. CONST., ART. 1, § 6.

The Court's inherent power to set aside a judgment for
fraud upon the Court is not a new concept, it is a historical
duty and obligation. Hazel-Atlas Glass Co. v. Hartford-Empire Co.
322 U.S. 238 (1944)("Every element of fraud here disclosed
demands the exercise of the historic power of equity to set aside
fraudulently begotten judgment"). Fraud upon the Court involves
willful conduct that is deceitful and obstructionistic, which
injects misrepresentations and false information into the
judicial process "so serious that it undermines ... the integrity
of the proceeding." Baba-Ali v. State of New York, 19 N.Y.3d 627,
634 (2012). It strikes a discordant chord and threatens the
integrity of the legal system as a whole, constituting "a wrong
against the institutions set up to protect and safeguard
the public." Koschak v Gates Constr. Corp., 225 A.D.2d 315, 316
(1st. Dept. 1996)("the paramount concern of this court is the
preservation of the integrity of the judicial process").

Federal courts have applied the clear and convincing
standard in determining whether the offending party's action
constitutes fraud upon the court. See, Aouds v. Mobil Oil Corp.,
892 F.2d 1115, 1118 (1st. Cir. 1989). Fraud upon the court
warrants heavy sanctions, involving the striking of an offending
party's pleading and dismissal of the action.

Appellant presented the lower court with clear

-59-

and convincing evidence that the prosecution willfully destroyed the original 911 master tape recordings because of its exculpatory value and knowingly manufactured and used a false secondary audio tape recordings with a culpable state of mind to perpetrated a fraud upon the courts. The People had every opportunity to conclusively refute the appellant's contentions and has failed to provide an explanation or submit evidence to the contrary, which was not done in the lower court and cannot be done in this forum.

The United States Supreme Court as long ago as <u>Mooney v. Holohan</u>, 294 U.S. 103 (1935), stated that deliberate deception of a court by the presentation of false evidence is incompatible with "rudimentary demands of justice." This was reaffirmed in <u>Pyle v. Kansas</u>, 317 U.S. 213 (1942). "Tempering with the administration of justice in the manner indisputably alleged here involves far more than an injury to a single litigant." It is a wrong against the institutions in which fraud cannot complacently be tolerated consistently within good order of society. Surely, it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. "The public welfare demands that agencies of public justice be not so impotent that they must always be mute and helpless victims of deceptions and fraud." <u>Hazel-Atlas</u>, 322 U.S. @ 246.

It is one thing for the agents of the government, acting under enormous pressure, to manufacture false evidence and used it against a poor individual. It is quite another for the courts, reflectively reviewing such actions in the context of the

criminal prosecution, to accord them an air of constitutional legitimacy. "Our government is the potent, omnipresent teacher, for good or for ill, it teaches the whole people by its example, crime is contagious. If the government becomes a lawbreaker, it breeds contempt for the law, it invites every man to become law unto himself." (Quoting the former Justice Brandeis of the Second Circuit Court of Appeals).

## CONCLUSION

FOR ALL OF THE REASONS STATED ABOVE, THIS COURT SHOULD REVERSE THE LOWER COURT'S SUMMARY DENIAL OF APPELLANT'S C.P.L. § 440.10 MOTION, AND DISMISS THE INDICTMENT, IF NOT, THEN THIS COURT SHOULD REMAND THE CASE TO THE LOWER COURT, AND ASSIGN A NEW JUDGE TO CONDUCT A HEARING CONSISTENT WITH C.P.L. § 440.30(5), AND FOR SUCH AND ANY FURTHER RELIEF DEEMED JUST AND PROPER.

Dated:   June 28, 2016
         Stormville, New York 12582

Respectfully Submitted,

Wayne Chin, #09-A-6287
Green Haven Corr. Fac.
594 Route 216
Stormville, New York 12582

Sworn before me this

28 day of June, 2016

NOTARY PUBLIC



-61-

CERTIFICATE OF COMPLIANCE
PURSUANT TO NYCRR § 670.10(3)(F)

This Pro se supplemental brief was prepared on a Swintec 2416DM CC typewriter. A typescript was used a follows;

Name of typeface: Courier

Print size: 10

Line space: Double

The total number of pages in the brief are sixty-one (61), exclusive of pages containing the table of contents, table of authorities, certificate of compliance, proof of service, or any addendum containing statutory rules, regulations, and exhibits, etc.,.

Wayne Chin, Pro-se
Din. # 09-A-6287
Green Haven Corr. Fac.
594 Route 216
Stormville, New York 12582

Sworn to before me this

28ᵗʰ day of June, 2016

NOTARY PUBLIC



-62-

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:   SECOND DEPARTMENT
------------------------------------------
THE PEOPLE OF THE STATE OF NEW YORK,                AFFIDAVIT   OF
                                                 SERVICE   BY   MAIL
                              Respondent,

                                                 App. Div. Docket No.
                                                     2013-04432

                    -against-

                                                 Kings County Ind. No.
WAYNE CHIN,                                          1018/2003

                    Defendant/Appellant.
------------------------------------------

STATE OF   NEW YORK   )
                      )SS.:
COUNTY OF DUTCHESS    )

          I, **Wayne Chin**,  being duly sworn, deposes and says:

          I am the above-mentioned Defendant/Appellant and I have

served a copy of my **Pro Se Supplemental Brief** upon the **Kings**

**County Attorney's Office; Kenneth Thompson, Esq., Renaissance**

**Plaza, 350 Jay Street, Brooklyn, New York 11201-2908**, by placing

the same in a post-paid envelope and deposited it in the United

States Postal Service Mailbox located at Green Haven Correctional

Facility, Stormville, New York 12582-4000, on the 5th day of

July, 2016, as due and sufficient service.

                                        _____
                                        Wayne Chin, Pro-se
                                        Din. # 09-A-6287

SWORN TO BEFORE ME THIS

_5_ day of July, 2016.

_____
          NOTARY    PUBLIC



Due Process Clause of The Fourteenth Amend
is violated when prosecutorial misconduct "so
infests The Trial with unfairness As To make The
Resulting conviction A denial of Due process. PARdon v. WAiNwright
477 U.S. 168, 181 (1986) (Quoting Donnelly v. DeChristoforo, 416
U.S 637, 642 (1974)