Exhibit C

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:   SECOND DEPARTMENT
_____

THE PEOPLE OF THE STATE OF NEW YORK,

                       **Respondent,**

           -against-

WAYNE CHIN,

               **Defendant—Appellant.**
_____

NOTICE OF MOTION
FOR A WRIT OF ERROR
CORAM NOBIS

Ind. No. 1018/03
(Kings County)

EXHIBIT C 1-21

C-1:   FDNY "CAD" & NYPD "SPRINT REPORTS
C-2:   TRIAL TRANSCRIPTS 274-275
C-3:   DD5 POLICE REPORT, MS. COBBS' STATEMENTS
C-4:   DD5 POLICE REPORT, MS. GASTON'S STATEMENTS
C-5:   DD5 POLICE REPORT, RASHAWN AARONS' STATEMENTS
C-6:   DD5 POLICE REPORT, AISHA WHITE'S STATEMENTS
C-7:   DD5 POLICE REPORT, RYAN AARONS' STATEMENTS
C-8:   AISHA WHITE'S GRAND JURY STATEMENTS
C-9:   PEOPLE'S ANSWER TO APPELLANT'S OMNIBUS MOTION
C-10:  THE COURT'S DECISION TO APPELLANT'S OMNIBUS MOTION
C-11:  DEFENSE COUNSEL, HAROLD BAKER'S SUPPLEMENTAL REQUESTS
C-12:  APPELLANT'S REQUEST FOR SUBSTITUTION OF COUNSEL---STUTMAN
C-13:  APPELLANT'S MOTIONS FOR SANCTIONS--PEOPLE'S DESTRUCTION
C-14:  APPELLANT'S LETTER, SUBSTITUTION OF COUNSEL---SMALLMAN
C-15:  APPELLANT'S LETTER TO COURT---CELL-PHONE RECORDS
C-16:  APPELLANT'S LETTER TO MR. SMALLMAN, SUBPOENA RECORDS
C-17:  APPELLANT'S MOTION FOR SUBSTITUTION OF COUNSEL---Smallman
C-18:  PRIVATE INVESTIGATOR, JOHN BROWN'S LETTER
C-19:  PRETRIAL TRANSCRIPTS-- SEPT. 9, 2009
C-20:  TRANSCRIPTION OF PEOPLE'S TRIAL EXHIBIT 8
C-21:  ADA CEDANIO--DR. STYLES, AUTOPSY REQUEST--EXAMINE CLOTHING

<u>ANNEXED TRIAL TRANSCRIPTS AND COURT'S EXHIBITS</u>

**\*\***     COURT'S EXHIBIT 3A,  .  . AND 5

**\*\*\*\*\***

```
Date: 06/12/01    Call: 3438    PDJob#: 0116314324         NYFDJob#: ....
Initial type:    SHOT      Final type:  ARREST      --- CARDIAC OR RESPIRTORY ARREST
CRO:# 8741 (CR00)    Disp:# 0863 (BK1D)    Held ?: NO    Relay:    Segment:  3    Area: K3   Atom: 071J
Location:  95 LINDEN BL ,BK
```

| Time | Type | Detail |
|---|---|---|
| 22:45:13 | PDCOMP | (T10) FEM SHOT AT LOC...........IFO LOC.....OPR 2249 C10+ (8741) |
| 22:45:29 | SUPPLEMENT-PD | (T10) ANI-ALI- ~~~~~~~~AT& T WIRELESS CELLULAR CALL CALLTAKER REQUEST MORE INFO OPER 2249-CP10+ (8741) ·· |
| 22:45:29 | CHANGED-PDPHONE | (T10)  NAME: "" TO "ANON FC NCB" (8741) |
| 22:45:38 | SUPPLEMENT-PD | (D20A) 067A ASSIGNED+ (8741) |
| 22:45:39 | SUPPLEMENT-PD | (D20A) 067C ASSIGNED+ (8741) |
| 22:45:41 | SUPPLEMENT-PD | (D20A) 067ST1 ASSIGNED+ (8741) |
| 22:45:51 | SUPPLEMENT-PD | (D20A) 067M ASSIGNED+ (8741) |
| 22:46:11 | SUPPLEMENT-PD | (T10) ANON FC STS......FEM SHOT AT LOC.....N ML RAN INTO A BLK LEXUS.........FC STS......FEM SHOT 2 TIMES IN THE HEAD.....OPR 2249 C10+ (8741) |
| 22:46:32 | SUPPLEMENT-PD | (T03) ANOTHER CALL ANON FC STS A MAN JUST SHOT ~~~~~ IFO LOC---- - ANON FC HU----OPR 2192 CP 03+ (8741) |
| 22:46:47 | SUPPLEMENT-PD | (T03) ANI-ALI-~~~~TAYLOR, GARFIELD ~~~~~~~~~~~~~ 11A OPER 2192-CP03+ (8741) |
| 22:46:49 | SUPPLEMENT-PD | (D20A) 067ST2 ASSIGNED+ (8741) |
| 22:46:51 | ENTRY | (8741) NO MORE INFORMATION |
| 22:46:58 | FINAL | (8741)ACK SENT TO PD |
| 22:47:12 | SUGG-UNITS1 | (0863) *58A3 >38D3 *58I3 *38F1  Dual *31H3 |
| 22:47:12 | SUGG-UNITS2 | (0863) >58W1 %38W3 %38X3   Dual >41W3 -38Y3 |
| 22:47:12 | SUGG-UNITS3 | (0863) *58A3 >38D3 *58I3 >58W1 %38W3 %38F1 |
| 22:47:12 | ASSIGNED | (0863) 58G3 #5489 HUNT EMT-D BATT 58 #2788 DEROSA EMT BATT 58 |
| 22:47:13 | ETA-88 | (0863) 58G3=225712 |
| 22:47:12 | SUGG-UNITS1 | (0863) *58A3 >38D3 *58I3 *38F1  Dual *31H3 |
| 22:47:12 | SUGG-UNITS2 | (0863) >58W1 %38W3 %38X3   Dual >41W3 -38Y3 |
| 22:47:12 | SUGG-UNITS3 | (0863) *58A3 >38D3 *58I3 >58W1 %38W3 %38F1 |
| 22:47:12 | ASSIGNED | (0863) 58W1 #6257 DENDEROWICZ EMT-P STMARY #6209 BOHR EMT-P ST MARY |
| 22:47:13 | ETA-88 | (0863) 58W1=225512 |
| 22:47:12 | SUGG-UNITS1 | (0863) *58A3 >38D3 *58I3 *38F1  Dual *31H3 |
| 22:47:12 | SUGG-UNITS2 | (0863) >58W1 %38W3 %38X3   Dual >41W3 -38Y3 |
| 22:47:12 | SUGG-UNITS3 | (0863) *58A3 >38D3 *58I3 >58W1 %38W3 %38F1 |
| 22:47:12 | ASSIGNED | (0863) C441 #0270 MEYER LT BATT 44 |
| 22:47:13 | ETA-88 | (0863) C441=230612 |
| 22:47:14 | SUPPLEMENT-PD | (D20A) 067C 84  + |
| 22:47:15 | SUPPLEMENT-PD | (D20A) RUSH EMS---------------D1355+ |
| 22:47:28 | PDEMS | (T51) ANOTHER CALL STS PERP MB---STS PERP STEP OUT OF A GRAY CAR N SHOT ML--ANON MC HU STS POLICE ARE THER NFI ANI-ALI ~~~~~~~~ - GASTON, ODETTE ~~~~~~~~~~~~~~~~~~~~ OPER 2018-CP51+ |
| 22:47:28 | ENROUTE | (0863) 58W1 , VB |
| 22:47:33 | ENROUTE | (0863) 58G3 , VB |
| 22:47:46 | PDEMS | (T41) ANOTHER CALL-------ANON FC------STS FML SHOT AT LOC--------N LAYING IFO LOC------N STS SHE HEARD SHOTS FIRED AS WELL----NFI---- ANI-ALI-~~~~~~~~ ELLIOTT, EVERALD ~~~~~~~~~~~~~~~~~ OPER 2007-CP41+ |
| 22:47:47 | ENROUTE | (0863) C441 , VB |
| 22:47:54 | SUPPLEMENT-PD | (D20A) CONFIRMED-------FEM SHOT-------D1355+ |
| 22:48:03 | SUPPLEMENT-PD | (T49) ANOTHER CALL---FC STS SAME--PO NOW AT SCENE------ANI-ALI- |

FIRE DEPARTMENT OF CITY OF NEW YORK

I hereby certify pursuant to CPLR 2306 and 2307 that this document is a true and accurate copy of a Fire Department record kept in the regular course of Fire Department business.

Signature: _Sonia Scott_    Date _6/24/08_

Print Name: _SONIA SCOTT_    Unit: _CDLS_

Exhibit C1

```
Date: 06/12/01   Call: 3438   PDJob#: 0116314324        NYFDJob#: ....
Initial type:  SHOT      Final type: ARREST     --- CARDIAC OR RESPIRTORY ARREST
CRO:# 8741 (CR00)   Disp:# 0863 (BK1D)   Held ?: NO   Relay:   Segment:  3  Area: K3  Atom: 071J
Location:  95 LINDEN BL ,BK
```

```
                                    WILLIAMS S                         OPER 2042-CP49+
  22:48:08    ONSCENE          (0863) 58G3 , VB -
  22:48:20    SUPPLEMENT-PD    (D20A) 067SP88 ASSIGNED+
  22:48:23    SUPPLEMENT-PD    (D20A) 067SP88 84  +
  22:48:34    SUPPLEMENT-PD    (D20A) 067A 84  +
  22:48:56    SUPPLEMENT-PD    (D20A) PERP FLED------EB--LENOX---RD---D1355+
  22:48:58    DUPLICATE        (0863) #3443 ANON MC REFUSE   , SAME
  22:48:58    DUPLICATE        (T38) POSS PEOPLE SHOT + (8741)
  22:49:05    SUPPLEMENT-PD    (D20A) FEM LIKELY---AT THIS--TIME---D1355+
  22:49:09    SUPPLEMENT-PD    (B11A) OU-JONES--SPCT DMO+
  22:49:19    SUPPLEMENT-PD    (B11A) PPCT WILLIS NTFYD--SPCT DMO+
  22:49:41  * ONSCENE          (0270) C441
  22:50:13    SUPPLEMENT-PD    (D20A) PERP----------FLED---EB---IN GOLD COLOR---LEXUS----------
                               D1355+
  22:50:24    SUPPLEMENT-PD    (D42A) XMT-------TRAFFIC CW2365+
  22:51:30    SUPPLEMENT-PD    (N03E) -----------PBBS NG TO NTFY CAPT LOMBARDI------OU+
  22:51:33    ASSIST/ONSCENE   (0863) 38U1 #6039 JACKSON EMT-P KINGSBROOK JEWISH #6067 WATENBERG
                               EMT-P KINGSBROOK @ 95 LINDEN BL ,BK
  22:51:33    ETA-88           (0863) 38U1=225133
  22:51:33    SUPPLEMENT-PD    (D20A) 067ST2 84  +
  22:51:44    CLEAR            (0863) 58W1 94 , 38U1
  22:52:26    HDSP             (0863) 48 BK 38U1 FOR GED /CREW (0863/BK1D) ,FEM ARREST 45 -
  22:52:26    ETA-AH           (0863) 38U1= 225524
  22:52:26    GIVE-DISPO       (0863) 38U1 82
  22:52:26    SUPPLEMENT-PD    (D41A) XIMTED SOD CW 1854+
  22:52:30    SUPPLEMENT-PD    (D44A) XMTD CW 2 & 3---CW 1378+
  22:52:37    SUPPLEMENT-PD    (D45A) CW 1170-CW B XMITTED LEVEL 1 MOBIL-----AUTH SPCT WITKOWSKI +
  22:52:38    SUPPLEMENT-PD    (D42A) XMT--------TRAFFIC CW2365+
  22:52:45    HDSP             (0863) 48 BK 58G3 FOR GED /CREW (0863/BK1D) -
  22:52:45    ETA-AH           (0863) 58G3= 225544
  22:52:45    GIVE-DISPO       (0863) 58G3 82 .
  22:52:50    SUPPLEMENT-PD    (D43A) XMTD OVER CW 1--CW 2134+
  22:52:59    CLEAR            (0863) C441 87 , SELF
  22:53:04    SUPPLEMENT-PD    (D20A) AUTH OF SRGT----LEVEL ONE MOBILZATIOON-----2----PT---1 ST-
                               POINT----BEDFORD AVE-LINDEN BLVD--------2ND PT----ROGERS AND LINDEN
                               BLVD---D1355+
  22:53:18    SUPPLEMENT-PD    (D17A) ----XMITT-----LEVEL 1---DIVISION 17-----D1143+
  22:53:34  * 10-81           (6039) 38U1
  22:53:36    SUPPLEMENT-PD    (D20A) 067M 84  +
  22:54:06    10-81           (0863) 58G3 , V -
  22:54:07    SUPPLEMENT-PD    (D42A) XMT------TRAFFIC CW+
  22:54:28    SUPPLEMENT-PD    (D20A) HAVE ESU RESPOND FOR EVIDENCE SEARCH-------D1355+
  22:54:31    SUPPLEMENT-PD    (D19A) XMITD--ZONE 19----OPR2180+
  22:55:00    SUPPLEMENT-PD    (D23A) ----XMMTD OVER ZONE 23-----XMMTD OVER ZONE 23 D1152+
  22:55:02    SUPPLEMENT-PD    (D18A) XMITTED OVER ZONE 18----D1694+
  22:55:06    SUPPLEMENT-PD    (D16A) ------XMITTED .ZONE .....16 ...D0277 ..LEVEL ..1 .....D0277+
  22:55:16    SUPPLEMENT-PD    (D21A) ---XMITTED--ZONE--------D21+
```

Exhibit C-1

```
Date: 06/12/01    Call: 3438    PDJob#: 0116314324         NYFDJob#: ....
Initial type:  SHOT         Final type:  ARREST      --- CARDIAC OR RESPIRTORY ARREST
CRO:# 8741 (CR00)    Disp:# 0863 (BK1D)   Held ?: NO   Relay:   Segment:  3  Area: K3  Atom: 071J
Location:  95 LINDEN BL ,BK
```

| | | |
|---|---|---|
| 22:55:17 | SUPPLEMENT-PD ~ | (N04) ADVISE-HOSPITAL-INJURY-AND-CONDITION-OF-AIDED----OPS-SGT+ |
| 22:55:17 | CHANGED-TYP | (0863) SHOT TO ARREST |
| 22:55:43 | SUPPLEMENT-PD | (B13A) ...PLT CDR BENJAMAN NTFD+ |
| 22:56:24 | SUPPLEMENT-PD | (D17A) ---RE-XMITT----ZONE 17----D1143+ |
| 22:56:27 | SUPPLEMENT-PD | (B13A) ,,,,OPS PO GUIMAN+ |
| 22:57:06 | SUPPLEMENT-PD | (D38A) ....XMITTED OVER TAPD BROOKLYN ZONE AT 2254 HRS---CAD JOB |
| | | NUMBER N438-----TB OPS WILLIAMS NTFD---SPCT CHANG+ |
| 22:57:11 | SUPPLEMENT-PD | (N03E) PBBS--PO GAVIN, CAPT WHITE, CAPT LOMBARDI--KG-OPS+ |
| 22:57:14 | SUPPLEMENT-PD | (D20A) PERP MB-----6X1-----47 YO-------WRNG GREY SHIRT---WILL ESCO ON |
| | | THE FRNT-----GREY SHORTS----POSS PLATE----ADC8082----+ |
| 22:57:22 | SUPPLEMENT-PD | (B13A) ...PBBS-PO GAVIN NTFD+ |
| 22:57:33 | SUPPLEMENT-PD | (L10) OPS SGT MARESCO--QES PALAZZOTTO--RT DUDZUICK+ |
| 22:57:42 | SUPPLEMENT-PD | (D20A) AIDED IS LIKELY--AUTH OF THE SRGT--1----D1355+ |
| 22:57:47 | SUPPLEMENT-PD | (D18A) XMITTED ZONE 18--+ |
| 22:58:08 | SUPPLEMENT-PD | (D20A) PLZ READ DESCRIP------------OF THE VEH--OVER CW-----D1355+ |
| 22:58:24 | SUPPLEMENT-PD | (D20A) 067K ASSIGNED+ |
| 22:58:30 | SUPPLEMENT-PD | (D20A) 067K 87_ KCH--WITH VICTIM---D1355+ |
| 22:58:54 | SUPPLEMENT-PD | (D41A) 000ESA7 ASSIGNED+ |
| 22:58:54 | SUPPLEMENT-PD | (B05A) ---XMITTED ALL CW--SPCT WITKOWSKI+ |
| 22:59:07 | SUPPLEMENT-PD | (D20A) 067ST1 84 + |
| 22:59:17 | SUPPLEMENT-PD | (D21A) ....CORR XMITED ZONE 21...AT 2254 HRS......D1416+ |
| 22:59:36 | SUPPLEMENT-PD | (B11A) XMITED OVER ALL BROOKLYN SOUTH ZONES SPCT OLLIVIERRE+ |
| 23:05:55 | SUPPLEMENT-PD | (Y26) AC ANON MC STS HIS SISTER WAS SHOT PERP DESC MB NO CLOTHNG |
| | | DESC DRIVING GOLD LEXUS VEH REGISTER IN MC SISTER'S NAME 12JUN01 |
| | | 2304 LIVE+ |
| 23:06:47 | SUPPLEMENT-PD | (Y26) MC STS SISTER LIVES IN JERSEY---466 RIVERSIDE AVE IN TRENTON |
| | | ,NJ NFI OPR 2129 C8M+ |
| 23:06:54 | SUPPLEMENT-PD | (D20A) 067ST2 98 + |
| 23:09:01 | SUPPLEMENT-PD | (Y26) PERP MAYBE RESP BACK TO THAT LOC IN TRENTON ,NJ AUTH OF AIDED |
| | | FEM MOTHER STS THIS INFO WHO IS IN MANHATTAN NOW NFI OPR 2129 C8M+ |
| 23:12:22 | SUPPLEMENT-PD | (D43A) XMITTED MOBILIZATION----CW SP A-------CW1205+ |
| 23:16:06 | SUPPLEMENT-PD | (D20A) VEH PARKED IFO NOSTRAND N LINDEN BLVD---------D1059+ |
| 23:16:25 | SUPPLEMENT-PD | (D20A) PARKED RIGHT SIDE UNOCCUPIED--------D1059+ |
| 23:17:02 | SUPPLEMENT-PD | (D20A) 067ST2 ASSIGNED+ |
| 23:19:28 | 10-98 | (0863) 58G3 , V |
| 23:20:08 | CONTACT | (0863) 38U1 , X PPWRK |
| 23:25:32 | SUPPLEMENT-PD | (D20A) 067C 98 + |
| 23:30:20 | SUPPLEMENT-PD | (D20A) HAVE K9 RESP TO LOC AUTH OF SGT 1---WANTS BLOODHOUNDS FOR |
| | | PERP SEARCH-------D1059+ |
| 23:34:01 | * 10-97 | (6039) 38U1 + |
| 23:34:01 | * CLOSED | |
| 23:38:34 | SUPPLEMENT-PD | (D20A) 067K 98 + |
| 23:41:27 | SUPPLEMENT-PD | (D41A) DELAY RESP TO LOCATION FOR BLOODHOUND+ |
| 23:49:20 | SUPPLEMENT-PD | (D20A) 067M 98 + |
| 23:51:41 | SUPPLEMENT-PD | (D41A) 000HSP5269 ASSIGNED+ |
| 23:55:56 | SUPPLEMENT-PD | (D20A) STILLOUT + |
| 23:56:15 | SUPPLEMENT-PD | (D20A) STILLOUT + |

Exhibit G-1

Date: 06/12/01    Call: 3438    PDJob#: 0116314324          NYPDJob#: ....

Initial type:   SHOT          Final type: ARREST       --- CARDIAC OR RESPIRTORY ARREST

CRO:# 8741 (CR00)    Disp:# 0863 (BK1D)    Held ?: NO   Relay:   Segment: 3  Area: K3  Atom: 071J

Location:   95 LINDEN BL ,BK


01:03:45      SUPPLEMENT-PD      (D41A) 000ESA7 91  +
01:22:53      SUPPLEMENT-PD      (D20A) 067A 91  +
01:53:06      SUPPLEMENT-PD      (D20A) 067ST2 ASSIGNED+
01:55:18      SUPPLEMENT-PD      (D20A) AUTH OF 4X12 67 ST2 CORRECT FINAL IS---93C--TIME ADV 0155 HRS
                                 D2129+
01:55:21      SUPPLEMENT-PD      (D20A) 067ST2 93C  +

```
TOT INC      67A    S1       HL75 T34  2245 D20  2330 T14322  S
10-10 SHOTS/OUT
     KEEP HEARING              PR 2                RMK
ROUT  D B Y S J G H I M U               UF61       CC
LINDEN BLVD
BEDFORD AVE - ROGERS AVE
FC REF
DUP T14324 *T34 2245 IE D B Y S J G H I M U SHOTS AT LOC--
*D41A 2245 G$ B *T34 2245 IA D B -FC STS SO MANY TO COUNT--UNK
DESCRIPTIO N--UNK INJ--FC REF ORP 1931-C34 *B05A 2245 G$ *D44A
2245 IA XMTD CW 2 & 3--CW 1378 *D44A 2245 G$ *T34 2245 IF D
ANI-ALI-▓▓▓▓▓▓▓▓▓▓   KNIGHT, RUTH M ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
OPER 1931-CP34 *D42A 2246 IA XMT-------TRAF CW2365 *D42A 2246
G$ *T50 2247 IA D B ANOTHER CALL---ANON FC STS SAME AS ABOVE NFI
ANI-ALI-▓▓▓▓▓▓▓▓▓ COBBS, DEANNA ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
OPER 1526-CP50 *D38A 2248 G$ *D45A 2248 G$ *D43A 2248 IA XMTD
OVER CW 1--CW 2134 *D43A 2248 G$ *D20A 2249 F$ *D20A 2249 F$
*D20A 2330 S. 67ST1 99 *B11A 2332 G$ *D38A 2334 G$ B *B11A 2336
G$ *D20A 0023 X. *D20A 0023 99 67ST1 SEE DUPE FF *B13A 0102 G$
```

*← knight*

*← Cobbs*

13JUN01 1530 LIVE

*Exhibit C-1*

```
TOT INC      67A     S1          HL75 T10  2245 D20   2245 T14324 AS
10-34 SHOTS/IN
        FEM SHOT                 PR 1      CCD 48   2252 RMK
ROUT  D B A N T W S F P C I M U                    UF61         CC
```
BEDFORD AVE - ROGERS AVE
ANON FC NCB
DUP T14335 *T10 2245 IE D B A C AT LOC...........IFO
LOC.....OPR 2249 C10 *T10 2245 IF D F ANI-ALI▓▓▓▓▓▓▓▓▓▓▓▓▓▓
WIRELESS CELLULAR CALL CALLTAKER REQUEST MORE INFO OPER
2249-CP10 *D20A 2245 S. 67A 91 *D20A 2245 S. 67C 98 *D20A 2245
M. 67ST1 91 *D20A 2245 M. 67M 98 *T10 2246 IA D B F ANON FC
STS......FEM SHOT AT LOC.....N ML RAN INTO A BLK
LEXUS.........FC STS......FEM SHOT 2 TIMES IN THE HEAD......OPR
2249 C10 *T03 2246 IA D B A ANOTHER CALL ANON FC STS A MAN JUST
SHOT HIS WIFE IFO LOC----ANON FC HU----OPR 2192 CP 03 *T03 2246
IA D B ANI-ALI▓▓▓▓▓▓▓▓▓ TAYLOR, GARFIELD ▓▓▓▓▓▓▓▓▓▓▓     Garfield
APT 11A OPER 2192-CP03 *D20A 2246 M. 67ST2 98 *D20A 2247 84 67C
*E11A 2247 AI A8741 011633438 8741 *D20A 2247 IA RUSH
EMS---------------D1355 *E11A 2247 IA 20 ETA 2257 *E11A 2247

                              13JUN01 1524 LIVE
```

ExHibit C-1

```
TOT INC       67A      S1         HL75 T38   2247 D20   2250 T14360 A
10-34 SHOTS/OUT
      POSS PEOPLE SHOT              PR 2       CCD              RMK
ROUT  D B A F C Z                                 UF61          CC
████████████████████████
BEDFORD AVE - ROGERS AVE
ANON MC REFUSE
DUP T14322 *T38 2247 IE D B C IN CARS IFO LOC NO DESCRPS OF
PERPS MC REF HU OPER 1372-CP38 *T38 2247 IA A F *T38 2247 IC D Z
PREVIOUS ADDRESS LINDEN BLVD BEDFORD AVE ROGERS AVE  *T38 2247
IA B ANI-ALI-███████████████ DOVE-ATWELL, J ████████████████████
████OPER 1372-CP38 *T38 2247 IF *E11A 2248 AI A8741 011633443
8741 *E11A 2249 IA 16 POS DUP T14324 011633438 , SAME *D20A
2250 S. 67A 99 *T07 2253 IA D B F ----ANOTHER CALL---ANON FC
NCB--STS THAT POSS A FEM WAS
SHOT---ATTEMPT--RECONNECT---TO--RO--NO
ANSWER---ANI-ALI-██████████████ CARTER, J M ████████████████
███ OPER 1876-CP07 *D20A 2258 F$ *B11A 2332 G$ *D20A 2351 X.
*D20A 2352 99 67A SEE DUPE FF
```

* Dove

* Carter

                              13JUN01 1519 LIVE

Exhibit C-1

3

```
TOT INC      67A      S1        HL75 T09  2247 D20   2250 T14358  S
10-10 SHOTS/OUT
     SHOOTING                    PR 2                    RMK
ROUT  D B Y S J G H I M U                    UF61        CC
████████████████████
BEDFORD AVE - ROGERS AVE
ANON MC HU
DUP T14360 *T09 2247 IE D B Y S J G H I M U GOING ON AT
LOC---ANON MC STS SEND POLICE SHOOTING GOING ON---UNK DESP OF
PEPR---UNK HOW MANY SHOTS---ANI-ALI-7██████████ BURRELL LLOYSTON
G ████████████████████ OPER 1128-CP09 *D41A 2247 G$ B *T09
2247 IF *D42A 2247 G$ *D38A 2248 G$ *D45A 2248 G$ *D43A 2248 IA
XMTD OVER CW 1--CW 2134 *D43A 2248 G$ *T09 2249 IA D B
AC---FIGHTING IN BLDG---UNK WHO---IN LOBBY---UNK
WPNS----ANI-ALI-████████ JACOBS, BEVERLEY ████████████████1
██████████ OPER 1128-CP09 *D44A 2249 IA XMTD CW 2 & 3---CW 1378
*D44A 2249 G$ *D20A 2250 S. 67A 99 *B05A 2305 G$ *B11A 2317 G$
*D20A 2351 X. *D20A 2352 99 67A SEE DUPE FF  *B13A 0102 G$
```

BuRRELL

JACobs

                                        13JUN01 1521 LIVE

Ex Hibit C-1

```
TOT INC      67A      S1        HL75 T25  2246 D20  2249 T14335  S
10-10 SHOTS/OUT
         SHOTS FIRED                 PR 2                RMK
ROUT  D B Y S J G H I M U                    UF61       CC
██████████████████
BEDFORD AVE - ROGERS AVE
FMC ANDERSON 7182844964
DUP T14358 *T25 2246 IE D B Y S J G H I M U OPR 2352 CP 25
*D41A 2246 G$ B *D44A 2246 IA XMTD CW 2 & 3--CW 1378 *D44A 2246
G$ *D42A 2246 IA XMT--------TRAF CW2365 *D42A 2246 G$ *T25 2247
IA D B FMC ANDERSON ....CB ████████████------FMC STS SHOT FIRED
AT LOC FMC STS POSS ACROSS THE STREET IN THE BIG BUILDING ,,,NFI
...OPR 2352 CP 25 *T25 2247 IF *D38A 2248 G$ *D43A 2248 IA XMTD
OVER CW 1--CW 2134 *D43A 2248 G$ *D45A 2248 G$ *T47 2248 IA D B
AC ANON FC STS SAME....UNK INJUR.....NFI...ANI-ALI-██████████
PRINCIVIL, ERNINE ██████████ OPER 2361-CP47 *D20A
2249 S. 67A 99 *B05A 2305 G$ *B11A 2317 G$ *D20A 2351 X. *D20A
2352 99 67A SEE DUPE FF  *B13A 0048 G$
```

ANDERSON

PRINCIVIL

13JUN01 1522 LIVE

EXHIBIT C-1

2

IA 20 ETA 2255 *E11A 2247 IA 20 ETA 2306 *T51 2247 IA D B F
ANOTHER CALL STS PERP MB---STS PERP STEP OUT OF A GRAY CAR N
SHOT ML--ANON MC HU STS POLICE ARE THER NFI ANI-ALI-███████   # GASTON
GASTON, ODETTE ████████████████         OPER 2018-CP51
*T41 2247 IA D B A F ANOTHER CALL-------ANON FC------STS FML
SHOT AT LOC--------N LAYING IFQ LOC------N STS SHE HEARD SHOTS
FIRED AS WELL----NFI----ANI-ALI-████████ ELLIOTT, EVERALD ███   * ELLIOTT
██████████████████       OPER 2007-CP41 *D20A 2247 IA
CONFIRMED-------FEM SHOT-------D1355 *T49 2247 IA B A ANOTHER
CALL---FC STS SAME--PO NOW AT SCENE------ANI-ALI-███████████   william
WILLIAMS S █████████████████     OPER 2042-CP49 *D20A
247 M. 67SP88 91 *D20A 2247 84 67SP88 *D20A 2247 84 67A *E11A
2248 IA 25 58G3 BLSN, VB *D20A 2248 IA PERP
FLED------EB--LENOX--RD---D1355 *D20A 2248 IA A N W S I M FEM
LIKELY--AT THIS--TIME---D1355 *B11A 2248 IA N OU JONES--SPCT
DMO *B11A 2248 IA PPCT WILLIS NTFYD--SPCT DMO *D41A 2249 G$ B
*T41 2249 IA T *D20A 2249 IA PERP----------FLED---EB--IN GOLD
COLOR---LEXUS----------D1355 *D42A 2249 IA XMT-------TRAFFIC   *   █████
CW2365 *D42A 2249 G$ *E11A 2249 IA 25 C441 UNKN *D20A 2250 F$
*N03E 2250 IA D B S ------------PBBS NG TO NTFY CAPT

13JUN01 1536 LIVE

Exhibit C-1

```
---RE-XMITT----ZONE 17---D1143 *D42A 2255 G$ *B13A 2255 IA
,,,,OPS PO GUIMAN *D38A 2256 IA ....XMITTED OVER TAPD BROOKLYN
ZONE AT 2254 HRS---CAD JOB NUMBER N438-----TB OPS WILLIAMS
NTFD---SPCT CHANG *N03E 2256 IA N PBBS--PO GAVIN, CAPT WHITE,
CAPT LOMBARDI--KG-OPS *D20A 2256 IA PERP MB----6X1-----47
YO-------WRNG GREY SHIRT---WILL ESCO ON THE FRNT----GREY
SHORTS----POSS PLATE----ADC8082---- *B13A 2256 IA ...PBBS-PO
GAVIN NTFD *D20A 2256 IA A N W S I M *L10 2256 IA OPS SGT
MARESCO--QES PALAZZOTTO--RT DUDZUICK *D20A 2257 IA N W S I M U
AIDED IS LIKELY--AUTH OF THE SRGT--1----D1355 *D41A 2257 G$ B
*D18A 2257 IA XMITTED ZONE 18-- *D20A 2257 IA W S *D20A 2257 IA
PLZ READ DESCRIP-----------OF THE VEH---OVER CW------D1355
*D20A 2257 M. 67K 98 *D20A 2257 87 67K KCH--WITH VICTIM---D1355
*D20A 2258 G$ *D44A 2258 G$ *D20A 2258 IA N W S I M U *D42A
2258 G$ *D41A 2258 S. 0ESA7 91 *B05A 2258 IA ---XMITTED ALL
CW--SPCT WITKOWSKI *D20A 2259 84 67ST1 *D38A 2259 G$ *D38A 2259
IA I *D21A 2259 IA ....CORR XMITED ZONE 21...AT 2254
HRS......D1416 *B11A 2259 IA XMITED OVER ALL BROOKLYN SOUTH
ZONES SPCT OLLIVIERRE *Y26 2306 IA B AC ANON MC STS HIS SISTER
WAS SHOT PERP DESC MB NO CLOTHNG DESC DRIVING GOLD LEXUS VEH
```

13JUN01 1537 LIVE

Exhibit C-1

*Exhibit C-2*

273

**DET. PATRICK HENN - PEOPLE - CROSS - MR. SMALLMAN**

1          MS. PAISNER:  Objection.

2          THE COURT:  Step outside, please.

3          (Whereupon, there was a discussion held on

4     the record sidebar outside of the presence of the

5     jury.)

6          THE COURT:  What's your objection?

7          MS. PAISNER:  My objection is that what

8     Ms. Cobs said would be hearsay.  And if counsel wants

9     to explore what Ms. Cobs said, he should call

10    Ms. Cobs.

11         THE COURT:  Okay.  Well, tell me what you are

12    trying to elicit.  And tell me if it is out-of-court

13    statements, tell me why they come in.

14         MR. SMALLMAN:  It's a description of a

15    different vehicle and a different number of people

16    leaving the scene.

17         THE COURT:  That's what another person said?

18         MR. SMALLMAN:  Yes, directly.

19         THE COURT:  Why is it not hearsay?

20         MR. SMALLMAN:  I can ask him in a more

21    conclusory fashion if he interviewed somebody who

22    gave a description of a different vehicle.

23         MS. PAISNER:  I object again.

24         THE COURT:  But why is that not hearsay?  It

25    is out-of-court statements.  You received information

*Exhibit C-2*

**DET. PATRICK HENN - PEOPLE - CROSS - MR. SMALLMAN**

1    from someone else.

2            MR. SMALLMAN:  I can ask him if every

3    description that he got about the car that left was

4    consistent.  That's a yes or no.

5            THE COURT:  What is he going to say to that?

6            MS. PAISNER:  That's still hearsay.

7            THE COURT:  What is his answer?  Does he know

8    what that answer is?

9            MS. PAISNER:  I am sure there is a five on

10   Ms. Cobs.

11           THE COURT:  Tell me about Ms. Cobs.

12           MR. SMALLMAN:  She is someone who made a 911

13   call who said she saw two people leaving in a black

14   Lexus.

15           THE COURT:  That was on the 911 call?

16           MS. PAISNER:  Yes.

17           THE COURT:  You heard that 911 call?

18           MR. SMALLMAN:  Yes.

19           THE COURT:  And does that 911 call come in?

20           MR. SMALLMAN:  I'm not seeking to introduce

21   it.  I'm just asking him basically if he interviewed

22   somebody who gave a different description.  Do you

23   want me to phrase it that way?  I will phrase it that

24   way.

25           MS. CEDENO:  It is still hearsay.

E/Hibit C-2

275

**DET. PATRICK HENN - PEOPLE - CROSS - MR. SMALLMAN**

1      MR. SMALLMAN:  No, it's not being offered for

2  the truth of the matter.

3      THE COURT:  Why is it relevant?

4      MR. SMALLMAN:  What the color of the car was,

5  different people see different things.

6      THE COURT:  I am going to allow you to ask

7  that question.  Your objection is noted.

8      (Whereupon, the following takes place back in

9  open court.

10     Q.   Detective, in the course of your investigation,

11 did you interview any eyewitness who gave a description

12 of a different vehicle and different amount of people

13 leaving the scene?

14     A.   I don't recall.

15     Q.   Do you have your case file with you?

16     A.   Yes, I do.

17     Q.   Is there anything in that case file that might

18 refresh your recollection?  Citing you to DD5 follow up

19 which looks like --

20     THE COURT:  Repeat that, Mr. Smallman.

21     Q.   Citing you to what appears to be DD5 follow up

22 No. 37 or 39 dated June 14$^{th}$ in your file.

23     (Witness reviewing documents.)

24     A.   Yes.

25     Q.   Yes to my first question was yes?

- VM -

DET. PATRICK HENN - PEOPLE - CROSS - MR. SMALLMAN

1       A.    What was your first question, sir?

2               MR. SMALLMAN:  Can it be read back to the

3       detective, please?

4               THE COURT:  Mr. Smallman, I don't know what

5       you're referring to.

6               MR. SMALLMAN:  The question was whether or

7       not he interviewed somebody, an eyewitness, who gave

8       a description of a different vehicle with a different

9       number of people leaving the scene.

10              THE COURT:  And the answer is yes.

11      A.    Yes.

12              THE COURT:  Next question.

13              MR. SMALLMAN:  Thank you.  May I have a

14      moment, please?

15              THE COURT:  Yes.

16              (Whereupon, there was a pause in the

17      proceedings.)

18      Q.    A number of items were removed from the inside

19      of the car and returned to the family, Detective; is that

20      correct?

21      A.    Yes, sir.

22      Q.    Were any of those items tested or any forensic

23      evidence prior to their return?

24      A.    No.

25      Q.    Did the family request those items or you just

- VM -

| Date of Orig. Report | Date Assigned | Case No. | Unit Reporting | Date of This Report |
|---|---|---|---|---|
| 6/12/01 | 6/12/01 | 2281 | 67 Sqd | 6/14/01 |

Follow-Up No. **37**

**Complainant's Name - Last, First, M.I.**
PSNY for Renee Aarons

Victim's Name - If Different

**Witness No. 1**
Last Name, First, M.I.

Address, Include City, State, Zip — Apt. No. PEP

Home Telephone — Business Telephone — Position / Relationship — Sex — Race — Date of Birth — Age

**Total No. of Perpetrators** — Wanted — Arrested — Weapon ☐ Used ☐ Possessed — Describe Weapon (if firearm, give color, make, calibre, type, model, etc.)

**Perp. No. 1**
Wanted ☐ — Arrested ☐ — Last Name, First, M.I. — Address, Include City, State, Zip — Apt. No. — Res. Pct.

Sex — Race — Date of Birth — Age — Height ft. in. — Weight — Eye Color — Hair Color — Hair Length — Facial Hair — NYSID No.

☐ Eyeglasses ☐ Sunglasses — Nickname, First Name, Alias — Clothing Description — Scars, Marks, M.O., Etc. (Continue in "Details")

**Perp. No. 2**
Wanted ☐ — Arrested ☐ — Last Name, First, M.I. — Address, Include City, State, Zip — Apt. No. — Res. Pct.

Sex — Race — Date of Birth — Age — Height ft. in. — Weight — Eye Color — Hair Color — Hair Length — Facial Hair — NYSID No.

☐ Eyeglasses ☐ Sunglasses — Nickname, First Name, Alias — Clothing Description — Scars, Marks, M.O., Etc. (Continue in "Details")

**AREA WITHIN BOX FOR DETECTIVE / LATENT FINGERPRINT OFFICER ONLY. THIS BOX WILL BE UTILIZED BY INVESTIGATOR WHENEVER POSSIBLE AND MUST BE FULLY COMPLETED WHEN USING THIS FORM TO CLOSE A CASE "NO RESULTS."**

Comp. Interviewed ☐ Yes ☐ No — In Person — By Phone — Date — Time — Results. Same as Comp. Report - Different (Explain in Details)

Witness Interviewed ☐ Yes ☐ No — In Person — By Phone — Date — Time — Results. Same as Comp. Report - Different (Explain in Details)

Canvass Conducted ☐ Yes ☐ No — If Yes - Make Entry in Body Re: Time, Date, Names, Addresses, Results — Crime Scene Visited ☐ Yes ☐ No — If Yes - Make Entry in Details Re: Time, Date, Evidence Obtained

Complainant Viewed Photos ☐ Yes ☐ Refused ☐ Future — Results:

Witness Viewed Photos ☐ Yes ☐ Refused ☐ Future — Results:

Crime Scene Dusted ☐ Yes ☐ No — By (Enter Results in Details) — Crime Scene Photos ☐ Yes ☐ No — By (Enter Results in Details)

If Closing Case "No Results," Check Appropriate Box and State Justification in Details:
☐ C-1 Improper Referral ☐ C-2 Inaccurate Facts ☐ C-3 No Evidence / Can't ID ☐ C-4 Uncooperative Complainant ☐ C-5 "Leads" Exhausted

**DETAILS:**

Investigation: Homicide #06/01
Subject: Interview 911 caller ▓▓▓▓▓▓▓▓▓▓▓▓
Status: Active

1. On 6/14/01,at 1700 hours,I spoke on the phone with ▓▓▓▓▓▓▓▓▓ who called 911 in regards to this investigation, she related the following: That on 6/12/01 between 1030 and 11:00 she was in bed in her apt at ▓▓ ▓▓▓▓▓▓▓ and heard a gunshot. She got up and looked out the window and heard 2 more shots,she believes she saw two people in a black car drive off and make a u-turn and speed off.She then heard a lot of people screaming,then she called 911.
2. Case active

**CASE** ☐ ACTIVE ☐ CLOSED — DATE REVIEWED / CLOSED — IF ACTIVE, DATE OF NEXT REVIEW

REPORTING OFFICER: — RANK Det — SIGNATURE — NAME PRINTED Patrick Benn — TAX REG. NO. 899342 — COMMAND 67

REVIEWING / CLOSING SUPERVISOR: — CASE CLOSED: C ___ OR 8 ___ — SIGNATURE — C.O.'s INITIALS

Choice 1 — Choice 2 — Perp 1 — Perp 2 — Perp 1 — Perp 2

EXHibit G3

EXHibit G3

PD-113-081A (Rev. 1-85)-91

| Date of Orig. Report 06/12/01 | Date Assigned 06/12/01 | Case No. 2218 | Unit Reporting 067 DET. SQUAD | Follow-Up No 10 |
|---|---|---|---|---|

| Complainant's Name - Last, First, M I  P.S.N.Y.  FOR | Victim's Name - If Different  AARONS, RENEE |
|---|---|

**Witness No 1**

| Last Name, First, M I | Address, Include City, State, Zip | Apt. No |
|---|---|---|

| Home Telephone | Business Telephone | Position / Relationship | Sex | Race | Date of Birth | Age |
|---|---|---|---|---|---|---|

**Perpetrators**

| Total No. of Perpetrators | Wanted | Arrested | Weapon ☐ Used ☐ Possessed | Describe Weapon (If firearm, give color, make, calibre, type, model, etc.) |
|---|---|---|---|---|

Perp No 1

| Wanted | Arrested | Last Name, First M I | Address, Include City, State, Zip | Apt No | Res. Pct |
|---|---|---|---|---|---|

| Sex | Race | Date of Birth | Age | Height Ft   In | Weight | Eye Color | Hair Color | Hair Length | Facial Hair | NYSID No |
|---|---|---|---|---|---|---|---|---|---|---|

☐ Eyeglasses ☐ Sunglasses

Nickname, First Name, Alias

Clothing Description,
Scars, Marks, M O , Etc _____
(Continue in ''Details'')

Perp No 2

| Wanted | Arrested | Last Name, First M I | Address, Include City, State, Zip | Apt No | Res. Pct |
|---|---|---|---|---|---|

| Sex | Race | Date of Birth | Age | Height Ft   In | Weight | Eye Color | Hair Color | Hair Length | Facial Hair | NYSID No |
|---|---|---|---|---|---|---|---|---|---|---|

☐ Eyeglasses ☐ Sunglasses

Nickname, First Name, Alias

Clothing Description,
Scars, Marks, M O , Etc _____
(Continue in ''Details'')

AREA WITHIN BOX FOR DETECTIVE / LATENT FINGERPRINT OFFICER ONLY. THIS BOX WILL BE UTILIZED BY INVESTIGATOR WHENEVER POSSIBLE AND MUST BE FULLY COMPLETED WHEN USING THIS FORM TO CLOSE A CASE "NO RESULTS."

| Comp. Interviewed ☐ Yes ☐ No | In Person ☐ | By Phone ☐ | Time | Results: Same as Comp. Report ☐ Different (Explain in Details) ☐ |
|---|---|---|---|---|

| Witness Interviewed ☐ Yes ☐ No | In Person ☐ | By Phone ☐ | Date | Time | Results: Same as Comp. Report ☐ Different (Explain in Details) ☐ |
|---|---|---|---|---|---|

| Canvass Conducted ☐ No | If Yes - Make Entry in Body Re: Time, Date, Names, Addresses, Results | Crime Scene Visited ☐ Yes ☐ No | If Yes - Make Entry in Details Re: Time, Date, Evidence Obtained |
|---|---|---|---|

| Complainant Viewed Photos ☐ Yes ☐ Refused ☐ Future | Results: |
|---|---|

| Witness Viewed Photos ☐ Yes ☐ Refused ☐ Future | Results: |
|---|---|

| Crime Scene Dusted ☐ Yes ☐ No | By (Enter Results in Details) | Crime Scene Photos ☐ Yes ☐ No | By (Enter Results in Details) |
|---|---|---|---|

If Closing Case "No Results." Check Appropriate Box and State Justification in Details:
☐ C-1 Improper Referral ☐ C-2 Inaccurate Facts ☐ C-3 No Evidence / Can't ID ☐ C-4 Uncooperative Complainant ☐ C-5 "Leads" Exhausted

**DETAILS:**

INVESTIGATION:        INVESTIGATE HOMICIDE #6/01
SUBJECT        :        INTERVIEW WITH PARNELLE GASTON
STATUS        :        ACTIVE.

1.   On this date at approximately 2245 hours, a female known as Renee Aarons was shot in front of 95 Linden Blvd. while sitting in her auto. A 911 call was made by Ms. Parnelle Gaston. The following is an interview conducted by this officer in regards to this incident.

Ms. Gaston states that she heard an argument coming from the street and observed through her window an individual described as a male black, wearing a gray short set punching at a female black that was sitting in a black auto across the street. Ms. Gaston states that the subject continued assaulting the female while standing out side of the driver's side door. Ms. Gaston then stated another individual described as a possible female hispanic was attempting to hold back the subject. This individual was stating, "Don't do that Johnny, a couple of time. Ms. Gaston then states she heard approximately two or more shots while observing flashes of light. Ms. Gaston states that the subject then entered an auto and left the location. Ms. Gaston is unable to identify the auto.

PARNELLE GASTON
100 LINDEN BLVD. APT 4C
BROOKLYN NY
DOB ▓▓▓▓▓▓▓▓
PHONE # 718-462-3417

EXHIBIT C-4

| CASE ☐ ACTIVE ☐ CLOSED | DATE REVIEWED / CLOSED | IF ACTIVE, DATE OF NEXT REVIEW |
|---|---|---|

| REPORTING OFFICER: | RANK DET. | SIGNATURE | NAME PRINTED CRICK, M. | TAX ▓▓▓▓ | COMMAND |
|---|---|---|---|---|---|

| REVIEWING / CLOSING SUPERVISOR: | CASE CLOSED: C ___ OR B ___ | SIGNATURE | | C.O.'s INITIALS |
|---|---|---|---|---|

| | Choice 1 | Choice 2 | Perp 1 | Perp 2 | Perp 1 | Perp 2 |
|---|---|---|---|---|---|---|

INFORMATIONAL
PD 313-081A (Rev. 4-89-31)    **Homicide #6/01**    67

| Date of Orig. Report | Date Assigned | Case No. | Unit Reporting | Crime | Follow-Up No. |
|---|---|---|---|---|---|
| 6/12/01 | 6/12/01 | | 67 Sqd | | 5 |

Complainant's Name - Last, First, M.I.    Victim's Name - If Different

**PSNY for Renee AArons**

| Last Name, First, M.I. | Address, Include City, State, Zip | Apt. No |
|---|---|---|
| | | |

| Home Telephone | Business Telephone | Position / Relationship | Sex | Race | Date of Birth | Age |
|---|---|---|---|---|---|---|
| | | | | | | |

| Total No. of Perpetrators | Wanted | Arrested | Weapon ☐ Used ☐ Possessed | Describe Weapon (If firearm, give color, make, calibre, type, model, etc.) |
|---|---|---|---|---|
| | | | | |

| Wanted ☐ | Arrested ☐ | Last Name, First, M.I. | Address, Include City, State, Zip | Apt. No | Res. Pct. |
|---|---|---|---|---|---|

| Sex | Race | Date of Birth | Age | Height Ft. In. | Weight | Eye Color | Hair Color | Hair Length | Facial Hair | NYSID No. |
|---|---|---|---|---|---|---|---|---|---|---|

☐ Eyeglasses ☐ Sunglasses    Clothing Description,
Nickname, First Name, Alias    Scars, Marks, M.O., Etc.
(Continue in "Details"):

| Wanted ☐ | Arrested ☐ | Last Name, First, M.I. | Address, Include City, State, Zip | Apt. No | Res. Pct. |
|---|---|---|---|---|---|

| Sex | Race | Date of Birth | Age | Height Ft. In. | Weight | Eye Color | Hair Color | Hair Length | Facial Hair | NYSID No. |
|---|---|---|---|---|---|---|---|---|---|---|

☐ Eyeglasses ☐ Sunglasses    Clothing Description,
Nickname, First Name, Alias    Scars, Marks, M.O., Etc.
(Continue in "Details"):

**AREA WITHIN BOX FOR DETECTIVE / LATENT FINGERPRINT OFFICER ONLY. THIS BOX WILL BE UTILIZED BY INVESTIGATOR WHENEVER POSSIBLE AND MUST BE FULLY COMPLETED WHEN USING THIS FORM TO CLOSE A CASE "NO RESULTS."**

| Comp. Interviewed ☐ Yes ☐ No | In Person ☐ | By Phone ☐ | Date | Time | Results: Same as Comp. Report · Different (Explain in Details) ☐ |
|---|---|---|---|---|---|

| Witness Interviewed ☐ Yes ☐ No | In Person ☐ | By Phone ☐ | Date | Time | Results: Same as Comp. Report · Different (Explain in Details) ☐ |
|---|---|---|---|---|---|

| Canvass Conducted ☐ Yes ☐ No | If Yes - Make Entry in Body Re: Time, Date, Names, Addresses, Results | Crime Scene Visited ☐ Yes ☐ No | If Yes - Make Entry in Details Re: Time, Date, Evidence Obtained |
|---|---|---|---|

| Complainant Viewed Photos ☐ Yes ☐ Refused ☐ Future | Results: |
|---|---|

| Witness Viewed Photos ☐ Yes ☐ Refused ☐ Future | Results: |
|---|---|

| Crime Scene Dusted ☐ Yes ☐ No | By (Enter Results in Details) | Crime Scene Photos ☐ Yes ☐ No | By (Enter Results in Details) |
|---|---|---|---|

If Closing Case "No Results," Check Appropriate Box and State Justification In Details:
☐C-1 Improper Referral  ☐C-2 Inaccurate Facts  ☐C-3 No Evidence/Can't ID  ☐C-4 Uncooperative Complainant  ☐C-5 "Leads" Exhausted

DETAILS:

Investigation: homicide #6/01
Subject: Interview witness    Rashawn Aarons

Status: Active

1. On 6/12/01 at apx 2315 hours, the above witness along with his cousins Aisha White and Leeford White were transported to the 67 pct from in front of 95 Linden Blvd via 67 patrol van regarding this case. At apx 2330 hours,I along with Det Guinane conducted an interview with Rashawn in the aprehension office on the 2nd floor. Present during this interview was Aisha White. Rashawn stated the following in regards to what he saw. That on this date at about 330pm his father Wayne Chin picked him up from school and dropped him off at Jamal Bogles house (in NJ).At apx 5pm he came back and said where going to brooklyn,it's your grandmothers birthday. Some time around 7pm Wayne dropped Rashawn off at 95 Linden Blvd and then drove off. Rashawn stated that he went to visit a friend a few doors down and stayed there until a little after 10pm. When Rashawn walked outside he observed his mother sitting in the car in front of 95 Linden Blvd. He then walked up to the car and said hello to her and got into the car,she seamed shocked and asked him how he got there, he stated that daddy braught me here. At this time dad pulled up along side of them in his car.Dad then asked Ryan"What happened to Ryan" and she replied "Dont say anything to me,this is your fault". Dad then got out of his car and walked up to the drivers side and punched mom in the face. He then pulled out a gun and shot mom about 4 or 5 times. Rashawn stated that he jumped out of the car and was grabbed by his cousin Leeford.

2. Case active

| CASE ☐ACTIVE ☐CLOSED | DATE REVIEWED/CLOSED | IF ACTIVE, DATE OF NEXT REVIEW |
|---|---|---|

| REPORTING OFFICER | RANK det | SIGNATURE | NAME PRINTED Patrick Denn | TAX REG. NO. 899342 | COMMAND 67 |
|---|---|---|---|---|---|

| REVIEWING / CLOSING SUPERVISOR | CASE CLOSED: C | ENTER DESIGNATION ORB | SIGNATURE | C.O.'s INITIALS |
|---|---|---|---|---|

*EXHIBIT G-5*

EXHIBIT 3

1st COPY CRIMINAL RECORDS SECTION    2nd COPY UNIT REFERRED TO    3rd COPY BOROUGH ROBBERY SQUAD

INFORMATIONAL
PD 313-081A (Rev. 4-69)-31

Crime: Homicide #6/01 — 67 — 6/12/01

| Date of Orig. Report | Case Assigned | Case No. | Unit Reporting |
|---|---|---|---|
| 6/12/01 | 6/12/01 | | 67 Sqd — 4 |

Complainant's Name - Last, First, M.I. — REnee Aarons

Victim's Name - If Different

PERP 1 — 15

**Details:**

Investigation: Homocide #06/01
Subject : Interview with witness                    Aisha White

Status : Active

1. On 6/12/01 at apx 2245 hours, I along with members of the 67 Sqd responded to 95 Linden Blvd regarding a female shot. Once there I observed a crime scene established and safegaurded by uniformed officers. I observed a female who is identified as Aisha White standing near the crime scene crying. She was escorted to the 67 pct via patrol van and was braught to the 67 Sqd where I conducted an interview. Aisha stated the following in regards to what she observed: That at apx 2235 hours she was in her apt at _____, her mother received a phone call and it was Renee calling from her cell phone. Renee stated to her mother that Kevin drove off the block with Aishas veh. Aisha then walked outside and saw Renee sitting in her car parked curbside in front of 95 linden Blvd with her son Rashawn. As she neared the car she observed Wayne pull along side Renee's car in his gold colored Lexus and double park next to her. Aisha heard the two conversating about Ryan who was arrested in the 71st pct earlier on todays date. Wayne then exited the car and aproached the drivers side window of Renee's car. He then punched her in the face. Aisha then ducked down and called 911, at this time Wayne pulled out a handgun and kept firing into the car as Aisha was still on the phone with the 911 operator, Aisha heard Renee screaming for Wayne to stop.

2. Case active

Exhibit G6

| CASE | | DATE REVIEWED / CLOSED | IF ACTIVE, DATE OF NEXT REVIEW |
|---|---|---|---|
| ☐ACTIVE ☐CLOSED | | | |

| REPORTING OFFICER | RANK | SIGNATURE | NAME PRINTED | TAX REG. NO. | COMM |
|---|---|---|---|---|---|
| | Det | | patrick Henn | 899342 | 67 |

1st COPY CRIMINAL RECORDS SECTION    2nd COPY UNIT REFERRED TO    3rd COPY BOROUGH ROBBERY SQUAD

| COMPLAINT FOLLOW-UP INFORMATIONAL PD 313-081A (Rev. 4-69)-31 | Crime | Crime Homicide # 6 | Pct. 67 | OCCB N° | Complaint N° | Date of this Report 6/12/01 | PERP 1 |
|---|---|---|---|---|---|---|---|

| Date of Orig. Report 6/12/01 | Date Assigned 6/12/01 | Case No. 2281 | Unit Reporting 67 Sqd | | Follow-Up No. 7 | PERP 2 |
|---|---|---|---|---|---|---|

Complainant's Name - Last, First, M.I.
PSNY for Renee Arrons   Victim's Name - if Different

Last Name, First, M.I.   Address, Include City, State, Zip   Apt. No   PERP 1

Home Telephone   Business Telephone   Position/Relationship   Sex   Race   Date of Birth   Age   PERP 2

Total No. of Perpetrators   Wanted   Arrested   Weapon ☐ Used ☐ Possessed   Describe Weapon (if firearm, give color, make, calibre, type, model, etc.)

**Perp. No. 1**
Wanted ☐   Arrested ☐   Last Name, First, M.I.   Address, Include City, State, Zip   Apt. No   Res. Pct.
Sex   Race   Date of Birth   Age   Height Ft. In.   Weight   Eye Color   Hair Color   Hair Length   Facial Hair   NYSID No.
☐ Eyeglasses ☐ Sunglasses   Clothing Description,
Nickname, First Name, Alias   Scars, Marks, M.O., etc. (Continue in "Details"):

**Perp. No. 2**
Wanted ☐   Arrested ☐   Last Name, First, M.I.   Address, Include City, State, Zip   Apt. No   Res. Pct.
Sex   Race   Date of Birth   Age   Height Ft. In.   Weight   Eye Color   Hair Color   Hair Length   Facial Hair   NYSID No.
☐ Eyeglasses ☐ Sunglasses   Clothing Description,
Nickname, First Name, Alias   Scars, Marks, M.O., Etc. (Continue in "Details"):

AREA WITHIN BOX FOR DETECTIVE/LATENT FINGERPRINT OFFICER ONLY. THIS BOX WILL BE UTILIZED BY INVESTIGATOR WHENEVER POSSIBLE AND MUST BE FULLY COMPLETED WHEN USING THIS FORM TO CLOSE A CASE "NO RESULTS."

Comp. Interviewed ☐ Yes ☐ No   In Person   By Phone   Date   Time   Results: Same as Comp. Report • Different (Explain in Details) ☐ ☐

Witness Interviewed ☐ Yes ☐ No   In Person   By Phone   Date   Time   Results: Same as Comp. Report • Different (Explain in Details) ☐ ☐

Canvass Conducted ☐ Yes ☐ No   If Yes - Make Entry in Body Re: Time, Date, Names, Addresses, Results   Crime Scene Visited ☐ Yes ☐ No   If Yes - Make Entry in Details Re: Time, Date, Evidence Obtained

Complainant Viewed Photos ☐ Yes ☐ Refused ☐ Future   Results:

Witness Viewed Photos ☐ Yes ☐ Refused ☐ Future   Results:

Crime Scene Dusted ☐ Yes ☐ No   By (Enter Results In Details)   Crime Scene Photos ☐ Yes ☐ No   By (Enter Results In Details)

If Closing Case "No Results," Check Appropriate Box and State Justification in Details:
☐C-1 Improper Referral   ☐C-2 Inaccurate Facts   ☐C-3 No Evidence/Can't ID   ☐C-4 Uncooperative Complainant   ☐C-5 "Leads" Exhausted

DETAILS:

INVESTIGATION:   HOMICIDE
    SUBJECT:       INTERVIEW OF RYAN AARONS
    RESULTS:       CASE OPEN

1.   On 6/13/01 at 0030 hours Detectives Leto and Calabrese
responded to the 71 Precinct to pick up a prisoner arrested
for Penal Law violation 195.05 and handled under arrest number
K01056277.

2.   At this time Ryan Aarons stated that he was arrested on
6/12/01 with his cousin. Ryan stated that the Police took his
vehicle, being a 1993 Lexus, NY registration # AEX1318. During
the night Ryan's mother was contacted by the 71 Precinct to
come and pick up the vehicle. During the evening Ryan stated
that his mother, Renee Aarons responded to the precinct, Ryan
visited with her and she picks up the vehicle. Ryan further
added that during the visit, Renee Aaron receives a phone call
from her boyfriend, Wayne Chin stated that her 11 year old son
was injured and being transported to the hospital and that she
should responded to Renee's mother's residence, being 95 Linden
Blvd. Ryan stated that he didn't know anything else until a
Detective from the 71 Squad came down to the holding cell and
told him that his mother was killed.

CASE ☐ ACTIVE ☐ CLOSED   DATE REVIEWED/CLOSED   IF ACTIVE, DATE OF NEXT REVIEW

REPORTING OFFICER   RANK Det   SIGNATURE   NAME PRINTED Leto   TAX REG. NO. 879948   COMMAND 67 Sqd

REVIEWING/CLOSING SUPERVISOR   CASE CLOSED: ☐   ENTER DESIGNATION ____ ORB ____   SIGNATURE   C.O.'s INITIALS

1st COPY CRIMINAL RECORDS SECTION   2nd COPY UNIT REFERRED TO   3rd COPY BOROUGH ROBBERY SQUAD

Exhibit C-7

COMPLAINT FOLLOW-UP INFORMATION L
PD 313-081A SECOND SHEET (Rev: 8-90)-H-1

Pct. 067   Complaint No.   Date of This Report 6/12/01

Page 2 of 3 Pages

DETAILS:

3. Ryan was very upset and began explaining the history of his family. Ryan explained that he and his little brother, Rashawn Aarons both have different fathers however Wayne Chin has been in their life since Ryan has been a small child and Ryan considers him his father. Ryan further stated that Wayne Chin has been physically and mentally abusive to his mother through out the last twenty years. Ryan stated that he has seen his father, Wayne Chin, assault his mother on numerous occasions and has witnessed Wayne following his mother about in public places. Ryan explained that a few years ago Wayne Chin shot his mother in the leg and he believed that Wayne was arrested for the assault. Ryan further stated that he heard through the family that Wayne Chin has an ex-wife, Claudette, and Wayne had shot her 16 times and she survived. Ryan stated that he believes that Claudette's mother resides near Beth Israel Hospital (near Kings Highway). This occurred about 10 to 12 years ago.

4. Furthermore, Ryan added that Wayne and his mother always argued and explained that on one occasion he went to his mothers aid because Wayne was forcing his mother to have sexual intercourse with him and Wayne was yelling and in a rage stated in substance that he could kill her and then kill both her children so there would be no witnesses. Ryan explained that there where many times that Renee was afraid to come home (being 466 River Side Ave, Trenton, NJ) and she would call Ryan and tell him that she was afraid Wayne will kill her. Ryan stated that his mother was in Florida (exact location is unknown to him) looking for a house to move her children and herself to get way from Wayne Chin. During this time Rashawn was left with Ryan and Wayne to take care of him. Ryan explained that his mother had told Wayne that she planned to move to Florida after the school year was over. Ryan stated that the arguments between his mother and Wayne were lately about the move and Wayne was extremely upset about her moving.

5. Ryan described Wayne as an individual dealing in large quantities of controlled substances. Ryan stated that Wayne has numerous drug spots used in the distribution of narcotics and listed one spot in Harlem (exact location is unknown to him) and Avenue A and Remsen Avenue. Also it was explained that Wayne was involved in a shoot out in Harlem over drugs and money where his friend was shot in the back and Wayne was shot in the left shoulder. Ryan remembered that he and his mother drove Wayne to a location, later identified as 9307 Glenwood Road, to have a female known to him as "Pookie" administer aid to Wayne. Ryan stated that "Pookie" owned a herbal shop on Nostrand Ave between Sterling and Park Place.

6. Ryan proceeded to explained that Wayne was known to always carry a gun and Ryan has seen numerous guns on his person and in his vehicle over the duration of his life. Ryan also stated that he knows that Wayne has served time in jail and has visited him in a jail in Pennsylvania. Ryan stated that Wayne had returned to their residence about one year ago and Ryan believed that Wayne had been released from jail. Ryan also stated that he believed that Wayne was on Parole.

CASE ☐ACTIVE ☐CLOSED   DATE REVIEWED/CLOSED   IF ACTIVE, DATE OF NEXT REVIEW

REPORTING OFFICER: RANK   SIGNATURE Teresa Aheto   NAME PRINTED   TAX REG. NO.   COMMAND

REVIEWING/CLOSING SUPERVISOR: CASE CLOSED: C___ OR B___   ENTER DESIGNATION   SIGNATURE

COMPLAINT FOLLOW-UP INFORMATION
PD 313-081A SECOND SHEET (Rev. 8-90)-H-1

| Page | Pct. | Complaint No. | Date of This Report |
|---|---|---|---|
| 2 of 2 Pages | 067 | | 6/13/01 |

DETAILS:

7. Ryan stated that he believed that Wayne uses different aliases and one name is known to him being Anthony Larkwood because Wayne received a recent speeding ticket in Essex County under that name.

8. Ryan provided the following locations the subject is known to frequent. The following is a list of the locations:

-A building in a housing project at Mother Gaton Blvd.The subject was known to be dating a young black female known to Ryan as Angela Green. Ms. Green's phone number is ▮▮▮▮▮. Ryan stated that he obtained this telephone number from his mother's caller identification because Ms. Green frequently called his mother at their Trenton, New Jersey residence. One several occasions Ryan would answer the phone and Ms. Green would be cursing and stating in substance that Wayne was her man and Ryan's mother should let her go. This location was later identified as ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮

- **Jam-Roc Club** located on Hempstead Turnpike in Hemstead, New York. Wayne Chin hangs out with the owner of the location and Ryan had been at this club with Wayne on several occasions and has seen the owner give Wayne money. Ryan could not remember the owners name however he stated that this is a popular location.

- 90-12 Avenue A, a tailor shop owned by a Michael Gillins. Ryan explained that Gillins is a friend of both Wayne and his mother and his mother has numerous items of clothes made by this individual. Furthermore Ryan believed that Gillin resided in the West Hempstead area and all his mother's vehicles are registered at this location. Furthermore Ryan believes that Gillin is a close friend of Wayne's and would assist Wayne in fleeing the jurisdiction.

-9307 Glenwood Road: Residence of a female known to him as "Pookie" who aided Wayne when he was shot in the shoulder and is into Voodoo and performs Voodoo rituals on the subject to assist him in his criminal enterprises.

- Jamacia, West Indies: Ryan stated that Wayne has two children who reside in Jamacia (the exact location is unknown). The children's names are Patrick and Lorena Chin and he has seen E-Mail messages from Patrick addressed to Wayne on their home computer. Ryan stated that Wayne has two E-Mail addresses known to him, BABY BOY 2 LOVE @ AOL.COM and RENEE BOXCUTTER @ AOL. COM. Ryan stated that he has observed messages and mail sent to Wayne on BABY BOY 2 LOVE @AOL.COM however he didn't have a security code to access the other site.

- L.A. California: Ryan bragged that he knows many people in L.A. and was recently trying to find someone to drive a truck to drive a shipment of marijuana to the New York area

- Georgia and Houston, Texas: Ryan knew from numerous conversations through out his life of friends Wayne had in these locations. Ryan explained that the past week he as seen computer flight information about a plan trip planned by Wayne to Georgia. The exact locations are unknown to Ryan.

9. Case open

| CASE | ☐ ACTIVE ☐ CLOSED | DATE REVIEWED/CLOSED | | IF ACTIVE, DATE OF NEXT REVIEW |
|---|---|---|---|---|
| REPORTING OFFICER: | RANK | SIGNATURE | NAME PRINTED | TAX REG. NO. | COMMAND |
| REVIEWING/CLOSING SUPERVISOR: | CASE CLOSED: | ENTER DESIGNATION C____ OR B____ | SIGNATURE | | C.O.'s INITIALS |

AISHA WHITE

Q.   Aisha, I'm going to stand here so you will speak loud so everybody in the room can hear, all right?

A.   Okay.

Q.   Will you tell the Grand Jury your name, please?

A.   My name is Aisha White.

Q.   Ms. White, what county do you live in?

A.   Kings.

Q.   Do you live alone or do you live with anyone?

A.   I live with my mom, my brother, my sister.

Q.   How old are you now, Aisha?

A.   24.

Q.   Do you work?

A.   Yes.

Q.   What do you do?

A.   I work as a paralegal and a calendar coordinator.

Q.   Aisha, do you remember where you were on June 12, 2001, at approximately 10:35 in the evening?

A.   Yes.

Q.   Can you tell the jurors where you were?

A.   I was outside of my building 95 Linden Boulevard.

Q.   What county is 95 Linden Boulevard?

Exhibit C-8

5

1     A.    In Kings.

2    Q.    Will you tell the jurors what happened?

3     A.    That night Renee was sitting in front of --

4    she was sitting in her son's car in front of me.

5    Q.    May I interrupt you.   When you say Renee, Renee

6    who?

7     A.    Renee Aarons.

8    Q.    How do you know Renee?

9     A.    Renee is my cousin's mother.

10   Q.    Where was that car?

11    A.    In front of 95 Linden Boulevard parked.

12   Q.    What position in the car was Renee?

13    A.    She was sitting in the driver's seat.

14   Q.    I'm sorry to interrupt you.   Go ahead.

15    A.    She was sitting in the driver's seat of her

16   son's car in front of my building.

17   Q.    Okay.   And what happened?

18    A.    And I saw Wayne Chin pulled up in his

19   vehicle parallel parked to her vehicle.

20   Q.    Okay.   Now, you mentioned Wayne Chin.   How do you

21   know him?

22    A.    I know him because he was a friend of my dad

23   and you know, he's around the family.   Her family

24   lives downstairs from where I live.

25   Q.    Would it be fair to say, Aisha, that you have

Exhibit C-8

1   seen Wayne Chin over a period of years?

2         A.   Yeah.

3   Q.   Okay.  Now, you said that Wayne Chin pulled up

4   parallel to the car that Renee Aarons was in, correct?

5         A.   Yeah, blocking her in.

6   Q.   Now what happens?

7         A.   They exchange a few words.

8   Q.   Is Wayne Chin in his car or did he get out of his

9   car?

10        A.   After he exchanged a few words with her, he

11  gets out of his vehicle.

12  Q.   Can you tell us what his tone of voice was when

13  he exchanged a few words?

14        A.   He was very angry.  He was upset.

15  Q.   What did you see him do?

16        A.   He gets out of the vehicle and then he walks

17  over to her vehicle.  Her driver's side window was

18  open, and they were arguing and then he punches her in

19  her face.

20  Q.   Now what happens?

21        A.   And then after that, I called 911.

22  Q.   Okay.

23        A.   And I started to tell the operator that I

24  needed the cops to come in front of 95 Linden

25  Boulevard because my aunt's boyfriend is beating her

Exhibit C-8

1    up.

2    Q.    Does anything else happen?

3         A.    Yeah.  After that, he -- after that, I see

4    that he reached into his waistband.

5    Q.    When you say "he," who do you mean?

6         A.    Wayne Chin reached into his waistband and

7    then he went to her window.  He reached out of his

8    waistband and went to her window and shot her once.  I

9    heard a shot.

10   Q.    Did you see the gun?

11        A.    No.

12   Q.    But you saw that Wayne did reach in his waistband

13   and pull out something and then went into the driver's

14   window and then he shot?

15        A.    I heard one shot.

16   Q.    What happened now?

17        A.    Then I didn't know that anyone was in the

18   vehicle.  Then I see Rashawn Aarons, which is her son.

19   He jumps out.

20   Q.    Now, how old was Rashawn at the time?

21        A.    12 years old.

22   Q.    Do you know his date of birth?

23        A.    Yes, November 12, 1989.

24   Q.    Please continue.

25        A.    After Rashawn jumps out of the car, he holds



1  Wayne, like a bear-hug, and he says, "Daddy, no.

2  Please stop.  Please stop."  And that's when he

3  actually pushed him away.

4  Q.    He being who?

5      A.    Wayne Chin pushed him away.  He reloaded.

6  Q.    Where was Rashawn kind of bear-hugging Wayne

7  Chin?

8      A.    Right in front of the driver's door of his

9  mom's vehicle.

10  Q.    What, if anything, does Wayne Chin do to Rashawn?

11      A.    Excuse me?  Please repeat.

12  Q.    Does Wayne Chin do anything to Rashawn when

13  Rashawn was bear-hugging him?

14      A.    Yeah, he pushed him away.

15  Q.    Okay.  Now where are we?

16      A.    We're at the part where he pushed him away

17  and Wayne reloads the gun and then he goes back to the

18  vehicle that Renee was in and then he shot her up

19  numerous times, but his hands were inside the window

20  of the vehicle.

21  Q.    After Wayne Chin reloads, you hear more shots?

22      A.    Yes.

23  Q.    And the hand was inside the car.  What happens

24  now?

25      A.    Then he -- then he puts the gun away, gets

EtHibt G 8

1   in his car and he drives off.

2   Q.   In what direction?

3        A.   He actually made a U-turn 'cause Linden

4   Boulevard is a two-way street, and he made a U-turn

5   towards Rogers Avenue.

6   Q.   Have you seen Wayne Chin since that night?

7        A.   No.

8   Q.   Aisha, would you step out for a moment, please?

9        A.   Sure.

10

11                   (WITNESS EXCUSED)

12

13   ~~████████████████████████████~~

14   ~~████████████████████~~

15   ~~████████████████████████████~~

16   ~~████████████████████████████~~

17   ~~████████████████████████████~~

18   ~~████████████████████████████~~

19   ~~████████████████████████████~~

20   ~~████████████~~

21   ~~████████████~~

22

23   ~~████████████████████████████~~

24   ~~████████████████████████████~~

25



AISHA WHITE, RECALLED

Q.   Aisha, when all of this was occurring in front of 95 Linden Boulevard, where were you in relationship to the car and where Wayne Chin was when he was shooting?

A.   Repeat that, I'm sorry?

Q.   Where were you?

A.   I was actually standing in -- from my view, I could see the back of her car.

Q.   Could you estimate about how far you think you were?  Can you do something in this room, if I started walking away from you?

A.   Yes.

Q.   I'm going to walk away from you sitting in the witness stand.  Tell me when to stop.

A.   Stop.

MS. PAISNER:  Ladies and gentlemen, could we estimate this as being, I don't know, 10, 12 feet?

JURORS:  Yes.

JUROR:  15.

MS. PAISNER:  15 feet.

Q.   Thank you very much.  That's where you were standing when it all occurred?

A.   Right.

Q.   Okay.  You can go now.

Exhibit C8

THOROUGHLY

8

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF KINGS: CRIMINAL TERM: PART 4

THE PEOPLE OF THE STATE OF NEW YORK,            ANSWER TO OMNIBUS MOTION
                                                 AND CROSS-MOTION FOR
                                                 RECIPROCAL DISCOVERY
                  - against -

WAYNE CHIN,                                      Kings County Indictment
                                                 Number 1018/2003
                         Defendant.

_____

        ELISA PAISNER, an attorney admitted to practice in the State

of New York and an Assistant District Attorney in the County of

Kings, affirms the following to be true under penalty of perjury:

        1.      This   affirmation   is   submitted   in   opposition   to

defendant's omnibus motion, dated   April 2, 2008.   I am also

submitting a cross-motion for reciprocal discovery.

        2.      The  following  statements  are  made  on  information  and

belief based upon the records and files of the Kings County

District Attorney's Office.

        3.      The People have previously served upon defendant and

filed with the court a Voluntary Disclosure Form together with

notices and attachments (hereinafter collectively referred to as

the VDF).   The information contained in the VDF is incorporated

herein by reference and constitutes a response to defendant's

motion where appropriate.

Exhibit C 9

I.   BILL OF PARTICULARS

Provided below is a bill of particulars.  The facts set forth in the indictment and the bill of particulars, demand to produce and motion for discovery provide all the particulars to which defendant is entitled.  They specify "the substance of defendant's conduct . . . which the People intend to prove at trial on their direct case . . . ."  C.P.L. § 200.95(1)(a).  The other information requested is evidentiary detail, beyond the scope of a bill of particulars, not authorized to be included in a bill of particulars and not necessary to enable defendant to adequately prepare to conduct his defense.  See C.P.L. § 200.95(1)(4); People v. Davis, 41 N.Y.2d 678, 680 (1977) (a "bill of particulars serves to clarify the pleading: it is not a discovery device").  The People reserve the right to file an amended bill of particulars prior to or at trial.  C.P.L. § 200.95(8).  Accordingly, defendant's motion for further particulars should be denied.

On June 12, 2001, at approximately 10:30 P.M., in front of 95 Linden Blvd. in Brooklyn, defendant approached Renee Aarons from the driver's side of her car.  Words were exchanged, defendant punched Renee Aarons and then shot her numerous times, causing her death.  Defendant was a fugitive and subsequently was arrested and tried in Arizona.  Defendant was extradited from Arizona to New York.

Exhibit G-9

## 1. DISCOVERY

(a) Statements by defendant.

There are no statements by defendant known to the People at this time.

(b) Grand jury testimony.

Defendant did not testify before the Grand Jury.

(c) Scientific reports.

A copy of the death certificate, emergency room medical records and autopsy have been provided to defendant.    There are no other scientific reports in the possession of the People at this time.  The People reserve the right to have reports prepared. Upon receipt of these reports, copies will be provided to the defendant.

(d) Photographs and drawings.

Defendant's arrest photograph can be obtained by subpoena. Copies of this photograph and any other photographs made by law enforcement will be made available for defendant to view at trial. The People reserve the right to prepare such drawings or photographs as are necessary to further the investigation and prosecution of this case.  The People will provide copies of any such items to defense counsel if and when prepared.

(e) Photographs of released property.

None known to the People at this time.  The People reserve the right to locate and use at trial.

Exhibit G 9

(f)  Property.

The People are not aware of any property recovered from defendant at this time.  The People reserve the right to locate such property and use it at trial.

(g)  Recordings.

The sprint reports of 911 calls have been previously provided to defendant.  The 911 recording has been erased.  The People reserve the right to locate other recordings, if they exist, and use them at trial.

(h)  Other material.

1.  The People's witnesses.

The People oppose any further disclosure of information regarding witnesses at this time pursuant to C.P.L. § 240.50.  The People reserve the right to locate and call for trial other witnesses.

Witnesses' criminal records, if any, and a complete witness list will be provided prior to trial.  Other information is opposed as beyond the scope of discovery.

2.  Identification.

See C.P.L. § 710.30(1)(b) notice in VDF.

3.  Rosario material.

Exhibit G-9

All material required pursuant to People v. Rosario, 9 N.Y.2d 286 (1961), will be provided at the appropriate time, as per C.P.L. § 240.45. Prior statements of the People's witnesses are not discoverable at this time. See People v. Anderson, 66 N.Y.2d 529, 542 (1985). They will be provided to defendant to the extent and at the time prescribed by law. See C.P.L. §§ 240.44(1) and 240.45(1)(a).

4. Brady material.

No Brady material is known to the People at this time. The People are aware of their continuing obligation pursuant to Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and the Federal and State Constitutions, and will turn over any such material upon receipt by the People.

(5) Date and time of incident and arrest.

The incident occurred on June 12, 2001, at approximately 10:30 P.M. in front of 95 Linden Blvd., Brooklyn, New York. Defendant was arrested in Arizona for charges there and extradited to New York.

(6) Miscellaneous

Defendant acted as a principal. All other requests made by defendant are opposed as beyond the scope of discovery.

EXHIBIT G-9

## II.   ANSWER TO MOTIONS TO INSPECT GRAND JURY MINUTES, AND TO DISMISS THE INDICTMENT OR REDUCE THE CHARGES

The People consent to an in camera inspection of the Grand Jury minutes, and have submitted the minutes to the Court. The People oppose dismissal of the indictment or reduction of the charges contained therein.   Each and every count therein is supported by legally sufficient evidence and the Grand Jury was correctly charged on the applicable law pursuant to C.P.L. § 190. The People further oppose defendant's request for release of the Grand Jury minutes because defendant's rights are adequately protected by the procedure set forth in the C.P.L. and defendant presents no support for his request.

## III.   ANSWER TO MOTION TO SUPPRESS STATEMENTS (Huntley).

There are no statements known to the People at this time.

## IV.   ANSWER TO MOTION TO SUPRESS IDENTIFICATION (Wade).

The People oppose defendant's motion.   The only identification in this case is confirmatory.

Exhibit C-9

## V.   ANSWER TO SANDOVAL MOTION

The People oppose defendant's motion, but consent to a Sandoval hearing.   In addition, in accordance with C.P.L. § 240.43, immediately prior to the commencement of jury selection, at any Sandoval hearing, any information regarding prior uncharged bad acts will be provided to defendant.

## VII. RESERVATION CLAUSE

The People reserve the right to amend their answers to the above-stated responses as new or additional information becomes available.  Furthermore, the People reserve the right to amend any or all of the above answers in the interests of justice.

## CROSS-MOTION FOR RECIPROCAL DISCOVERY

Pursuant to Criminal Procedure Law § 240.30, the District Attorney hereby demands that within twenty days of the date of service of this demand, defendant disclose and make available to the District Attorney for inspection, photographing, copying and testing:

a)   Any written report or document or portion thereof concerning a physical or mental examination, or scientific test, experiment, or comparisons, made by or at the request or direction of defendant, if defendant intends to introduce such report or document at trial;

b)   Any written report or document or portion thereof concerning psychiatric examination of the defendant if the defendant has filed a notice of intent to proffer psychiatric evidence and such report or document was

Exhibit C-9

made by a person, other than the defendant, whom the defendant intends to call as a witness at trial;

c)   Any photograph, drawing, tape, or other electronic recording which the defendant intends to introduce at trial; and

d)   Whether the defendant has ever been committed, voluntarily or involuntarily, for drug and alcohol abuse or for psychiatric treatment.   If so, state the dates and places of commitment.

ALIBI NOTICE

Pursuant to Criminal Procedure Law § 250.20, the District Attorney hereby demands that, if the defendant intends to offer at trial a defense that at the time of the commission of the crime charged the defendant was at some place or places other than the scene of the crime, and to call witnesses in support of such defense, the defendant must, within eight days of service of the demand, serve upon the People, and file a copy thereof with the court, a "notice of alibi", reciting:

a)   the place or places where the defendant claims to have been at the time in question; and

b)   the names, the residential addresses, the place of employment and the addresses thereof of every such alibi witness on whom the defendant intends to rely.

Exhibit C-9

CONCLUSION

It is respectfully requested that, except as consented to herein, defendant's motion should be denied.


Dated:     Brooklyn, New York
           April                    16,                    2008




                        Respectfully submitted,

                        *Elisa Paisner*
                        ELISA PAISNER
                        Assistant   District Attorney
                        (718) 250-4915




EXHIBIT C-9

# M E M O R A N D U M

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
CRIMINAL TERM, PART 4

- - - - - - - - - - - - - - - - - - - -

THE PEOPLE OF THE STATE OF NEW YORK  | By: Justice D'Emic, M. J.

      - against -          Date: April 22, 2008

                        Ind. #:1018-03

        Wayne Chin

- - - - - - - - - - - - - - - - - - - -

Defendant is charged with, among other things, Murder in the Second Degree. His motion for pretrial relief is decided as follows:

The defendant's motion for a Bill of Particulars and Discovery is granted to the extent of the information provided by the People in their answer. The People remain aware of their continuing obligation pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and will make any such material available as soon as it is received.

Defendant moves the court to preclude any identification evidence. The People represent that there was no police arranged identification procedure, only a confirmatory identification of the defendant and the witnesses are known to each other.

The defendant's motion to preclude statements is denied to the extent that the People represent that no statements were made by the defendant, accordingly the only hearing that will take place immediately before trial is a <u>Sandoval</u> hearing.

The court has reviewed the grand jury minutes <u>in camera</u> and concludes that the evidence before the grand jury is legally sufficient

EXHIBIT C-10

to establish the findings of the indictment (see, People v. Pelchat, 62
NY2d 97;   People v. Calbud Inc., 49 NY2d 389). In addition, the
presenting district attorney charged the grand jury on the applicable
law and there is nothing in the record to indicate that the integrity of
the grand jury proceedings was compromised (CPL 210.35).

The defendant's reservation of the right to make additional motions
shall be governed by CPL § 255.20(3), and the People's request for
reciprocal discovery is granted only to the extent that the defendant is
directed to respond to the People's demands by the next adjourn date.

This constitutes the Decision and Order of the court.

Matthew J. D'Emic
J.S.C.

**HAROLD C. BAKER**
**ATTORNEY AT LAW**
**32 COURT STREET SUITE 1800**
**BROOKLYN, NY 11201**
**(718) 858-7927 Fax (718) 260-9636**

**BY FACSIMILE AND REGULAR MAIL**                    August 31, 2008

Kings County District Attorney
350 Jay Street
Brooklyn, NY 11201
Att.:   ADA's Elisa Paisner and Vivian Cedeno-Nieves

Re:   **People v. Chin, Indictment#1018/03**

Dear Adas Paisner & Cedeno-Nieves:

As you will recall, I represent the above captioned defendant. After a review of the discovery provided to date, defendant hereby makes the following supplemental discovery demands:

1. As the discovery provided to date indicates, a four door Lexus bearing NYS license plate#AEX-1318 (hereinafter vehicle "1") and a four door Lexus bearing NYS license# ABC-8082 (hereinafter vehicle"2") were towed from the vicinity of the crime scene and then stored at the 71$^{st}$ precinct where they were processed for evidence. Various ballistic evidence was allegedly observed inside vehicle 1 and recovered there from by the police. However, as you have previously informed the undersigned, neither vehicle is available for inspection or testing by the defense since they have both been "disposed of." The defense contends that the vehicles should have been retained and preserved. In light of the foregoing, please provide all paperwork regarding the recovery, transport, storing and disposal of the two vehicles recovered in this case including the identity of the tow truck operator(s) and by whom they were employed on the date the vehicles were moved. Furthermore, please provide all paperwork, including but not limited to hand written reports, invoices, log book entries etc. associated with the vehicles. State when and how the vehicles were disposed of, who authorized such disposal and why, and provide all related paperwork thereto. Please also specify whether or not there were any scientific testing done of the vehicles or their contents (personal belongings within the passenger compartments and trunks, glove compartments etc, of each vehicle, some of which is seen in the crime scene photographs), including but not limited to DNA, fiber, hair or fingerprint tests. If no such tests were conducted, please state so in writing. Please also provide an accounting of the personal items

Exhibit C 11

recovered from each vehicle, including but not limited to the items seen in the crime scene photographs, specifically, the purse and contents thereof seen in the floor of the front passenger compartment of the vehicle 1, the shopping bags inside the trunk, the dry cleaning seen in the rear passenger compartment of vehicle 2, and any other property recovered from either vehicle.

2.   A search warrant was obtained to seize and search the vehicle 2.  The defense has previously demanded copies of the search warrant affidavit, the search warrant and minutes of the application for the search warrant so that the defense could explore the viability of a motion to controvert.  To date, none of the search warrant documentation has been provided.  Please provide copies of the documents immediately.

3.   DD5# 66 makes reference to the investigation of certain telephone records.  Please provide copies of any and all telephone records in the possession of the People relevant to the case.  Furthermore, please state whether or not any cell phones were recovered either from the deceased or from either vehicle, or from witness(es).  If so, please provide the cell phone number(s) and carrier information so the defense can subpoena this information.

4.   The 911/sprint reports previously provided are nearly illegible.  Please provide more legible copies.  Furthermore, it appears from a review of the 911/sprint reports that there were numerous calls to 911 by eye/ear witnesses to the shooting.  The telephone numbers of these callers have been redacted.  Please provide un-redacted copies of the 911/sprint reports so that the defense can subpoena the subscriber information and attempt to locate and interview these witnesses.

5.   DD5 number ten memorializes an interview with an eye-witness who provides a detailed description of a male black who the witness reports was "punching at" a female black that was sitting in the deceased's vehicle.  Moreover, this witness goes on to describe that another female was trying to pull the male black away while stating "Don't do that Johnny," a couple of times.  Upon information and belief, "Johnny" is not a name used by the defendant.  There has been no other information provided confirming or contradicting this witness' version of the events.  Specifically, there has been no other witness descriptions provided of either the suspect of the female that was apparently accompanying him.  It is imperative that the defense has access to the witness whose statement is memorialized in DD5#10 to explore the possibility of the existence of a suspect other than defendant and to attempt to identify and locate the female who, according to the witness, accompanied the suspect.  Furthermore, if the People are aware of the identity of the woman trying to pull the suspect away from the car of the deceased, the defense respectfully requests that the People provide the contact information for this witness so that the defense may interview her.

Exhibit C-11

6. The "Results of Evaluation/Comparison Latent Print Section" report dated 11/6/03 states that "Upon *re-evaluation* (emphasis added), it has been determined that an identification is made of Michael Edward." Please provide all paperwork regarding any earlier analysis, evaluation, testing, comparison or conclusions with respect to any fingerprints recovered in this case.

7. There are numerous DD5's that have been omitted from the discovery previously provided. The defense requests that these DD5's including eye-witness statements be provided sufficiently prior to trial so that the defense can meaningfully review and evaluate them and if necessary make reasonable attempts to identify and locate potential witnesses.

8. Please also provide any investigative reports generated by the office of the District Attorney, including but not limited to the Riding DA's scratch and typed reports, summaries of witness interviews, etc.

9. A blank CD and audiocassettes were previously provided to your office so that copies of the 911 calls and recorded witness statements could be made for the defense. To date, these items have not been provided. Please provide them as soon as possible along with any transcripts of same.

10. You have opposed a Wade hearing on the grounds that any identification will be confirmatory. Please state specifically and in detail the reasons why any identification of defendant will be "confirmatory" with respect to any such identifying witness.

11. There are no crime scene photos or diagrams setting forth the positioning of the body of the deceased prior to her removal from the vehicle. Please provide the names, shields and contact information for the individual(s) who moved and/or removed the deceased from the vehicle.

Thank you for your attention regarding the foregoing. Should you have any questions or comments, please do not hesitate to contact the undersigned.

Very truly yours,

Harold C. Baker

Wayne Chin
Reg. No. 900-08-00305
G.M.D.C.-4upper
15-15 Hazen Street
East Elmhurst, NY. 11370

The Honorable Matthew D'Emic
Brooklyn Supreme Court-Part 4
320 Jay Street
Brooklyn, NY. 11201

                    Re:  State vs. Chin
                         INDICTMENT # 1018/03

        Dear Judge D'Emic,

                    Nineteen years ago, Alan Stutman, Esq.,
was assigned to defend me against the state in a weapon possession
case before the Honorable Judge Lippman in Brooklyn.   I became
uncomfortable with his representation he was providing then as  a
18'B attorney.  We had discussion along those lines  and I
believe that if he was privately retained,  his representation
would improve.  Thereafter,  Ms. Renee Aarons, the decease,
contacted Mr. Stutman, and a price for his service was worked out
between them.   Ms. Aarons and her mother, Pauline Williams,
provided the funds necessary to privately retain him.  If  my
memories served me well,  I believe that he was paid by check
from Ms. Williams' account.

        For those reasons,  I believe that Mr. Stutman  harbors
some kind of animosity towards me and there exist a conflict  of
interest.  Therefore, I am  respectfully requesting that Your Honor
appoint new counsel.

Dated:  East Elmhurst, New York
        December 23, 2008

                                Respectfully Submitted,

                                _____
                                Wayne Chin

CC:  Alan Stutman, Esq.
     50 Court Street
     Suite 501
     Brooklyn, NY. 11201

Exhibit G-12

SUPREME COURT OF THE CITY OF NEW YORK
COUNTY OF KINGS, PART 4

------------------------------------x
The People of the State of New York

          -against-                NOTICE OF MOTION

                                   Indictment #1018,'03

WAYNE CHIN,
                    Defendant.
------------------------------------x

        PLEASE   TAKE NOTICE,   that upon the annexed
affirmation  of WAYNE CHIN, the defendant herein, dated this
20th., of April 2009, will moved this Court at Part 4,   to
be held at the Courthouse located at 320 Jay Street, Brooklyn,
New York,  on the 27th., day of April 2009,  at 9;30 o'clock
in the  forenoon of that day or as soon thereafter  as the
defendant may be heard;

        1.   For an Order of Preclusion and Sanctions
against the State  and/or dismissal of the indictment  with
prejudice for violations of the defendant's right pursuant
tothe  law articulated in People vs.  Rosario, 9 N.Y. 2d
286, 213 N.Y.S.  2d 448 (1961), and its progencies.  In the
alternative,  the defendant respectfully request a hearing
to determine what Sanctions if any, this Court will impose
upon the State.

        2.   The Notice of Motion  is also premised upon
the rules of law articulated in People vs. Renaud, 535 N.Y.S.
2d  985 (1988)(a motion,  whether made by counsel or pro-se

-1-

Exhibit C-13

defendant, mandates a ruling or else the court must clearly state  its reasons  for refusing to decide the motion). id., at 988.

     3.    Contemplating Brady vs. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L. Ed. 2d 215, the suppression of exculpatory evidence by the state violated the defendant's right to due process under both State and the United States Constitution, and the discovery requirements of Criminal Procedure Law, Article 240.00.

Dated:  April 20, 2009
       East Elmhurst, New York 11370

                           Respectfully Submitted,

                           Wayne Chin
                           Reg. No. 900-08-00305
                           G.R.V.C. 17A47
                           09-09 Hazen Street
                           East Elmhurst, NY. 11370

cc:  Clerk of the Court
     Brooklyn Supreme Court
     320 Jay Street
     Brooklyn, New York 11201

     The Hon. Matthew D'Emic

     Charles Hynes, Esq.
     Brooklyn District Attorney
     350 Jay Street
     Brooklyn, New York 11201

     Phillip Smallman, Esq.

     copy retained....

-2-

Exhibit G-13

SUPREME COURT OF THE CITY OF NEW YORK
COUNTY OF KINGS,   PART 4

-------------------------------------x
The People of the State of New York

        -against-                        AFFIRMATION
                                         Indictment # 1018/03

WAYNE CHIN,
               Defendant.
-------------------------------------x

State   of   New York  )
                   )SS:
County  of Queens   )

     .I,  WAYNE CHIN,   the defendant herein the above
entitled  action,  being duly  sworn deposes and say:

           1.   I am  personally familar with the facts
and circumstances stated herein,  but although I am personally
familar with all facts and statements hereinafter stated  to
the best of my knowledge, information and belief.  I am  a
layperson  in the matter of law and seek this Court's
indulgence for errors, defects and faults pursuant to section
2101(f) of the Civil Practice Law and Rules.

           2.   This affirmation · is submitted to support
the Motion for Preclusion and Sanctions for the State's failure
to preserve evidence in their possession until requested by
the defense for inspection, examination and testing.

           3.   This affirmation is based upon personal
knowledge,  information and belief,  the sources of which are
things observed,  heard,  court proceedings, police reports,

<div align="center">1</div>

Exhibit G·13

and admission on  the record by the assistant district attorney.

    4.   The discovery provided so far indicates that a green four door Lexus vehicle bearing New York License AEX 1318, (hereinafter vehicle #1), and a gold four door Lexus vehicle bearind New York License ADC 8082, (hereinafter vehicle #2), were towed from two separate location on Linden Boulivard, Brooklyn, New York, on the morning of June 13,2001, and stored at the 71st., Precinct for a period of time.  The vehicles were placed at the back of the precinct in an unsecured area, accessible to both police officers and civilians.  Two days later on June 15, 2001, the vehicles were processed for ballistic and fingerprint evidence.  Thereafter, the gold four door Lexus  was removed from the 71st., Precinct to the vicinity of the 67th., Precinct and parked on Snyder Avenue  and  Rogers Avenue  for several months.

    5.  It  is alleged that various  ballistic evidence were recovered from  vehicle #1, along with thirty four, "(34)" fingerprints recovered from both vehicles.  No photographs or  videos were  taken to  show  the exact location of  the  fingerprints  lifts.

    6.  All fingerprints were submitted for <u>SAFIS</u> latent evaluation comparison on July 7, 2001. Detective Gregg Timpanaro made the comparison and determined that there  was a negative result against the defendant's prints.  However, on  November 6, 2003,  Detective Robert A. Otero claimed that he made the same <u>SAFIS</u>  comparison and found a positive match against the defendant's  prints.

<center>-2-</center>

Exhibit G 13

7.    However, no Forensic Biology DNA Extract-
(skin cell), Rotorgene Data Collection- (swab of seat, etc.,),
Touch Object Extraction was done on the vehicles before they
were disposed of.  The prosecutor alleged that Rashawn Aarons
was sitting in the passenger's seat when shots were fired
therein.  There is no way for the defense to disprove  that
allegation by DNA extraction because the vehicle and its
contents were disposed of.

8.    On  or about April 23, 2008,  the assistant
district attorney  informed the defense that the vehicles
were not available for inspection, examination or testing.
By letter dated August 31, 2008,  the defense contends that
the vehicles should have been retained and preserved  and
requested that the prosecutor provides all paperworks regarding
the recovery, transport, storing and disposal of the  vehicles.
Quoting verbatim, the letter stated; "Please provide  all
paperworks, including but not limited to, handwritten reports,
invoice, log book entries etc; associated with the vehicles.
State when and how the vehicles were disposed of, who authorized
such disposal and why, and provide all related paperwork thereto.
Please also specify whether or not there were any  scientific
testing done of the vehicles or their contents, (personal
belongings within the passenger compartments and trucks, gloves
compartments etc;  of each vehicle, some of which is seen in
the crime scene photographs), including but not limited to
DNA, fiber, hair or fingerprints test.  If no such tests

-3-

Exhibit C-13

were conducted, please state so in writing.   Please provide an
accounting  of the personal items recovered from each vehicle,
including but not limited to items seen in the crime scene
photographs, specifically,  the purse and contents thereof
seen on the floor of the front passenger compartment of
vehicle #1,  the shopping bags inside the trunk. id.

9.   Playing catch up to the eight ball, the
prosecutor created an unofficial five page  document  on
October 6, 2008,  with  a non-existing invoice number
itemizing several items of shoe and clothes allegedly taken
from vehicle #2.  There is no video or photographs showing
any placement of 95%, (precent), of the items within that
vehicle.  Furthermore,  other items observed from the photos
provided, such as cigarette butt,  bottles, tissue papers,
CDs  etc.,  were suppressed by the state.

10.  Without responding to the defendant demands
in toto,  the prosecutor creation of the October 6's documents
were to justify the taking of my DNA, therefore, a motion was
filed on October 7, 2008, for that purpose.  Being informed
by the defendant that she did not produce the proper chain of
custody for the items, the Prosecutor, Ms. Paisner, admitted
errors to justify the fabrication, (manipulation), of  the
evidence.

11.  Answering the defendant's demands for inspection,
examination and/or testing for the contents of the purse and bags
in vehicle #1.  On January 16, 2009,  Ms.  Paisner,  informed

Exhibit G-13

the court and the defense that all such evidence was suppressed because the contents of the purse and bags were given to the victim's family. That was done in spite of the fact that the contents were never vouchered, video or photograph.

12. Just as the People have a duty to produce Rosario material, they also have a correlative "obligation" to preserve evidence until request for disclosure is made. People vs. Kelly, 478 N.Y.S. 2d 834, United States vs. Bryant, 439 F. 2d 642. Thus, its no answer to a demand to produce that the material has been lost of destroyed. If the People fail to exercise care to preserve it and the defendant is prejudice by their mistake, the court must impose sanction. see generally United States vs. Angenblick, 393 U.S. 348,355-56.

13. The victim, (a convicted shoplifter, a drug smuggler, wanted by Florida authorities for bring drugs from Jamaica to Florida, and an associate of the notorious Blood Stain Gang), was generally armed with a nine millimeter weapon supplied by individual known to the defendant.

14. There is no way for the defense to prove that there were stolen properties, weapons and drugs or whether different firmarms were discharged from or into vehicle #1, because the vehicle and its contents were suppressed.

15. In order to safeguard the defendant's right under Brady, Ms. Painser and other law enforcement officials are duty bound to deligently preserve all material which may be subject to disclosure, United States vs. Bryant, supra), it is not for Ms. Painser or the police officers to

EXHIBIT C-13

select which materials should be preserve and which should be destroyed. Were law enforcement officials empowered to pick and choose the materials deemed worthy of preservation, then the due process rights guaranteed by Brady would be shallow; Brady could be circumvented by merely destroying evidence unfavorable to the prosecution before it is demand by the defendant. United States vs. Bryant, supra at page 648, People vs. Saddy, 84 AD 2d 175, 178.

16.  Brady vs. Maryland, id., did not appoint the police and the District Attorney as the final arbiters of whether or not the missing evidence is exculpatory. Because of the destruction or the failure to preserve that evidence, it must be presumed so.  The failure to preserve exculpatory evidence not only was prejudicial to the defendant; it violated his state and federal constitutional rights  to due process and is subject to mandatory sanctions. People vs. Torres, 190 AD 2d 52, 54, 597 N.Y.S. 2d492 (3rd. Dept. 1993). See also Criminal Procedure Law, Section 240.20 (1)(h), and 240.70.

WHEREFORE,  your affirmant respectfully request that the Court properly sanction the prosecution by limiting the State's evidence, and/or dismissal of the indictment with prejudice and for such and any further relief deems just and proper in the interest of justice.

Dated: April 20, 2009
       East Elmhurst, New York 11370.

Respectfully Submitted;

Wayne Chin
Reg. No. 900-08-00305
G.R.V.C.  17A47

Andre Boehm
Notary Public State Of New York
Kings County
NO. 01BE6191483
Commission Expires Aug. 18 2012

Exhibit C-13

-6-

SUPREME COURT OF THE STATE OF NEW YORK
CRIMINAL TERM  MOTION CLERK: 347-296-1279

7113
Pt-4

## <u>Pro Se Motion / Application</u>

# Please give to Judge or Law Clerk

**DEFENDANT** _Wayne Chin_

**PART** _4_

**INDICTMENT #** _1018-03_

**NEXT COURT DATE** _4-27-09_

**TYPE OF MOTION / APPLICATION** _for order of Preclusion & sanctions against the State or dismiss._

| DATE | DISPOSITION | JUDGE |
|------|-------------|-------|
|      |             |       |
|      |             |       |
|      |             |       |
|      |             |       |
|      |             |       |
|      |             |       |
|      |             |       |

Wayne Chin
Reg. No. 900-08-00305
G.R.V.C. 17A47
09-09 Hazen Street
East Elmhurst, NY. 11370

May 21, 2009

The  Honorable Matthew D'Emic
Brooklyn Supreme Court- Part 4
320 Jay Street
Brooklyn, New York 11201

Re: State  vs.  Chin
Ind. # 1018/03

Dear  Judge D'Emic,

Please  accept this letter as a formal
motion for appointment of new counsel.  I know that the trial
date is less than sixty days away,  however, my request is not A
strategy for any type of delay in the proceedings,  but  its
essential due to the lack of communication between Mr. Smallman
and myself.  Phone calls made to his office are never answered
personally and all messages has to be left on the answering
machine,  letters sent to his office are never answered and
personal appointment he has made to see me are never fulfilled.
Even  messages  left by the private investigator are ignored.
This request for appointment of new counsel is one of urgency
in order for me to properly prepare for trial.  Should my
request be denied, alternatively,  I request to exercise my
Sixth Amendment constitutional right to self representation
pursuant to  Freretta vs. Califirnia.

I  also hereby request that  Your Honor grant the
appointment of an forensic and ballistic experts in  light of
annexed New York Post article on forensic evidence and the
evidence the state will try to introduce at trial.

Respectfully Submitted,

Wayne  Chin

cc:  Clerk of the Court

Charles Hynes, Esq.
Brooklyn District Attorney

Phillip Smallman, Esq.

Mr.  Brown — Private Investigator

EXHIBIT G-14

SUPREME COURT OF THE STATE OF NEW YORK
CRIMINAL TERM MOTION CLERK: 347-296-1279

## Pro Se Motion / Application

## Please give to Judge or Law Clerk

DEFENDANT *WAYNE Chin*

PART *4*

INDICTMENT # *1018 - 03*

NEXT COURT DATE *7-13-09*

TYPE OF MOTION / APPLICATION *Reassignment of Counsel*

| DATE | DISPOSITION | JUDGE |
|---|---|---|
| 6/23/09 | Application Denied. | DiMic |
| | | |
| | ENTERED | |
| | JUN 2 4 2009 | |
| | NANCY T. SUNSHINE COUNTY CLERK | |
| | | |

Wayne Chin
Reg. No. 900-08-00305
G.R.V.C.  17A47
09-09 Hazen Street
East Elmhurst, NY. 11370

July 17, 2009

The Honorable Matthew D'Emic
Brooklyn Supreme Court
320  Jay Street
Brooklyn, New York 11201

Re:  People vs. Chin,  Indictment #1018/03

Dear Judge D'Emic,

On June 27, 2009,  I submitted a letter to the
court requesting sanctions for the prosecutor failure to timely
produce specific demanded materials.  One of my specific demand
for disclosure were for the victim's cell phone and cell phone
number 917-6040018  records, including but not limited to, cell
phone tower emissions, (cell site affirmations).

On July 13, 2009,  the prosecutor, Ms. Paisner, informed
the court that she did not possess any phone records and that the
defendant could subpoena any phone record that is require.
Judging from the disclosure provided so far,  In the matter of
an application for an order authorizing the installation and use
of a pen register and trap device, including caller identification
and cell site information information, for cell phone 917-604-0018,
Detective Jack Guinane states the following:
On June 12, 2001, at approximately 3:20 p.m., Ryan Aarons
received a telephone call from phone number 917-604-0018........
registering on said witness' caller identification (hereinafter
caller ID) and said witness spoke to Wayne Chin.  Deponent is
further informed by ............  that Wayne Chin has called
informant from the phone number ....... numerous times over the
pass six (6) days,  said telephone number registering on informant's
caller ID.  (See, application and Order annexed hereto.)
Based upon the above statements,  the People obtained and
have in their possession all of the requested disclosure materials.
Furthermore,  DD5 number 66,  indicated that on December 7, 2001,
the People subpoena and obtained records for two phones.  (See,
DD5 number 66 annexed hereto).   The phone records constitute
Rosario materials.

On May 21, 2009,  in a letter submitted  to the court,
I requested the assignment of ballistic and forensic experts.

-1-

EYHibit G-15

However, on July 13, 2009, I forgot to address the court about the appointment of the experts. Although my intentions of getting the experts assigned were known and agreed upon by Attorney Smallman, he failed likewise to make the application. Therefore, I reiterate that I respectfully request the appointment of a ballistic and forensic experts.

Respectfully Submitted,

Wayne Chin
Reg. No. 900-08-00305
G.R.V.C. 17A47
09-09 Hazen Street
East Elmhurst, NY. 11370

cc: Clerk of Court
Brooklyn Supreme Court
320 Jay Street
Brooklyn, NY. 11201

Charles Hynes, Esq.
Brooklyn District Attorney
350 Jay Street
Brooklyn, New York 11201

Phillip Smallman, Esq.
32 Court Street
Suite 1702
Brooklyn, New York 11201

EXHIBIT G 15

Wayne Chin
Reg. No. 900-08-00305
G.R.V.C. -17A47
09-09 Hazen Street
East Elmhurst, NY.11370

August 4, 2009

Phillip Smallman, Esq.
32 Court Street
Suite 1702
Brooklyn, New York 11201

Re:  State vs.  chin,  Ind. # 1018/03

Dear Sir,

Before you were even assigned to my criminal case by the court, I saw you with a copy of a specific letter I had wrote to your school friend, the Honorable Judge D'Emic. Several weeks after your assignment to the case, I asked you how you had obtained a copy that letter when you were not yet assigned to represent me. Considering a conspiracy theory regarding you, the judge and the prosecutor. You claimed that you understand my concerns, but you never gave me an explaination as to how you obtained my letter to the judge before your assignment to the case. Personally, I would like to know on whose behalf are you working.

I have asked you to let the investigator conduct a investigation of Rashawn Aarons regarding issues related to a incident. I told you the parties involved. Nothing has been done regarding that information I gave you. I asked you to conduct interviews of other witnesses, you have done nothing. Actually, you have systematically curtailed any investigation that I have requested. I have asked you to subpoena certain records, have experts witnesses assigned to the case, afford me the privilege to examine your files and listen to audio tapes provided by the prosecutor. You have told me so many lies, and have not honor none of my request. Who are you representing? I reiterate my request that you step-down as my counsel on record.

Respectfully Yours,

Wayne Chin
Reg. No. 900-08-00305

cc:  Hon. Matthew D'Emic

Sworn to me on
August 4th, 2009
Barbara Musmacher

Exhibit G-16

BARBARA MUSMACHER
Notary Public, State of New York
No. 01MU6205811
Qualified in Westchester County
Commission Expires May 11, 20__

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY  OF  KINGS,  PART 4
------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,
                    Respondent.

                                        NOTICE  OF  MOTION
                                             FOR
                                        REASSIGNMENT OF COUNSEL

                    VS.

                                        Indictment #1018/03

WAYNE CHIN,
                    Defendant.
------------------------------------X


          PLEASE TAKE NOTICE,   that upon the annexed affidavit
of  WAYNE CHIN,   the defendant herein,  and upon the indictment and
all  the proceedings had herein,  the undersigned  will move  this
Court  at  Part 4 thereof,  to be held in the Courthouse located at
320 Jay Street,  Brooklyn,  New York  11201,  on the 9th.,  day of
September 2009,  at  9:30 o'clock in thr forenoon of said day,  or
as soon as the defendant may be heard for  an  ORDER  to  remove
current defense counsel  and replace with another that the defendant
feels  is adequately representing his best interest.  This  motion
for REASSIGNMENT OF COUNSEL  is made pursuant to the New York State
County law,  Article 18B.  The defendant respectfully request such
and any further relief this Court may deem just and proper in the
interest of justice.


Dated:  August 22, 2009
        County of Bronx.


                                        Respectfully  submitted,

                                        _____
                                        Wayne  Chin-Pro-se
                                        Reg. No. 900-08-00305
                                        G.R.V.C.-17A47
                                        09-09 Hazen Street
                                        East Elmhurst, NY. 11370


Exhibit G-17

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY   OF   KINGS,   PART 4
---------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK.

                                              AFFIDAVIT
                                    IN SUPPORT OF   MOTION FOR
                                    REASSIGNMENT OF   COUNSEL

              vs.

                                         Indictment #1018/03

WAYNE CHIN,
                        Defendant.
---------------------------------------------x

STATE OF NEW YORK )
                  )ss:
COUNTY OF BRONX   )


              I,   WAYNE CHIN, being duly sworn,
deposes and says;   I am the defendant in the above entitled
action,   and I am personally familiar with the facts and
circumstances herein stated.   However,  although I  am
personally familiar with all the facts and statements
hereinafter stated to the best of my knowledge, information
and belief,   I am a layperson in the matter of law and seeks
this Court indulgence for errors, defects and faults pursuant
to section 2101 (f) of the Civil Practice Law and Rules.

       1.   On  February 11, 2003, the defendant was indicted
by a Brooklyn Grand Jury  for two counts of murder in the
second degree, Penal Law 125.25(1), and 125.25(2), illegal
possession of a firearm in the second and third degree, PL
265.03(2) and 265.02(4), and endangering the welfare of  a
child, PL 260.10(1).

                        -1-

Exhibit C-17

2.   The defendant was arrested upon a arrest warrant on November 29, 2005, in Tucson, Arizona, and was arraigned in Pima County Superior Court.  Bail was set in the amount of one million dollars.

3.   With the action pending in the Pima County Superior Court, and the defendant's right to counsel acknowledged. The Brooklyn District Attorney circumvented the process of the superior court, and filed a second arrest warrant with the Arizona State Department of Corrections.  That warrant served as the basis of the Interstate Agreement on Detainers which the defendant signed without the assistance of counsel.

4.   The defendant was extradited to New York on February 29, 2008, and was arraigned upon the indictment on March 10, 2008, in Brooklyn Supreme Court where he was represented by Harold Baker, Esq.

5.   Harold Baker conspired with the prosecutor to deprive the defendant of a essential protected right. Therefore, the defendant requested that the court relieve him.  He was replaced by Alan Stutman, Esq., who was later relieved because the defendant believe that a conflict of interest existed which would compromised the representation.

6.   Phillip Smallman, Esq., was assigned to represent the defendant on January 16, 2009.  At the time of the appointment, the Honorable Matthew D'Emic, informed the defendant that Mr. Smallman is a personal friend with a relationship dating back to college.   The appointment was

--2--

Exhibit C-17

suspect from the begining because the defendant was challenging Judge D'Emic's ruling regarding issues related to the grand jury proceedings, the judge dismissal of charge of depraved indifference murder, and his authorities to select a particular trial theory upon which the People must proceed.

7. During the course of Mr. Smallman representation, there has been a lack of communication and differences between us. However, I have tried to work through the difficulties in order to save time and judicial resources.

8. On April 27, 2009, this Court set a trial date for July 13, 2009. Given the time Mr. Smallman was appointed and the time the court set the trial date, Mr. Smallman had two and a half months to make final preparation for trial, which I believe was more than sufficient time. However, a week or two before July 13, 2009, Mr. Smallman contacted me via video conference and informed me that he could not proceed on July 13,2009, and the only way the case could be tried on that date was for me to represent myself. Thereby, forcing me into accepting a continuance.

9. Its my position that Mr. Smallman is not competently representing my best interest in this criminal matter. Apart from limiting my investigation in several aspects, he has hampered my ability to dig-up background information (evidence) to impeach the credibility of the People's witnesses whose credibility is central to the People's case.

-3-

10.  Mr. Smallman has misled me regarding legal issues. He has misled me about visiting me in an environment where its convenient for us to discuss important issues of the case outside ear-range of court officers, correction officers and other individuals.  He has denied me access to copies of my legal documents so I cannot intelligently assess the strength/weakness of the People's allegations.  He has denied me access to audio tapes provided by the People.

11.  Mr. Smallman has failed to discuss defense strategies with me, or respond to my various correspondence. He has failed to interview certain witnesses or filed any motion on my behalf.

12.  Mr. Smallman has failed to request the appointment of expert witnesses who is able to challenge the People's evidence at trial and the inconsistent analysis already made by the People's experts.  He has failed to pursue suppression of evidence, and failed to confer adequately with me.

13.  I believe that counsel has expressed a conflict of interest, operating under a ethical breach (duty of loyalty) by conveying to the prosecutor the defendant's confidential theories, and evidence.

14.  Simply put, counsel has failed to expand pretrial resources in an effort to unearth exculpatory evidence and/or evidence that will tend to discredit the People's witness or witnesses.

-4-

Exhibit C-17

WHEREFORE,   the defendant respectfully request taht this Court grant an ORDER for REASSIGNMENT OF COUNSEL, and such and any other relief the court deems just and proper  in the interest of justice.


Dated:   August 22, 2009
         County of Bronx.


                                    Respectfully submitted,

                                    _____
                                    Wayne Chin      Pro-se
                                    Reg. No. 900-08-00305
                                    GRVC-17A47
                                    09-09 Hazen Street
                                    East Elmhurst, New York 11370


cc:   Clerk of Court
      Brooklyn Supreme Court
      320 Jay Street
      Brooklyn, New York 11201

      Charles Hynes, Esq.
      Brooklyn District Attorney
      350 Jay Street
      Brooklyn, New York 11201

      Phillip Smallman, Esq.
      32 Court Street
      Suite 1702
      Brooklyn, New York 11201

      Sworn to before me thid

      22nd day of August, 2009


      _____
      NOTARY PUBLIC COMISSIONER OF DEEDS


ROSE F. OLANIYI
NOTARY PUBLIC-STATE OF NEW YORK
No. 01OL6208822
Qualified in Queens County
My Commission Expires July 13, 2013

-5-

Exhibit C-17

| | | |
|---|---|---|
| **81 Pondfield Road, Suite 143** | **325 Broadway, Suite 505** | **Post Office Box 455** |
| **Bronxville, New York 10708** | **New York, NY 10013** | **Middle Island, N.Y. 11953** |
| **Office: 914 699-0774** | **Office: 212 334-9033** | **Office: 631 924-0903** |
| **Fax:   914 699-4314** | | **Fax:    631 614-7839** |

## UNIVERSAL INVESTIGATIONS, INC.

**John L Brown**                                        **Licensed-Bonded**
**Vice-President**                                       **Insured**

April 25, 2010

Mr. Wayne Chin
DIN: 09A6287
Green Haven Correctional Facility
P.O. Box 4000
Stormville, N.Y. 12582-0010

**Re:        PSNY vs. Wayne Chin**
**Indictment:   01018/2003**

Dear Mr. Chin:

I received your letter dated March 8, 2010, about three weeks ago. I had not checked my Post Office Box in some time due to my wife's illness. It was only after receiving a call from your girlfriend that I retrieved the letter. Then I no longer had the file available to me, and needed to get it out of storage. I sent you a letter to that affect, but for some reason it came back as undeliverable. That sometimes happens when sending mail to a correctional facility.

Your request regarding the two witnesses who used to reside at 100 Linden Boulevard. As you are aware, I can only take direction from assigned counsel. If the defendant requests specific work, the attorney must approve that assignment. According to my records, we spoke on December 22, 2008 regarding the fact that the newly assigned attorney showed up in court unprepared. You advised me that you needed to argue your own case. During that telephone conversation, we discussed two people mentioned in the Sprint Report. You advised that you would have your new attorney contact me so they could be located and interviewed.

We next spoke on May 21, 2009, when you advised that you had a new attorney. You explained the conflicts with the new investigator. I then received a telephone call from Mr. Smallman on July 1, 2009 where he requested that I continue my investigation. You and I spoke on many occasions following that July 1, 2009 conversation. You wanted to meet in person with both Mr. Smallman and myself. Scheduling conflicts preventing our meeting. On July 21, 2009 at 1:41pm, we again spoke. During that conversation you insisted on a three-way in person conversation at Rikers Island. We spoke on July 23, 27, August 13, 19, 24, and 25. Finally on August 26, 2009 at 5:10pm, Mr. Smallman and I

*Exhibit C-18*

met with you at GRVC on Rikers Island. It was during this meeting that Mr. Smallman approved the assignment to the two people who reside at 100 Linden Boulevard.

On September 2, 2010 at 3:35pm, I visited 100 Linden Boulevard located in Kings County. I first visited the apartment of Mr. Darnelle Gaston. I spoke with the apartments occupant Mr. Joseph. Mr. Joseph resides in this apartment for about 1-½ years. He said that he occasionally gets mail for Mr. Gaston, but does not have a forwarding address. I then visited the apartment of Ms. Deanna Cobbs. I spoke with Ms. Larochelle the apartments occupant. She too has been in the apartment for just over a year and has no forwarding address for Ms. Cobbs.

At about 3:55pm, I spoke with the buildings superintendent, Mr. Everald Elliot. According to Mr. Elliot, Mr. Gaston has been gone for about 7 or 8 years. He thinks that they live in the area of Ocean and Church Avenues but wasn't sure. As far as Ms. Cobbs, he believes that she moved to Pennsylvania. He had no forwarding addresses.

On September 4, 2009, I conducted data searches in an attempt to locate both persons. I utilized reliable pay databases that draw their information from credit report header information.  These search processes failed to locate a trail back to 100 Linden Boulevard. The trail is important to verify the correct people are located.  At times these reports only provide the first initial, so the trail must validate the correct person.  All searches failed to locate either person. At 1:54pm, we spoke for 9 minutes and 13 seconds.  During this conversation I advised you of this information.

If you require additional work on this case, or additional follow-up, please provide a new order of assignment.  This can be handled by your appeals attorney.

Sincerely,

John L Brown
Private Investigator
Universal Investigations, Inc.

**LS/paws**

2

Exhibit G 18

18

ODETTE GASTON —
Quick SEARCH of Public Records.
    Con. Ed.
    Telephone Co.
    LICENSE - MOTOR vehicle .

The infamation for is, however, sold daily to the
MAJOR credit bureaus Like EXPERIAN, Trans-Union, Equifax,
And MERGED into skip TRACING and Locator databases
called Missing Links, Discover, People Finder, Sleuth, TRACKER,
And WIZARD. where does it goes After That? It is
REsold to marketing Agencies, government and
private INVESTIGATORs, collection Agencies, and skip
TRAcers that want to "REAch out and Touch someone"
Like you or me .

```
 1    SUPREME COURT OF THE STATE OF NEW YORK

 2    COUNTY OF KINGS: CRIMINAL TERM:  PART 4
      -------------------------------------------X
 3                                             :
      THE PEOPLE OF THE STATE OF NEW YORK,     :
 4                                             :
 5              -against-                      :INDICTMENT NO.
                                              : 1018/2003
 6    WAYNE CHIN,                              :
                                               :
 7                                             :
                                               :
 8                            DEFENDANT.       :
      -------------------------------------------X
 9                            320 Jay Street
                              Brooklyn, New York
10                            September 9, 2009

11    B E F O R E:     THE HONORABLE MATTHEW D'EMIC,
                          Justice of the Supreme Court
12

13    A P P E A R A N C E S:

14    OFFICE OF CHARLES HYNES, ESQ.
      DISTRICT ATTORNEY - KINGS COUNTY
15    Attorney for the People
              350 Jay Street
16            Brooklyn, New York 11201
      BY:   ELISA PAISNER, ESQ.
17            Assistant District Attorney

18
      PHILIP SMALLMAN, ESQ.
19    Attorney for defendant
      32 Court Street
20            Brooklyn, New York 11201
      BY:   PHILIP SMALLMAN, ESQ.
21

22                                   TERI MALTESE
                                Senior Court Reporter
23

24

25
```

Exhibit C-19

PROCEEDINGS

1          (Whereupon, the following takes place

2     on the record in open court in the presence of

3     the Court, the assistant district attorney,

4     defense counsel and Wayne Chin.)

5          COURT CLERK:  Calendar number one on the Part

6     4 calendar, Wayne Chin.

7          MR. SMALLMAN: Philip Smallman, 32 Court

8     Street, Brooklyn, New York.

9          MS. PAISNER: Elisa Paisner.

10         THE COURT:  We are on for trial.  Before I

11    address that, I received a motion from Mr. Chin

12    asking for reassignment of counsel.

13         THE DEFENDANT:  Yes, that's correct.

14         THE COURT:  You still want that?

15         THE DEFENDANT:  Yes.

16         THE COURT:  I will deny that application.

17    You have had about four lawyers already and you're

18    just delaying the trial.

19         THE DEFENDANT:  It is not a matter of

20    delaying the trial, it is a matter that my attorney

21    is effectively what you call sabbotaging my defense.

22         THE COURT:  Okay, well, motion denied.

23         THE DEFENDANT:  I have an attorney that I

24    asked to file a notice of defense for me and I give

25    him additional time and he doesn't do what I ask him

tm

Exhibit C-19

3

PROCEEDINGS

1    adequately to do and he comes to me and he told me

2    that I'm only human, I forgot.

3          You sabbotaged my defense.  When I have an

4    attorney who I ask almost eight months ago to find

5    certain amount of witnesses and interview them and he

6    just gave the investigator that order a week ago he's

7    sabotaging my defense.

8          THE COURT:  All right.

9          THE DEFENDANT:  My investigator is telling me

10   he cannot find certain people because they moved

11   away, they can't be located.  I mean, I been asking

12   the prior attorney -- I mean, to find these

13   witnesses, interview them and prepare for trial.

14         MR. SMALLMAN:  I need to make a record on

15   this.

16         THE COURT:  Sure.

17         MR. SMALLMAN:  Let the record reflect the

18   point at which I was assigned to represent Mr. Chin.

19   At that point, I hired an investigator who I use in

20   all of my homicide cases, very experienced.  The

21   problem with that individual was that that individual

22   was actually looking for Mr. Chin for a number of

23   years as a member of the U.S. Marshals Service and he

24   developed what he perceived would ultimately be a

25   conflict of interest with Mr. Chin.

tm

*Exhibit C-19*

PROCEEDINGS

1          At that point, he asked to be relieved of his

2     duties and I agreed with him in that assessment.  At

3     that point John Brown, graciously I might add, agreed

4     to reenter the case having been assigned by a prior

5     attorney.  So, if Mr. Chin wishes to make any

6     allegations regarding the effectiveness of any of

7     these investigators, he ought to be more specific in

8     those allegations.

9          He is charged in an event that apparently

10    took place in 2001.  He is asking investigators to

11    look for witnesses who would be relevant to events in

12    2001.  Our investigation has determined that these

13    people no longer reside in the areas that he asked

14    they be found.  And beyond that, have been gone for a

15    considerable period of time, the time frame long

16    preceding my entry into this case and probably

17    preceding the time that Mr. Brown entered into this

18    case.

19          So, I will be happy to go forward and

20    represent Mr. Chin, but if he has matters that he

21    wants to put on the record so he can address them at

22    a point subsequent, I ask that he be quite specific

23    so that I might address them.

24          THE COURT:  Go ahead.

25          THE DEFENDANT:  Specifically, like I say, I

tm

Exhibit C-19

PROCEEDINGS

1   asked him to file a notice of defense.

2           THE COURT:   What do you mean by that?   I

3   don't even know what this means.

4           MR. SMALLMAN:   Nor do I.

5           THE DEFENDANT:   Notice defense, like alibi.

6           THE COURT:   You have an alibi?

7           THE DEFENDANT: That's what I'm referencing.

8           THE COURT:   You have an alibi?

9           THE DEFENDANT: Argument was it may be too

10  late.

11          THE COURT:   This is your third attorney.   Why

12  didn't you tell that to Mr. Stutman or Mr. Baker?

13  First time I'm hearing about it and I've been on this

14  case since what, March of 2001?

15          All right, I've had enough.   Motion denied.

16  Anything else?

17          THE DEFENDANT:   I don't assume so, your

18  honor.   If I am forced, what can I say.

19          MS. PAISNER:   Just to make a clear record,

20  there have been a number of motions filed by Mr. Chin

21  pro se and this court does not have to accept them.

22  I do not know if counsel is adopting them in light --

23  if he does, then this court needs to rule on each and

24  every one of those motions.

25          THE COURT:   I already denied the motion to

tm

Exhibit C-19

PROCEEDINGS

1    relieve Mr -- to reassign counsel.  Okay, what else?

2    Mr. Chin made a motion to dismiss the indictment.

3              MS. PAISNER:  Those you ruled on.

4              THE COURT:  Because of the intentional murder

5    versus the depraved indifference murder, we already

6    dismissed the depraved indifference, Counsel.  You

7    made a 190.50 that was denied as untimely.  You

8    requested sanctions for disruption of vehicle, that

9    is denied.  You made a request for information on the

10   cars including recovery, transport, storage,

11   disposal, identity of truck drivers, etcetera.

12             How do you feel about that?

13             MS. PAISNER:  We turned over all the

14   information we had concerning Mr. Chin's request last

15   year, I believe.

16             THE COURT:  All right.  And phone records

17   were turned over as well, right?

18             MS. PAISNER:  Yes, and I even have more for

19   him.

20             THE COURT:  All right.  I think that that

21   pretty much takes care of everything.

22             MR. SMALLMAN:  Judge, if there are no parts

23   available today, may I suggest we simply calendar it

24   for tomorrow?  I will be happy to reappear.

25             Mr. Chin made much in the past of his

tm                        Exhibit G19

PROCEEDINGS

1    footwear.  I know that he is before the court in what

2    appears to be a black canvas set of sneakers.  I

3    think he wishes to wear his regular footwear.

4         THE COURT:  We will mark his card that he is

5    going to trial so he will be able to certainly have

6    his shoes, all right?

7         MS. PAISNER:  Also, there was one motion for

8    counsel that defendant requested.  His own experts to

9    review the ballistics and the fingerprints.  We

10   consented.  I do not know the results so--

11        MR. SMALLMAN:  My understanding is that the

12   ballistics evidence is being examined, I believe, as

13   we speak, judge, in front of Mr. Fragapani. Mr. Chin

14   saw fit to contact Fragapani directly and made his

15   wishes known to him.  Mr. Fragapani reported that

16   back to me.

17        MS. PAISNER:  If I may add, your honor, also

18   request for search warrant minutes.  We turned over

19   the search warrant -- there are no minutes beyond

20   what we asked.

21        THE COURT:  Okay.

22        MR. SMALLMAN:  I didn't hear the district

23   attorney.

24        MS. PAISNER:  There was a request for any

25   minutes concerning the search warrant and there are

tm

Exhibit C-19

PROCEEDINGS

1    none.

2              MR. SMALLMAN:  Okay.

3              THE COURT:  All right.  Let's try tomorrow,

4    okay?

5              MS. PAISNER:  One thing that I mention.

6              MR. SMALLMAN:  Now that we are in a ready

7    impasse, I renew my application to have all material

8    turned over.  If there is any material that has been

9    previously provided that contains redactions, I ask

10   to be given unredacted copies of all.

11             MS. PAISNER:  That which I turned over I

12   already redacted.

13             THE COURT:  Tomorrow is no good?  We can make

14   it Friday.  Is Friday good?

15             MS. PAISNER:  I don't know if it is okay for

16   Mr. Chin.  This is, I mean, I will change it if

17   necessary, but there is a memorial for two

18   detectives.

19             THE COURT:  Put it on for Monday.  Ready to

20   go to trial on Monday

21             (Discussion at the bench.)

22             THE COURT:  We will put the case on for

23   Monday.  Mark his card he should be able to wear

24   whatever he wants to wear.

25             MR. SMALLMAN:  Judge, I was handing the

tm

Exhibit C-19

PROCEEDINGS

1    letter from Mr. Chin to your honor dated the 5th of

2    September.  I provided the court with a copy and

3    given Miss Paisner a copy as well.

4         For the record, I have turned over to

5    Mr. Chin the phone records that I have.

6         THE COURT:  Okay. We may have a part

7    available just to do some preliminary matters and

8    then in five minutes we will have it, we will know.

9         MS. PAISNER:  For the record, I am turning

10   over phone records through counsel relating to the

11   register that was done when the case initially

12   started.  It consists of seven pages.

13        MS. PAISNER:  Are you going to address this

14   last thing?

15        THE COURT:  If you wish.

16        MS. PAISNER:  I'm not quite sure what

17   Mr. Chin is requesting.

18        THE COURT:  Neither am I.

19        MS. PAISNER:  He is saying he was denied his

20   right to counsel, but his right to counsel -- I took

21   no statements from him.  His right to counsel doesn't

22   apply in any way.  When we arraigned him here, he was

23   given counsel.  There were no critical aspects of

24   this case where he was not represented by counsel.

25   For a procedural point of view, what happened when

tm

Exhibit G-M

PROCEEDINGS

1    Mr. Chin was arrested in Arizona, we already indicted

2    Mr. Chin and there was an arrest warrant out for him.

3    I filed extradition papers to the State of Arizona

4    who chose to complete their case before they would

5    consider our request.

6         So, those extradition papers had to be

7    withdrawn and the detainer papers, the agreement was

8    then filed.  Mr. Chin went into their custody and we

9    took him from the state custody of Arizona.

10        THE COURT:  Pursuant to the governor's

11    warrant.

12        MS. PAISNER:  Well--

13        THE COURT:  There you go.

14        (Next page, please.)

15

16

17

18

19

20

21

22

23

24

25

tm                    Exhibit G 19

11

PROCEEDINGS

1          MS. PAISNER:  It is an interstate agreement.

2     The extradition was the Governor's warrant and he

3     won't sign that.

4          THE COURT:  Okay.  Judge Konviser will take

5     the case now.

6          So, 9/14 in Part 26.

7          (Whereupon, the matter was adjourned to

8     9/14 in Part 26.)

9                    *      *      *      *

10         Certified to be a true and accurate

11    transcript of the stenographic minutes taken

12    within.

13

14                    _Teri Maltese_

15                    TERI MALTESE
                      Senior Court Reporter

16

17

18

19

20

21

22

23

24

25

Exhibit. G-19

tm

People v. Wilson

91 A.D 2d 1052

458 NYS 2d 655

( 2 Dept    1983 )

Adverse position

citing

People v. Wilson

15 NY 2d 634

255 NYS 2d 675

Wayne Chin

The following cassette tape reproduction is being prepared by police communications technician Jackson on June 14, 2001 in connection with tape room child number 13592. Message number 1 is a 911 call originally received on June 12, 2001 by 911 operator 1931 on position 34 terminal 34 in reference to sprint number 2 stay 143 22. This call was recorded on master tape 8540 channel 19. The message commences at 22 hundred hours 44 minutes 08 seconds.

911 Operator: Police 1931 what is your emergency and what borough?

Caller: I'm in Brooklyn on the Linden Boulevard between Bedford and Rogers.

911 Operator: What's going on there?

Caller: I heard what sounds like a shot and a lot of screaming near the corner of Bedford.

911 Operator: Atlantic Avenue and Rogers Avenue?

Caller: I'm sorry?

911 Operator: You said Linden Atlantic and Rogers?

Caller: Linden Boulevard between Bedford and Rogers.

911 Operator: Bedford and Rogers ok. How many shots you heard ma'am?

Caller: One.

911 Operator: You have any descriptions?

Caller: I'm uh [background noise] oh God, I just heard another one. I'm not outside and I will not be going outside.

911 Operator: I didn't ask you to go outside. I only asked if you have any description you said no you don't that's it.

Caller: Yea I can't see anything.

911 Operator: Would you like to leave your last name and telephone number?

Caller: Not really.

911 Operator: Alright they'll be there soon as possible.

Caller: Oh God, there's another shot.

Exhibit G-20

911 Operator: Third shot?

Caller: Yea. Will you send somebody over?

911 Operator: They'll be there.

[call ends]

Message number 1 concludes at 22 hundred hours 45 minutes 03 seconds. Message number 2 is a 911 call received by 911 operator 1526 on position 50 terminal 50 in reference to sprint number 2 stay 14322 this call was recorded on master tape 8539 channel 4 the message commences at 22 hundred hours 45 minutes 43 seconds.

911 Operator: Police operator 1526 what is your emergency and borough?

Caller: Brooklyn. I think someone just got shot across the street.

911 Operator: Ok what's the address?

Caller: It's Linden Boulevard between Bedford and Rogers.

911 Operator: Linden Boulevard?

Caller: It's either 98 or 95 it's the big building across the street they're still in the car and they're out there screaming. Oh my God.

911 Operator: Ok Bedford Avenue and Rogers?

Caller: Yes.

911 Operator: That Rogers Avenue right?

Caller: Yes. Oh please tell them to send somebody, hurry. Oh my god I don't believe it.

911 Operator: We got a call already.

Caller: Oh you did? Good. Good.

911 Operator: It's that's on Linden and shots were fired?

Caller: Yea. But they're still in the car.

911 Operator: Right. We sent someone already. Hold on.

Caller: Oh god.

911 Operator: Ok.

Caller: Oh my god. The cops are there. They're there.

911 Operator: They're there?

Caller: Yea.

911 Operator: Ok.

Caller: Oh God. I'm sorry. Thank you.

911 Operator: Would you like to leave a name?

Caller: No.

911 Operator: Ok.

Caller: I just hope that they're alright. Oh my god. Ok. Good night I'm sorry.

911 Operator: Alright thank you.

[call ends]

Message number 2 concludes at 22 hundred hours 46 minutes 53 seconds. Message number 3 is a 911 call received by 911 operator 2249 on position ten terminal 10 in reference to sprint number 2 stay 14324. This call was recorded on master tape 8541 channel 5. The message commences at 22 hundred hours 44 minutes 13 seconds.

Caller: [Unintelligible] Hurry please come in front of 95 Linden Boulevard right now please. This man...

911 Operator: What's the address?

Caller: 95 Linden Boulevard between Bedford and Rogers. He shot his girlfriend in the head. Please. Shut up shut up. Come now please. Please Come now because I don't know.

911 Operator: 795?

Caller: Linden Boulevard between Bedford and Rogers I don't want him to know that-that I'm calling the police. Please. And he...

911 Operator: Ok. Listen. Listen.

Caller: And he...on her face...alright...

*Exhibit G 20*

911 Operator:  Where are they now?

Caller:  They are in front of 95 Linden Boulevard between Bedford and Rogers. Please he is killing her. Miss please, go now. Get the cos here. Please get the cops here. Get the cops here. He just shot her two times in the head. Please miss, lease, listen.

911 Oerator:  How far...

Caller:  Listen, listen.

911 Operator:  OK. I heard everything you said.

Caller:  Get them. I just heard two shots. You listening miss. You gotta get the police here now please miss. Ma'am i beg you please miss [unintelligible]. Oh my god he took his shots at her. He took both his shots. Please miss.  I am laying on the floor miss.

911 Oerator: Listen, listen, ma'am. I can't get through ma'am listen.

Caller: Oh God. I'm listening.  God get the olice she's too beautiful and he just killed her in front of her son miss. Miss I'm lying on the floor. Please I beg of you miss. [unintelligible] Miss. He's killing her miss, he's killed her, he killed her miss. He killed her, he drove off in a gold Lexus, I got to get off.


[call end]


Message number 3 concludes at 22 hundred hours 45 minutes 41 seconds. Message number 4 is a 911 call received by 911 operator 2192 on position 3 terminal 3 in reference to sprint number 2 stay 14324. This call was recorded on master tape 8539 channel 20 the message commences at 22 hundred hours 45 minutes 42 seconds.

911 Operator 2192. What is the emergency?

Caller:  Hello good day a man just shoot in front on 95 Linden Boulevard about four or five times.

911 Operator: Hello?

Caller:  Hello? Oh my god.

911 Operator: Hello?

911 Operator: hello?

911 Operator: Hello? [screaming in caller background]

911 Operator: Hello miss.

911 operator: Hello?

Exibit G-20

[call ends]

Message number 4 concludes at 22 hundred hours 47 minutes 17 seconds. Message number 5 is a 911 call received by 911 operator 2018 on position 51 terminal 51 in reference to sprint number 2 stay 14324. This call was recorded on master tape 8539 channel 5  the message commences at 22 hundred hours 45 minutes 42 seconds.

911 Operator: Police Operator 2018. What is your emergency?

Caller: He die.

911 Operator: Hello?

Caller: Hello, hello. I just see shoot right now he died right now.

911 Operator: What?

Caller: He shoot somebody right there.

911 Operator: Where is this at?

Caller: At Linden and Bedford and Rogers. I'm looking out the window. The Man got out of the car and shoot him and he died. The person died right now.

911 Operator: Is it at Bedford and Rogers?

Caller: Yes. Linden yes.

911 Operator: Did you see the male that did it?

Caller: Uh-huh

911 Operator: Is he white, black, Hispanic?

Caller: [Unintelligible]

911 Operator: Is he white, black, Hispanic?

Caller: Black. And some black mixed Spanish.

911 Operator: Alright. The guy that did it is he white black Hispanic?

Caller: Black.

911 Operator: And did he get out of a car?

Exhibit G-20

Caller: Yes.

911 Operator: What kind of car did he get out of?

Caller: A-a gray car. I don't know.

911 Operator: A Gray car?

Caller: The police there. The police there right now is there.

[call ends]

Message number 5 concludes at 22 hundred hours 46 minutes 38 seconds. Message number 6 is a 911 call received by 911 operator 2007 on position 41 terminal 41 in reference to sprint number 2 stay 14324 this call was recorded on master tape 8539 channel 10 the message commences at 22 hundred hours 45 minutes 32 seconds.

911 Operator: Police operator 2007 what is the emergency what borough?

Caller: Just please shots been fired right in front of 100 Linden Boulevard please.

911 Operator: What borough?

Caller: Brooklyn please and linden boulevard right across the street

911 Operator: One moment. Ok that's 100 Linden Boulevard between Bedford and Rogers Avenue?

Caller: Yes ma'am right at 95.

911 Operator: 95 Linden Boulevard?

Caller: Somebody just shot at their face.

911 Operator: Oh someone is shot there?

Caller: Yes.

911 Operator: Ok one moment.

Caller: Somebody shot over there and I just turned to the window ma'am.

911 Operator: You just turned to where?

Caller: My window turns to the look to the street and the woman died and shot out there

Exhibit C-20

911 Operator: The woman got shot?

Caller: Yes ma'am. One woman. There was one who we were going to bed when I hear this gun shot.

911 Operator: Where is she at?

Caller: She out the street there over 95 over the road over there that she...

911 Operator: Is she in front of you?

Caller: In front--in front of 100 Linden over the there over the road what I'm so scared that made me come to you were the shots that's by a car [unintelligible].

911 Operator: Ok so is she in front of 95 linden boulevard?

Caller: Yes ma'am [unintelligible] is out there

911 Operator: You know who was shooting?

Caller: No we don't know who.

911 Operator: Ok assistance will be there as soon as possible

Caller: Yes.

911 Operator: Ok ma'am?

Caller: Yes ma'am.

911 Operator: Ok.

[call ends]

Message number 6 concludes at 22 hundred hours 46 minutes 59 seconds. Message number 7 is a 911 call received by 911 operator 2042 on position 49 terminal 49 in reference to sprint number 2 stay 14324. This call was recorded on master tape 8539 channel 3. The message commences at 22 hundred hours 45 minutes 42 seconds.

911 Operator: Police operator 2042

Caller: Yes hello I'm at 100 Linden Boulevard and somebody's just been shot.

911 Operator: What borough please?

Exhibit G20

Caller: I'm in Brooklyn right across the street from me miss, right across the street from me. I'm at 100 Linden Boulevard somebody just been shot three times the person that drove off is in a gray car the person that been shot is sitting in the car in a black car. It's right across the street from 100 Linden Boulevard.

911 Operator: Thank you ma'am ma'am slow down tell me...

Caller: Oh my god everybody [unintelligible] call 911.

911 Operator: Ma'am is it between Bedford Avenue and Rogers?

Caller: Between Bedford and Rogers yes. And the person is sitting in the car. And it's right across the street at 98 I think that's the address Linden. And the person that shot this person three times the person drove off in a gray car

911 Operator: Gray car yea I heard you.

Caller: Oh the cops are here. Bye.

[call ends]

Message number 7 concludes at 22 hundred hours 46 minutes 41 seconds. Message number 8 is a 911 call received by 911 operator 2129 on position 8 terminal 26 in reference to sprint number 2 stay 14324. This call was recorded on master tape 8538 channel 8. The message commences at 23 hundred hours 04 minutes 06 seconds.

911 Operator: Police operator what borough?

Caller: Hello umm I'm calling my-- someone-- my sisters boyfriend just shot her on Linden Boulevard but you already have the call.

911 Operator: Is this in Queens?

Caller: No it's in Brooklyn. You already have the call they said because I called a little while ago.

911 Operator: Ok did--did... Ok hold on... Is this for 95 linden?

Caller: Yes it is. Yes it is.

911 Operator: Ok and your calling to say what?

Caller: No. She lives in Jersey and he might go by there to get his clothes and his stuff. She lives in Trenton, New Jersey. I don't think he might go there or whatever. I'm just calling maybe or whatever I could give you the address and maybe you could have a cop go there or look to see if he might come there or something I don't know.

911 Operator: Ok so where are you at?

Caller: I'm in Manhattan. I was picking up my mother in the city and they just called me and told me. I haven't gotten to the scene yet.

911 Operator: Ok can you give a description?

Caller: He's around 6'3...

911 Operator: Ok ok hello? Is he black, white, or Hispanic?

Caller: He's black.

911 Operator: Ok a male black. You know what he might be wearing?

Caller: No he's not. I know he's driving a gold Lexus though registered in Renee's name. Registered at that same address, 95 linden Boulevard. The car's registered in my sister's name.

911 Operator: And he's driving a gold Lexus

Caller: Yea that's registered in her name.

911 Operator: Ok the police was already there.

Caller: I know but I'm just saying that she lives in Jersey. That's what I'm saying. Hold on a second...Hello?

911 Operator: Hello. Yes.

Caller: Hello? Yes. I'm Renee's mother and she lives in Jersey and the guy that kill her he–he lives in Jersey at the house and I'm saying that he might be on his way there to...

911 Operator: What is the house location?

Caller: It's 466 riverside avenue in Trenton, New Jersey.

911 Operator: Hold on ok I just entered that information.

Caller: Ok and he drives a gold Lexus.

911 Operator: Ok I already have that ma'am.

Caller: Ok thank you.

911 Operator: Thank you ma'am.

*Exhibit G 20*

[call ends]

Message number 8 concludes at 23 hundred hours 06 minutes 42 seconds. Message number 9 is a 911 call received by 911 operator 2352 on position 25 terminal 25 in reference to sprint number 2 stay14335. This call was recorded on master tape 8540 channel 22. The message commences at 22 hundred hours 45 minutes 08 seconds.

911 Operator: Police 2352.

Caller: Yes please there is a shooting over here at one uh uh Linden Boulevard 100 and 95. Quick please between Bedford and Rogers at big a shooting out in the yard please.

911 Operator: Ok Linden Boulevard and Rogers.

Caller: Yes and a 104

911 Operator: Ma'am. ma'am

Caller: Please

911 Operator: Calm down.

Caller: We got a shooting.

911 Operator: Calm down, calm down. Linden Boulevard and what?

Caller: 104 Linden Boulevard. It's across the street from me please.

911 Operator: Ok calm down.

Caller: Please. Hurry up please for the man.

911 Operator: Ma'am calm down ok? Do you see who's shooting?

Caller: No the bullet [unintelligible]

911 Operator: Listen are you between Bedford Avenue and Rogers?

Caller: Yes Bedford and Rogers.

911 Operator: Ok. Calm down ma'am. You have to calm down. How many shots do you hear?

Caller: Before the shots there was somebody shouting out there screaming and carrying on

911 Operator: Ok

Exhibit G20

Caller: Please

911 Operator: Do you see?

Caller: I'm not looking out there I turn back.

911 Operator: Ma'am, ma'am listen to me. You gonna listen?

Caller: Yes.

911 Operator: While you're talking to me the police are already on the way. You need to explain to me now so those people don't get away. You gonna calm down?

Caller: I didn't look hard I just saw my son out there and I hear something so I went out to see he must have gone to the store and shouting and crying across the street at 100 and

911 Operator: Shh. Ok. Calm down.

Caller: And 95 up to 100 that building the big building across and I hear somebody shooting come into my yard and they shooting and they shooting at someone coming into my yard I don't know...

911 Operator: And you didn't see who was running?

Caller: No, miss. I don't look out when bullets shoot but I know it's out there a lot.

911 Operator: Ok would you like to leave your last name?

Caller: Anderson.

911 Operator: Anderson?

Caller: Yes. And I'm scared because my son went out to the store and I keep telling him don't to stop going out the street I don't know what's going on there's something out there.

911 Operator: What's your phone number?

Caller: 718-284-4964

911 Operator: Ok. Now you need to calm down, stay inside, and wait until your son comes home ok?

Caller: Yes. Ok..

911 Operator: Alright bye bye.

*Exhibit C-70*

[call ends]

Message number 9 concludes at 22 hundred hours 46 minutes 56 seconds. Message number 10 is a 911 call received by 911 operator 2361 on position 47 terminal 47 in reference to sprint number 2 stay 14335. This call was recorded on master tape 8539 channel 1. The message commences at 22 hundred hours 46 minutes 26 seconds.

911 Operator: Police operator 2361.

Caller: Hello police there's a lot of shooting in front of my house and I got a- I got a two month old baby there on Linden Boulevard between Bedford and Rogers.

911 Operator: Ok hold on what borough? Brooklyn?

Caller: Brooklyn between Bedford and Rogers.

911 Operator: Ok how many shots did you hear?

Caller: A lot of them.

911 Operator: Is anyone hurt did you see anyone got hurt?

Caller: I don't know. I don't even look. I-we get on the floor with the baby we can't even look.

911 Operator: And you said Rogers Avenue?

Caller: Linden between Bedford and Rogers.

911 Operator: Hold on... alright and you said shots was fired; you don't know how many, but they outside?

Caller: Yea.

911 Operator: Alright ma'am did you call before?

Caller: No I just called just now.

911 Operator: And this is between Bedford Avenue and Rogers Avenue? Linden Boulevard between...

Caller: Yea.

911 Operator: Bedford Avenue and Rogers Avenue?

Caller: Yea.

Exhibit G-20

911 Operator: Alright ma'am assistance will be there as soon as possible. Ok?

Caller: Alright thank you.

911 Operator: Your welcome. Bye bye.

[call ends]

Message number 10 concludes at 22 hundred hours 47 minutes 28 seconds. Message number 11 is a 911 call received by 911 operator 1128 on position 9 terminal 9 in reference to sprint number 2 stay 14358. This call was recorded on master tape 8541 channel 4 the message commences at 22 hundred hours 46 minutes 23 seconds.

911 Operator: Police operator 1128. Where is the emergency?

Caller: Hello send some-send police right over Linden Boulevard, 95 Linden Boulevard between Rogers- between Rogers and Bedford. Shooting, a lot of shooting going on over here.

911 Operator: Wait a minute 95 Rogers... Hello?

Caller: 95 Linden Boulevard.

911 Operator: 95 Linden Boulevard.

Caller: Between Rogers and Bedford

911 Operator: Between Bedford and...

Caller: Closer to Bedford. Lot of cops over here shooting going on.

911 Operator: Ok sir? [hangs up] oh my god.

[call ends]

Message number 11 concludes at 22 hundred hours 46 minutes 52 seconds. Message number 12 is a 911 call received by 911 operator 1372 on position 38 terminal 38 in reference to sprint number 2 stay 14360. This call was recorded on master tape 8539 channel 7. The message commences at 22 hundred hours 46 minutes 31 seconds.

911 Operator: Police operator 1372 911

Caller: Yes there's been a shooting on-on Linden Boulevard between Bedford and Rogers.

911 Operator: Did you see who did it?

Exhibit G 20

Caller: No-no it was just shooting. People are slumped over in cars downstairs.

911 Operator: Ok so somebody's shot?

Caller: Yes somebody's shot right now on Linden between Bedford and Rogers.

911 Operator: You know where at?

Caller: On Linden between Bedford and Rogers.

911 Operator: No what building are they in front of- in front of?

Caller: Umm...

911 Operator: You think?

Caller: 101. 101.

911 Operator: You think its 101?

Caller: Yes, yes.

911 Operator: Linden?

Caller: Yes.

911 Operator: Ok. Did you see who did it?

Caller: No.

911 Operator: Do you want to leave your name or anything?

Caller: No, no, no.

911 Operator: How many cars you think? People shot in what car, one car...

Caller: Ok?

911 Operator: You didn't see who did it?

[hangs up]

[call ends]

Call number 12 concludes at 22 hundred hours 47 minutes 16 seconds. Message number 13 is a

*Exhibit C-20*

911 call received by 911 operator 1876 on position 7 terminal 7 in reference to sprint number 2 stay 14360. This call was recorded on master tape 8541 channel 2. The message commences at 22 hundred hours 52 minutes 0 seconds.

911 Operator: Police operator 1876. What is the emergency?

Caller: Yes 95 Linden Boulevard at Bedford and Rogers.

911 Operator: What borough is this?

Caller: This is in Brooklyn. It was a shooting. I'm not sure I don't know the body's still outside or whatever the case may be, but it's a lot of commotion going on and I think you need an ambulance and you need...

911 Operator: Ok what happened out there?

Caller: It was a shooting.

911 Operator: And uh you think someone was shot?

Caller: Yes.

911 Operator: Is it a male or a female?

Caller: It is a Female.

911 Operator: Alright I'm going to connect you to the ambulance. Hold on.

[phone rings]

Ambulance Operator: Hello?

Caller: Yes...

Ambulance Operator: Alright we got a call for it already ok.

Caller: Oh ok thank you.

Ambulance Operator: Alright.

[call ends]

Message number 13 concludes at 22 hundred hours 52 minutes 52 seconds. Message number 14 is a radio transmission received on June 12, 2001 over the zone 20 radio frequency in reference to sprint number 2 stay 14324. This radio transmission was recorded on master tape 8556

Exhibit C-20

channel 8 the message commences at 22 hundred hours 45 minutes 15 seconds.

Dispatch: 667 I'm receiving shots fired at Linden Boulevard Bedford to Rogers also receiving a 34 female shot 95 Linden Boulevard Bedford to Rogers. [unintelligible] Call.

Dispatch: It's a back Adam.

Police Officer: Seven Mike Charlie

Dispatch: Sergeant I'm gaining on the list...Boulevard to Bedford 95 Linden. female shot in front of... Adam-Adam, Charlie, Sargent, Charlie, Mike who else is going?

Police Officer: 5479's going.

Dispatch: 7F Adam

Police Officer: Description on the shooter?

Dispatch: All I'm getting is shots fired female shot in front of.

Police Officer: Say the mike.

Dispatch: Say female shot. Male ran into a black Lexus. Say female shot twice in the head.

Police Officer: [unintelligible]

Dispatch: I'm getting [unintelligible] male fled in black Lexus.

Police Officer: [unintelligible]

Dispatch: Don't have one yet I don't even have a call back

Police Officer: Location?

Dispatch: 95 Linden Boulevard Bedford to Rogers supposed to be in front of.

Police Officer: [unintelligible] Deputy Sergeant.

Dispatch: Sergeant.

Police Officer: You got an ambulance coming in?

Dispatch: Ambulance is en route is a unit 84.

Dispatch: We got a confirmed shooter get an 84 with shooting was 84 central?

Exhibit C-20

Police Officer: 7 Adam special?

Dispatch: 7 special.

Police Officer 2: Confirm person shot I don't know the condition yet. We got a description a brown Lexus that went east bound on Lennox. I'll give you more in a minute.

Dispatch: Be advised on the job is staying at the perp is her husband.

Police Officer: East bound on Lennox or east side on Linden?

Police Officer: Sergeant

Police Officer: East bound on Lennox or what?

Police Officer: Black Lexus east bound on Linden.

Dispatch: Black Lexus east bound on Linden.

Police Officer: Alright Sergeant thank you.

Police Officer: 7 crime Sergeant

Dispatch: 67 crime Sergeant.

Police Officer: Can you get the police sergeant or 7 Adam and see if I can get a plate on that?

Dispatch: Alright Adam you have-can you get a plate?

Police Officer: Sergeant I don't have a plate yet I'm sorry get the witnesses together. Ok? I need a bus here.

Police Officer: 4A, turn your lights off.

Police Officer: EMS is pulling 84

Police Officer: 67 Adam

Dispatch: 67 Adam

Police Officer: likely.

Police Officer: Same plate on the Toyota?

Dispatch: No plate.

Exhibit G-20

Police Officer: Try.

Police Officer: What color is that Lexus?

Dispatch: Black Lexus.

Police Officer: Which way?

Dispatch: East bound on Lennox.

Police Officer: Linden

Dispatch: Correction: east bound on Linden from 95 Linden Boulevard. 95 Linden east bound on Linden.

Police Officer: Gold Lexus four door.

Dispatch: Correction units: vehicle is a gold color Lexus, gold color Lexus east bound on Linden.

Police Officer: [unintelligible]

Police Officer: You need black record. Gold, gold Lexus

You need to survive gold color Lexus

Police Officer: It was possibly light but tan not brown not black.

Police Officer: [Unintelligible]

Dispatch: The job came over at 22:45

Police Officer: Description of perp? He's gone east bound on Lennox or Linden?

Dispatch: East bound on Linden Boulevard. East bound on Linden in a gold color Lexus.

Police Officer: 67 Adam Central?

Dispatch: 7 Adam.

Police Officer: This perp might be known to her.

Dispatch: Affirmative. On the job they saying that the perp is her husband.

Police Officer: Affirmative. [Unintelligible].

Exhibit G 20

Police Officer: I'm running the car that she's in now and trying to get some info.

Police Officer: Thank you.

Police Officer: 7 Sergeant 2?

Dispatch: Sergeant 2.

Police Officer: Let me get a level 1 mobilization to this. I'll give you a mobilization point. Stand by.

Police Officer: the 71 car is at Bedford and Linden and the 67 car is at Nostrand and Linden. Make that Rogers and Linden. Two mobilization points north-uh east and west of the location.

Dispatch: I am sorry. I did not read you. Can you 10-5 it please?

Police Officer: [unintelligible] 63 will be two mobilization points one at Bedford at Linden and the other at Rogers and Linden. That's east and west of the scene.

Police Officer: Florida plates on the Lexus. [Unintelligible] Lexus.

Police Officer: [unintelligible] Central.

Dispatch: 34 female shot. You said the first point in Bedford and Linden. Second point is Rogers and Linden?

Police Officer: The plate anything on the plate yet? Anyone got a ride on the Florida plates?

Police Officer: Sergeant 2?

Dispatch: Sergeant 2.

Police Officer: Victim's being transported to the county via EMS and you can show the squad 84.

Police Officer: Thank you for that central.

Police Officer: Shootings.

Police Officer: 7 Sergeant 2.

Dispatch: Sergeant 2

Police Officer: Emergency service respond to this location for an evidence search not a perp search; evidence search and there's no rush on that.

Exhibit G 20

Dispatch: 4.

Police Officer: Do we have the address?

Dispatch: 95 Linden Boulevard, 95 Linden Boulevard.

Police Officer: Anything on the plate yet? Could we get the plate please?

Dispatch: Unit did not provide the plate as of yet.

Police Officer: 73 Sergeant 2 we're unable to get a plate as of this time the suspect is male black approximately... tall male black about 6 foot tall he's wearing a gray short sleeve shirt and-and a gray matching cut off shorts driving a gold Lexus.

Dispatch: Looking for a perp male black 6'1 gray shirt gray shorts gold colored Lexus do you have an approximate age on that perp?

Police Officer: 67 Central and there's something written on the shirt. What did it say? Louis X was written on the shirt in print.

Dispatch: 10-5 your message. Louis X on the front and what else?

Police Officer: About 47 years old.

Dispatch: 47 years old.

Dispatch: At this time perp is a male black 6'1 wearing a gray shirt gray short louis x printed on the front he's about 47 years old 6 feet tall

Police Officer: Plate on that Lexus?

Police Officer: Plate on that car?

Dispatch: No plate unit they don't have a plate.

Police Officer: What about a year?

Dispatch: 62 do you have an approximate year on that vehicle?

Police Officer: [unintelligible] Central I might have a plate. I ran the victim's information. I got another a 98 Lexus four door tan registered in her name. With a New York license plate of adam david charlie 8082.

Dispatch: A Possible plate on that Lexus is a 98 adam david charlie 8082. Tan in color unit.

Exhibit G-20

Police Officer: Let me on the air

Police Officer: Could you repeat that please?

Dispatch: Units 98 Lexus, tan in color, adam david cahrlie 8082.

Police Officer: On the air.

Police Officer: Ok.

Police Officer: 2704 could you just send the plates?

Police Officer: adam david charlie 8082.

Police Officer: Everything on the air?

Police Officer: Yea.

Police Officer: Ok you have an address?

Police Officer: I'm running it right now.

Police Officer: Thank you.

Police Officer: 42 Carroll Julia Avenue West Hempstead New York.

Police Officer: What's the condition of the victim kay?

Dispatch: 675.

Police Officer: 731.

Dispatch: 8 it is likely. 8 it is likely.

Dispatch: On the air?

Police Officer: Yea.

Dispatch: On the air?

Police Officer: On the air.

Dispatch: Are you at the location?

Police Officer: 630 [unintelligible] and Church.

Exhibit G-20

Dispatch: Stand by.

Police Officer: Does anybody have a directional flight on this vehicle?

Police Officer: East on Linden.

Police Officer: 7 traces are you clear did you put that description of the vehicle in the vicinity to anyone?

Police Officer: Copy that.

Police Officer: Reading central?

Dispatch: One minute kay, one minute.

Police Officer: 84 county hospital.

Dispatch: 10-4

Police Officer: 10-5 the numbers on that Lexus.

Police Officer: adam david cahrlie 8082.

Message number 14 concludes at 22 hundred hours 57 minutes 52 seconds. This reproduction is now concluded PCT Jackson NYPD Communications Division Tape Room.

EXHIBIT G-20



Melissa Pasquale-Styles, M.D.
The City of New York
Office of Chief Medical Examiner
520 First Avenue
New York, NY 10016



# Additional Autopsy Notes – Review of Homicide Clothing

Name of deceased __Renee Aarons__     M.E.#___K-01- 02714_____

Supplemental Information Date ____10/10/08_____

At the request of ADA Sedanio (sp?), I retrieved the clothing from Evidence through chain of custody. The bag was received marked "voucher K553979, stor 01K20638, bar DOA barrel 01K78, "one multicolored shirt (in 2 pieces)," "one purple bra," K-01-2714, Renee Aarons, 6-13-01, Dr. Veress."

I examined the contents. Inside are three clothing items consisting of a matching pink/multicolored, flowered short-sleeved shirt and pants and purple bra. [The two pieces of cloth that were previously listed as two pieces of cut shirt actually represent a shirt and pants.] All three items are cut by emergency rescue personnel and have old, dried, brown blood stains.

The front of the shirt has two gunshot defects on the left chest near the left sleeve. The upper left chest defect has a 1/16th inch-in-width rim of light gray discoloration (comment: consistent with bullet wipe) and no soot or stippling observed with the unaided eye. The lower left chest defect has dark dried blood stains on the cloth and very sparse, black/gray, punctate stippled marks on the cloth that are up to 1-1/2" away from the defects.

The front of the shirt also has a gunshot defect on the right chest near the sleeve and no gray discoloration, soot or stippling observed with the unaided eye.

The right back of the shirt has a gunshot defect near the right sleeve with no gray discoloration, soot or stippling observed with the unaided eye. The left back of the shirt has a gunshot defect near the right sleeve with no gray discoloration, soot or stippling observed with the unaided eye.

EX 3

The purple bra has a gunshot defect in the right breast cup and no discernible gray discoloration, soot or stippling observed with the unaided eye.

The pants are free of gunshot defect.

Melissa Pasquale-Styles

City Medical Examiner-II

10/10/08

THIS IS A TRUE COPY
Office of the Chief Medical Examiner
This record cannot be released without
prior consent from the Office of Chief
Medical Examiner, New York City, N.Y.
ZOILA SANCHEZ
10-28-08

Exhibit G 21

Ex 3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
BROOKLYN, NEW YORK 11201

# JURY NOTE

TIME: _12:30_

DATE: _7/21/07_

HON. **J. KONVISER** _____

MESSAGE:

1) Can we hear the 911 tape again?

     and

2) Can we hear Reshan's ~~the~~ direct
and cross for his description about
the night of the crime?

     and

3) Can we ~~b~~ hear Tesha's testimony -
both cross and direct?

4) Can we see all of the pictures?

SIGNED _Ted Aire_

DO NOT WRITE BELOW THIS LINE

MT 4/9          COURT'S EXHIBIT NO. _III_

_1 of 2 pgs_

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
BROOKLYN, NEW YORK 11201

# JURY NOTE

TIME: _12:30_

DATE: _9/24/09_

HON. __J. KONVISER__

MESSAGE:

5) Can you tell us The names of the witness
who met with The DA befor The
Trial.

SIGNED _____

DO NOT WRITE BELOW THIS LINE

MT 4/9          COURT'S EXHIBIT NO ___III-A___

1 of 2 Pgs

Case 1:19-cv-02729-ARR   Document 50-6   Filed 05/06/19   Page 109 of 157   PageID #: 297

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
BROOKLYN, NEW YORK 11201

# JURY NOTE

TIME: 4:42 PM

DATE: 9/29/09

HON. **J. KONVISER**

MESSAGE:

1) What happens if we do not decide today.

2) What happens if all 12 of us cannot come to the same decesion.

SIGNED _____

DO NOT WRITE BELOW THIS LINE

MT 4/9          COURT'S EXHIBIT NO _____

27

People v. Bell, 2017 WL 3253970

James v. Goord et al
2017 WL 3251253

Exhibit D

Wayne Chin
Din: 09-A-6287
Attica Correctional Facility
639 Exchange Street
Attica, New York 14011-0149

March 14, 2019

Hon. Janet DiFiore
Chief Judge
New York State Court of Appeals
Court Of Appeals Hall
20 Eagle Street
Albany, New York 12207-1095

Re: **People v. Wayne Chin**
(Defendant's Leave Application)

App. Div. Docket # 2013-04432

Your Honor,

Please Take Judicial Notice, that I, Wayne Chin, the above-named Defendant-Appellant, hereby respectfully request the issuance of a Certificate pursuant to N.Y. Crim. Proc. Law § 460.20 (McKinney 1994), granting permission to appeal and certifying that there are questions of state and federal constitutional law in the above-captioned case, as stated in my coram nobis application presented to the State Supreme Court, Appellate Division, Second Judicial Department, which ought to be review by the Court of Appeals. I have enclosed copies of the coram nobis application with the addendum in support; my replies to Respondent(s) opposition; as well as the Appellate Division's decision and order dated February 20, 2019, denying appellant's application for a writ of error coram nobis.

On September 30, 2009, I was convicted after a jury trial, for murder in the second degree (N.Y. Penal Law § 125.25[1]). On November 17, 2009, the trial court (Konviser, J.,), sentenced me to an indeterminate prison term of twenty-five years to life. On February 7, 2012, while the appeal was pending, I moved to vacate the judgment pursuant to N.Y. Crim. Proc. Law § 440.10-1(c)(d)(f) and (h). Appellant's post-conviction motion of ineffective assistance of counsel involves ..., mixed-claim relating to both record-based and non-record-based issues, ...., such claims may be brought in a collateral proceeding, whether or not the [defendant] could have raised the4 claim on direct appeal. See, **People v. Evans**, 16 NY3d 571, 575 n. 2 (2011), cert. denied 565 US 912 (2011); **People v. Kocaj**, 160 AD3d 766, 767 (2d Dept. 2018). However, the 440 motion court (Simpson, J.,), arbitrarily disregarded stare decisis and ruled that appellant's mixed-claim motion was procedurally barred from totality review pursuant to NYCPL § 440.10(2)(b). See, **People v. Chin**, 2013 WL 990955 (N.Y. Sup. Ct., Feb. 20, 2013).

Likewise, the Appellate Division which has consistently held that ineffective assistance of counsel constitutes a single ground or issue for relief..., and a defendant's mixed-claim motion of ineffective assistance of counsel cannot be procedurally barred under CPL § 440.10(2)(b). See, **People v. Maxwell**, 89 AD3d 1108, 1109-10 (2d Dept. 2011). Abrogated its own precedent to deprived appellant of procedural due process and equal protection of law and upheld the motion court's arbitrary ruling which procedurally barred a totality review of the petitioner's ineffective assistance of counsel claim. See, **People v. Chin**, 148 AD3d 926 (2d Dept. 2017).

In **People v. Brown**, 45 NY2d 852, 853-54 (1978), this Court held; "In the typical case it would be better, and in some cases essential, that an appellate attack on the effectiveness of counsel be bottomed on an evidentiary exploration by collateral or post-conviction proceeding brought under CPL § 440.10." See also, **Lopez v. Grenier**, 323 F.Supp.2d 456, 466 (S.D.N.Y. 2004)("In general, post-judgment attacks on trial counsel's assistance should therefore be made by motion pursuant to N.Y. Crim. Proc. Law § 440.10."); **People v. Potts**, 49 AD3d 782, 783 (2d Dept. 2008)("Portions of the defendant's claim of ineffective assistance of counsel, raised in his supplemental brief, are based on matter dehors the record, which cannot be review on direct appeal."). Furthermore, the weight of federal and state case law has never suggested that ineffective assistance of counsel claim based on out-of-court conversations between a defendant and his attorney are procedurally barred. See, **Pierotti v. Walsh**, 834 F3d 171, 177-180 (2d Cir. 2016); **People v. Peque**, 22 NY3d 168, 202 (2013)(""where defendant's complaint about counsel is predicated on factors such as counsel's advice or preparation that do not appear on the face of the record, the defendant must raise his ||.. claim via CPL § 440.10 motion.")

Despite those controlling precedents, this Court failed to redressed the absurdity that was created within the law by the lower state courts' arbitrary and unreasonable rulings in appellant's case|| Thus, denying appellant a certificate of appealability. See, **People v. Chin**, 30 NY3d 1124 (2017). Reconsideration was denied, See, **People v. Chin**, 30 NY3d 978 (2017).

### The People's case at trial

The facts of the trial that provided the basis for the arguments advanced here, has repeatedly been documented in appellant's and the People's numerous submissions before this Court. Familiarity is assumed, in the interest of brevity, the appellant does not recount the facts, but incorporated them by reference herein.

### STATEMENT OF ISSUES WHY LEAVE SHOULD BE GRANTED

Appellate counsel, Anna Pervukhin, conflict to protect her

-2-

own self-interest was occasioned by appellant exposing her deficiency in failing to investigate and settle the record on appeal before fling the direct appeal brief. The undisputed evidence and the record substantiated appellate counsel's egregious and prejudicial conduct. In August 2011, appellant informing appellate counsel that the records on appeal she had obtained from the state court were incomplete. By letter dated August 31, 2011, counsel reassured appellant that she would investigate the record **"extremely careful to make sure nothing is missing. If something is missing, I will track it down as quickly as possible."** (See, Ms. Pervukhin's letter dated August 31, 2011, annexed as exhibit 1). On October 3, 2012, Ms. Pervukhin filed the appellant's direct appeal brief (App. **Div. #** 2009-10764) without investigating and settling the entire record on appeal. A mode of proceedings error, affecting the organization of the court to provided a record of completeness to afford adequate appellate review and effective assistance. See, **Draper v. Washington**, 372 US 487 (1963); **People v. Harrison**, 85 NY2d 794, 796 (1995)(original citations and quotations omitted); C.P.L.R. §§ 5525 & 5526.

On June 10, 2013, appellant was compelled to take pro-se action to enlarged the judgment roll to included the pretrial minutes of the September 9, 2009, proceeding. In her affirmation to the Appellate Division, Ms. Pervukhin's stated; **"I support his recent request for the minutes of ...., September 9, 2009, if they exist."** (See, Ms. Pervukhin's unsigned affirmation, annexed as exhibit 2). Even then, counsel refused to conducted any investigation to acquired and certify the existence of the minutes because it would have exposed her ineptitude.

On September 16, 2015, Ms. Pevukhin filed the appellant's CPL § 440 appeal brief (App. **Div. #** 2013-04432). To protect her own self-interest against any possible civil liability, she undermined appellant's cause to vacatur of the judgment by raising a frivolous issue without investigating the pertinent September 9, 2009, pretrial minutes. As a result, the prosecutor was able to used the minutes of September 9, 2009, to decisively rebutted Ms. Pervukhin's only argument on appeal. In a remarkable letter conceding she had not reviewed the September 9, 2009, pretrial minutes until two years after filing the 440 appeal brief, Ms. Pervukhin's stated: **"On January 9, 2017, you sent me a transcript dated September 9, 2009, I have read it with interest and if I think it is helpful for answering a question, I will not hesitate to bring it up."** See, Ms. Pervukhin's letter dated Jan. 13, 2017, annexed as exhibit 3).

## ISSUES THAT SHOULD BE REVIEWED

1. WHETHER APPELLATE COUNSEL'S CONFLICT TO PROTECT HER OWN SELF-INTEREST, COMPROMISED THE APPELLANT'S CONSTITUTIONAL RIGHTS TO EFFECTIVE ASSISTANCE: U.S.C.A. VI, XIV; MICKENS v. TAYLOR, 535 US 162 (2002); WOOD v. GEORGIA, 450 US 261 (1981); CUYLER v. SULLIVAN, 446 US 335 (1980); UNITED STATES v. FULTON, 5 F3d 605, 613 (2d Cir. 1993); PEOPLE v. MATTISON, 67 NY2d 462, 468 (1986).

-3-

2. WHETHER THE APPELLATE DIVISION ERRED WHEN IT SUMMARILY DENIED APPELLANT'S REQUEST FOR SUBSTITUTION OF APPELLATE COUNSEL PREDICATED UPON SPECIFIC COMPLAINTS DEMONSTRATING GOOD CAUSE: U.S.C.A. VI, XIV; EVITTS v. LUCEY, 469 US 387, 393-94 (1985); POINTER v. TEXAS, 380 US 400 (1965); PEOPLE v. LINARES, 2 NY3d 507 (2004); PEOPLE v. MEDINA, 44 NY2d 199 (1978).

## The Applicable Law Regarding Conflict-Of-Interest Representation

The right to assistance of conflict-free representation is guaranteed by the Sixth and Fourteenth Amendments to United States Constitution, and Art‖ 1, § 6, of the New York State Constitution. See, Wood v. Georgia, 450 US 261, 271-72 (1981)(right to conflict-free counsel is protected by Sixth Amendment and Due Process Clause); People v. Ennis, 11 NY3d 403, 409-10 (2008); People v. Gomberg, 38 NY2d 307, 312 (1975). The courts distinguished between conflicts implicating the attorney's "ethical obligation to someone other than the defendant" and conflicts implicating the attorney's self-interest, nothing that the latter are so serious as to, in some cases, be unwaivable, since "no rational defendant would knowingly and intelligently be represented by a lawyer whose conduct was guided largely by a desire for self-preservation‖" United States v. Fulton, 5 F3d 605, 613 (2d Cir. 1993).

In Strickland v. Washington, 466 US 668, 688 (1984), the Supreme Court placed conflict-of-interest claims outside the traditional "prejudice" requirement that a defendant show a reasonable probability of a different result but for counsel's error. ..., prejudice is presumed only if the defendant demonstrates that counsel actively represented conflicting interests and that actual conflict of interest adversely affected his lawyer's performance‖ (See, Id., 466 US @ 692-93). A defendant need only show some "lapse in representation," that is, "that some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties and interests." United States v. Williams, 372 F3d 96, 106 (2d Cir. 2004).

## The Issue Appellate Counsel's Raised To Protected Her Own Self-Interest While Undermining The Petitioner's Cause On CPL § 440.10 Appeal

On September 16, 2015, appellate counsel, Anna Pervukhin filed appellant's 440 appeal brief without obtaining and reviewing the pretrial transcripts of the September 9, 2009, proceeding. To protected her own self-interest, appellate counsel's raised a frivolous ineffective assistance argument, despite trial counsel's cumulative trial errors and omissions‖ Ms. Pervukhin argued that trial counsel was ineffective for not conducting an adequate investigation to locate two eyewitnesses who had given potentially exculpatory statements and failed to entered the police reports of their statements into evidence.

-4-

The People was able to decisively rebutted appellate counsel's argument by emphatically pointing to the pretrial record of the September 9, 2009, proceeding, where trial counsel had proffered to the court that the two eyewitnesses could not be located because they had moved to unknown locations‖ (See, generally, People's 440 oppos‖ brief dated January 29, 2016).

## THE PLAUSIBLE ALTERNATIVE STRATEGIES THAT APPELLATE COUNSEL COULD HAVE PURSUED, IF NOT FOR PROTECTING HER OWN SELF-INTEREST

**1. The Court's Violated Petitioner's Sixth Amendment Secured Autonomy And Freedom Of Choice to Decided The Objective Of His Own Defense By Allowing Trial Counsel To Usurped Control Of A Decision That Was Within The Petitioner"s Exclusive Prerogative.**

On May 21, 2009, and August 22, 2009, Appellant submitted applications to the motion court (D'Emic, J.,) for substitution of trial counsel predicated on a conflict of interest. Appellant's motions were summarily denied by the court without a hearing. On September 9, 2009, conference call, the court inquiry whether appellant still wanted substitution of trial counsel. Appellant's responded in the affirmative, and explained that counsel had not followed appellant's instruction to advanced an affirmative alibi defense. The court's responded; "**This is your third attorney. Why didn't you tell that to Mr. Stutman or Mr. Baker? First time I'm hearing about it and I've been on this case since ..., March 2001! All right, I've had enough! Motion denied.**" (See, Id., September 9, 2009, transcripts @ 2-5).

The court's failed to recognized the conflict of interest inherent with trial counsel's representation. Since the issuance of 1976, the American Bar Association (ABA), has not deviated from defense counsel's responsibility to consult a client to make fundamental decisions. The ABA Model of Rules of Professional Conduct provides: "<u>A lawyer shall abide by a client's decisions concerning the objectives of the representation ..., and shall consult with the client as to the means by which they are to be pursued ...,</u>" (See, Model of Professional Conduct Proposed Rule 1.2[a], [First Draft 1982]; <u>see also</u>, **Jones v. Barnes**, 463 US @ 753 n. 6).

The court's unreasonable rulings violated the appellant's Sixth Amendment secured autonomy and freedom of choice to selected the objective of his defense and allowed trial counsel to usurped control of an issue within the appellant's exclusive prerogative. **McCoy v. Louisians**, 138 S.Ct‖ 1500 (2018); **Weaver v. Massachusetts**, 582 US ___, 137 S.Ct. 1899, 1908 (2017)("The fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty."); **People v. DeGina**, 72 NY2d 768, 776 (1988)("A defendant unquestionable has the right to chart his own defense.").

Appellant C.P.L. § 330.30 affidavit to vacate the conviction, averred; "I informed him (counsel) that he should subpoena the phone records and file a late notice of alibi for me." In thier opposition dated November 5, 2009, the People contended; "During the proceedings, defense counsel informed the Court that defendant was considering a possible alibi defense. However, defense counsel did not provide any specific information as required by statute .... In any event, any further conversations that the defendant may or may not have had with his attorney regarding potential alibi ..., are not on the record. Therefore this claim in not preserved and procedurally barred ...,. Should defendant wish to pursue this claim, he may make the appropriate motion pursuant to C.P.L. § 440.10." (See, People's Memorandum of law @ 5)||

Appellant recounted in his C.P.L. § 440.10 affidavit a conversation in which he instructed trial counsel to obtain appellant's phone record to advanced an affirmative alibi defense|| (See, Appellant's 440 affidavit @ 26). The 440 motion court (Simpson, J.,) determined that trial counsel faced with the People's overwhelming evidence could simply defied appellant's instruction and undermined appellant's assertion of innocence by interjecting into the case of a factually and logically inconsistent defense, impermissibly compromising that personal constitutional right of the appellant's prerogative to make his own defense. The factual allegation of the issue are more fully set forth in appellant's addendum in support of the coram nobis application @ pages 1-6.

2. WHETHER THE MOTION COURT ABUSED ITS DISCRETION WHEN IT SUMMARILY DENIED APPELLANT'S CPL § 440.10 MIXED-CLAIM MOTION, WHICH CONTENDED THAT THE TRIAL COURT'S APPLICATION OF THE HEARSAY RULE TO PRECLUDED AN UNAVAILABLE WITNESS'S EXCULPATORY STATEMENT, DEPRIVED HIM OF HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL: USCA V, VI, XIV.

Ms. Deanna Cobbs and Ms. Odette Gaston were two eyewitnesses whom observed the alleged crime from their respective fourth-floor apartments at 100 Linden Boulevard, and made calls to the 911 operators, contemporaneous with the event as it unfolded. Their exculpatory statements had all indicia of reliability and was repeated to the case detectives|| Both eyewitnesses were unavailable for trial, and trial counsel sought to introduced Ms|| Cobbs' exculpatory statements through the testimony of Detective Patrick Henn. The prosecutor's objected that Ms. Cobbs' exculpatory statements were inadmissible hearsay. Trial counsel interposed that he was not offering Ms Cobbs' statements for the truth of the matter asserted, but that it was made. Which did not constituted hearsay under prevailing norm. See, George v. Celotex Corp., 914 F2d 26, 30 (2d Cir. 1990); People v. Gibian, 76 AD3d 583, 585 (2d Dept. 2010)("Evidence of a statement offered not to prove the truth of its contents but to prove that the statement was made, is not hearsay."). Nonetheless, the trial court's sustained the prosecutor's objection and curtailed trial counsel's cross-examination of Detective Henn to a single question regarding Ms. Cobbs. (See, trial tr. @ 272-276).

-6-

To supported a defense that the police investigation was not thorough, trial counsel sought to call Detective Crick to introduce Ms. Gaston's exculpatory statements. The prosecutor's objected that Ms. Gaston's statements were inadmissible hearsay. The trial court's precluded Ms. Gaston's exculpatory statements as inadmissible hearsay without allowing counsel to make a record of her statements. (trial tr. @ 305-07). The next day the prosecutor informed the court that Detective Crick had retired and was in Georgia, beyond the court jurisdiction. Had counsel been permitted to introduce the police DD5 report, it should have been admitted. See, **Espinal v. Bennett**, 558 F.Supp.2d 388, 409-10 (E.D.N.Y. 2008)("admitting police DD5 report of unavailable witeness's exculpatory statements")

The trial court's evidentiary rulings was an error of law which was contrary to, an unreasonable application of established federal law, as was determined by the United States Supreme Court. The court's rulings violated the appellant's constitutional rights to confront witnesses and present evidence as guaranteed by the Due Process Clause and Confrontation Clause. See, **Holmes v. South Carolina**, 574 US 319, 321-325, 330-31 (2006); **Chambers v. Mississippi**, 410 US 284, 302 (1973)("Trial court's 'mechanistical' application of the hearsay rule to keep out testimony helpful to the accused, violated the constitution."); **Alvarez v. Ercole**, 763 F3d 223, 226-234 (2d Cir 2014).

The People contended that the appellate court could not review this issue on direct appeal because Ms. Gaston's statements were dehors the record. Appellant ample supported his CPL § 440.10 motion with the police DD5 report of Ms. Gaston's exculpatory statements, substantiating all the factual components requiring a hearing under the enumerated applicable standards of CPL § 440.30(5). However, the motion court's determined that there were no indication that Detective Crick would have been able to offer relevant, beneficial, or otherwise admissible evidence. Even assuming that Ms. Gaston's exculpatory statements constitutes hearsay, its inconceivable how the motion court reached it conclusion when Ms. Gaston's exculpatory statements were plainly admissible under federal and state constitutional law. See, **Lopez v. Miller**, 915 F.Supp.2d 373, 420-26 (E.D.N.Y. 2013)("discussing the admission of hearsay statements under Rule 807, and finding that state court's denial of discovery and evidentiary hearing produced an adjudication of a claim that was materially incomplete, and thus, required no deference to state court"); **Morales v. Portuondo**, 154 F.Suup.2d 706, 736 (S.D.N.Y. 2001); **People v. Robinson**, 89 NY2d 648 (1997)(original citations and quotation omitted). The full text of appellant's argument can be found within the coram nobis application @ pages 21-25.

3. THE MOTION COURT ABUSED ITS DISCRETION WHEN IT SUMMARILY DENIED APPELLANT'S CPL § 440.10 MIXED-CLAIM MOTION WITHOUT A HEARING WHERE TRIAL COUNSEL'S CUMULATIVE ERRORS AND OMISSIONS WERE SIGNIFICANT, THAT VIEWED IN ITS TOTALITY, THE

REPRESENTATION WAS OBJECTIVELY DEFICIENT AND PREJUDICIAL: USCA VI, XIV.

### A. The motion court's arbitrarily disregarded stare decisis to constructed a bar for appellant

Contrary to the lower court's determination that several of appellant's claims permits adequate review on appeal, misapprehended the narrow unique underpinning invoking appellate considering from a scant defunct record. The claims advanced in appellant's CPL § 440.10 motion and subdivisions did not justify appellate consideration by an inexorable defect in the trial records unpresuasive force owing to trial counsel's ineptitude and analogous to appellate counsel's failure to forcefully advocate the potential claim error properly for appellate review.

Here, the appellate court already criticized Judge Konviser for mishandling the introduction of a police report that was otherwise admissible. See, **People v. Mullings**, 83 AD3d 871 (2d Dept. 2011). For the motion court to concluded that this same type of error complain of sub judice, derived from appellant's own conclusion is precipitated into a joint venture by the People and the motion court, embracing this unseemingly flawed logic.

Judge Simpson and the author in response to appellant's motion, did not participated in the trial proceeding. Nonetheless, she parrot the People's position. The People drafted its reasons why the relief sought by appellant should be rejected and the motion court merely reprinted verbatim those same reasons in its decision.

Equally unpersuasive, the challenged deprivation of trial counsel's failure to conduct pretrial investigation lacks the basic record-based claim that bars appellate review on direct appeal, when vital evidence was conclusively documented in appellant's exhibits annexed in the CPL § 440.10 motion, and the people fell way short of refuting the documentary proof by clear and convincing evidence. Its inconceivable to conclude another vehicle outside post-collateral proceeding, is just faulty reasoning.

the undivided infidelity rejecting this Court's wisdom which set forth the statutory framework by explicitly restricting claim of pretrial ineffectiveness on direct appeal, demonstrates a complete disconnect from resounding precedents. **People v. Brown**, 45 NY2d 852, 853-54 (1978). In particular, if a "defendant's ineffective assistance of counsel turns on matters out-side the record, ... it is not reviewable on direct appeal and would require a further record to be developed by way of a CPL § 440.10 motion." **People v. Santer**, 30 Ad3d 1129 (1st Dept. 2006); **People v. Potts**, 49 AD3d 782, 783 (2d Dept. 2008)(original citations and quotations omitted).

-8-

Viewing the motion court's determination that sans specificity, identifying what claims, or for that matter, were not reviewable on direct appeal incorporated in its decision. It was improper for the motion court to engaged in a torturous procedural barrier that would forever deny appellant equitable consideration in a claim undeveloped, and failure to have challenge trial counsel be heard offering explanation for his inexcusable neglect to object to the People's introduction of inadmissible and prejudicial evidence, lacking evidentiary foundation that added substantial weight to the People's case and his failure to conduct essential pretrial investigation that would have led to vital evidence of appellant's innocence, is wanting for correction which requires remittal.

## B. The Motion Court's Factual Findings Are Unreasonable

It was unreasonable for the motion court to analyzed trial counsel's off-the-record performance and made a findings of facts without a hearing that trial counsel rendered effective assistance while refusing to analyze trial counsel's cumulative trial errors and omissions under the notion that it was procedurally barred pursuant to CPL § 440.10(2)(b). Such analysis cannot be reconciled with the appellant's constitutional rights to a totality review. In other word, "such a claim constitutes a single, unified claim that must be assessed in totality." See, **People v. Taylor**, 156 AD3d 86, 92 (3d Dept. 2017).

Appellant's sworn 440 affidavit proffered conversations with both trial counsel and sentencing counsel. Particularly, the affidavit recounted a discussion with trial counsel regarding preparation of an affirmative alibi/third-party-culpability defense. The weight of federal and state case law has never suggested that ineffective assistance of counsel claim based on out-of-court conversation between a defendant and his attorney are procedurally barred. See, **Pierotti v. Walsh**, 834 F3d 171, 177-80 (2d Cir. 2016); **Constant v. Sabol**, 987 F.Supp.2d 323, 351-52 (E.D.N.Y. 2013); **People v. Peque**, 22 NY2d 168, 202 (2002)(original citations and quotations omitted).

Notwithstanding that trial counsel had disregarded the appellant's instruction to advance an affirmative alibi defense which constituted a structural error. **McCoy v. Louisiana**, 138 S.Ct. 1500 (2018). The motion court went to great lengths purporting the merits of appellant's contentions with the following:

> "The defendant has failed to alleged any facts that would have warranted further examination of the defendant's cell phone records. Defendant contends that counsel could have substantiated an alibi through the phone global positioning system [GPS], that he was not at the scene of the crime. On June 13, 2001, Detective Guinane applied for and was granted a pen register and trap and trace device on a phone that defendant had used to call Renee. The police intended to use the pen register and trap and trace device in order to locate and apprehend defendant, who had since fled. To the extend

-9-

that defendant is claiming that counsel should have obtain
those records from the police, they would not have been
relevant because they would have been generated after the
shooting. In addition, counsel had little basis to pursue an
alibi defense because he was faced with two strong
eyewitnesses' account of the shooting that unequivocally
identified defendant as the shooter."

(Id., People v. Chin, 2013 WL 990955, NY Sup. 2/20/13).

First, Judge Simpson failed to recognized the structural
error and conflict-of-interest that was inherent in appellant's
case. It was the appellant, not counsel, who selects the
objectives of his own defense, and counsel was duty-bound to
carry it through. If trial counsel could not advocated the
appellant's affirmative alibi defense, counsel should have
withdrawn from the representation. "The right to defend is
personal, and a defendant's choice in exercising that right must
be honored out of that respect for the individual which is the
lifeblood of the law." See, McCoy v. Louisiana, 138 S.Ct. 1500,
1507 (2018); see also, State of Vermont v. Tribble, 193 Vt. 194,
222-25; 67 A3d 210 (2012)(Affirming the principle that defense
counsel cannot interjects an inconsistent defense over the
defendant's objections to advanced a specific defense).

Second, instead of conducting an evidentiary hearing in
accordance with CPL § 440.30(5), Judge Simpson simply
rationalized-away trial counsel's failure to conduct essential
pretrial investigation with a preposterous explanation that
"defendant used the cell phone to call Renee on June 12, 2001,"
but contradicted her reasoning that appellant wanted to use the
cell phone records of June 13, 2001, to established an alibi
defense. Cf., Lopez v. Miller, 915 F.Supp.2d 373, 421 (E.D.N.Y.
2013)("finding that the state court's denial of discovery and an
evidentiary hearing produced an adjudication of 'a claim that was
materially incomplete,' and extending no deference to state
court.") Id.

In United States v. Velazquez, 197 F.Supp.3d 481 (E.D.N.Y.
2016), the defendant contended that his trial attorney rendered
constitutional ineffective assistance for failing to investigate
alibi evidence in the form of his cell phone records. The Court
conducted an evidentiary hearing upon the defendant's post-
conviction motion for a new trial, notwithstanding that the same
judge conducted the initial trial. There, the defendant's
attorney testified and acknowledged that the defendant had asked
him to get the cell phone records. He informed the defendant that
the cell phone records were basically worthless, because the
cooperators in the case were going to testify that all the
defendants used burner phones. The Court's concluded that "a
decision cannot be fairly characterized as 'strategy' unless it
is a conscious choice between two legitimate and rational
alternatives. thus, finding Velazquez's trial counsel failure to
subpoena and investigate the cell phone records was deficient and
prejudicial performance.

-10-

### C. Trial Counsel's failed to Objected to the Prosecutor's Introduction Of Inadmissible And Prejudicial Dog's Tracking Evidence, Lacking Evidentiary Foundation

Appellant's Omnibus motion sought preclusion of all identification evidence the prosecutor intended to offered at trial. In their opposition dated April 16, 2008, the prosecutor's contended that all identification are confirmatory because the witnesses and defendant are known to each other. Therefore, the court's summarily denied appellant's motion without a conducting a Wade hearing.

At trial, without disclosure or evidentiary foundation, the prosecutor's ambushed appellant with her improper and unduly prejudicial statements that "a bloodhound named Kojak, identified the appellant's scent and traces it from the gold Lexus to a nearby bus-stop." (trial tr. @ 16). To established her point, she improperly elicited opinion testimonies from Detectives Calabrese and Henn (Trial tr. @ 173, 239-40), whom were not the bloodhound's handler, nor had any expert proficiency with the bloodhound's ability to distinguished the human's scent. The prosecutor's improper and prejudicial statements were made in <u>bad faith</u> to deprived appellant's constitutional due process and a fair trial.

Furthermore, decisional case law dictates that opinion trial testimony relative to a bloodhound's reaction will not be countenanced unless the prosecutor has established an evidentiary foundation and the trial court has given a cautionary instruction to the jury. <u>United States v. McNiece</u>, 558 F.Supp. 612, 615 (E.D.N.Y. 1983); <u>People v. Gangler</u>, 227 AD2d 946, 946-47 (4th. Dept. 1996)("Bloodhound's tracking evidence is admissible on issue of identity if proper foundation is laid and the jury is given cautionary instruction.").

In light of those resounding precedents which set forth the evidentiary foundation requirements, trial counsel inexcusably failed to objected, moved for a mistrial, or requested any ameliorative remedies for the prosecutor's improper and unduly prejudicial statements and elicitations of inadmissible opinion testimonies.

Not only did trial counsel allowed the prosecutor without objections to improperly bolstered their witnesses' credibility with inadmissible bloodhound's tracking evidence. In fact, it was trial counsel who when cross-examining both Detectives Claebrese and Henn, elicited the worse inferential bolstering (trial tr. @ 186-89, 267-68), and compounded his errors with his summation statements. (Trial tr. @ 392-95).

Trial counsel's failed to fulfilled his "duty to protected the interest of his client ..., [in that he failed to follow] ..., the required and proper practice," which was for counsel to objected to the prosecutor's improper statements. See, e.g.,

-11-

C. **Trial Counsel's failed to Objected to the Prosecutor's Introduction Of Inadmissible And Prejudicial Dog's Tracking Evidence, Lacking Evidentiary Foundation**

Appellant's Omnibus motion sought preclusion of all identification evidence the prosecutor intended to offered at trial. In their opposition dated April 16, 2008, the prosecutor contended that all identification are confirmatory because the witnesses and defendant are known to each other. Therefore, the court's summarily denied appellant's motion without a conducting a Wade hearing.

At trial, without disclosure or evidentiary foundation, the prosecutor's ambushed appellant with her improper and unduly prejudicial statements that "a bloodhound named Kojak, identified the appellant's scent and traces it from the gold Lexus to a nearby bus-stop." (trial tr. @ 16). To established her point, she improperly elicited opinion testimonies from Detectives Calabrese and Henn (Trial tr. @ 173, 239-40), whom were not the bloodhound's handler, nor had any expert proficiency with the bloodhound's ability to distinguished the human's scent. The prosecutor's improper and prejudicial statements were made in <u>bad faith</u> to deprived appellant's constitutional due process and a fair trial.

Furthermore, decisional case law dictates that opinion trial testimony relative to a bloodhound's reaction will not be countenanced unless the prosecutor has established an evidentiary foundation and the trial court has given a cautionary instruction to the jury. **United States v. McNiece**, 558 F.Supp. 612, 615 (E.D.N.Y. 1983); **People v. Gangler**, 227 AD2d 946, 946-47 (4th. Dept. 1996)("Bloodhound's tracking evidence is admissible on issue of identity if proper foundation is laid and the jury is given cautionary instruction.").

In light of those resounding precedents which set forth the evidentiary foundation requirements, trial counsel inexcusably failed to objected, moved for a mistrial, or requested any ameliorative remedies for the prosecutor's improper and unduly prejudicial statements and elicitations of inadmissible opinion testimonies.

Not only did trial counsel allowed the prosecutor without objections to improperly bolstered their witnesses' credibility with inadmissible bloodhound's tracking evidence. In fact, it was trial counsel who when cross-examining both Detectives Claebrese and Henn, elicited the worse inferential bolstering (trial tr. @ 186-89, 267-68), and compounded his errors with his summation statements. (Trial tr. @ 392-95).

Trial counsel's failed to fulfilled his "duty to protected the interest of his client ..., [in that he failed to follow] ..., the required and proper practice," which was for counsel to objected to the prosecutor's improper statements. See. e.g.,

**People v. DeJesus**, 42 NY2d 519, 526. Indeed, the absence of a timely and specific objection fails to preserve the issue of the propriety of the prosecutor's improper statements to the jury for appellate review. See, CPL § 470.05[2]; **People v. Dean**, 856 NY2d 649, 651 (2d Dept. 2008); **People v. Miller**, 87 AD3d 1075 (2d Dept. 2011)(original citations and quotations omitted). To illustrate the point, in **United States v. Hebshie**, 754 F.Supp2d 89, 115-20 (D. Mass. 2010), Judge Nancy Gertner took defense counsel to the task for not adequately challenging key forensic evidence from a accelerant-detection dog. First, counsel should have requested a reliability hearing at the outset. Second, counsel's plainly should have objected to the testimony of the dog's power and accuracy. Hence, defense counsel was found ineffective‖

Here, appellant was adversely and severely prejudice by trial counsel's inexcusable failure to object to the inadmissible bloodhound's tracking evidence lacking evidentiary foundation because the last testimony the jury heard before rendering its verdict, was prejudicial opinion testimony about the bloodhound's reaction from Detective Henn. (Trial tr. @ 455). Under those circumstances, the error cannot be considered harmless because it contributed to the verdict. Furthermore, this Court has affirmatively enunciated that even "harmless error" could undermined the fairness of the process in such a way that violates the State's constitutional guarantee of effective assistance of counsel‖ **People v. Benevento**, 91 NY2d 708, 714.

### D. Trial Counsel's Failure To Object To Doctor Styles' Inadmissible And Prejudicial Testimony That Gunpowder Residue Was On Clothing, Was <u>Objectively Deficient And Prejudicial Performance</u>

On October 10, 2008, Assistant District Attorney, Ms. Sedanio, requested that Medical Pathologist, Doctor Pasquale-Styles examined clothing contained in an evidence bag. At trial, Dr. Styles' testified that the clothing had gunpowder residue consistent with a firearm fired within a distance of eighteen inches of the victim. (Trial tr. @ 319-330). Dr. Styles' testimony and photographs were inadmissible as a matter of law because the prosecutor's laid no evidentiary foundation‖

Trial counsel simply sat silent without any objections and allowed the prosecutor to skirted the evidentiary foundation with no proof of who recovered, and placed the clothing inside the evidence bag or that the clothing was unaltered‖ Further, the prosecutor failed to authenticate Dr. Styles' photographs through any method, (no witness testified that the photographs were a fair and accurate representation of the clothing as when they were recovered, or that it was unaltered). See, **People v. Julian**, 41 NY2d 340, 342-43 (1977)("The offering party must establish that the evidence d identical to that involved in the crime, and that it has not been tampered with.").

-12-

Trial counsel further compounded his errors when without objections, he allowed the prosecutor to infested and prejudiced the entire trial with unfairness by improperly vouching and bolstering their witnesses' credibility with her summation statements that; "The medical examiner told you she found stippling, ... and that stippling means a gun was shot at close range. It make sense that she would found stippling on the left side of Renee's shirt, because that would have been the closest part of Renee's body to the defendant as he stood outside of the car and shot her." (Trial tr. @ 410).

No competent New York attorney would have sat silent in a case of this nature and allowed the prosecutor to introduced highly inadmissible and unduly prejudicial evidence without evidentiary foundation or failed to objected to the prosecutor's improper summation statements vouching for the credibility of their witnesses. Inasmuch, as the prosecutor's emphasized upon Dr. Styles' inadmissible prejudicial testimony and the jury requested to examined her photographs during deliberation (Court's exhibit # 3A), the error cannot be deemed harmless. See, Satterwhite v. Texas, 486 US 249, 260 (1988)("Emphasis prosecutor placed on improper admitted evidence during summation suggested its importance to the jury's decision."); Wood v. Ercole, 644 F3d 83, 96-97 (2d Cir. 2005)("Prosecutor spending nearly half its summation discussing improperly admitted evidence. demonstrated its substantially injurious character.").

**E. Trial Counsel's Acceding With the Court And the People To Relieved Them Of Their Burden To Prove A Material Element Of The Charged Crime, Was Objectively Deficient And Prejudicial Performance**

The grand jury's indictment charged appellant caused the death of Renee Aarons by shooting her with a weapon, namely a firearm. the death, the intent to kill, and causation were the facts which constitutes the material elements that the People were required to prove beyond a reasonable doubt‼ See, Schad v. Arizona, 501 US 624, 657 (1991).

Medical Examiner, Doctor Joseph Veress, conducted the autopsy and filed a Death Certificate which stated:

"Name of deceased, Renee Aarons; Borough, Brooklyn; Hospital, Kings County; Date and hour of death, June 12, 2001, at 10:55 p.m.; Sex, female; Approximate age, 39 years; Death was cause by gunshot wounds to the chest, with perforations of the lungs, pulmonary trunk, stomach, liver and inferior vena cava; Injury date, June 12, 2001, 10:45 p.m.; Place of injury, location, front of 95 Linden Boulevard; On the basis of examination, and/or investigation, in my opinion, death occurred due to the cause and manner as stated, ..."

(Id., Trial tr. 334-35; People's exhibit 21).

-13-

Death Certificate contained hearsay statements and are considered business record. Business records are customarily offered into evidence through a foundation witness, such as a custodian of the records or an employee who is familiar with the record-keeping procedures of the maker. **People v. Bell**, 2017 WL 3253490 (citing **People v. Kennedy**, 68 NY2d 569, 578 [1986]).

During trial, the judge, prosecutor and trial counsel convened outside the courtroom and appellant's presence to discussed how to circumvented appellant's constitutional rights to confront Dr. Veress and relieved the People of their burden of proving a factual material element of the charged crime. (Trial tr. @ 330-335). The prosecutor offered no evidentiary foundation for the admission of the Death Certificate. Faced with hearsay evidence of that type, appellant had no means of challenging the People's proof on a critical element without the opportunity to cross-examine Dr. Veress and/or a foundation witness. That is exactly the evil that the Confrontation Clause was designed to prevented. **Crawford v. Washington**, 541 US 36 (2004).

In **People v. Freycinet**, 11 NY3d 38, 42 (2008), this Court affirmed a defendant's conviction finding no confrontation violation because Doctor Lacy's autopsy report was redacted to eliminated any prejudicial opinion bearing upon the element of the charged crime. See also, **People v. John**, 27 NY3d 294, 325 n. 5 (2016); **People v. Nisonoff**, 293 NY 597, 600 (1944)("the opinion contained in the autopsy report was not offered."). Here, in contrast, Dr. Veress' testimonial hearsay opinionated statements, left unredacted, was the linchpin of providing an essential material element of the charged crime.

Decisional case laws has held that defense counsel "may waive his client's Sixth Amendment right to confrontation by stipulating to the admission of evidence, so long as the defendant does not dissent from his attorney's decision, and so long as it can be said that the attorney's decision was legitimate trial tactic." **United States v. Plitman**, 194 F3d 59, 63-64 (2d Cir. 1999). Here, there were no strategy inherent with trial counsel's relinquishment of his objection, except under the circumstances, his concession to a material element of the offense, was tantamount to a guilty plea without appellant's permission under the principles set forth in **Brookhart v. Janis**, 384 US 1 (1966).

Furthermore, when a defendant (as in this case), expressly asserted the objective of an affirmative alibi defense, to maintained his innocence, his lawyer must abide by that objective and may not override it by interjecting into the proceeding an inconsistent defense and admitting an element of the offense. See, **McCoy v. Louisiana** 138 S.Ct. @ 1508-09. The Supreme Court has enunciated that because a client's autonomy, not counsel's competence, is in issue, neither the **Strickland** standard, not **United States v. Cronic**, 466 US 648 (1984), apply. Id., 138 S.Ct.

-14-

@ 1510-11. The full text of appellant's arguments are fully set forth in the coram nobis application @ pages 44-48, and addendum in support @ pages 1-6.

### F. Trial Counsel's Failure To Investigate the People's Secondary Audio Tape Recording And Objected To Its Reliability And Admissibility Was Objectively Deficient And Prejudicial Performance

The People has never been held accountable for their pervasive and will destruction of material evidence despite the prosecutor's complicity. On June 14, 2001, within forty-eight hours of the alleged crime, Police Telecommunication Technician, Officer Jackson wilfully destroyed all the original 911 master tape recordings because of its exculpatory value that Aisha White informed 911 operator 2249, that, "a male shot a female two times in the head and fled in a black Lexus." (See, Certified "FDNY" CAD reports). Officer Jackson than manufactured a secondary audio tape recording and to strengthened the People's case against the appellant, she edited the recording with her testimonial opinion statements and made substantial changes the components of the recordings which did not corresponded with either the NYPD Sprint reports or the FDNY Computerized Aid Dispatch reports.

There are no provisions within the New York Jurisprudence which allows an officer to alter the materiality of a original recordings by editing its contents for uses at trial. Actually, in People v. Cortez, 149 Misc.2d 866 (NY Civil Ct. 1990), the court enunciated; "IF a storage medium contains "Rosario' materials, the materials must be accurately copied, 'without editing,' in the same medium." Id.

During void dire when the prosecutor's disclosed the edited secondary audio tape recording and requested that the court allowed her to play it to the jury in her opining statements. (See, void dire @ 4-5, 45-47, 78; trial tr. 13). Trial counsel did not requested an adjournment to conduct essential investigation to ascertain the accuracy of the edited secondary evidence, nor make crucial objections to the prosecutor's Brady/Rosario violations, demanded full disclosure of the transcription of the edited secondary evidence pursuant to CPLR § 3101(i), requested sanctions for the spoliation of the original 911 master tape recordings pursuant to CPLR § 3126, and/or challenge the reliability and admissibility of the edited secondary audio tape recording pursuant to CPLR § 4539.

Due to trial counsel's ineptitude, appellant's defense was compromised and severely prejudiced because the prosecutor was allowed to skirted the evidentiary foundation requirements for the admission of the edited secondary audio tape recording¦ See, Schozer v. William Penn Life Ins., 84 NY2d 639, 644 (1994)("The more important the evidence to the resolution of the ultimate issue in the case, 'the sticker becomes the requirement of the evidentiary foundation establishing the loss/destruction was not

-15-

done in bad faith for the admission of the secondary evidence.").
Id.

There are no strategy, sound or otherwise, which would forego challenging the reliability and admissibility of the People's highly prejudicial edited secondary audio tape recording. A strategy that contradicts the records cannot justify a lawyer's failure to investigate. Schulz v. Marshall, 528 F.Supp.2d 77, 95 (E.D.N.Y. 2007)(original citations and quotations omitted). The full text of appellant's argument within the application for a writ of error coram nobis can be found @ pages 49-51.

### G. Trial Counsel's Failure To Objected To The Trial Court's Coercive And Unbalanced Supplemental Jury's Instruction Was Objectively Deficient And Prejudicial Performance

A criminal defendant has a constitutional right to an uncoerced unanimous jury verdict representing each jurors's honest belief that the People have, or have not, carried their burden of proving the defendant guilty beyond a reasonable doubt‖ See, USCA Art‖ 111, § 2; NY Const., Art. 1, § 2; Wong v. Smith, 562 US 1021 (2010); Lowenfield v. Phelps, 484 US 231 (1988). Accordingly, "[t]rial courts are entrusted 'to give adequate and balanced instructions to jury in a criminal case.'" People v. Bell, 38 NY2d 116, 120 (1975)(quoting People v. Johnson, 6 AD2d 181, 183 [1st. Dept. 1953]).

At the end of the first day of deliberation, the jury submitted a note which stated; (1) "What happens if we do not decide today?" (2) "What happens if all 12 of us cannot come to the same decision?" (See, trial tr. @ 447-450; Court's exhibit 5). Trial counsel's acceded with the trial court and prosecutor to give the jury a coercive and unbalanced supplemental jury instruction which stated; "I've told you, your verdict, whether its guilty or not guilty, must be unanimous, that each and every juror must agree to it." (See, trial tr. @ 449).

A supplemental jury instruction that stresses the need for a verdict at the expense of individual juror's judgment mandates reversal. People v. Aponte, 306 AD3d 42, 45 (1st‖ Dept‖ 2003), aff'd‖, 2 NY3d 304 (2004); see also, Jenkins v. United States, 380 US 445 (1965)("court's instruction to jurors who had declared inability to agree on a verdict that they 'have got to reach a decision in this case' was coercive."). Furthermore, the trial court's supplemental instruction did not included any encouraging language to balanced its instruction that it was the jurors' duty to decide the case if they [can] conscientiously do so without surrendering their honest convictions for the mere purpose of returning a verdict.

The possibility of disagreement by the jury and the lack

-16-

of unanimous verdict is a protection conferred upon a defendant in a criminal case. Indeed, there is no absolute necessity for a jury to reach a verdict in any trial, and the jury has no duty to do so. See, **People v. Robinson**, 84 AD2d 732, 733 (1st. Dept. 1981). For a trial judge to tell a jury that a case must be decided is therefore, not only coercive in nature, but misleading in facts. It precludes the right of the defendant to rely on the possibility of a disagreement by the jury. It was enunciated in **Kearl v. State of Montana**, 213 US 135, 138 (1909), that both the Fifth and Fourteenth Amendments invest courts of justice with the authority to discharge a jury from giving any verdict whatsoever‖ In the Court's opinion, there is, after due time for deliberation, "a reasonable probability that the jury could not agree." **Id.**

There are no legitimate strategic explanation that could possibly justify trial counsel's inexcusable deficient and prejudicial conduct of failing to objected to the trial court's unduly coercive and unbalanced supplemental jury instructive. See, e.g., **Cox v. Donnelly**, 432 F3d 388 (2d Cir. 2005); **People v. Morales**, 108 Ad3d 174 (2d Dept. 2013)("no objectively reasonable and legitimate trial strategy for defense counsel's failure to object ..., to court's erroneous instruction."). The full text of appellant's argument within the coram nobis application can be found @ pages 51-54.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

3. **THE PROSECUTOR'S KNOWINGLY PRESENTED FALSE TESTIMONY FROM RYAN AARONS**

On June 13, 2001, Ryan Aarons made statements that were materially different from his trial testimony. Appellant's submitted Ryan's prior inconsistent statements (which dehors the records) to the 440 motion court to substantiated that the People's knowingly presented false testimony at trial (CPL § 440.10-[b],[c],[f],[d]), and that trial counsel's failure to impeach Ryan Aarons with his prior inconsistent statements, constituted ineffective assistance of counsel (CPL § 440.10[h]). The People did not refuted appellant's contentions and appellant was entitled to a evidentiary hearing pursuant to CPL § 440.30(5). However, the motion court summarily denied the post-conviction motion by implication of CPL § 440.10(2)(b). The motion court's ruling contravened the law enunciated by **People v. Maxwell**, 89 AD3d 1108, 1109-10 (2d Dept. 2011)("Those branches of the defendant's motion which alleged that the People ...., knowingly presented perjured testimony at trial were based on matters that did not appear on the record and, therefore, were not procedurally barred under CPL § 440.10[2][b]").

Deliberate deception of the court and jurors by the presentation of known false evidence is incompatible with the rudimentary demands of justice. **United States v. Agurs**, 427 US 97, 103 (1976)("The Supreme Court has consistently held that a

conviction obtained by the knowing uses of false testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."). Id. The full text of appellant's argument are more fully set forth in the coram nobis application @ pages 55-59.

**********************************

**4. Appellate Counsel's Failed To Raise An Obviously Strong, Meritorious Issue That The Motion Court Abused Its Discretion When It Summarily Denied Appellant's CPL § 440.10 Mixed-Claim Motion Without A Hearing, Which Contended That The People's Perpetrated A Fraud Upon The Court To Obtained The Judgment, And Appellate Counsel's Omission Was Not Strategic**

On June 14, 2001, within forty-eight hours of the alleged crime, Police Telecommunication Technician, Officer Jackson, wilfully destroyed all of the original 911 master tape recordings because of the exculpatory value that Aisha White informed 911 operator 2249; "A male shot a female two times in the head, and fled in a black Lexus." Subsequently, Officer Jackson's manufactured a secondary audio tape recording which she edited with her opinion statements and make substantial changes to components of the original 911 recordings which did not correlated with the "FDNY" Computerized Aid Dispatch reports or the "NYPD" Sprint reports.

Appellant submitted a certified "FDNY" Computerized Aid Dispatch report (which dehors the record) to the motion court to substantiated his contentions that the People's knowingly used false evidence at trial to obtained the judgment. The People did not refuted appellant's contentions and appellant was entitled to an evidentiary hearing to expand the record and develop the factual basis of his contentions pursuant to CPL § 440.30(5). However, the motion court summarily denied appellant's mixed-claim petition without a hearing by implication of CPL § 440.10(2)(b).

Fraud upon the court involves wilful conduct that is deceitful and obstructionistic, which injects misrepresentations and false information into the judicial process "so serious that it undermines ||.., the integrity of the proceeding. See, Baba-Ali v. State of New York, 19 NY3d 627, 634 (2012); see also, Hazel-Atlas Glass Co., v. Hartford Empire Co., 322 US 238 (1944)("every element of fraud ..., demands the exercise of the historic power of equity to set aside fraudulently begotten judgment."). The full text of appellant's argument are more fully set forth in the coram nobis application @ pages 59-63.

**********************************

### The Appellate Division Erred When It Summarily
### Denied Appellant's Requests For Substitution Of Appellate Counsel
### Predicated Upon Specific Complaints Demonstrating Good Cause

The factual allegation that the Appellate Division's erred when it summarily denied appellant's requests for substitution of appellate counsel, are fully set forth in the coram nobis application @ pages 15-19.

Finally, It undisputed that appellate counsel's labored under a conflict to protected her own self-interest while undermining the appellant's 440 appeal. Its also undisputed that appellate counsel did not review the September 9, 2009, pretrial transcripts until two years after filing appellant's 440 appeal brief. The Appellate Division made no attempt to explain how appellate counsel could have made a reasonable strategic decision on which issues would have been most successful to advanced on appeal without reviewing the pertinent pretrial transcripts and while laboring under a conflict-of-interest.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

WHEREFORE, for all the reasons stated herein, Appellant respectfully request a Certificate of appealability on all claims raised before the Appellate Division, including all state and federal constitutional claims. If this Court require addition information and/or transcripts, I will be willing to supply them.

Respectfully submitted,

Wayne Chin
Din: 09-A-6287
Defendant-Appellant; Pro se
Attica Corr. Fac.
639 Exchange Street
Attica, New York 14011-0149

TO SERVICE:

Eric Gonzalez, Esq.
Kings County District Attorney
Appeals Unit
350 Jay Street
Brooklyn, New York 11201

## AFFIDAVIT OF SERVICE

STATE  OF NEW YORK )
                    ) SS.:
COUNTY OF WYOMING   )

I, WAYNE CHIN, being duly sworn, deposes and says that I am the Defendant-Appellant in the instant application seeking a Certificate of appealability, and on the 14th., day of March 2019, have cause to serve a true and accurate copy of said application for leave to appeal to the New York State Court of Appeals, and upon the below listed party:

<div style="text-align:center">

Eric Gonzalez, Esq.
Kings County District Attorney
Criminal Appeals Unit
350 Jay Street
Brooklyn, New York 11201

</div>

By placing the same in a sealed prepaid envelop and delivering the same to officials at Attica Correctional Facility with the exclusive authority to mail the same by First-Class Mail via the United States Postal Service as due and sufficient service.

Wayne Chin
Din: 09-A-6287
Defendant-Appellant: Pro-se
Attica Corr. Fac.
639 Exchange Street
Attica, New York 14011-0149

Sworn before me on this

14 , day of March 2019

NOTARY PUBLIC

BRIAN HEMBROOK
NOTARY PUBLIC-STATE OF NEW YORK
No. 01HE6342568
Qualified In Erie County
My Commission Expires 05-31-2020

Wayne Chin
Din: 09-A-6287
Attica Correctional Facility
639 Exchange Street
Attica, New York 14011-0149

April 16, 2019

Hon. Jenny Rivera
Judge of the Court of Appeals
Court of Appeals Hall
20 Eagle Street
Albany, New York 12207-1095

Re: **People v. Wayne Chin**
App. Div. Dkt. No, 2013-04432

**(Addendum To Appellant's Leave Application)**

Your Honor,

This addendum is respectfully submitted in support of my application seeking a certificate of appealability. Its intended purpose is to broaden the areas of consideration that appellate counsel labored under a conflict of interest and that the motion court's violated my Sixth Amendment right to make my own choices about the proper way to protect my own liberty by allowing trial to usurped control of an issue that was within my exclusive prerogative.

First, for the Court convenience its best to recount the factual predicate underlying my complaints for substitution of trial counsel. By application May 21, 2009, I contended there a lack of communication from trial counsel, phone calls and letters sent to counsel's office were never responded to ---even appointments made to discuss the investigation and developments of the case were never fulfilled. Id.

My motion dated August 22, 2009, for substitution of trial counsel contended, inter alia, counsel has failed to pursue suppression of evidence--- he has misled me about visiting me in an environment where its convenient for us to discuss important issues ..., he has denied me access to copies of legal documents and audio tapes disclosed by the people so I cannot intelligently assess the People's allegations---, he has not discuss what his defense strategy would be. Id.

Even under the liberal standard of America Bar Association, (**Criminal Justice Standard 4-3.8[a], 4-3[a] & [b]**); and applicable law of **Strickland v. Washington**, 466 US 668, 688 (1984)("**From counsel's function as assistance to the defendant derives the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and keep the defendant informed of important**

**developments in the course of the prosecution.") Id.** My complaints established substantial good reasons for substitution of trial counsel. The People did not opposed my motions and the motion court's summary denial of my motions without a hearing was an abused of discretion and an error of law.

On August 26, 2009, twenty days prior to trial, counsel visited me for the first and only time on Rikers Island to discuss the development of the case. (See, Investigator Brown's letter annexed herewith). In **Hurrell-Harring**, this Court characterized a claim that counsel was routinely unavailable to clients as a **complete** denial of counsel--- where prejudice is presumed--- and not simply a claim of ineffectiveness. See, **Hurrell-Harring v. State**, 15 NY3d 8, 19 (2010)(finding plaintiffs alleged facts sufficient to state a civil claim for denial of right to counsel where lawyers met with clients "little, if at all, were often completely unresponsive to their urgent inquires and requests from jail, sometimes for months on end, waived important rights without consulting them ...)

Second, the Sixth Amendment, in granting me the exclusive right to make my own defense, "speak of the 'assistance' of counsel, and an assistance, however expert, is still an assistance.'" **Farretta v. California**, 422 US 806, 819-20 (1975); **Gannett Co. v. DePasquate**, 443 US 368, 382 n. 10 (1979)(The Sixth Amendment "contemplates a norm in which the accused, and not a lawyer, is master of his own defense).

The motion court's abused of discretion was not cured and only exacerbated on September 9, 2009, when an actual conflict in the representation became even more apparent on the record. There, I made it known to the court and prosecutors that trial counsel had defied my instructions to file a notice to advance an affirmative defense. When the court's rejected my contentions and allowed trial counsel to usurped control of an issue within my exclusive prerogative. The violation of my constitutional rights to decide the objectives of my own defense was completed. See, e.g., **U.S. Const. Amend., VI; XIV; ABA Model Rule of Professional Conduct 1.2(a)(2016)**(A "lawyer shall abide by a client's decision concerning the objectives of the representation."). In **McCoy v. Louisiana**, 138 S.Ct. 1500, 1508 (2018), the Court affirmed the defendant's autonomy to determine the "objectives" of a defense, a right the Supreme Court recognized in **Farretta**, 422 US @ 806. A represented defendant surrenders control over tactical decisions at trial while retaining the right to be "master" of his own defense. See, **Farretta**, 422 US @ 820; **Illinois v. Allen**, 397 US 337, 350-51 (1970)("The right to defend is personal," and a defendant's choice in exercising that right "must be honored out of 'that respect for the individual which is the lifeblood of the law.'").

-2-

Third, the 440 motion court's concluded; "..., counsel had little basis to pursue an alibi defense because he was faced with two strong eyewitnesses' account of the shooting that unequivocally identified defendant as the shooter." (Id., **People v. Chin**, 2013 WL 990955). The **McCoy's** Court explained; "**A lawyer is not placed in a professional embarrassing position when he is reluctantly required ... to go to trial in a weak case, since that decision is clearly attributed to his client**") **Id., McCoy**, 138 S.Ct. @ 1510. Therefore, trial counsel's strategy was not in issue, the relevance was counsel's defiance to my explicit instructions to advanced an affirmative alibi defense, such is the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty. **Weaver**, 582 US ___, 137 S.Ct. @ 1908 (citing **Faretta**, 422 US @ 834); **People v. DeGina**, 72 NY2d 768, 776 (1988); **People v. Clark**, 129 AD3d 1, 11-13 (2d Dept. 2015).

Fourth, the present case is a prime example of circumstances well outside the realm of the ordinary, appellate counsel was placed on notice that the record on appeal was incomplete and inexcusably failed to conduct any investigation and settlement of the record. Exposing counsel's ineptitude, created a conflict for her to protect her own interest. The facts and undisputed evidence (appellate counsel's letters and affirmation), I submitted to the appellate court should have been decisive of the issue presented that appellate counsel operated under an actual conflict-of-interest. Cf. **United States v. Ellison**, 798 F2d 1102, 1106-08 (7th. Cir. 1986)(actual conflict between lawyer and client when pursuit of client's interest would lead to evidence of attorney's malpractice); **Mathis v. Hood**, 937 F2d 790, 793-95 (2d Cir. 1991)(original citations and quotations omitted). The Appellate Division's decision (169 AD3d 916) denying my coram nobis application was an abused of discretion.

**WHEREFORE**; for all the reasons set forth herein, as well as those issues set forth in the original application seeking a certificate of appealability, I respectfully request that the Court grant a certificate allowing leave to appeal. I have enclosed appellate attorney, Paul Skip Laisure's affirmations in opposition to my coram nobis application.

Respectfully submitted,

_____
Wayne Chin
Din: 09-A-628
Defendant-Appellant

TO SERVICE:

Eric Gonzalez, Esq.
Kings County District Attorney
350 Jay Street
Brooklyn, New York 11201

-3-

EXHIBIT D-1

# APPELLATE ADVOCATES

2 RECTOR STREET - 10TH FLOOR, NEW YORK, NEW YORK 10006
PHONE: (212) 693-0085    FAX: (212) 693-0878

*Attorney-in-Charge*
LYNN W. L. FAHEY

*Assistant Attorney-in-Charge*
BARRY S. STENDIG

*Supervising Attorneys*
WINSTON MCINTOSH
DAVID P. GREENBERG
ERICA HORWITZ
PAUL SKIP LAISURE

ALEXIS A. ASCHER
STEVEN R. BERNHARD
DENISE A. CORSÍ
JONATHAN GARVIN
JOHN GEMMILL
BENJAMIN GOLD
KENDRA L. HUTCHINSON
BERTRAND J. KAHN
WILLIAM G. KASTIN
JULIE A. KLEEMAN
JONATHAN M. KRATTER
WARREN S. LANDAU
JOSHUA M. LEVINE
LISA NAPOLI
ANNA PERVUKHIN
TONYA PLANK
DENICE POWELL
KATHERINE R. SCHAEFER

*Of Counsel*
MELISSA S. HORLICK
REYNA E. MARDER
MICHELLE MOGAL

August 31, 2011

PRIVATE AND CONFIDENTIAL

Mr. Wayne Chin
No.: 09-A-6287
Green Haven Correctional Facility
P.O. Box 4000
Stromville, N.Y. 12582

Dear Mr. Chin:

Thank you for your letter dated August 24, 2011. To answer your questions, I have received all the exhibits I requested from Mr. Ho, including People's Exh. 8, an audio-cassette tape. Our office does not have the equipment to copy audio-cassettes, so I cannot send you a copy. However, it is my usual practice to have someone in the office transcribe all audio recordings, and I have already put in a request. Once I have received and reviewed the transcript of the 911 call, I will be sure to send it to you.

Also, you note that there is no search warrant application in your file. It does not appear that any of the evidence presented at trial was recovered pursuant to a warrant. So it makes sense that there would be no application in the file.

Please rest assured that once I begin work on your case, I will go over your file <u>extremely carefully</u> to make sure nothing is missing. If something *is* missing, I will track it down as quickly as possible. Please feel free to write again if you have any other questions or concerns.

Very truly yours,

Anna Pervukhin
Appellate Counsel

Exhibit   D-2

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:   SECOND DEPARTMENT

------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,        :    Return Date: 8/23/13

                              Respondent,   :    Affirmation

                                            :    Kings Co.
            -against-                       :    Ind. 1018/03

WAYNE CHIN,                                 :    Case. No. 09-10764

                  Defendant-Appellant.      :

------------------------------------------x

        ANNA PERVUKHIN, an attorney admitted to practice in the courts

of this State, affirms under penalty of perjury that the following

statements are true, except those made on information and belief,

which he believes to be true:

        1.   I am associated with Lynn W. L. Fahey, Appellate

Advocates, who was assigned to represent appellant on his appeal

from a judgment convicting him, after trial, of second-degree

murder and sentencing him to 25 years to life.

        2.   I filed a brief on appellant's behalf on October 3, 2012.

        3.   In an earlier affidavit, I supported appellant's motion to

file a pro se supplemental brief.   That motion was granted.

        4.   I support his recent request for minutes of the September

2, 2009, and September 9, 2009, proceedings, if they exist.   I also

support his request for a copy of the 911 tape (People's Exhibit

8).   Because our office was provided with an audio cassette tape

rather than a CD, we were unable to make a copy for the defendant as our office does not have the necessary equipment.   We would therefore respectfully request the court to direct the People to provide defendant with his own copy of People's Exhibit 8, which is necessary for him to complete his supplemental brief.

5.   I do not take a position on Mr. Chin's request for a resettlement of the sentencing minutes.

Dated:   New York, NY
         August 19, 2013

                                    _____
                                    ANNA PERVUKHIN

TO:   Wayne Chin 09-A-6287
      Green Haven Correctional Facility
      PO Box 4000
      Stormville, NY 12582

      District Attorney
      Kings Country
      350 Jay Street
      Brooklyn, NY 11201
      attn: Lori Glachman

ExHiBit  D - 3

# APPELLATE ADVOCATES

## 111 JOHN STREET ~ 9TH FLOOR, NEW YORK, NEW YORK 10038
### PHONE: (212) 693-0085     FAX: (212) 693-0878

ATTORNEY-IN-CHARGE
LYNN W. L. FAHEY

ASSISTANT ATTORNEY-IN-CHARGE
PAUL SKIP LAISURE

SUPERVISING ATTORNEYS
DAVID P. GREENBERG
ERICA HORWITZ
LISA NAPOLI
WILLIAM G. KASTIN
KENDRA L. HUTCHINSON
LEILA HULL
A. ALEXANDER DONN
PATRICIA PAZNER

DIRECTOR OF INNOCENCE INVESTIGATIONS
DE NICE POWELL

DIRECTOR OF FEDERAL LITIGATION
MARK W. VORKINK

SENIOR STAFF ATTORNEYS
ALEXIS A. ASCHER
STEVEN R. BERNHARD
DENISE A. CORSI
JOSHUA M. LEVINE

SENIOR COUNSEL
MELISSA S. HORLICK

STAFF ATTORNEYS
MICHAEL ARTHUS
SAMUEL E. BROWN
GOLNAZ FAKHIMI
REBECCA J. GANNON
CAITLIN HALPERN
MEREDITH S. HOLT
LAUREN E. JONES
ANNA KOU
BRYAN KREYKES
TAMMY E. LINN
BENJAMIN S. LITMAN
SEAN H. MURRAY
ANDERS NELSON
ANNA PERVUKHIN
YVONNE SHIVERS
ANGAD SINGH
LAURA B. TATELMAN
NAO TERAI
ERIN TOMLINSON
KATHLEEN E. WHOOLEY
JENIN YOUNES
RONALD ZAPATA
HANNAH ZHAO
DINA ZLOCZOWER

OF COUNSEL
ALAN CHEVAT

January 13, 2017

Mr. Wayne Chin
No.: 09-A-6287
Green Haven Correctional Facility
594 Rt. 216
Stormville, New York 12582-0010

Dear Mr. Chin

    I am writing for several reasons.

    First, I am writing to inform you that both of your cases (the direct appeal and the 440) have been scheduled for oral argument for Friday, January 23, 2017. The argument will take place at 10:00 a.m. at the Courthouse of the Appellate Division, Second Department, which is located in downtown Brooklyn:

<div align="center">

45 Monroe Place
Brooklyn, New York 11201
(718) 875-1300

</div>

    I know how carefully you research everything, so I thought I would also let you know that your four judges are Chambers, Roman, LaSalle and Barros.

Second, I wanted to let you know that I received a telephone message from you. Unfortunately, I cannot send you the audio recording you requested as I have already mailed you a recording of the 911 call. Please let me know if you would like to speak over the phone to discuss this (or any other topic) and perhaps I can arrange a conversation with you through one of the counselor's at Green Haven.

I received two letters dated December 16, 2016 and December 18, 2016, in which you alert me to the recent decision in Garner v. Lee. Thank you for doing that. Please rest assured that as I prepare for the oral argument, I will review the case law we cited to see if there have been any other favorable rulings handed down since we filed our briefs. On January 9, 2017, you sent me a transcript dated September 9, 2009. I have read it with interest and if I think it is helpful for answering a question, I will not hesitate to bring it up.

You have also asked a number of follow-up questions regarding my oral argument strategy. As I previously explained, an oral argument is not a presentation. It is a dynamic process. The judges ask questions and steer the conversation in the direction they want it to go. I really cannot predict what will happen.

Please feel free to write to me with any questions, ideas or concerns.

Very truly yours,

Anna Pervukhin
Appellate Counsel

2

Exhibit E

EXHIBIT E-1









Ex Hibit  E-2





ExHibiT  E-3





