UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------- -----x
WAYNE CHIN,

                Petitioner,

      -against-

JOSEPH NOETH,

              Respondent.
-------------------- --------x



MOTION FOR RELEASE ON BAIL
PENDING RESOLUTION OF 28 U.S.C
§ 2254 PETITION

19-CV-02729 (RRM)
ECF Case

      Wayne Chin's criminal conviction and sentence is invalid because a violation of a defendant's autonomy is complete whenever counsel [or the court] usurps control of an issue within defendant's sole prerogative.

      Petitioner's odyssey began in 2009 with a state court's sentence of twenty-five years to life. The State's prosecutor contended that on June 12, 2001, the petitioner called Renee Aarons on her cell phone and lured her to 95 Linden Boulevard, Brooklyn, New York, with the intent to kill her for fifty thousand dollars. At approximately 10:30 that evening, Ms. Aarons was talking on her cell phone, while seated in a dark green Lexus vehicle, parked in front of 95 Linden Boulevard (80, 156) when she was shot several times by an assailant who fled the scene.

      Twelve people within the confines of the crime scene, as well as the victim's brother who was in Manhattan, called 911 to report the crime. Petitioner was charged with Aarons' murder and subsequently tried and convicted in the Supreme Court of the State of New York, Kings County, on September 30, 2009.

Three members of Aarons' family testified at trial; her mother, Chinwe Ifeoma, her sons, Ryan Aarons and Rashawn Aarons, and Aisha White, who falsely claimed to be Aarons' niece.   Both Rashawn and Ms. White testified that they saw the petitioner shoot Aarons. No fingerprints or DNA linked the petitioner to the crime.

## PRELIMINARY STATEMENT

As relevant to the instant bail application, on March 10, 2008, Petitioner represented by court's appointed attorney, Harold Baker, Esq., was arraigned upon the charges of second degree murder and weaponns possession in the Supreme Court, Kings County, New York (D'Emic, J.).   On October 7, 2008, the petitioner sought substitution of counsel predicated on a conflict of interest and the court's appointed Alan Stutman, Esq., as defense counsel.

On December 23, 2008, the petitioner presented cause, questioning the constitutionality of Alan Stutman assignment because the victim's mother had paid him for services rendered to the petitioner in a prior criminal case.   On January 16, 2009, the court's granted substitution of counsel and appointed Phillip Smallman, Esq., as defense counsel.

Several weeks after his appointment, Smallman's private investigator interviewed the petitioner at the court. Approximately, twenty minutes into the interview, the investigator informed the petitiopner that he was a former member of the United States Marshal, who had worked with the Kings County District Attorney's apprehension squad, to located the petitioner. Consequently, Smallman hired investigator, John Brown, who had previously worked on the case for Attorney Baker.

-2-

Smallman did not visit and consulted with the petitioner (See, exhibit A), or file any pretrial motion on his behalf. By letter dated May 21, 2009, Petitioner sought substitution of counsel predicated on a conflict of interest.

Petitioner's motion dated August 22, 2009, made clear that there was a complete breakdown in communication. Specifically, the petitioner asserted that Smallman never review with him any discovery materials, or discuss any details of what the State's trial evidence consist of and what the defense strategy would be The court's summarily denied the motion without a hearing on September 2, 2009.

On August 26, 2009, twenty days before trial, Smallman visited petitioner for the first and only time at Rikers Island to discussed the relevant investigation of the case (See, exhibit A). At a conference call on September 9, 2009, the petitioner's renewed his request for substitution of counsel on the basis that Smallman was sabotaging the objective of petitioner's selected affirmative alibi defense. (See, exhibit B @ pages 2-9).[1]

During the Rosario/Molineax hearing on September 14, 2009, Smallman's informed the court (Konviser, J.), that the petitioner instructed him to advanced an affirmative alibi defense.

Respondent's averment that during the proceeding, "defense

---

1. Restatement (Third) of the Law Governing Lawyers § 21 cmt.d (Am. Law Inst, 2000), makes clear that "a lawyer may not continue a representation while refusing to follow a client's continuing instruction." Instead, the lawyer may only advise the client on the advantages of his decision and seek to dissuade the client from adhering to it, if the client, nonetheless, maintains his position, the choices before the lawyer are to follow the client's instruction or voluntarily withdraw from the representation. [*19] id.

-3-

counsel [Smallman] informed the court that defendant was considering a possible alibi defense." (See, exhibit C, People's Opp. 330.30 Memorandum of Law, @ page 5), is undeniable clear. Therefore, the trial court was fully aware of the petitioner's insistence on the objectives of his own defense.

At trial, Smallman advanced a defense strategy that the police investigation was not thorough over the petitioner's instructions to advance an affirmative alibi defense while conceding a material element of the offense without authorization (330-35),[2] and petitioner's guilt by requesting a manslaughter charge over petitioner's instant objections (361-63).[3] Thus, undermining the petitioner's assertion of innocence by interjecting into the case, a factually and logically inconsistent defense, impermissibly compromising the personal rights of the accused.

In rejecting petitioner's C.P.L. § 330.30 contention, the trial court (Konviser, J.), ruled; "The defendant's ineffective assistance of counsel claim largely concerns matters that de-hors the record as they involve challenges to defense counsel's strategic decisions ..." Id. (See, exhibit D, @ page 17).

The C.P.L. § 440.10 motion court (Simpson, J.), likewise went to great length, purporting the merits of the petitioner's

---

2. Unprefixed numbers refers to the minutes of the trial.

3. A defendant is not required to abandon his entitled to make these basic choices regarding the protection of his life and liberty as a condition of exercising his right to the assistance of counsel. Counsel is a "defense tool [] guaranteed by the [Sixth] Amendment," to be "an aid to a willing defendant -- not an organ of the State interposed between an unwilling defendant and his right to defend himself personal." Faretta, 422 U.S. @ 820.

contention with the following:

> "The defendant has failed to alleged any facts that would
> have warranted further examination of the defendant's cell
> phone records. Defendant contends that counsel could have
> substantiated an alibi through the phone global positioning
> system (GPS) that he was not at the scene of the crime. On
> June 13, 2001, Detective Guinane applied for and was granted
> a pen register and trap and trace device on the phone that
> defendant had used to call Renee [Aarons]. The police
> intended to use the pen register and trap and trace device
> in order to locate and apprehend defendant, who had since
> fled. To the extend that defendant is claiming that counsel
> should have obtain those records from the police, they
> would have been generated after the shooting. In Addition,
> counsel had little basis to pursue an alibi defense because
> he was faced with two strong eyewitnesses' account of the
> shooting that unequivocally identified defendant as the
> shooter."

(See, exhibit E , @ page 7)

The Supreme Court, Appellate Division, Second Department,

affirmed the petitioner's conviction, See, **People v. Chin**, 148

A.D.3d 926 (2d Dept. 2017), and the Court of Appeals denied leave

to appeal. See, **People v. Chin**, 29 N.Y.3d 1124 (2017). Consequently,

Petitioner unable to articulate his claim by himself, was not able

to prevail.

## ARGUMENT

Federal courts has the inherent power to admit applicants

to bail pending the decision of their cases, but a power to be

exercised sparingly. **Cherek v. United States**, 767 F.2d 335, 337

(7th. Cir. 1985)(collecting cases); **Mapp v. Reno**, 241 F.3d 221,

226 (2d Cir. 2001)(original citations and quotations omitted).

This power is "necessary to make the habeas remedy effective,"

**Mapp**, 241 F.3d @ 226, Consistent with a statutory mandate to decide

habeas petition "as law and justice requires." 28 U.S.C. § 2243.

"[Habeas] corpus is, at its core, an equitable remedy," **Schlup v.**

**v. Delo**, 513 U.S. 298 (1995), and is to "be administered with ... initiative and flexibility." **Harris v. Nelson**, 394 U.S. 286 (1969). "[Habeas] corpus is not a static, narrow, formalistic remedy, but one which must retain the ability to cut through barriers of form and procedural maze." **Brown v. Vasquez**, 952 F.2d 1164, 1166 (9th. Cir. 1992)(quoting **Hensley v. Municipal Court**, 411 U.S. 345, 349-50 [1973]). In sum, this Court may and should grant bail when a habeas petitioner is likely to prevail and further imprisonment causes irremediable harm.

## FACTORS IN DETERMINING BAIL

"[R]elease should be granted to an offender pending collateral review ... When the petitioner has raised substantial constitutional claims upon which he has a high probability of success, and also when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective." **United States v. Vogel**, 595 Fed. Appx. 416, 416-17 (5th. Cir. 2015)(Per Curiam)(Citations and quotations marks omitted); **Grune v. Coughlin**, 913 F.2d 41, 44 (2d Cir. 1990).

Petitioner, Wayne Chin, has a high probability of success on his current habeas corpus claims because the "State court's violated the petitioner's Sixth Amendemnt secured autonomy to make his own choices about the proper way to protect his liberty, by allowing defense counsel [Smallman] to usurped control of an issue that was within the petitioner's exclusive prorogative. **McCoy v. Louisiana**, 138 S.Ct. 1500 (2018); **Weaver v. Massachusetts**, 137 U.S. 1899, 1908 (2017)("The fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty."); **People v. DeGina**, 72 N.Y. 2d 768, 776

-6-

(1988); **People v. Morton**, 173 AD3d 1081, 1085 (3d Dept. 1991)(counsel had no authority to pursue any defense other than the one authorized by defendant).

These traditions have carried forward to the present. It is the defendant, not his counsel, who selects his defense, and counsel is duty-bound to carry it through. What took place in this case at bar, should be viewed as a patent, sturctural violation of the law, such that reversal of the petitioner's conviction should be auto-matic.

A review of the practice in several countries are relevant to the issue at hand.  In England and Wales, barristers must not put forward any case inconsistent with their client's instructions. In **R. v. Clinton**, [1993] 1 W.L.R. 1181 (1993) 2 All R.R. 998 (Eng.), the Court of Appeals considered the question of departure from instruction;

> The court was rightly concerned to emphasize that where counsel had made decisions in good faith after proper consideration of the competing arguments, and, where appropriate, after due discussion with his client, such decisions could not possibly be said to render a subsequent verdict unsafe or unsatisfactory.

Id., @ 1187.

Conversely, the court held, where a decision was taken "either in defiance  of or without proper instructions," the situation is reversed. Then the conviction is unsafe. Id., 1187-88. For example, in **R. v. Irwin** [1987] 1 W.L.R. 902, (1987) 2 All E.R. 1085 (Eng.), two alibi witnesses [*11] had been presented to an initial, hung jury. At the second trial, counsel decided, without consulting with his client, not to present the alibi defense. This course of action was condemned by the reviewing court and the conviction was reversed.

-7-

Certain it is, whether that supposition is correct or not, that he made no communication of his intention to his client. If he had done so he would have been, in the view of the Court, fully entitled, no doubt explaining his reasons, to give his client the appellant very strong advice. The appellant might then have accepted that advice. He might have declined to accept it and insisted on the witnesses being called. Counsel might then have accepted his instructions and called the witnesses or he might have asked the learned recorder to discharge him from further service to his client. Yet a further possibility is that the appellant himself, dissatisfied with the advice, might have asked the recorder to adjourn the case to allow him other counsel even at that stage or to permit him to continue the case on his own. All those possibilities would have been dealt with if they had arisen, no doubt in an appropriate manner. None of them did arise for the simple reason that the appellant was not given any opportunity of protesting against his counsel's decision. In those circumstances it is immaterial whether the decision of counse was right or wrong.

In England and Wales, this legal rule is buttressed by counsel's ethical duties that confirm the client decides the objectives of the representation:

You are obliged ... to promote and to protect your client's interest so far as that is consistent with the law and with your overriding duty to the court... Your duty to the court does not prevent you from putting forward your client's case simply because you do not believe that the facts are as your client states them to be (or as you, on your client's behalf, state them to be), as long as any positive case you put forward accords with your instructions and you do not mislead the court. Your role when acting as an advocate or conducting litigation is to present your client's case, and it is not for you to decide whether your client's case is to be believe. [4]

Indeed, as a matter of English practice, it amounts to misleading the court for the barrister to put forward a case that is inconsistent with the client's instructions. [5]

---

4. Bar Standards Board, The Bar Standards Board Handbook C. The Conduct Rules, Cl. You and the Court at gC6 (3rd ed. April 2017) available @

-8-

In New Zealand, defense counsel is not entitled to disregard the instructions of the defendant with respect to the nature of the defense. In **R. v. Mcloughlin** [1985] 1 NZLR 106 (CA), the defendant instructed counsel to present an alibi defense to a rape charge. Counsel took the view that this defense was implausible, and instead presented a consent defense. The court held that counsel was not entitled to defy the instructions of a client. It held that a failure to follow instructions gives rise to a "miscarriage of justice." The court observed:

> It is basic in our law that an accused person receive a full and fair trial. That principle requires that the accused be afforded every proper opportunity to put his defense to the jury (cf. s 354 of the Crimes Act 1961). The present appellant has been deprived of that opportunity and justice has therefore been denied to him. Such a denial can be made good only by the ordering of a new trial.

(Id., @ 107).

The practice is the same in Scotland. It is for the accused to decide whether he wishes to plead guilty and defense counsel must follow the client's instructions regarding the defense. The courts there have confirmed that when an advocate advances a defense against the client's clear instructions the conviction must be reverse. See, **Anderson v. H.M. Advocate** [1996] J.C. 39 (Scot). A fair determination of guilt cannot occur when;

> the accused was deprived was deprived of the opportunity to present his defense, or because his counsel or solicitor acted contrary to his instructions as to the defense which he wishes to be put or because of other conduct which had the effect that, because his defence was not presented to the court, a fair trial was denied him. Id. @ 44

https://www. barstandards board.org.uk/media/1826458/bsb_ handbook_31_ march 2017.pdf (last visited Nov. 7, 2017).

5. Susan Blake, A Practical Approach to Effective Litigation, § 24.38 (8th ed. 2016).

The duty of the advocate to carry out the defense as instructed by the client is confirmed by the Faculty of Advocates' Code of Conduct, and strongly supports the petitioner, Chin; "An advocate is however obliged to follow instructions as to basic matters such as the line of defence in criminal cases. If he is unable to do so in a manner which allows him to fulfil his duties to the Court, he should withdraw from acting."[6]

In Canada, the accused has the autonomy to determine the fundamental objectives of the defense, as well as the decision of how to plead, and counsel is obligated to follow the client's instructions. In **R. v. Szostak** [2012] 111 O.R. 3d 241 (Can. Ont. C.A.), the defendant appealed his conviction arguing that trial counsel raised his fitness to stand trial without instructions. Although the court dismissed appellant's case for failure to prove that counsel defied his instructions, it asserted that "control over the defense is a necessary consequence of the values of dignity and autonomy that underlie our adversarial system." Id., @ 77.

In his commentary on South African Law, Etienne du Toit writes that:

> "Grave incompetence, resulting in a fatal irregularity, is present where a legal representative..., does not establish the defence of his client ..."[7]

Thus, South African Law goes even further; In **S. v. Mafu** and others 2008 (2) ALL SA 657 (W) (S.Afr.) at P15, for example,

---

6. Faculty of Advocates, Guide to the Professional Conduct of Advocates § 1.2.3, (Oct. 2008) http://www.advocates.org.uk/media/1417/guide-to-conduct-fifth-edition.pdf (last accessed Nov. 17, 2017).

7. Etienne du Toit, et al., Commentary on the Criminal Procedure Act PP 11-42E (1987)

-10-

counsel's failure to put an affirmative alibi defense was held to breach "the very rudimentary duties of counsel when defending an accused."

Indeed, the West Indian practice reflects a rule broader than the one claimed by Petitioner. In **Ebanks v. R.** [2006] UKPC 16, a Privy Council case that originated from the Cayman islands but referenced law from Trinidad and Tobago, the appellant alleged that counsel had "defied his instructions" by not challenging police evidence. Id., @ P31. Lord Rodger said that even if counsel deemed it tactically inadvisable, "counsel must carry out [his client's] instructions even though he was aware" of the adverse impact they might have on the case. Id., @ P28.

An authoritative treatise on Caribbean practice emphasizes "the necessity on the part of defense counsel to take written instructions and to act on those instructions. If counsel finds that he cannot do so, he must so indicate and seek leave to withdraw from the defense." See, Seetahal, Commonwealth Caribbean; Criminal Practice and Procedure 230.

Here, in contrast, the ABA's Criminal Justice Standards for the Defense Function similarly explain that defense counsel should ask what "the client's" objectives are at the outset of the representation, and determine "how to fulfill them," Standard 4-3.3(a); see, Standard 4-3.1(b). Since defense counsel [Smallman] overruled the petitioner's informed and final decision to the objectives of the defense (Ex. B, @ pg. 4-5, Ex. C, @ pg. 5), whence the need for such substantive consultation in the first place? At best, the duty to consult would be reduced to the

-11-

duty to notify. But see, **Strickland**, 466 U.S. at 688 (separately discussing the duties "to consult with the defendant on important decisions" and "to keep the defendant informed of important developments in the course of the prosecution")(emphases added).

Accordingly, the only alternative to ordering the release of the petitioner, would be to force him to endure yet more time in a maximum security penitentiary in service of a conviction that is constitutionally flawed.

### Other Exceptional Circumstances

Continued detention of the petitioner pending the resolution of the habeas corpus petition, could caused him substantial injury. Petitioner is in the senior age of sixty-five, who suffers from several severe medical conditions without the proper medical care. In essence, the Department of Community and Correction Supervision, (hereinafter "DOCCS"), has exhibited deliberate indifference to petitioner's serious medical needs.

In or about May 2012, the petitioner developed complications of the prostate gland, left without adequate medical treatment, caused petitioner's bladder to partially collapsed, (See, **Chin v. Burnstein**, 2017 WL 1169670 [S.D.N.Y. 2017]), for familiarity. Four years after the federal court's decision, DOCCS has still not provided any medical surgery to rehabilitate petitioner's bladder which has led to more complications of leaking after urination and recurring prostate problems. In January 2020, a blood test result of the petitioner shows a elevated Prostate-Specific Antigen ("PSA") of above 5.00 ng/ml, which is abnormal. Yet, DOCCS continued to ignored the

-12-

petitioner's serious medical needs.

The petitioner suffers from gastric acid reflex disease. In or about 2016, the cancer causing medication, Renitidine 150mg, was prescribed and given to the petitioner to be taken twice per day. In September 2019, several lawsuits was filed against the manufacture of Zantac and Renitidine, (See, **In Re: Zantac**, 437 F.Supp. 3d 1368 [2020]). In October 2019, the Food and Drug Administration, ordered that Zantac and Renitidine be removed from all human consumption because of its effect to cause bladder, stomach, kidney, intestinal, and other organs cancer. Notwithstanding, DOCCS continued to dispensed Renitidine to the petitioner until February 16, 2020, endangering his health and life. Despite the fact that the petitioner continue to experience chest and stomach pains, DOCCS has not taken any actions for the petitioner to be examine by a gastroenterologist and other medical experts to diagnose whether the petitioner had been harmed by Renitidine. Petitioner also suffers from high blood pressure, high cholesterol and arthritic.

In 2017, Correction Officer Patrick Squire maliciously kicked petitioner in his lower spine while restrained in handcuff. As a result of the injuries to petitioner's spinal column, he has continuous back pain, (See, **Chin v. Squire**, 20-CV-3711 [S.D.N.Y. Philip Halpern, DJ.]). Most recently, the petitioner is experiencing right hip pain which sometimes affects his ability to walk quickly. These medical needs has remains unmet because the petitioner has been unable to consult with a back and spine specialist.

-13-

In 2019, the Covid 19 epidemic caused the death of four inmates in Sing Sing Correctional Facility. Due to the lack of social distancing in Sing Sing, the conditions renders the petitioner peculiarly at risk of serious injury or death in the event of contracting Covid 19.

### Conclusion

In order to avoid irreparable harm, this Court should grant the petitioner immediate release on a recognizance bond, until this Court resolves the matters related to his habeas petition.

Dated: March 11, 2021
      Ossining, New York 10562-5442

Respectfully submitted,

Wayne Chin: Pro se
Din: 09-A-6287
Sing Sing Corr. Fac.
354 Hunter Street
Ossining, New York 10562-5442

TO SERVICE:

      Marie John-Drigo, Esq.
      Assistant District Attorney
      Kings County
      Criminal Appeals Unit
      350 Jay Street
      Brooklyn, New York 11201

-14-

# Exhibit

# A

| | | |
|---|---|---|
| **81 Pondfield Road, Suite 143** | **325 Broadway, Suite 505** | **Post Office Box 455** |
| **Bronxville, New York 10708** | **New York, NY 10013** | **Middle Island, N.Y. 11953** |
| **Office: 914 699-0774** | **Office: 212 334-9033** | **Office: 631 924-0903** |
| **Fax:    914 699-4314** | | **Fax:    631 614-7839** |

## *UNIVERSAL INVESTIGATIONS, INC.*

| | |
|---|---|
| **John L Brown** | **Licensed-Bonded** |
| **Vice-President** | **Insured** |

April 25, 2010

Mr. Wayne Chin
DIN: 09A6287
Green Haven Correctional Facility
P.O. Box 4000
Stormville, N.Y. 12582-0010

**Re:        PSNY vs. Wayne Chin**
**Indictment:    01018/2003**

Dear Mr. Chin:

I received your letter dated March 8, 2010, about three weeks ago. I had not checked my Post Office Box in some time due to my wife's illness. It was only after receiving a call from your girlfriend that I retrieved the letter. Then I no longer had the file available to me, and needed to get it out of storage. I sent you a letter to that affect, but for some reason it came back as undeliverable. That sometimes happens when sending mail to a correctional facility.

Your request regarding the two witnesses who used to reside at 100 Linden Boulevard. As you are aware, I can only take direction from assigned counsel. If the defendant requests specific work, the attorney must approve that assignment. According to my records, we spoke on December 22, 2008 regarding the fact that the newly assigned attorney showed up in court unprepared. You advised me that you needed to argue your own case. During that telephone conversation, we discussed two people mentioned in the Sprint Report. You advised that you would have your new attorney contact me so they could be located and interviewed.

We next spoke on May 21, 2009, when you advised that you had a new attorney. You explained the conflicts with the new investigator. I then received a telephone call from Mr. Smallman on July 1, 2009 where he requested that I continue my investigation. You and I spoke on many occasions following that July 1, 2009 conversation. You wanted to meet in person with both Mr. Smallman and myself. Scheduling conflicts preventing our meeting. On July 21, 2009 at 1:41pm, we again spoke. During that conversation you insisted on a three-way in person conversation at Rikers Island. We spoke on July 23, 27, August 13, 19, 24, and 25. Finally on August 26, 2009 at 5:10pm, Mr. Smallman and I

1

Exhibit G-18

met with you at GRVC on Rikers Island. It was during this meeting that Mr. Smallman approved the assignment to the two people who reside at 100 Linden Boulevard.

On September 2, 2010 at 3:35pm, I visited 100 Linden Boulevard located in Kings County. I first visited the apartment of Mr. Darnelle Gaston. I spoke with the apartments occupant Mr. Joseph. Mr. Joseph resides in this apartment for about 1-½ years. He said that he occasionally gets mail for Mr. Gaston, but does not have a forwarding address. I then visited the apartment of Ms. Deanna Cobbs. I spoke with Ms. Larochelle the apartments occupant. She too has been in the apartment for just over a year and has no forwarding address for Ms. Cobbs.

At about 3:55pm, I spoke with the buildings superintendent, Mr. Everald Elliot. According to Mr. Elliot, Mr. Gaston has been gone for about 7 or 8 years. He thinks that they live in the area of Ocean and Church Avenues but wasn't sure. As far as Ms. Cobbs, he believes that she moved to Pennsylvania. He had no forwarding addresses.

On September 4, 2009, I conducted data searches in an attempt to locate both persons. I utilized reliable pay databases that draw their information from credit report header information. These search processes failed to locate a trail back to 100 Linden Boulevard. The trail is important to verify the correct people are located. At times these reports only provide the first initial, so the trail must validate the correct person. All searches failed to locate either person. At 1:54pm, we spoke for 9 minutes and 13 seconds. During this conversation I advised you of this information.

If you require additional work on this case, or additional follow-up, please provide a new order of assignment. This can be handled by your appeals attorney.

Sincerely,

*John L. Br*

John L Brown
Private Investigator
Universal Investigations, Inc.

**LS/paws**

2

EXHIBIT G-18

# Exhibit

# B

```
 1    SUPREME COURT OF THE STATE OF NEW YORK

 2    COUNTY OF KINGS: CRIMINAL TERM:  PART 4
      -------------------------------------------X
 3                                              :
      THE PEOPLE OF THE STATE OF NEW YORK,       :
 4                                              :
                                                :
 5                  -against-                    :INDICTMENT NO.
                                                : 1018/2003
 6    WAYNE CHIN,                                :
                                                :
 7                                              :
                                                :
 8                              DEFENDANT.       :
      -------------------------------------------X
 9                              320 Jay Street
                               Brooklyn, New York
10                             September 9, 2009

11    B E F O R E:      THE HONORABLE MATTHEW D'EMIC,
                        Justice of the Supreme Court
12

13    A P P E A R A N C E S:

14    OFFICE OF CHARLES HYNES, ESQ.
      DISTRICT ATTORNEY - KINGS COUNTY
15    Attorney for the People
            350 Jay Street
16          Brooklyn, New York 11201
      BY:   ELISA PAISNER, ESQ.
17          Assistant District Attorney

18
      PHILIP SMALLMAN, ESQ.
19    Attorney for defendant
      32 Court Street
20          Brooklyn, New York 11201
      BY:   PHILIP SMALLMAN, ESQ.
21

22                                  TERI MALTESE
                                Senior Court Reporter
23

24

25
```

2

PROCEEDINGS

1              (Whereupon, the following takes place

2        on the record in open court in the presence of

3        the Court, the assistant district attorney,

4        defense counsel and Wayne Chin.)

5              COURT CLERK:  Calendar number one on the Part

6        4 calendar, Wayne Chin.

7              MR. SMALLMAN:  Philip Smallman, 32 Court

8        Street, Brooklyn, New York.

9              MS. PAISNER:  Elisa Paisner.

10             THE COURT:  We are on for trial.  Before I

11       address that, I received a motion from Mr. Chin

12       asking for reassignment of counsel.

13             THE DEFENDANT:  Yes, that's correct.

14             THE COURT:  You still want that?

15             THE DEFENDANT:  Yes.

16             THE COURT:  I will deny that application.

17       You have had about four lawyers already and you're

18       just delaying the trial.

19             THE DEFENDANT:  It is not a matter of

20       delaying the trial, it is a matter that my attorney

21       is effectively what you call sabbotaging my defense.

22             THE COURT:  Okay, well, motion denied.

23             THE DEFENDANT:  I have an attorney that I

24       asked to file a notice of defense for me and I give

25       him additional time and he doesn't do what I ask him

tm

1      adequately to do and he comes to me and he told me

2      that I'm only human, I forgot.

3              You sabbotaged my defense.  When I have an

4      attorney who I ask almost eight months ago to find

5      certain amount of witnesses and interview them and he

6      just gave the investigator that order a week ago he's

7      sabotaging my defense.

8              THE COURT:  All right.

9              THE DEFENDANT:  My investigator is telling me

10     he cannot find certain people because they moved

11     away, they can't be located.  I mean, I been asking

12     the prior attorney -- I mean, to find these

13     witnesses, interview them and prepare for trial.

14             MR. SMALLMAN:  I need to make a record on

15     this.

16             THE COURT:  Sure.

17             MR. SMALLMAN:  Let the record reflect the

18     point at which I was assigned to represent Mr. Chin.

19     At that point, I hired an investigator who I use in

20     all of my homicide cases, very experienced.  The

21     problem with that individual was that that individual

22     was actually looking for Mr. Chin for a number of

23     years as a member of the U.S. Marshals Service and he

24     developed what he perceived would ultimately be a

25     conflict of interest with Mr. Chin.

PROCEEDINGS

1    At that point, he asked to be relieved of his

2    duties and I agreed with him in that assessment.  At

3    that point John Brown, graciously I might add, agreed

4    to reenter the case having been assigned by a prior

5    attorney.  So, if Mr. Chin wishes to make any

6    allegations regarding the effectiveness of any of

7    these investigators, he ought to be more specific in

8    those allegations.

9    He is charged in an event that apparently

10   took place in 2001.  He is asking investigators to

11   look for witnesses who would be relevant to events in

12   2001.  Our investigation has determined that these

13   people no longer reside in the areas that he asked

14   they be found.  And beyond that, have been gone for a

15   considerable period of time, the time frame long

16   preceding my entry into this case and probably

17   preceding the time that Mr. Brown entered into this

18   case.

19   So, I will be happy to go forward and

20   represent Mr. Chin, but if he has matters that he

21   wants to put on the record so he can address them at

22   a point subsequent, I ask that he be quite specific

23   so that I might address them.

24   THE COURT:  Go ahead.

25   THE DEFENDANT:  Specifically, like I say, I

tm

1  asked him to file a notice of defense.

2          THE COURT:  What do you mean by that?  I

3  don't even know what this means.

4          MR. SMALLMAN:  Nor do I.

5          THE DEFENDANT:  Notice defense, like alibi.

6          THE COURT:  You have an alibi?

7          THE DEFENDANT:  That's what I'm referencing.

8          THE COURT:  You have an alibi?

9          THE DEFENDANT:  Argument was it may be too

10  late.

11          THE COURT:  This is your third attorney.  Why

12  didn't you tell that to Mr. Stutman or Mr. Baker?

13  First time I'm hearing about it and I've been on this

14  case since what, March of 2001?

15          All right, I've had enough.  Motion denied.

16  Anything else?

17          THE DEFENDANT:  I don't assume so, your

18  honor.  If I am forced, what can I say.

19          MS. PAISNER:  Just to make a clear record,

20  there have been a number of motions filed by Mr. Chin

21  pro se and this court does not have to accept them.

22  I do not know if counsel is adopting them in light --

23  if he does, then this court needs to rule on each and

24  every one of those motions.

25          THE COURT:  I already denied the motion to

6

PROCEEDINGS

1    relieve Mr -- to reassign counsel.  Okay, what else?

2    Mr. Chin made a motion to dismiss the indictment.

3              MS. PAISNER:  Those you ruled on.

4              THE COURT:  Because of the intentional murder

5    versus the depraved indifference murder, we already

6    dismissed the depraved indifference, Counsel.  You

7    made a 190.50 that was denied as untimely.  You

8    requested sanctions for disruption of vehicle, that

9    is denied.  You made a request for information on the

10   cars including recovery, transport, storage,

11   disposal, identity of truck drivers, etcetera.

12             How do you feel about that?

13             MS. PAISNER:  We turned over all the

14   information we had concerning Mr. Chin's request last

15   year, I believe.

16             THE COURT:  All right.  And phone records

17   were turned over as well, right?

18             MS. PAISNER:  Yes, and I even have more for

19   him.

20             THE COURT:  All right.  I think that that

21   pretty much takes care of everything.

22             MR. SMALLMAN:  Judge, if there are no parts

23   available today, may I suggest we simply calendar it

24   for tomorrow?  I will be happy to reappear.

25             Mr. Chin made much in the past of his

tm

7

PROCEEDINGS

1    footwear.  I know that he is before the court in what

2    appears to be a black canvas set of sneakers.  I

3    think he wishes to wear his regular footwear.

4            THE COURT:  We will mark his card that he is

5    going to trial so he will be able to certainly have

6    his shoes, all right?

7            MS. PAISNER:  Also, there was one motion for

8    counsel that defendant requested.  His own experts to

9    review the ballistics and the fingerprints.  We

10   consented.  I do not know the results so--

11           MR. SMALLMAN:  My understanding is that the

12   ballistics evidence is being examined, I believe, as

13   we speak, judge, in front of Mr. Fragapani.  Mr. Chin

14   saw fit to contact Fragapani directly and made his

15   wishes known to him.  Mr. Fragapani reported that

16   back to me.

17           MS. PAISNER:  If I may add, your honor, also

18   request for search warrant minutes.  We turned over

19   the search warrant -- there are no minutes beyond

20   what we asked.

21           THE COURT:  Okay.

22           MR. SMALLMAN:  I didn't hear the district

23   attorney.

24           MS. PAISNER:  There was a request for any

25   minutes concerning the search warrant and there are

tm

PROCEEDINGS

1   none.

2           MR. SMALLMAN:  Okay.

3           THE COURT:  All right.  Let's try tomorrow,

4   okay?

5           MS. PAISNER:  One thing that I mention.

6           MR. SMALLMAN:  Now that we are in a ready

7   impasse, I renew my application to have all material

8   turned over.  If there is any material that has been

9   previously provided that contains redactions, I ask

10  to be given unredacted copies of all.

11          MS. PAISNER:  That which I turned over I

12  already redacted.

13          THE COURT:  Tomorrow is no good?  We can make

14  it Friday.  Is Friday good?

15          MS. PAISNER:  I don't know if it is okay for

16  Mr. Chin.  This is, I mean, I will change it if

17  necessary, but there is a memorial for two

18  detectives.

19          THE COURT:  Put it on for Monday.  Ready to

20  go to trial on Monday

21              (Discussion at the bench.)

22          THE COURT:  We will put the case on for

23  Monday.  Mark his card he should be able to wear

24  whatever he wants to wear.

25          MR. SMALLMAN:  Judge, I was handing the

PROCEEDINGS

1    letter from Mr. Chin to your honor dated the 5th of

2    September.  I provided the court with a copy and

3    given Miss Paisner a copy as well.

4         For the record, I have turned over to

5    Mr. Chin the phone records that I have.

6         THE COURT:  Okay. We may have a part

7    available just to do some preliminary matters and

8    then in five minutes we will have it, we will know.

9         MS. PAISNER:  For the record, I am turning

10   over phone records through counsel relating to the

11   register that was done when the case initially

12   started.  It consists of seven pages.

13        MS. PAISNER:  Are you going to address this

14   last thing?

15        THE COURT:  If you wish.

16        MS. PAISNER:  I'm not quite sure what

17   Mr. Chin is requesting.

18        THE COURT:  Neither am I.

19        MS. PAISNER:  He is saying he was denied his

20   right to counsel, but his right to counsel -- I took

21   no statements from him.  His right to counsel doesn't

22   apply in any way.  When we arraigned him here, he was

23   given counsel.  There were no critical aspects of

24   this case where he was not represented by counsel.

25   For a procedural point of view, what happened when

tm

PROCEEDINGS

1    Mr. Chin was arrested in Arizona, we already indicted

2    Mr. Chin and there was an arrest warrant out for him.

3    I filed extradition papers to the State of Arizona

4    who chose to complete their case before they would

5    consider our request.

6         So, those extradition papers had to be

7    withdrawn and the detainer papers, the agreement was

8    then filed.  Mr. Chin went into their custody and we

9    took him from the state custody of Arizona.

10        THE COURT:  Pursuant to the governor's

11   warrant.

12        MS. PAISNER:  Well--

13        THE COURT:  There you go.

14        (Next page, please.)

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1          MS. PAISNER:  It is an interstate agreement.

2     The extradition was the Governor's warrant and he

3     won't sign that.

4          THE COURT:  Okay.  Judge Konviser will take

5     the case now.

6          So, 9/14 in Part 26.

7          (Whereupon, the matter was adjourned to

8     9/14 in Part 26.)

9               *     *     *     *

10         Certified to be a true and accurate

11    transcript of the stenographic minutes taken

12    within.

13

14    _____

15              TERI MALTESE
              Senior Court Reporter

16

17

18

19

20

21

22

23

24

25

# <u>Exhibit</u>

# C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM: PART 26
-------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

            -against-

WAYNE CHIN

                       Defendant.
-------------------------------------------------------------------X

**AFFIRMATION IN
OPPOSITION TO
MOTION TO SET ASIDE
THE VERDICT**

KINGS COUNTY
INDICTMENT NUMBER
1018 / 2003

       Vivian Cedeno, an attorney at law duly licensed to practice law in the State of New York, and an Assistant District Attorney in Kings County, hereby affirms the following to be true under the penalty of perjury:

       1.     This affirmation is submitted in opposition to the defendant's motions, dated October 14, 2009 and October 28, 2009, pursuant to C.P.L. 330.30, seeking an order setting aside the verdict.

       2.     The following statements are made on information and belief based upon the records and files of the Kings County District Attorney's Office and the evidence presented at the trial of the above entitled action in the Supreme Court, Kings County.

       3.     The People's evidence at trial showed the following:  The defendant, Wayne Chin, and the deceased, Renee Aarons, were involved in a relationship for approximately eighteen years.  On June 12, 2001, at approximately 10:30pm,  Renee Aarons and her eleven year old son, Rashawn Aarons, were sitting inside of her green Lexus that was parked in front of 95 Linden Boulevard in Brooklyn.  Defendant drove up in a gold colored lexus.  Defendant and Renee Aarons argue.  Defendant then approached the driver's side of Renee's vehicle, where she was seated, and shot her.  As defendant was walking away, Renee Aarons called

out her son's name.  Defendant returned to Renee and shot her two more times. The defendant fled in the gold Lexus abandoning it a couple of blocks away.

4.  Rashawn Aarons and Aisha White, another eyewitness who knew the defendant, both testified about defendant's actions and identified defendant as the shooter.

5.  Detective Patrick Henn, the assigned case detective,  testified that he interviewed witnesses and re-interviewed them; he conducted surveillances at places defendant was known to go and sought media attention, including America's Most Wanted, and followed up anonymous tips.

6.  During the investigation, the K-9 unit was called to assist in tracking the defendant.

7.  The gold lexus that the defendant abandoned was recovered and vouchered. All evidence recovered from the gold Lexus that had also been vouchered, was viewed and inventoried by Harold Baker, defendant's first attorney.  On October 6, 2008, pursuant to Mr. Baker's request, the evidence was brought to the District Attorney's Office and a list of each item was prepared and acknowledged by counsel.   The inventory included numerous pieces of clothing, some of which were in a dry cleaning bag affixed with a ticket from "Bell Boy" dry cleaners.  Other items were labeled with Michael Gillings' name.  A copy of the inventory was provided to counsel for his file.

8.  A crime scene officer, Detective Gilford, fingerprinted both vehicles and lifted latent fingerprint evidence.  This evidence was later determined to match defendant: defendant's fingerprints on the trunk of the gold Lexus and his palm print on the window of the green Lexus.

9.  Defendant was arrested in Arizona on November 17, 2005 and convicted of drug charges on October 24, 2007.  Defendant was sentenced on November 27, 2007.  A warrant

for defendant's arrest was lodged with the State of Arizona. While the People attempted to extradite defendant, the Arizona authorities chose to retain defendant until the conclusion of its case. Upon completion of the Arizona case, the People filed an Interstate Agreement on Retainer and defendant was taken into NY custody in February 2008, seven years after this crime.

10.     Sgt. Lai of the NYPD Property Division testified that, according to proper procedure, the green Lexus was auctioned on February 27, 2003 and the gold Lexus was auctioned on May 26, 2004.

11.  On September 30, 2009, the defendant was found guilty after a jury trial of the only count submitted to the jury, Murder in the Second Degree.

12.  Defendant is presently incarcerated.

13.  The defendant now moves to set aside the verdict pursuant to C.P.L. Section 330.30 (1) on the grounds of (1) Ineffective Assistance of Counsel; (2) Rosario and Brady Violations; (3) Cumulative Prejudicial Errors (4) Improper hearsay/Crawford violations; and (5) Improper comments made by the prosecutors.

For the reasons stated in the accompanying Memorandum of Law, the defendant's motion should be denied.


Dated: Brooklyn, New York
         November 5, 2009


                                                Vivian R. Cedeno
                                                Assistant District Attorney
                                                (718) 250-2290

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM:  PART 26
--------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

        -against-

                                          KINGS COUNTY

WAYNE CHIN,
                                        INDICTMENT #1018/2003
                      Defendant.

--------------------------------------------------------------------X

## MEMORANDUM OF LAW

**Defendant's motion to set aside the verdict should be denied summarily because the grounds upon which defendant relies, if raised on appeal from defendant's prospective judgment of conviction, would not require a reversal or a modification of that judgment as a matter of law.**

This Court should summarily deny defendant's motion to set aside the verdict pursuant to C.P.L. 330.30(1).  Under that subsection, this Court may grant such a motion, only on a "ground appearing on the record which, if raised upon an appeal from a prospective judgment of conviction, would require a reversal or modification of judgment as a matter of law by an appellate court." C.P.L. 330.30(1).

Defendant's claims of  (1) Ineffective Assistance of Counsel; (2) Rosario and Brady violations; (3) Cumulative Prejudicial Errors; (4) Improper hearsay/Crawford violations; and (5) Improper comments made by the prosecutors should be denied because these claims would not require a reversal or modification of the judgment as a matter of law and should be denied.

## Point 1

### Defendant's Claim of Ineffective Assistance of Counsel is procedurally barred and meritless.

Defendant's claim that the trial tactics and strategies employed by his trial attorney, Mr. Smallman, was in any way inadequate, is procedurally barred and has no merit. Furthermore, there is nothing in the trial record or defendant's motion to support such a claim.

In order to prevail on a claim of ineffective assistance of counsel, the defendant must demonstrate that "the law, and the circumstances of [the] particular case, viewed in totality and as of the time of the representation," showed that counsel failed to provide the defendant with "meaningful" representation. People v. Baldi, 54 N.Y.2d 137, 147 (1981). Whether defendant was prejudiced as a result of counsel's performance is relevant to the determination of a claim of ineffective assistance of counsel. People v. Benevento, 91 N.Y.2d 708, 713-15 (1998). Because defendant's motion does not demonstrate that he was denied meaningful representation his motion should be denied.

Defendant dramatically intones that defense counsel failed to: (1) seek suppression of evidence; (2) file a "motion of defense"; (3) demand full disclosure of evidence; (4) obtain a forensic biology expert; and (5) locate witnesses in a timely manner.

### A.   Defendant's claims that counsel failed to seek suppression of both vehicles, including the loss or destruction of forensic and physical evidence; and (2 ) the Court's failure to sanction the People are without merit.

Defendant raised the issue of the destruction of the vehicles numerous times before Judge D'Emic and before this Court. Each time defendant's motion to suppress the

evidence was denied.

When discoverable evidence gathered by the prosecution is lost or destroyed, the People "have a heavy burden of establishing that diligent, good faith efforts were made to prevent the loss." People v. Kelly, 62 N.Y.2d 516, 520 (1984). The People may be sanctioned unless they meet the burden of establishing that diligent, good faith efforts were made to prevent the loss of the evidence. It is the court's discretion what, if any, sanctions may be imposed. Factors to be considered are (1) the degree of negligence or bad faith on the part of law enforcement officials; (2) the importance of the lost evidence and (3) the sufficiency of other evidence. People v. Haupt, 71 N.Y.2d 929 (1988); People v. Saddy, 84 A.D.2d175 (2d Dep't 1981). However, a defendant may forfeit his right to demand the production of the property. People v. Haupt, 71 N.Y.2d at 930 (16 year delay between arrest and trial, due to defendant's incompetence, was negligible and attributed to long delay); People v. Panzarino,282 A.D.2d 292 (1st Dep't 2001) (delay caused by defendant's bail jumping); People v. Gonzales, 266 A.D.2d 30 (1st Dep't 1999) ( forfeited right where defendant absconded and remained at large for two years).

In this case, while defendant avoided apprehension, the vehicles were auctioned by the NYPD. They were auctioned at a time when defendant's whereabouts were unknown and before defendant was taken into custody in Arizona. The auctioning of the vehicles was not committed in bad faith but according to normal property procedures.

In any event, defendant was only minimally prejudiced, if at all, by the unavailability of the vehicles in light of the evidence presented. Crime scene photographs showed the ballistics evidence and their location, the interior of the vehicles, the property found inside of both vehicles and the location where the cars were recovered. Another photo shows the bullet recovered in the console between the front seats. The fact that the

photo only shows the cut out portion of the passenger seat rather than an additional bullet which was also recovered was not objected to and is unpreserved.

In addition, defendant's assertion that he was prejudiced by his inability to test for "forensic biology extraction" is mere speculation. The People elected not to call Detective Gilford or present other fingerprint evidence at trial. The fact that defense counsel chose not to call a fingerprint expert of his choosing, have the evidence re-examined, or call Detective Gilford as his own witness, can reasonably be viewed as tactical and calculated. Not having the evidence re-examined avoided the possibility of confirming, by defendant's own witness, that the defendant's fingerprints were on the cars. Moreover, without fingerprint testimony the defense was able to argue a lack of corroborating evidence and shoddy police work.

Further, the jury's verdict of guilt on the one count submitted against defendant was not immediate, as the jury was out for a day and a half before they were able to reach a conclusion of guilt. This fact demonstrates that the strategy and arguments of defense counsel were probative and persuasive enough to engender prolonged discussion by the jury, further demonstrating the effectiveness of defense counsel's trial stratagems.

Moreover, defendant was actively involved in all decisions made during trial. Before defense counsel concluded his cross-examination of any witness, he conferred with his client. Any other conferrals defendant and his counsel may have had, or not had, are not on the record and therefore not cognizable. Defendant can not now complain that he has been denied a fair trial simply because the strategy followed by counsel, and with defendant's concurrence, ultimately failed.

Defendant's additional claims that the loss or destruction of evidence concerning the victim's cell phone and DNA from the victim's car, as well as various items in

defendant's car, are speculative and, and would not necessarily be favorable to the defense. In any event, the People are under no obligation to gather evidence for defendant. See People v. Alvarez, 70 N.Y. 2d 375, 380-81 (1987) (prosecution not required to affirmatively gather evidence for defendant). Therefore,  the loss or destruction of the vehicles and their contents does not constitute a Brady violation.

Defendant's further contention that the court's failure to sanction the People for destruction of evidence is without merit.  It is within the sound discretion of the trial court to determine what sanctions, if any, should be imposed.  Absent a showing of prejudice the court is not required to impose a sanction, and certainly need not impose the most serious sanctions: preclusion of a witness's testimony or other evidence or grant a mistrial.  See People v. Haupt , 71 N.Y.2d at 930-31; People v. Panzarino , 282 A.D.2d 292.  Since the cars were auctioned within normal procedures and defendant was responsible for the long delay affecting the loss or destruction of evidence, denying any sanctions was proper.

**B.**   **Defendant claims that counsel failed to  (1) file a notice of alibi; and (2) properly investigate potentially exculpatory witnesses are procedurally barred and without merit.**

During the proceedings, defense counsel informed the Court that defendant was considering a possible alibi defense. However, defense counsel did not provide any specific information as required by statute and requested by the Court.  C.P.L. 250.20.   In any event, any further conversations that the defendant may or may not have had with his attorney regarding potential alibi, forensic evidence or phone records to support that claim, are not on the record.  Therefore this claim is not preserved and procedurally barred. Moreover, the claim of "forensic biology extractions" upon which defendant now relies in order to exonerate himself is simply unsupported conjecture. Should defendant wish to pursue this claim, he may make the appropriate motion pursuant to C.P.L. 440.10.

In support of his alibi, defendant complains that counsel failed to locate and call for trial two witnesses. During discovery, fulfilling its obligation under <u>Brady,</u> the People turned over the names and addresses of the potential witnesses. The defense failure to find these witnesses is more to do with defendant's fleeing than counsel's ineffectiveness. It is not hard to understand that in an eight year lapse, witnesses may move and become unavailable. Defendant cannot now complain.

Defendant further claims it was error not to allow Detective Henn to testify about these witnesses' prior statements to him. Because of the witnesses unavailability, defendant's desire for this evidence was in fact offered for the truth of the matter asserted. Defendant is also in error when he claims that the witnesses' statements are admissible within the state of mind exception to the hearsay rule. To properly admit the witnesses' prior statements would require calling these witnesses to testify. Their unavailability does not change the rules of evidence. In any event, as defendant concedes, the Court allowed limited cross-examination of the Detective concerning these prior statements. (<u>See</u> trial transcript pgs. 272 – 276).

<u>Point II</u>

**<u>Defendant's additional claims of Brady and Rosario violations are without merit.</u>**

A. **<u>Dry Cleaning Ticket</u>**

Defendant claims that non-disclosure of the ticket constituted a <u>Brady</u> violation. Under <u>Brady v. Maryland,</u> 373 U.S. 83 (1963), the People are under a continuing duty to disclose information that is material to the issue of defendant's guilt or punishment. Defendant has failed to demonstrate that these records would have been favorable to him

and material to his guilt or punishment. United States v. Bagley, 473 U.S. 667, 675-76 (1985); United States v. Agurs, 427 US 97 (1976). Since the contested evidence is purely speculative, a Brady claim must be rejected. People v. Kaminski, 156 A.D.2d 471, 472 (2d Dep't 1989); People v. Fappiano. 139 A.D.2d 524 (2ⁿᵈ Dep't 1988).

All evidence recovered from the gold Lexus was vouchered, viewed and inventoried by Harold Baker, defendant's first attorney.  The inventory included numerous pieces of clothing: some of this clothing was labeled with Michael Gillings name; other items were contained in a dry cleaning bag affixed with a ticket from "Bell Boy" Dry Cleaners.  Therefore, defendant did have disclosure of the ticket of which he now complains.

Defendant's assertion that Detective Henn's testimony concerning the ticket was perjured is erroneous.  Since the inventoried property reflects both names, this testimony merely suggests that defense counsel was asking about one particular item and Detective Henn was referring to another. Any mistake made in his testimony is just that, an example of a confusing and non-specific inquiry disconnected to the answer.  Defendant's further assertion that the People suborned perjury because of this testimony is specious.

Defendant also claims that Detective Henn's testimony regarding the clothing ticket was used to bolster Rashawn Aarons' testimony. This claim is unpreserved.  In any event, the challenged testimony was elicited to establish how the witness could distinguish one gold Lexus from another, thus identifying this particular car as the defendant's. The witness was familiar with defendant's car and was with defendant when defendant picked up the dry cleaning earlier that day. The testimony is probative and corroborates both eyewitnesses' accounts that, after the shooting, defendant drove away in the gold Lexus. Defendant's clothing in the car, abandoned just blocks from the shooting, further

corroborates defendant's identity as the shooter.

## B.  K-9 Training and Service Records

Defendant's belatedly claim that he was denied a fair trial because the People failed to provide certain Rosario material is procedurally barred and not preserved.

The Rosario rule applies only to recorded statements.  See C.P.L. 240.44(1), 249.45(1)(a).  Thus, if a statement was not written or tape recorded, it is not Rosario material.  See People v. Barnes, 200 A.D.2d 751 (2d Dep't 1994). The records which defendant now complains, if they exist, are not recorded and do not require disclosure. See People v. Barnes, 200 A.D.2d 751 (2d Dep't 1994).  See generally People v. Dudley, 156 A.D.2d 581 (2d Dep't 1989) (no Rosario violation where undisclosed telephone conversation between police and complainant was not memorialized); People v. McDonald, 287 A..D.2d 655, 656-57 (2nd Dep't 2001).

The claim concerning the K-9 training and service records is not preserved because defendant did not object to the testimony; nor did he request this information even though he had knowledge that a K-9 was used in the investigation. In any event, these records, if they exist, are not recorded statements and do not require disclosure.  People v. Fuller, 286 A.D.2d 650 (2d Dep't 2001) (no evidence that alleged Rosario material);  People v. Ray, 224 A.D.2d 722 (2d Dep't 1996) (same); accord People v. Parkinson, 268 A.D.2d 792, 793 (3d Dep't 2000) (speculation concerning existence of evidence insufficient to establish Rosario or Brady claim).  Moreover, this was not the subject matter of a witnesses' testimony.  While Detectives Calbrese and Henn did testify that the bloodhound, Kojak, was involved as part of the investigation, they could testify only to their observations. Neither witness is assigned to the K-9 unit and, therefore, is not qualified to testify about

training and service records.

## POINT III

### Cumulative Prejudicial Errors

**Defendant's claims that there were numerous cumulative and prejudicial errors which deprived him of due process to a fair trial including: (1) references made to America's Most Wanted, to Jamaican Restaurants and bars, and to prisoner interviews; (2) testimony involving defendant's prior incarceration and (3) evidence of Molineux are all without merit.  In addition, defendant's claim regarding summation comments are without merit and unpreserved for appellate review.**

### A.    America's Most Wanted and other investigative techniques

References made to America's Most Wanted in the People's opening and closing statements, as well as testimony elicited from Detective Henn, was proper.  The assistance of America's Most Wanted was an investigative technique used by the police in an effort to apprehend the defendant.  In accordance with the Court's ruling, no other details concerning the program were elicited. Similarly, the surveillances conducted of Jamaican restaurants and bars, and interviews with prisoners, were also relevant as part of the police investigation. The testimony was probative on the issue of flight and evidence of the defendant's consciousness of guilt.   See People v. Slater, 268 A.D.2d 260 (1st Dep't, 2000) (testimony regarding America's Most Wanted was probative of the issue of flight, and was admissible as circumstantial evidence of defendant's consciousness of guilt). Further, it was not necessary that an instruction be given to the jury before the prosecution could argue or elicit testimony regarding flight or consciousness of guilt.

In addition, during jury selection and throughout the defense case, defendant raised the issue of sloppy police work.   As such, it was proper for the People to comment during opening and elicit testimony in order to rebut the defense claim of sloppy police work.

Defendant's claim of improper comments during the prosecutor's summation is unpreserved for appellate review and equally without merit. The summation comments were within the bounds of proper rhetorical argument permitted on summation and were either fair comment on the evidence or reasonable inferences therefrom, or appropriate responses to comments in the defense summation. C.P.L. Section 470.05(2); People v. Tonge, 93 N.Y.2d. 838, 839-40 (1999) (claim that defendant was denied fair trial by prosecutor's stating in summation that defendant's conduct fit the "typical behavior or a sex offender" was unpreserved for appellate review); People v. Jenkins, 38 A.D.3d. 566, 567 (2d Dep't 2007); People v. Bermudez, 36 A.D.3d. 928, 929 (2d Dep't 2007); People v. Gillespie, 36 A.D.3d 626, 627 (2d Dep't 2007).

To the extent that comments made regarding America's Most Wanted and the other investigatory techniques used was error, such error was harmless in light of the court's final instructions and the overwhelming evidence of the defendant's guilt. See People v. Pearson, 29 A.D.3d 711 (2d. Dep't 2006) (prosecutor's improper summation comment that "defendant had a propensity to drive stolen cars in a reckless manner," was harmless error based upon the overwhelming evidence of his guilt); People v. Almonte, 23 A.D. 3d 392, 394 (2d Dep't 2005) (prosecutor's remarks not sufficiently flagrant or pervasive to deny the defendant fair trial); People v. Roopchand, 107 A.D.2d 35, 36 (2d Dep't 1985), aff'd, 65 N.Y. 2d 837 (1985).

The Court properly instructed the jury that comments made during opening and summation were not evidence. The court also charged it was the jury's "sworn duty to decide whether or not the defendant is guilty based solely on the evidence that they heard during trial".

Defendant's guilt of Murder in the Second Degree was proved by overwhelming

evidence. Both Rashawn Aarons, and another eyewitness, Aisha White, observed defendant shooting the deceased and identified defendant as the shooter. Medical evidence of multiple gunshot wounds to the deceased's chest and arms, and the medical examiner testimony of stippling being found on the deceased clothing all supported the eyewitnesses account of what happened. Detective Muzak, the ballistics expert, testified that the bullets recovered were fired from the same gun; and that the shell casings recovered matched each other and were ejected in a position consistent with defendant standing at the driver's window. Thus, proof of the defendant's guilt of Murder in the Second Degree was overwhelming and any error was harmless. See People v. Crimmins, 36 N.Y.2d. 230, 243 (1975); People v. Brosnan, 32 N.Y.2d 254, 262 (1973) (improper comments in summation are to be assessed for their prejudicial effect, and "it requires greater impropriety to produce that effect in a stronger case") (internal quotations omitted); People v.Almonte, 23 A.D.3d at 394 (prosecutor's remarks did not deny defendant fair trial).

**B. Defendant's claim that Rashawn Aarons response to a question on cross examination was highly prejudicial and denied the defendant due process to a fair trial is without merit.**

During cross examination, defendant attempted to establish that the defendant's relationship to the deceased was "on again off again". Rashawn Aarons' referral to defendant's incarceration was in response to defense counsels' question. In any event, any prejudice that may have resulted from the answer was resolved with the court's immediate action in striking the response from the record. Moreover, such error was harmless in light of the court's final instructions and the overwhelming evidence of the defendant's guilt.

**C. Defendant's claim that Detective Henn's testimony regarding the recovery of the bullet from the deceased body during the autopsy is hearsay is without merit and unpreserved for appellate review.**

The defendant belatedly brings up an objection to the testimony of Detective Henn

regarding testimony about his request that the bullets recovered from the scene be compared

to the bullet recovered from the deceased body (see trial transcript pg 247).  This claim is

unpreserved for appellate review because defendant made no objection to it.

**D.  Defendant's claim that the prosecutor's comment during opening that the defendant was taken into custody in New York in 2008 was false information is without merit.**

Defendant's complaint that he was not taken into New York custody in March of

2008 but rather in 2005, when New York authorities lodged an arrest warrant is meaningless.

Not referring to the 2005 arrest warrant avoided undue prejudice to the defendant by referring

to an incarceration in Arizona.

**E.  Defendant's claim that Ryan Aarons' Molineux Statement was improper hearsay and violated his right to confrontation  is without merit.**

Defendant's claim that testimony about defendant's prior bad act is hearsay and

violates his confrontational rights is in error. The admission of defendant's prior bad act is

not hearsay because it defendant's admission of guilt.  The testimony does not implicate

the Confrontation Clause because (1) these are the defendant's own words and (2) the

testimony was offered by a testifying witness.

The Court, under the Molineux exception, allowed Ryan Aarons to testify about a

statement he overheard defendant make to the deceased.  Evidence of uncharged crimes

may be admitted if relevant to establish:  (1) motive, (2) intent or knowledge, (3) the

absence of mistake or accident, (4) a common scheme or plan, or (5) the identity of the

perpetrator.  Courts have also admitted evidence of prior bad acts to complete the narrative

and offer background information.  People v. Shorey, 172 A.D.2d 634 (2d Dep't 1991)(

where defendant was charged with stabbing his ex-wife, evidence of defendant's prior threats made during the marriage was admissible as background information regarding defendant's relationship with his wife). People v. DeLeon, 177 A.D.2d 641 (2d Dep't 1991). In this case, the prior bad act evidence was offered to establish motive, intent and identity, as well as being probative evidence relevant to establish background material. At the Ventimiglia hearing, the Court weighed the probative value of the proposed evidence against the potential prejudice to defendant. In exercising its discretion, the Court prohibited the People from eliciting any other evidence.

## POINT IV

### Weight of the Evidence

**Defendant's claim that the verdict is against the weight of the Evidence is procedurally barred and without merit.**

In assessing whether the verdict is supported by the weight of the evidence, the Court must, like the trier of fact, "'weigh the relative probative force of conflicting testimony and the relative strength of conflicting inference that may be drawn from the testimony.'" People v. Bleakley, 69 N.Y.2d ,495 (quoting People ex rel. MacCreaken v. Miller, 291 N.Y. 55, 62 [1943]). "If 'based on all the credible evidence a different finding would not have been reasonable' and if the 'trier of fact has failed to give the evidence the weight it should be accorded,' the appellate court may set aside the verdict." People v. Cahill, 2 N.Y.3d 14, 58 (2003) (quoting Bleakley, 69 N.Y.2d at 495). In conducting weight of the evidence review, the court must consider the elements of the crime as charged to the jury "for even if the prosecutor's witnesses were credible their testimony must prove the elements of the crime beyond a reasonable doubt". People v. Danielson, 9 N.Y.3d 342, 349 (2007).

This Court should not substitute its own judgment for that of the jury.  Bleakley, 69 N.Y.2d at 495.  The Court must accord great deference to the jury's opportunity to view the witnesses, hear the testimony and observe demeanor.  People v. Mateo, 2 N.Y.3d 383, 410. cert. denied, 542 U.S. 946 (2004).  The jury's verdict should not be disturbed unless it is unsupported by the record.  People v. Cummings, 291 D.D.2s 454, 455 (2d Dep't 2002).

The jury found defendant guilty of Murder in the Second Degree when: with the intent to cause the death of Renee Aarons, he caused the death of Renee Aarons.  "Intent can be established from an act itself …and the surrounding circumstances."  People v. Mejia, 297 A.D.2d 755, 756 (2d Dep't 2002); accord People v. Bracey, 41 N.Y2d 296, 301 (1977) (intent can be inferred from a defendant's conduct and the surrounding circumstances).

Viewing the evidence in the light most favorable to the People, a rational jury could have found beyond a reasonable doubt, that defendant shot Renee Aarons with the intent to kill her.  Thus, the jury's verdict was not against the weight of the evidence.  This Court instructed the jurors that, in order to convict defendant of Murder in the Second Degree, they must find that (1) defendant caused the death of Renee Aarons and (2) that defendant intended to cause her death.  The credible testimony of Rashawn Aarons and Aisha White and the death certificate from the autopsy preformed by Dr. Veress, made out all the elements of second degree Murder.   Any inconsistencies in the testimony were inconsequential due to the fact that eight years had passed between the night of the murder and the trial.

## CONCLUSION

**For the aforementioned reasons, defendant's motion to set aside the verdict should be denied.**

Dated: Brooklyn, New York
      November 5, 2009

Respectfully submitted,

CHARLES J. HYNES
District Attorney
Kings County

Vivian R. Cedeno
Assistant District Attorney

# Exhibit

# D

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM PART 26
----------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,          :

                    -against-                 :
                                                      Ind. No. 1018/03
WAYNE CHIN,                                   :

                    Defendant.                :

----------------------------------------X

JILL KONVISER, JUSTICE:

On September 30, 2009, the defendant was convicted of murder in the
second degree after a jury trial for shooting and killing his girlfriend
of eighteen years in front of her then eleven year old son. The defendant
has filed a motion to set aside the verdict pursuant to Criminal Procedure
Law §330.30(1). The People opposed the defendant's motion.  The defendant
filed reply papers. For the reasons that follow, the motion to set aside
the verdict is denied.

**Criminal Procedure Law §330.30(1)**

At any time after rendition of a verdict of guilty and before
imposition of sentence, a court may set aside a verdict if a claim
raised by the defendant would "require" reversal "as a matter of
law by an appellate court." C.P.L. §330.30(1).  A trial judge is
without authority, however, to review a claim raised under C.P.L.
§330.30(1) unless such claim was preserved at trial by a specific and
timely objection or other application for relief. People v. Everson,
100 N.Y.2d 609, 610 (2003); People v. Hines, 97 N.Y.2d 56 (2001); People
v. Green, 46 A.D.3d 324 (1st Dept. 2007), lv. denied, 10 N.Y.3d 840

(2008); People v. Patino, 259 A.D.2d 502 (2d Dept.), lv. denied, 93 N.Y.2d 976 (1999); People v. Tillman, 273 A.D.2d 913 (4th Dept.), lv. denied, 95 N.Y.2d 939 (2000); People v. Amato, 238 A.D.2d 432, 433 (2d Dept.), lv. denied, 90 N.Y.2d 237 (1997); People v. Josey, 204 A.D.2d 571 (2d Dept. 1994); People v. D'Alessandro, 184 A.D.2d 114, 118 (1st Dept. 1992), lv. denied, 81 N.Y.2d 884 (1993); People v. Sadowski, 173 A.D.2d 873 (2d Dept. 1991). A trial judge has no authority to review a claim under C.P.L. §330.30 in the interest of justice as such powers are reserved exclusively for the intermediate appellate courts. See C.P.L. §470.15(1); People v. Carter, 63 N.Y.2d 530, 536 (1984); People v. Carthens, 171 A.D.2d 387, 391-92 (1st Dept. 1991).

**The Motion Before the Court**

The defendant has raised the following claims in support of his motion to set aside the verdict pursuant to C.P.L. §330.30: (1) the Court erred during voir dire by failing to inquire of the prospective jurors whether they had been exposed to any pre-trial publicity about the case; (2) the People committed Brady and Rosario violations; (3) the Court's Molineux ruling with respect to the testimony supplied by Rashawn Aarons regarding a conversation he had with the victim in 2001 violated his Sixth Amendment right to confrontation; (4) his right to a fair trial was prejudiced by Rashawn Aarons's testimony on cross-examination regarding the nature of the defendant's relationship with the deceased; (5) Detective Henn's testimony that a bullet was recovered from the victim's body violated his Sixth Amendment right to

2

confrontation; (6) he was prejudiced by Detective's Calabrese's testimony that the police searched for him in "Jamaican restaurants and bars in the precinct;" (7) the Court prevented cross-examination of Detective Henn regarding statements made by other alleged eyewitnesses to the murder; (8) the Court erred by failing to sanction the People for the destruction of the victim's car and the contents thereof; (9) his right to a fair trial was prejudiced by the testimony that the police used the television program "America's Most Wanted" in their efforts to apprehend him; (10) the verdict was against the weight of the evidence; and, (11) trial counsel provided him with ineffective representation.

For the reasons that follow, each of these claims has been considered and rejected.

1.    **The Defendant's Claim that Prospective Jurors Should have Asked whether they had been Exposed to Pre-Trial Publicity Regarding the Case.**

The defendant did not ask the Court during jury selection to inquire of the prospective jurors whether they had been exposed to any pre-trial publicity regarding this case. Nor did the defendant ever object at trial on such ground. Accordingly, the defendant's claim with respect to this Court's conduct during jury selection is unpreserved for appellate review and not cognizable under C.P.L. §330.30(1).  People v. Everson, 100 N.Y.2d at 610; People v. Robinson, 88 N.Y.2d 1001, 1002 (1996).[1]

---

[1]As the defendant has failed to preserve this claim as a matter of law
(continued...)

In any event, the defendant's claim is without merit as the Court repeatedly advised the selected and sworn jurors to keep an open mind, to decide the case solely on the evidence presented in the courtroom, not to do any of their own research, and to refrain from reading or listening to any news accounts about this case, including those that might have been found on the internet. As the jury is presumed to have followed these instructions, the defendant's claim is without merit. People v. Davis, 58 N.Y.2d 1102, 1104 (1983); People v. Marji, 43 A.D.3d 961, 962 (2d Dept.), lv. denied, 9 N.Y.3d 1007 (2007); People v. D'Alessandro, 184 A.D.2d 114, lv. denied, 81 N.Y.2d 884 (1993).

2.     The Defendant's Brady and Rosario Claims.

The defendant claims that the People violated Brady v. Maryland, 373 U.S. 83 (1963) and People v. Rosario, 9 N.Y.2d 286, cert. denied, 368 U.S. 866 (1961) by failing to provide him with: (1) the "training and active service records" for a police dog about which Detectives Calabrese and Henn testified at trial; and, (2) a dry cleaning ticket that Detective Henn testfied about at trial. As the defendant failed to raise these alleged Brady and Rosario violations at trial, such claims are unpreserved for appellate review and may not be reviewed by this Court under C.P.L. §330.30(1). People v. Everson, 100 N.Y.2d at 610; People v. Wolf, 98 N.Y.2d 105, 119 (2002); People v. Thomas, 8

---

[1](...continued)
as required by C.P.L. §330.30(1), the fact that the People did not expressly respond to this claim in their motion papers is of no moment.

A.D.3d 303 (2d Dept.), lv. denied, 3 N.Y.3d 682 (2004); see People v. McFarlane, 24 A.D.3d 570 (2d Dept. 2005), lv. denied, 6 N.Y.3d 836 (2006); People v. Rodriguez, 281 A.D.2d 644, 645 (2d Dept. 2001). In any event, the defendant's claims are wholly without merit.

### Brady Claim

With respect to the defendant's Brady claim, there is no evidence that the K-9 service records about which he complains even exist. Thus, his assertion that such records are exculpatory is based on nothing more than sheer speculation and surmise and must fail. People v. Pacheco, 38 A.D.3d 686, 688 (2d Dept.); lv. denied, 9 N.Y.3d 849 (2007); People v. Pannell, 3 A.D.3d 541, 542 (2d Dept.), lv. denied, 2 N.Y.3d 743 (2004); People v. Finley, 190 A.D.2d 859, 860 (2d Dept. 1993). Equally speculative is the defendant's claim that the dry cleaning ticket found inside the car in which the defendant shot the victim to death was somehow exculpatory.  People v. Finley, 190 A.D.2d at 860.[2]

Finally, and in light of the overwhelming evidence of guilt, the defendant's Brady claim is rejected as he has not shown that there is a reasonable probability or even a reasonable possibility that the results at trial would have been different had the items at issue been disclosed.  People v. Bond, 95 N.Y.2d 840, 843 (2000);  People v. Vilardi, 76 N.Y.2d 67, 77 (1990); People v. Rhodes, 215 A.D.2d 696, 696-

---

[2]The defendant's claim in his reply papers that Detective Henn's testimony regarding the dry cleaning ticket violated the best evidence rule was not raised at trial and, thus, cannot be considered by this Court under C.P.L. §330.30(1).  People v. Amato, 238 A.D.2d at 243.

97 (2d Dept. 1995); People v. Gonzalez, 168 A.D.2d 568, 569 (2d Dept. 1990), lv. denied, 78 N.Y.2d 955 (1991); People v. Russo, 109 A.D.2d 855, 856 (2d Dept. 1985). To be clear, the defendant shot and killed his girlfriend of eighteen years, Renee Aarons, in front of her then eleven year old son, Rashawn Aarons. Rashawn Aarons testified at trial that he saw the defendant, to whom he referred to at the time of the shooting as "daddy," punch his mother in the face and then shoot her multiple times.

| The Prosecutor: | Now, you mentioned that he (the defendant) punched her (the decedent).  How did he punch her? |
|---|---|
| Rashawn Aarons: | He just walked out. He pulled out his fist and jabbed her. |
| The Prosecutor: | So would it be fair to say that his hand was clenched? |
| Rashawn Aarons: | Yes. |
| The Prosecutor: | Did something happen after that? |
| Rashawn Aarons: | Yeah, he pulled out his gun out of his waist and shot her three times. |
| The Prosecutor: | And after he shot her, what happens? |
| Rashawn Aarons: | When he shot her, I came out of the car and ran over to his side pulling him telling him to stop, stop. |
| The Prosecutor: | What, if anything, does defendant do? |
| Rashawn Aarons: | He walked away, and I looked at my mother and she said my name. And I see him, he was at the side of his car and he came back over and shot her two more times. |
| The Prosecutor: | And where were you when that happened? |

6

Rashawn Aarons:    Right next to him.

Transcript at 82-83.

A second eyewitness, Aisha White, the decedent's niece, testified that she too knew the defendant and also saw him shoot and kill the decedent on the date and time in question. The testimony supplied by these two eyewitness was corroborated by, _inter alia_, a 911 call, ballistics evidence, medical evidence and testimony that stipling was found on the deceased's clothing. In light of the overwhelming evidence of the defendant's guilt, the defendant's claimed _Brady_ violation is rejected. _People v. Rhodes_, 215 A.D.2d at 696-97; _People v. Gonzalez_, 168 A.D.2d at 569.

### _Rosario_ Claim

Equally without merit is the defendant's _Rosario_ claim. The K-9 service records, to the extent they even exist, do not qualify as _Rosario_ material as they were not prepared by an individual who testified at trial. C.P.L. §240.45(1)(a); _People v. Santorelli_, 95 N.Y.2d 412, 422 (2000); _People v. Williams_, 229 A.D.2d 603, 604 (2d Dept.), lv. denied, 89 N.Y.2d 931 (1996). Likewise, the dry cleaning ticket also does not qualify as _Rosario_ material as it was not prepared by a witness who testified at trial. _People v. Santorelli_, 95 N.Y.2d at 422. In any event, even if the failure to furnish the defendant with the subject materials (assuming their existence) constituted a _Rosario_ violation, in light of the overwhelming evidence of the defendant's guilt, he has not shown that there is a reasonable possibility that the

7

failure to disclose such material contributed to the result at trial.
See C.P.L. 240.75; People v. Wood, 40 A.D.3d 663 (2d Dept.), lv. denied,
9 N.Y.3d 928 (2007); People v. Cordero, 306 A.D.2d 9 (1st Dept. 2003).

The defendant's unpreserved Brady and Rosario claims are rejected.

3.   The Defendant's Claim that this Court's Molineux Ruling Deprived
     him of his Sixth Amendment Right to Confrontation.

The defendant claims that this Court's Molineux ruling with respect
to the testimony supplied by Rashawn Aarons regarding a conversation he
had with the victim in 2001 violated his Sixth Amendment right to
confrontation. As the defendant did not object to this testimony at
trial on this precise ground his current claim is unpreserved as a
matter of law and may not be considered by this Court under C.P.L.
§330.30. People v. Everson, 100 N.Y.2d at 610; People v. Gray, 86
N.Y.2d 10, 19-20 (1995).

In any event, the defendant's claim with respect to the propriety
of the challenged testimony is entirely without merit. This Court made
an extensive Molineux ruling at trial in which it determined that the
challenged testimony was admissible as it was relevant to the
defendant's motive, intent, and identity as the perpetrator of the
charged crimes. This Court also ruled that the testimony was relevant
background information with respect to the defendant's relationship with
the decedent. See Trial Transcript at 65-72. This Court adheres to the
Molineux ruling it made at trial -- the defendant's current claim is
rejected. Moreover, any undue prejudice that may have been caused to

8

the defendant by the challenged testimony was ameliorated by this
Court's limiting instruction that the jury is presumed to followed.
People v. Davis, 58 N.Y.2d at 1104.

4.    **The Defendant's Claim that his Right to a Fair Trial was
      Prejudiced by Rashawn Aarons's testimony on Cross-Examination
      Regarding the Nature of the Defendant's Relationship with the
      Deceased.**

The defendant, while cross examining the decedent's son, Rashawn
Aarons, questioned him about the nature of the defendant's relationship
with the deceased.

> Q.    In your recollection, that was an on-again-off-again
>       relationship?
>
> A.    Because he got incarcerated.  He came home.

Trial Transcript at 99.

Pursuant to defense counsel's request, the witness's answer, which
was responsive to the question posed, was immediately stricken from the
record.  As the Court repeatedly advised the jury that stricken
testimony was to be disregarded by them, and the jury is presumed to
have followed these instructions, the defendant's claim that he was
prejudiced by the above-referenced isolated responsive remark is
rejected.  People v. Davis, 58 N.Y.2d at 1104; People v. Marji, 43
A.D.3d at 962.  Notably, the stricken testimony was never brought to the
jury's attention during the prosecutor's summation and any possible
error resulting from such testimony was harmless in light of the
overwhelming evidence of the defendant's guilt.  People v. Crimmins, 36
N.Y.2d 240, 243 (1975).

9

5.   The Defendant's Claim that Detective Henn's Testimony Regarding
     Recovery of a Bullet from the Decedent's Body Violated his Sixth
     Amendment Right to Confrontation.

The defendant's claim that his Sixth Amendment right to confrontation was violated by Detective Henn's testimony regarding the recovery of a bullet from the victim's body was not raised at trial. As such, his current claim is unpreserved as a matter of law and may not be reviewed by this Court under C.P.L. §330.30. See People v. Amato, 238 A.D.2d at 433. In any event, the challenged testimony was entirely proper as Detective Henn merely testified that during the course of the police investigation he vouchered the shell casings and sent them to the police lab for comparison with a bullet recovered from the victim's body. Detective Henn's remarks were not "testimonial," and thus, did not violate the defendant's Sixth Amendment right to confrontation. See Crawford v. Washington, 541 U.S. 36 (2004). Furthermore, in light of the overwhelming evidence of guilt, any error in admitting such testimony was harmless beyond a reasonable doubt. People v. Crimmins, 36 N.Y.2d at 243.

6.   The Defendant's Claim that he was Prejudiced by Detective
     Calabrese's Testimony that the Police Searched for him in
     "Jamaican Restaurants and Bars in the Precinct."

The defendant claims that he was prejudiced by Detective's Calabrese's testimony that the police searched for him in "Jamaican restaurants and bars in the precinct." As the defendant failed to object to this testimony at trial, his current claim is unpreserved as a matter

10

of law and cannot be reviewed by this Court under C.P.L. §330.30. <u>People v. Everson</u>, 100 N.Y.2d at 610; <u>People v. Amato</u>, 238 A.D.2d at 433.   In any event, the defendant's claim is entirely without merit as the challenged testimony was elicited to explain not only the efforts the police undertook to apprehend the defendant as many years had passed between the date of the crime and the defendant's arrest, but also to rebut the defendant's trial strategy attacking the adequacy and thoroughness of the police investigation. Accordingly, the defendant's motion to set aside the verdict on this ground is rejected.

7.   **The Defendant's Claim that he was Prevented from Cross-Examining Detective Henn about Statements made by other Alleged Eyewitnesses to the Murder.**

Contrary to the defendant's claim this Court permitted the defendant, over the People's strenuous objection, to elicit hearsay testimony from Detective Henn that he interviewed an eyewitness who told him that she saw, from her fourth floor apartment window at 100 Linden Boulevard, a black Lexus with two people inside leaving the crime scene. <u>See</u> Trial Transcript at 275-76, 286, 290.   To the extent that the defendant appears to be claiming that this Court somehow prevented him from eliciting other statements that may have been made to Detective Henn, <u>see</u> Defendant's Motion at 10-11, such claim may not be reviewed by this Court under C.P.L. §330.30 as it was not raised at trial.   <u>See</u> <u>People v. Everson</u>, 100 N.Y.2d at 610; <u>People v. Amato</u>, 238 A.D.2d at 433.

11

8.   **The Defendant's Claim that this Court erred by Failing to Sanction the People for the Destruction of the Cars Involved in this Case and the Contents Thereof.**

At trial, this Court denied the defendant's application for an adverse inference with respect to the destruction of the vehicles in this case.  See Trial Transcript at 382-84.  This Court adheres to that ruling.  To the extent that the defendant is now claiming that the People should have been sanctioned for the loss or destruction of other items that were inside of the vehicles, see Defendant's Motion at 11-13 and Reply Motion at 4-5, such claim may not be reviewed by this Court under C.P.L. §330.30 as it was not specifically raised at trial.  See People v. Everson, 100 N.Y.2d at 610; People v. Robinson, 88 N.Y.2d at 1002. In any event, the defendant's claim that he was prejudiced by the absence of such items is purely speculative.  Moreover, any error in failing to sanction the People in the manner now suggested by the defendant is harmless in light of the overwhelming evidence of the defendant's guilt. People v. Crimmins, 36 N.Y.2d at 243.

9.   **The Defendant's Claim that his Right to a Fair Trial was Prejudiced by the Testimony that the Police used the Television Program "America's Most Wanted" in their efforts to Apprehend him.**

At trial this Court permitted the prosecutor to elicit brief and extremely limited testimony with respect to the investigative efforts taken by the police to apprehend him.  These efforts included not only the  use of wanted posters, neighborhood surveillance and witness interviews, but appeals to various media outlets including the Daily

12

News, Fox 5 News and "America's Most Wanted." Pursuant to this Court's explicit instruction, no details or particulars about the substance of the media coverage employed by the police were disclosed to the jury either by way of witness testimony or the prosecutor's opening or closing statements.

This Court permitted the prosecutor to elicit this testimony for a very narrow and specific reason. Eight years had passed between the time the defendant shot and killed the decedent and when this case was brought to trial. During those eight years, despite the efforts made by the police, the defendant avoided capture until the New York authorities located him in 2005 in the State of Arizona where he had been incarcerated for an unrelated felony. This Court prohibited the People from revealing to the jury that the police successfully apprehended the defendant as a result of his incarceration in Arizona. Nonetheless, the defendant sought to exploit the passage of time between the crime and the trial date by employing a trial strategy that challenged the adequacy and thoroughness of the police investigation. Rather than allowing the People to attempt to explain the lapse of time by eliciting the extremely prejudicial evidence that the defendant had been incarcerated in another state for a portion of this time period, this Court instead permitted the People to elicit very limited testimony with respect to the investigative efforts the police took to apprehend the defendant. This approach simultaneously protected the defendant's right to a fair trial while also allowing the People to defend the integrity of the police investigation.

13

Under these circumstances, there is absolutely no merit to the defendant's claim that he was unduly prejudiced by the brief references made at trial to the fact that one of several media outlets the police used to apprehend him was the "America's Most Wanted" television program. Indeed, the manner in which the testimony was elicited, which included no details regarding the substance of that coverage, showed that it was simply one small part of a larger effort undertaken by the police to apprehend the defendant.[3]

Moreover, as this Court repeatedly instructed the jury not to read or listen to any news accounts about this case, to keep an open mind, and to decide the case based solely on the evidence presented in the courtroom, the defendant's speculation that a juror may have been influenced by media coverage is rejected. See People v. Davis, 58 N.Y.2d at 1104. Accordingly, the defendant's challenge to said testimony is rejected.

The defendant's similar claim that he was prejudiced by the prosecutor's reference during her opening and closing statements to the

---

[3]The defendant's apparent claim that the police elicited the testimony with respect to the "America's Most Wanted" program to establish his consciousness of guilt was not raised at trial and, therefore, may not be reviewed by this Court under C.P.L. §330.30. In any event, the defendant's claim is wholly is without merit as the People neither in the opening or closing statements ever suggested to the jury that the defendant engaged in behavior that demonstrated his consciousness of guilt. Rather, from the context in which the challenged testimony was elicited, it is clear that such testimony was elicited for the sole purpose of establishing the steps the police took to apprehend the defendant and for no other reason.

14

"America's Most Wanted" television show is also without merit. The defendant raised only a general objection to these remarks during the prosecutor's opening statement and, therefore, his current claim with respect to their propriety is unpreserved as a matter of law. <u>People v. Lino</u>, 65 A.D.3d 1263 (2d Dept. 2009); <u>People v. Coleman</u>, 64 A.D.3d 787 (2d Dept. 2009); <u>People v. Stiff</u>, 60 A.D.3d 1094 (2d Dept.), lv. denied, 12 N.Y.3d 921 (2009). In addition, the defendant utterly failed to object to the remarks made during the prosecutor's closing statement. <u>People v. Gillespie</u>, 36 A.D.3d 626, 626-27 (2d Dept.), lv. denied, 8 N.Y.3d 984 (2007); <u>see</u> <u>People v. Gray</u>, 86 N.Y.2d 10, 19-20 (1995); <u>People v. Heide</u>, 84 N.Y.2d 943, 944 (1994). Accordingly, as the defendant's challenge to the prosecutor's opening and closing statements were not preserved as a matter of law, they cannot be reviewed by this Court under C.P.L. §330.30. <u>People v. Everson</u>, 100 N.Y.2d at 610; <u>People v. Amato</u>, 238 A.D.2d at 433.

In any event, for the reasons stated above, the brief comments were allowed to rebut the defendant's attack on the quality and thoroughness of the police investigation and to explain the efforts they undertook to apprehend the defendant who had absconded over the several years that passed between the date of the murder and the time of the defendant's apprehension, and did not prejudice the defendant's right to a fair trial. Moreover, any possible prejudice to the defendant was ameliorated by the fact that the jury was instructed that the prosecutor's opening

15

and closing statements were not evidence – an instruction that the jury is presumed to have followed. <u>People v. Davis</u>, 58 N.Y.2d at 1104.[4]

Finally, any error in eliciting the challenged testimony is harmless in light of the overwhelming evidence of the defendant's guilt. <u>People v. Crimmins</u>, 36 N.Y.2d at 243.

10.  **The Defendant's Claim that the Verdict was Against the Weight of the Evidence.**

The defendant's claim that the verdict should be set aside as it was against the weight of the evidence is rejected. A trial court is not empowered to set aside the verdict as against the weight of the evidence under C.P.L. §330.30(1) as such power is reserved exclusively for the Appellate Division. <u>See</u> <u>People v. Carter</u>, 63 N.Y.2d 530, 536 (1984); <u>People v. Brown</u>, 141 A.D.2d 657 (2d Dept. 1988). In any event, were this Court empowered to review the defendant's claim, it would find that in light of the overwhelming evidence that the defendant shot and killed the decedent, his girlfriend of eighteen years, in front of her eleven year old son and her young niece, the verdict was not against the weight of the evidence. <u>People v. Romero</u>, 7 N.Y.3d 633, 644-45 (2006); <u>People v. Burke</u>, 287 A.D.2d 512, 514 (2d Dept.), lv. denied, 97 N.Y.2d 679 (2001).

---

[4]Additionally, this Court finds that the prosecutor's summation constituted fair comment on the evidence, fair response to the defendant's summation and otherwise fell within the four corners of the evidence. <u>People v. Cephus</u>, 11 A.D.3d 553 (2d Dept.), lv. denied, 4 N.Y.3d 742 (2004); <u>People v. Holland</u>, 204 A.D.2d 483 (2d Dept.), lv. denied, 83 N.Y.2d 1004 (1994); <u>People v. Elliot</u>, 151 A.D.2d 498 (2d Dept.), lv. denied, 74 N.Y.2d 808 (1989).

11.  **The Defendant's Claim that Trial Counsel Provided him with Ineffective Representation.**

The defendant's ineffective assistance of counsel claim largely concerns matters that are *de hors* the record as they involve challenges to defense counsel's strategic decisions and alleged failure to investigate and call certain witnesses. People v. Dashosh, 59 A.D.3d 731 (2d Dept.), lv. denied, 12 N.Y.3d 852 (2009); People v. Alvarez, 51 A.D.3d 470, 471 (1st Dept.), lv. denied, 11 N.Y.3d 785 (2008); People v. Gillespie, 36 A.D.3d 626, 627 (2d Dept.), lv. denied, 8 N.Y.3d 984 (2007); People v. Zimmerman, 309 A.D.2d 824 (2d Dept. 2003), lv. denied, 1 N.Y.3d 603 (2004); People v. Rosas, 306 A.D.2d 91 (1st Dept.), lv. denied 100 N.Y.2d 645 (2003); People v. Aguirre, 304 A.D.2d 771 (2d Dept. 2003); People v. Boyd, 244 A.D.2d 497, 497-98 (2d Dept. 1997), lv. denied, 93 N.Y.2d 850 (1999). As such, these claims are not cognizable under C.P.L. §330.30. People v. Hardy, 49 A.D.3d 1232 (4th Dept. 2008), aff'd __ N.Y.3d __, 2009 WL 3294966 (Oct. 15, 2009); People v. Gruttadauria, 46 A.D.3d 837, 837-38 (2d Dept. 2007), lv. denied, 10 N.Y.3d 840 (2008).

In any event, to the extent that the defendant's claim is reviewable under C.P.L. §330.30(1), this court finds that the defendant has not met the "high burden of demonstrating that he was deprived of a fair trial by less than meaningful representation." People v. Hobot, 84 N.Y.2d 1021, 1022 (1995); People v. Finley, 27 A.D.3d 763 (2d Dept.); lv. denied, 7 N.Y.3d 788 (2006). This court finds that defense counsel

17

provided the defendant with meaningful representation in that he "prepared and pursued trial strategies and defense theories, presented a clear and cogent opening and summation, and adequately cross-examined the People's witnesses." People v. Tomlinson, __ A.D.2d __, 2009 WL 3766093 (2d Dept. Nov. 10, 2009); People v. Whaul, 63 A.D.3d 1182, 1183 (2d Dept. 2009); People v. Dashosh, 59 A.D.3d at 732. Furthermore, this Court finds that defense counsel, who frequently consulted with the defendant for long periods of time throughout the course of the trial, provided the defendant with thorough, competent, and professional representation. People v. Hinds, 183 A.D.2d 848, 849 (2d Dept.), lv. denied, 80 N.Y.2d 904 (1992); People v. Davis, 161 A.D.2d 787, 789 (2d Dept.), lv. denied, 76 N.Y.2d 939 (1990). The law is well-settled that "[h]indsight does not elevate counsel's unsuccessful trial strategies to ineffective assistance of counsel." People v. Monroe, 52 A.D.3d 623 (2d Dept. 2008); see People v. Benevento, 91 N.Y.2d 708, 712 (1998) People v. Satterfield, 66 N.Y.2d 796, 799 (1985); People v. Dashsoh, 59 A.D.3d at 732; People v. Hinds, 183 A.D.2d at 849.

In any event, due to the overwhelming evidence of the defendant's guilt, any "imperfections in trial counsel's performance . . . . did not rise to the level of ineffective assistance of counsel." People v. Chicas, 293 A.D.2d 687 (2d Dept.), lv. denied, 98 N.Y.2d 695 (2002); People v. Dover, 294 A.D.2d 594, 596 (2d Dept.), lv. denied, 98 N.Y.2d 767 (2002) ("it is evident that the defendant's conviction rested on the strength of the truly overwhelming weight of the evidence, and not upon

18

counsel's alleged ineffectiveness"); see People v. Arroyo, 38 A.D.3d 792 (2d Dept.), lv. denied, 9 N.Y.3d 839 (2007); People v. Ramirez, 22 A.D.3d 334 (1st Dept. 2005), lv. denied, 6 N.Y.3d 779 (2006); People v Wicker, 229 A.D.2d 602 (2d Dept.), lv. denied, 89 N.Y.2d 931 (1996).

As the defendant has failed to overcome the strong presumption that trial counsel rendered effective assistance, see People v. Louissant, 8 A.D.3d 407 (2d Dept.), lv. denied, 3 N.Y.3d 677 (2004); People v. Myers, 220 A.D.2d 461 (2d Dept.), lv. denied, 87 N.Y.2d 905 (1995), his ineffective assistance of counsel claim is rejected.

### Conclusion

The motion to set aside the verdict under C.P.L. §330.30(1) is denied without a hearing. This constitutes the Decision and Order of the Court.


Dated: Brooklyn, New York
       November 17, 2009

                                                    _____
                                                    J.S.C.

                                        HON. J. KONVISER

19

# Exhibit

# E

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS : CRIMINAL TERM PART 24
------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK

           -against-

WAYNE CHIN

------------------------------------------------------------------x

By: Hon. ShawnDya L. Simpson

Date: February 20, 2013

DECISION & ORDER

Indictment No. 1018/2003

Defendant moves to vacate his judgment of conviction pursuant to CPL § 440.10 on

numerous grounds. For the following reasons, the motion is denied in its entirety.

Defendant and the deceased, Renee Aarons, were involved in a relationship for

approximately eighteen years. Renee Aarons originally lived in Brooklyn but had recently

relocated with her children to Trenton, New Jersey. Shortly after the move, she was badly

injured in a car accident near her new home. She then returned to Brooklyn with her two sons,

Rashawn and Ryan, so that she could be closer to her family. Aarons lived at 95 Linden

Boulevard, as did several other members of her and defendant's family.

On June 12, 2001, defendant drove 12-year-old Rashawn Aarons from Trenton to

Brooklyn in a car that Renee had purchased for defendant's use. Rashawn had known defendant

all his life and called him "Daddy." Before dropping Rashawn off at his grandmother's residence

at 95 Linden Boulevard, defendant stopped to pick up some dry-cleaning.

Later that day, Renee parked her car in front of 95 Linden Boulevard to pick up Rashawn.

At approximately 10:30pm that night, Renee was sitting in the driver's seat and Rashawn was

-1-

sitting next to her in the front passenger seat when defendant drove up alongside Renee's car. He and Renee began arguing about Ryan, who had been arrested earlier that day. Defendant got out of the car and punched Renee in the face. He then pulled out a 9mm pistol from his waist and shot her once. Rashawn jumped out from the car and ran to defendant, holding him in a bear hug and telling him to stop. Defendant pushed Rashawn off, walked away, and then turned back when Renee called out to Rashawn. Defendant shot Renee two more times, causing her death.

Renee's neice, Alisha White, also witnessed the shooting from the sidewalk in front of 95 Linden Boulevard, approximately ten to twenty feet from the car in which Renee was sitting. She recognized defendant right away, having known him for approximately seventeen years, and testified to her observations at trial. White was also familiar with members of defendant's family who lived at 95 Linden Boulevard.

Immediately after the shooting defendant fled in his car, which he abandoned about two blocks from the murder scene. A K-9 unit bloodhound tracked defendant's scent from the vehicle to a nearby bus stop but lost the trail from that point. The dry-cleaning that defendant had picked up earlier that day was still inside the vehicle.

For his acts, defendant was charged with two counts of murder in the second degree (PL §§ 125.25[1], [2]), criminal possession of a weapon in the second degree (PL § 260.10[1]), criminal possession of a weapon in the third degree (PL § 265.02[4]), and endangering the welfare of a child (PL § 165.05).

Defendant evaded apprehension for several years. During that time the police employed media coverage in their search for him, including "America's Most Wanted." Defendant was finally apprehended on unrelated drug charges in Arizona on November 17, 2005, having

-2-

remained at liberty for over four years. Although a warrant for his arrest for the murder of Renee Aarons was lodged with the state of Arizona, Arizona authorities chose to detain defendant until the conclusion of its case. Defendant was convicted on October 24, 2007 and sentenced on November 27, 2007. After defendant had served his sentence in Arizona, the People filed an Interstate Agreement on Retainer, which defendant signed and thereby waived extradition as a part of his request for the final disposition of the charges pending against him in New York. He was taken into custody by New York authorities in February 2008.

When proceedings commenced against defendant in New York, Harold Baker, Esq. was originally assigned to represent him. At defendant's motion for substitution of counsel, Baker was replaced by Alan Stutman, Esq. and later by Philip Smallman, Esq., who represented defendant at trial. Defendant's motion to replace Smallman was denied before his case was sent out for trial. Defendant considered proceeding pro se but ultimately elected to retain Smallman after speaking with the trial judge and counsel. Jay Cohen, Esq. was subsequently appointed to represent defendant at sentencing.

On October 15, 2009, defendant was convicted by a jury of murder in the second degree (Konviser, J.). Immediately following his conviction he filed a pro se motion pursuant to CPL § 330.30 to set aside the verdict, raising a litany of claims against the court, the People, and trial counsel. The motion was denied in its entirety on November 17, 2009. That same day defendant was sentenced to a prison term of twenty-five years to life (Konviser, J.).

Defendant filed a notice to appeal on November 18, 2009 but has not yet perfected his appeal.

Defendant now moves to vacate his judgment of conviction pursuant to CPL § 440.10.

-3-

His list of allegations numbers approximately fifty, ranging from complaints about the extradition process to counsel's performance on his post-conviction motion to set aside the verdict. These allegations can be grouped and characterized as the following: 1) trial counsel provided ineffective assistance of counsel, depriving defendant of due process and a fair trial; 2) sentencing counsel was ineffective; 3) improper conduct by the court deprived defendant of his right to due process and a fair trial; 4) improper and prejudicial conduct and fraud by the prosecutor deprived defendant of his right to due process and a fair trial; and 5) evidence at trial was obtained in violation in violation of his rights under the New York state constitution. In reviewing defendant's voluminous submissions, it appears that, as the People note, defendant has "scoured the trial record to arrive at a multitude of claims, which all appear to be derived from defendant's conclusions, based almost entirely on the record, about what the Court, the prosecutor, and his counsel could or should have done or failed to do."

Every claim of impropriety by the court and the prosecutor and nearly all of the allegations of ineffective assistance of counsel are record-based. Accordingly, the court must reject them because the judgment is now pending on appeal and sufficient facts appear on the record with respect to the grounds raised in the instant motion to permit adequate review thereof on appeal (CPL § 440.10[2][b]). While defendant has filed a notice of appeal, he has not yet perfected an appeal to the Appellate Division. Moreover, a motion to vacate the judgment of conviction should not be employed as a substitute for an appeal (*People v Cooks,* 67 NY2d 100, 500 [1986]).

The remainder of defendant's claims of ineffective assistance of counsel, which are based on matters outside the record, are both procedurally barred and lack merit. Defendant argues

-4-

that: 1) counsel failed to investigate the trajectory of the bullet in order to advance defendant's assertion that the murder was committed by two people; 2) counsel failed to obtain the records from defendant's cellular telephone, thus prejudicing defendant's ability to mount a defense of actual innocence; 3) counsel failed to pursue available defenses; 4) counsel failed to prepare a witness list or follow up on a witness list prepared by defendant; and 5) counsel ignored defendant's request to question jurors during *voir dire* about media publicity and uncharged criminal conduct. All of these claims, made only by defendant and unsupported by any other affidavit or evidence, are wholly unsubstantiated and there is no reasonable possibility that they are true (CPL § 440.30[4][b], [d]).

Defendant's claims of ineffectiveness also lack merit. Under the federal standard for ineffective assistance of counsel, the court must engage in a two-prong analysis of the defendant's claim (*Strickland v Washington*, 466 US 668 [1984]). The defendant must first be able to show that counsel's representation fell below an "objective standard of reasonableness" based on "prevailing professional norms (*Strickland* at 687, 688). Second, the defendant must also "affirmatively prove prejudice" by showing that were it not for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different (*Strickland* at 693). In assessing prejudice under *Strickland* "[t]he likelihood of a different result must be substantial, not just conceivable" (*Harrington v Richter*, __ U.S.__, 131 S.Ct. 770, 792 [2011]).

Under New York law, counsel's representation is adequate "so long as the evidence, the law, and the circumstances of a particular case, viewed in totality, and as of the time of the representation, reveal that the attorney provided meaningful representation" (*People v Baldi*, 54

NY2d 137, 147 [1981]; *People v Benevento*, 91 NY2d 708 [1998]). With respect to prejudice under state law, "the claim of ineffectiveness is ultimately concerned with the fairness of the process as a whole rather than its particular impact on the outcome of the case" (*Benevento* at 714). The "question is whether the attorney's conduct constituted 'egregious and prejudicial' error such that defendant did not receive a fair trial" (*id.* at 713, quoting *People v Flores*, 84 NY2d 184, 188 [1994]). Accordingly, the reviewing court must separate ineffectiveness from "mere losing tactics" and the defendant must "demonstrate the absence of strategic or other legitimate explanation" for counsel's conduct (*People v Baldi* at 146; *People v Rivera*, 71 NY2d 705, 709 [1988]). Hindsight cannot elevate counsel's trial strategies, even if ultimately unsuccessful, into ineffective assistance of counsel (*People v Benevento* at 712; *People v Satterfield*, 66 NY2d 796 [1985]; *People v Baldi*, supra). Defendant must also show that his right to a fair trial was prejudiced by the unfairness of the proceedings as a whole (*People v Stulz*, 2 NY3d 277, 284 [2004]).

Defendant's first two claims pertaining to counsel's investigation of the case are without merit because defendant has failed to allege any facts that would have been revealed by such investigation and that would have possibly led to his acquittal. With respect to the victim's bullet wounds, counsel had access to the medical examiner's report that became part of the trial record. There is no indication from the report itself that further investigation was warranted. Nor does any of the evidence support defendant's claim that there were two shooters. Here, defendant has not established that counsel's investigation denied him meaningful representation or that deeper inquiry would have yielded a different outcome at trial (*see People v Henry*, 95 NY2d 563 [2000]; *Henry v Poole*, 409 F3d 48, 63 [2d Cir 2005] [even strategic choices made

-6-

after less-than complete investigation do not amount to ineffective assistance under the federal constitution so long as the known facts made it reasonable to believe that further investigation was unnecessary]).

Likewise, defendant has failed to allege any facts that would have warranted further examination of defendant's cell phone records. Defendant contends that counsel could have "substantiate[d] an alibi through the phone global positioning system, 'GPS', that [he] was not at the scene of the crime." On June 13, 2001, Detective Guinane applied for and was granted a pen register and trap and trace device on a phone that defendant had used to call Renee. The police intended to use the pen register and trap and trace device in order to locate and apprehend defendant, who had since fled. To the extent defendant is claiming that counsel should have obtained these records from the police, they would not have been relevant because they would have been generated after the shooting. In addition, counsel had little basis to pursue an alibi defense because he was faced with two strong eyewitness accounts of the shooting that unequivocally identified defendant as the shooter. In the instant motion defendant does not elaborate upon his proposed alibi beyond the bare allegation that he "was not at the scene of the crime." Where defendant's alibi was far-fetched at best, counsel's decision not to pursue the cell phone records was sound under the circumstances (*Strickland*, 466 U.S. at 691 [a particular decision "not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."]).

Defendant's remaining allegations involving an available defense, witness lists and the jury voir dire are unavailing attempts to challenge legitimate, strategic decisions made by counsel. First, in order to raise third-party culpability defense, as defendant argues his attorney

-7-

should have done, defense counsel must "make an offer of proof outside the presence of the jury to explain how it would introduce evidence of third-party culpability. The court will then hear any counter-arguments from the prosecutor, weigh the considerations, and make its determination followed by clear directives as to what it will and will not allow" (*People v Primo*, 96 NY2d 351, 359 [2001]). The proffered evidence must show a direct connection to the crime itself and its admission "may not rest on mere suspicion or surmise" (*id.*). Here, defendant offers no credible evidence of third-party culpability, instead offering vague and speculative assertions about an unnamed perpetrator and unfounded claims of innocence. Where counsel had no basis to make an offer of proof to the court, he cannot be faulted in hindsight for choosing not to pursue such a defense (*see People v Mathieu*, 19 AD3d 219 [1st Dept 2005] ["Even if we were to conclude that trial counsel should have introduced additional evidence in support of a theory of third-party culpability, we would find that the omitted evidence was exceedingly weak"]). As many practitioners realize, employing this strategy can be risky because a failure to produce credible evidence to support a third-party culpability defense could lead the jury to view the defense as consciousness of guilt on the part of the defendant. Thus, "[t]here can be no denial of effective assistance of trial counsel arising from counsel's failure to 'make a motion or argument that has little or no chance of success'" particularly where, as in the instant case, such an argument may have been detrimental to the defense (*People v Caban*, 5 NY3d 143, 152 [2005], quoting *People v Stulz*, supra at 287).

The record also contradicts defendant's claims concerning the witness lists and reveals strategic reasons for counsel's decision not to call witnesses whose testimony would not have been admissible or benefitted the defense. Counsel did in fact submit to the court, after private

-8-

consultation with defendant, a list of police officers whom defendant wanted to call in his direct case. The court ruled that the proposed testimony of Officer Guinane would be irrelevant to any issues in the case and that Detective Crick's testimony did not fall under any exception to the hearsay rule. Because Detective Sherman, who defendant wanted to testify about the crime scene investigation, had since retired, the parties agreed that defendant would instead call Detective Steiner of the Police Department Crime Scene Unit. Defendant also claims to have given counsel a list of eighteen proposed witnesses, including Guinane, Crick and Sherman, but there is no indication that these additional witnesses would have been able to offer relevant, beneficial, or otherwise admissible testimony. Counsel's decision not to call a witness whose testimony he or she assesses as weak is a strategic legal decision that does not amount to ineffective assistance of counsel (*People v Smith*, 82 NY2d 731 [1993]; *People v Peters*, 28 AD3d 686 [2d Dept 2006]). Moreover, disagreement over trial strategy alone is not a basis for a determination of ineffective assistance of counsel (*see People v Benevento*, 91 NY2d at 712–713; *People v Baldi*, 54 NY2d 137 at 146).

Finally, it is within the strategic province of counsel to question jurors and raise appropriate challenges (*see People v Turner*, 37 AD3d 874 [3d Dept 2007]). Defendant believes that counsel should have acceded to his request to question the jurors about "allegations of uncharged criminal conducts and media publicity." According to defendant, counsel did not "see the necessity for such inquiry." The record indicates that counsel made adequate inquiries during voir dire. There is no evidence that any of the jurors were biased by defendant's appearance on "America's Most Wanted" and the media's reference to uncharged criminal conduct. In this way, defendant has failed to establish that counsel's strategy affected the outcome of trial or

-9-

otherwise undermined the fairness of the proceedings (*Strickland* at 693; *Stulz*, 2 NY3d at 284).

Trial counsel proficiently advocated for his client even when faced with significant evidence of guilt. In this case, the People presented an overwhelmingly strong case supported by reliable eyewitness testimony and ballistics evidence. Rashawn, who had a close relationship with defendant, testified that he had looked on from the passenger's seat as defendant shot his mother to death. The other direct eyewitness, Alicia White, was only a short distance away from defendant when he shot Renee. She immediately recognized defendant based upon her longtime familial relationship with him. Both witnesses saw defendant driving a car that was known to belong to him. In addition, ballistics evidence confirmed the testimony that there was only one shooter, contrary to defendant's claim that there were two perpetrators.

Throughout the trial, counsel strategically mounted an effective defense of his client. Trial counsel gave an opening statement in which he cautioned the jury to be careful in listening to the evidence to determine whether it supported the claims made by the People. He effectively cross-examined the People's witnesses and highlighted inconsistencies between their trial testimony, grand jury testimony and statements to the police. He also raised questions about a large financial settlement that the victim had recently received, which may have provided a motive for someone other than defendant to kill the victim. For instance, he suggested through cross-examination that the victim's brother, who managed her money, may have had a motive to commit the murder. Counsel thoroughly cross-examined the police witnesses to highlight inconsistencies between their testimony and the police paperwork, as well as any questionable practices in the police investigation and the handling of evidence. Counsel successfully used the testimony of a crime scene unit detective to bolster defendant's theory that the police

-10-

investigation was sloppy and that the evidence was mishandled. Finally, trial counsel gave a compelling summation in which he tried to cast doubt upon the eyewitness testimony by arguing that although Alicia White knew defendant well, she did not name him in her 911 call. On the whole, the record demonstrates that defendant received meaningful representation (*People v Baldi*, supra; *People v Benevento*, supra).

Finally, there is no merit to defendant's claim that sentencing counsel was ineffective for failing to assist him in preparing his CPL § 330.30 motion. Defendant filed, pro se, an exhaustive 11-point motion which the court considered in depth and rejected as entirely meritless. The court reviewed every claim, finding each speculative, unpreserved and lacking in evidence. Even if counsel had adopted defendant's motion it would have failed. Thus, counsel cannot be found ineffective for failing to make a motion that had no chance of success (*People v Caban*, supra; *People v Stulz*, supra).

Accordingly, the motion is denied in its entirety.

This decision shall constitute the order of the court.

ENTER:

SHAWN DYA L. SIMPSON, J.S.C.

ENTERED

MAR - 5 2013

NANCY T. SUNSHINE
COUNTY CLERK

-11-

## CERTIFICATE OF SERVICE

**STATE OF NEW YORK** )
                         ).SS:
**COUNTY OF WESTCHESTER** )

       I, **Wayne Chin**, being duly sworn, deposes and says;

       1. I am the Petitioner, and have cause to serve a copy of my Bail Application upon the below listed party;

> Marie John-Drigo, Esq.
> Assistant District Attorney
> Kings County
> Criminal Appeals Unit
> Renaissance Plaza
> 350 Jay Street
> Brooklyn, New York 11201

By placing the same in a pre-paid envelop and delivering it to the custody and care of the authority here at Sing Sing Correctional Facility, 354 Hunter Street, Ossining, New York 10562-5442, on the 11th. day of March, 2021, as due and sufficient service.

                                 Wayne Chin
                                 Din: 09-A-6287
                                 Petitioner; Pro Se

WAYNE CHIN
DIN: 09-A-6287
Sing Sing Correctional Fac.
354 Hunter Street
Ossining, New York 10562-5442

NEOPOST
04/22/2021
US POSTAGE $002.20°
ZIP 10562
041M11283353

Clerk of the Court
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201



